# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVE SACHS, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| STEVEN SPRAGUE, ET AL, | ) NO.  04-30032-MAP |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Michael D. Blanchard, BBO #636860
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

CTDOCS/1613672.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above pleading was electronically served upon the attorneys of record for all parties on December 22, 2004.

/s/ Michael D. Blanchard
Michael D. Blanchard

*Akins v. Cobb,* No. Civ .A. 18266, 2001 WL 1360038 (Del. Ch. Nov. 1, 2001) ...........................1

*In re Amdocs Ltd. Sec. Litigation*, No. 04-110, 2004 WL 2735530 (8th Cir. Dec. 2, 2004)...........2

*Decker v. Clausen,* Nos. Civ.A. 10,684 &10,685, 1989 WL 133617
    (Del. Ch. Nov. 6, 1989)............................................................................................................3

*Dollens v. Zionts,* No. 01 C02826, 2002 WL 1632261 (N.D. Ill. July 22, 2002)...........................4

*In re Grace Energy Corp. Shareholders Litigation*, *No. Civ. A. 12,464,*
    1992 WL 145001 (Del. Ch. June 26, 1992)..............................................................................5

*Haseotes v. Bentas*, No.Civ.A. 19155 NC, 2002 WL 31058540
    (Del. Ch. Sept. 3, 2002) ...........................................................................................................6

*Jacobs v. Yang,* No. Civ. A. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ........................7

*Kaltman v. Sidhu,* No. Civ. 03-CV-1057-H, 2004 WL 357861 (N.D. Tex. Feb. 26, 2004) ..........8

*Lewis v. Fites,* No. Civ. A. 12566, 1993 WL 47842 (Del. Ch. Feb. 19, 1993)................................9

*In Re PEC Solutions Sec. Litigation,* NO. 03-CV-331, 2004 WL 1854202
    (E.D. Va. 2004).......................................................................................................................10

*In re Paxson Communication Corp. S'holders Litigation*, No.CIV.A. 17568,
    2001 WL 812028 (Del. Ch. July 12, 2001).............................................................................11

*Rattner v. Bidzos*, No.Civ.A. 19700, 2003 WL 22284323 (Del. Ch. Sep 30, 2003) ....................12

*Sekuk Global Enterprises Profit Sharing Plan v. Kevenides*, Nos. 24-C-03 007496,
007876 & 008010, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004)............................................13

*In re Sonus Networks, Inc. Derivative Litigation*, No. 040753BLS, 2004 WL 2341395
(Mass. Super. Sept. 27, 2004) ........................................................................................................14

*Spector v. Sidhu,* No. Civ. 3:03-CV-0841-H, 2004 WL 350682
    (Jan. 26, 2004 N.D. Tex.).......................................................................................................15

*In re Stratus Computer, Inc. Sec. Litigation,* Civ.A. 89-2075-Z, 1992 WL 73555
    (D. Mass. March 27, 1992) .....................................................................................................16

*In re United Telecommunications, Inc., Sec. Litigation*, No. 90-2251-EEO, 1993 WL
100202 (D. Kan. March 4, 1993)....................................................................................................17

*Zimmerman ex rel. Priceline.com, Inc. v. Braddock,* No. Civ. A.  18473-NC, 2002 WL
    31926608 (Del. Ch. Dec. 20, 2002) .......................................................................................18

# EXHIBIT 1

Not Reported in A.2d                                                                    Page 1
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

C

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

Michael J. AKINS, et al., Plaintiffs,
v.
Timothy S. COBB, et al., Defendants.

No. CIV.A. 18266.

Submitted: Oct. 26, 2001.
Decided: Nov. 1, 2001.

Pamela S. Tikellis, Esquire, of Chimicles & Tikellis,
Wilmington, Delaware; Of Counsel: Michael J. Boni and
George W. Croner, Esquires, of Kohn, Swift & Graf,
Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

M. Duncan Grant and Joseph S. Naylor, Esquires, of Pepper
Hamilton, Wilmington, Delaware; Of Counsel: Laurence Z.
Shiekman and Jacqueline V. Guynn, Esquires, of Pepper
Hamilton, Philadelphia, Pennsylvania, Attorneys for
Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**\*1** Stockholders of nominal defendant Salient 3
Communications, Inc. ("Salient 3") filed this action to
challenge allegedly excessive compensation packages
awarded by Salient 3 to three members of its senior
management team. The plaintiffs contend that the
compensation packages resulted from breaches of fiduciary
duty on the part of the directors of Salient 3.

According to the complaint, Salient 3's performance under
the leadership of directors and officers Timothy S. Cobb,
and Paul H. Snyder, and officer Thomas F. Hafer was
dismal. As a result, the company's only viable strategy was
to sell its operating businesses and put the company in
liquidation. Despite having presided over this decline in the
company's fortunes, Cobb, Snyder, and Hafer were
rewarded with compensation packages that diverted money
into their pockets that would otherwise have been paid to

Salient 3's stockholders in the liquidation.

The defendants have moved to dismiss the complaint on
various grounds, but the court needs to address only one of
them: that the plaintiffs' claim is derivative and must be
dismissed for failure to plead demand excusal under
Delaware Court of Chancery Rule 23.1. In this opinion, I
conclude that the plaintiffs' claim is derivative. I further
conclude that the claim must be dismissed because: (1) the
Salient 3 board is comprised of a majority of independent
directors who can impartially consider a demand; and (2)
that the amended complaint fails to plead particularized
facts that create a reasonable doubt as to whether the Salient
3 board complied with its fiduciary duties. As a result, the
complaint must be dismissed under the governing standard
of *Aronson v. Lewis.* [FN1] While the complaint contains
many conclusory statements, it lacks any facts regarding the
process used to make, or the substantive basis for, the
Salient 3 board's decision to award compensation benefits to
the senior managers. Therefore, the plaintiffs have failed to
meet the burden imposed by Court of Chancery Rule 23.1.
[FN2]

> FN1. Del.Supr., 473 A.2d 805 (1984).

> FN2. *See Brehm v. Eisner,* Del.Supr., 746 A.2d
> 244, 254-55 (2000).

I. *The Defendants*

The plaintiffs have named as defendants all eight members
of the Salient 3 board of directors. Six of the defendant
directors do not have management positions, and the
complaint does not allege any other facts that would suggest
their inability to act independently and disinterestedly as
directors. Collectively, the six outside directors control 23%
of the Company's Class B voting stock. As will be discussed
more in a moment, the only class of the company's stock
with voting rights is its Class B common stock.

The other two defendant directors do have a personal stake
in the compensation packages challenged in this action.
Defendant Cobb is chairman of the board, president, and
director of Salient 3. From 1999 to 2000, Cobb has
controlled at least 25% of the company's Class B common

Not Reported in A.2d                                                                      Page 2
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

stock, making him the Salient 3 stockholder with the most voting clout. Defendant Snyder is senior vice president, chief financial officer, and a director of Salient 3. During 1999 and 2000, Snyder controlled at least 10% of the Company's Class B voting stock.

**\*2** The plaintiffs have also named Hafer, a non-director, as a defendant. Hafer is a senior vice president, general counsel, and secretary of Salient 3. In 1999 and 2000, he controlled nearly 8% or more of the company's Class B voting stock.

Cobb, Snyder, and Hafer together controlled 44% or more of the company's voting stock at all times during 1999 and 2000. The complaint alleges that these three defendants have acted together to control shareholder votes at the company and therefore owe fiduciary duties as controlling stockholders.

II. *Factual Background* [FN3]

> [FN3.] This recitation of facts is drawn from the amended complaint, in keeping with the procedural posture of the motion before the court.

Salient 3 was formed as Gilbert Associates, Inc. in 1942. The initial thrust of Gilbert involved the provision of engineering services to design power plants, through its engineering subsidiary Gilbert/Commonwealth, Inc. This was the company's core business until the mid-1980s.

Gilbert had two classes of common stock, which differed from one another in only one respect: the Class B common stock had voting rights, while the Class A common stock did not. The difference in rights was a function of the company's status as a professional engineering firm. To satisfy state rules regarding the control of professional engineering firms, the Class B voting stock was issued exclusively to the company's managers who were professional engineers.

In 1995, Gilbert changed strategic direction in a major way: its engineering subsidiary was sold, and the Class B stock held by the professional engineers was converted into Class A stock. Meanwhile, the Class B voting stock became increasingly concentrated in the hands of Gilbert's remaining managers, even though the rationale for the

separate classes of stock had dissolved as a result of the sale of its professional engineering business.

The sale of the company's engineering division was a part of a strategy undertaken in the early 1990s to concentrate the company's efforts on the telecommunications industry. Defendant Cobb became the company's president and chief executive officer during that period and is alleged to have guided the implementation of that strategy.

As part of the strategy, the company sold off all its non-telecommunications business assets and changed its name to Salient 3. The idea was to center Salient 3's future on three wholly owned "Operating Subsidiaries": SAFCO Technologies, Inc.; XEL Communications, Inc.; and GAI-Tronics Corporation.

Salient 3 had purchased GAI-Tronics--which developed, assembled, and marketed communications systems for industrial operations--in 1982. It bought XEL, a company that "designed and sold transmission products to the access products market," in 1996. [FN4] In 1997, it purchased SAFCO, which "provided products and services which focus on measurement, analysis and predictive tools, and engineering and technical services used by the wireless communication industry." [FN5]

> [FN4.] Am Comp. ¶ 31.

> [FN5.] *Id.* at ¶ 32.

The complaint alleges that the execution of the company's decision to focus solely on the telecommunications market was "marked by a lack of focus and by managerial incoherence. Corporate acquisitions were undertaken without adequate planning or any comprehensive concept of properly positioning the Company within its newly chosen business area." [FN6] An example cited by plaintiffs is Salient 3's purchase of XEL, a company focused on analog technology, at a time when the industry standard was changing to digital. The plaintiffs further assert that Salient 3 did not perform due diligence in connection with the XEL purchase or obtain an investment banker's opinion that it was receiving fair value. Likewise, the plaintiffs contend that the SAFCO acquisition was of dubious wisdom.

Not Reported in A.2d                                                                                            Page 3
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

FN6. *Id.* at ¶ 34.

**\*3** During the period when this strategy was being implemented, defendant Cobb allegedly used the company's resources to reward himself and his friends. Cobb, Hafer, and Snyder received generous loans with charitable terms to use to purchase company stock. One friend of Cobb was put in a well-paying position that allegedly was created solely to provide her with a prominent position, to which she "telecommuted" from her North Carolina home four days a week, while staying at a "posh, two bedroom suite at a nice hotel" on the one day a week she spent at the company's headquarters in Reading, Pennsylvania. [FN7] Meanwhile, Cobb's "hand-picked" President of XEL was supposedly allowed to purchase items such as barbecue grills and hair dye with company money, all with Cobb's approval. The plaintiffs insinuate that these examples are indicative of a larger problem at the company involving Cobb's proclivity to allow himself and his friends to misuse corporate resources.

FN7. Am. Comp. ¶¶ 43-44.

The plaintiffs contend that the poor management of Cobb, Hafer, and Snyder manifested itself in the company's balance sheet. Before Cobb took charge in 1993, the company had over 3,600 employees, annual revenues in excess of $300 million, and net annual profits approaching $10 million. Much of this prosperity allegedly flowed from the company's engineering business.

After Cobb assumed command, the company's performance steadily declined, until it reached a 24-year low in 1999 during which it had revenues of only $115 million. Only once in Cobb's tenure did the company make a profit--and that profit was attributable to the sale of the company's remaining engineering business. By 1998, the company had to eliminate its quarterly dividend, having posted a loss of over $17 million that year.

The company's financial performance resulted in a sharp decline in the trading value of its shares. The shares evidenced an uneven but undeniable trend downward, as reflected in the difference between the 1999 average trading price of $7.50 and the 1993 trading price of $19.08. In the

complaint, the plaintiffs provide the following chart illustrating the extent to which the company's performance trailed that of its industry peer group:

CUMULATIVE TOTAL RETURN (IN %) [FN8]
FN8. *Id.* at ¶ 52.

|        | SALIENT 3 | PEER GROUP | NASDAQ |
|--------|-----------|------------|--------|
| Dec-94 | 100       | 100        | 100    |
| Dec-95 | 95        | 175        | 145    |
| Dec-96 | 104       | 170        | 180    |
| Dec-97 | 100       | 150        | 210    |
| Dec-98 | 75        | 150        | 300    |
| Dec-99 | 50        | 270        | 540    |

In the fall of 1999, Salient 3 retained a financial advisor to explore alternatives to enhance shareholder value. Eventually, the board decided that the best return could be obtained by selling each of the company's Operating Subsidiaries separately, and then liquidating the company.

In connection with its decision to sell the Operating Subsidiaries, the board also put into place the "Special Incentive Plan" that is the subject of the plaintiffs' ire. The Special Incentive Plan was adopted " 'to provide incentives for our executives who are in positions to contribute materially to the sale of our businesses," ' [FN9] and was comprised of two components: Sale Bonus Awards and Stay Bonus Awards.

FN9. *Id.* at ¶ 58 (quoting a Salient 3 proxy statement).

**\*4** The pool from which the Sale Bonus Awards were to be paid is based on a percentage of the total amount gained by Salient 3 from the sale of the Operating Subsidiaries, as

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
(Cite as: 2001 WL 1360038 (Del.Ch.))

follows: [FN10]

> FN10. *Id.* at ¶ 59.

------------------------------------------------------------

| If the Net Proceeds are<br>The Bonus Pool is: | |
|---|---|
| Not Over $80 million | $0 |
| Over $80 million but not over $90<br>million | 5% of the excess over $80 million |
| Over $90 million but not over $100<br>million | $500,000 plus 6% of the excess over $90<br>million |
| Over $100 million but not over $110<br>million | $1,100,000 plus 7% of the excess over<br>$100 million |
| Over $110 million but not over $120<br>million | $1,800,000 plus 8% of the excess over<br>$110 million |
| Over $120 million | $2,600,000 plus 10% of the excess over<br>$120 million |

------------------------------------------------------------

The Sale Bonus Award pool, however, was subject to reduction pursuant to the Stay Bonus Awards program.

The Stay Bonus Awards were payable to each eligible employee following the completion of the sale of the operating subsidiaries so long as the employee remained employed through the closing date of the last of the sales, or if the employee was terminated without cause before that time. The amount of the Stay Bonus Award payable to a recipient was determined by the employee's base monthly salary as of the closing date of the last Operating Subsidiary sale, the net proceeds realized from the sale of the Operating Subsidiaries, and the employee's years of service.

The complaint alleges that the bulk of the Bonus monies to be awarded under the Special Incentive Plan was earmarked for defendants Cobb, Snyder, and Hafer. The three of them were to split 90% of the Sales Bonus Award pool, with Cobb receiving 40% of the pool and Snyder and Hafer 25% each. Cobb had the discretion to determine which executives received the other 10%.

Cobb, Snyder, and Hafer had their Sale Bonus Awards reduced dollar-for-dollar by any monies they received under the Stay Bonus Award program. Under the Stay Bonus Awards program, Cobb was expected (as of the drafting of the amended complaint) to receive nearly $1.7 million, and Snyder and Hafer to receive $1 million each. Salient 3 also agreed to pay any federal excise taxes that may be imposed if Cobb, Snyder, and Hafer receive bonus payments considered excessive under Internal Revenue Code provisions. [FN11]

> FN11. The record is confusing about whether Cobb, Snyder, and Hafer were to benefit from the Stay Bonus Awards at all. At oral argument, the plaintiffs' counsel seemed to indicate that the answer was no. The amended complaint, however, paints a somewhat different picture. In either event, the disposition of this motion would be the same.

The Salient 3 board took other action to improve the compensation arrangements of Cobb, Snyder, and Hafer. For instance, though none had a formal employment contract as of 1999, each was provided with such a contract effective January 1, 2000. In addition, according to plaintiffs, the sale of the Operating Subsidiaries triggered "change in control" severance benefits of $524,000 for Cobb, and $399,000 each for Snyder and Hafer. Further, if the three were terminated within two years of a change in control, they would be entitled under their employment contracts to non-compete payments worth $2 million in Cobb's case, and nearly $600,000 apiece for Snyder and Hafer. Finally, in connection with the sale of the Operating

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 5
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

Subsidiaries, the Salient 3 board voted to accelerate the lapse of restrictions on a total of 141,100 shares of stock held by Cobb, Snyder, and Hafer, thus increasing their proportionate shares of the liquidation proceeds. Taken together, I hereafter refer to the various benefits Cobb, Hafer and Snyder received as the "Employment Benefits."

**\*5** In April, 2000, the Salient 3 board publicly announced its plans to sell the Operating Subsidiaries and liquidate the company. It projected that its stockholders would receive an initial distribution of $12.00 per share in September 2000, with additional distributions of $3.30 per share, for a total of $15.30.

The next month, the board approved the sale of SAFCO to Agilent Technologies for $120 million, before post-closing adjustments. In June, the board approved the sale of GAI-Tronics to Hubbel, Inc. for $40 million. Both the SAFCO and GAI-Tronics transactions were consummated in late 2000. By that time, the Class B stockholders of Salient 3 had approved the board's liquidation plans and the Special Incentive Plan. The initial $12.00-per-share liquidation payment was then made as scheduled in September 2000.

In January 2001, the company sold the last of its operating subsidiaries, XEL, for a $4.9 million promissory note. Salient 3 had purchased XEL for $30 million in 1996. Thus, its return on investment was dismal, and the company reduced its estimate of the remaining liquidation proceeds to be distributed down from $3.30 per share to $2.93--assuming full payment of the purchase note.

### III. *The Single Count Pled In The Complaint*

The plaintiffs' amended complaint sets forth only a single count for breach of fiduciary duty. That count alleges that the defendants breached their fiduciary duties by approving the various Employment Benefits awarded to Cobb, Snyder, and Hafer in connection with the liquidation. These improper Benefits operated to reduce the amount of the proceeds from the sale if the Operating Subsidiaries that would go to Salient 3's stockholders, and to divert that value to Cobb, Snyder, and Hafer personally. The complaint is, however, devoid of any facts relating to the process used by

the Salient 3 board to decide to award the Employment Benefits, or the substantive reasons for the board's decision.

### IV. *Legal Analysis*
#### A. *Is The Plaintiff's Claim Derivative Or Individual In Nature?*

The first question is whether the plaintiffs' claim is derivative or individual in nature. This inquiry is consequential because it affects the procedural standard governing the defendants' motion to dismiss. If the plaintiffs' claim is individual, the defendants' motion will be assessed under the pro-plaintiff standard of Court of Chancery Rule 12(b)(6). By contrast, if the plaintiffs' claim is derivative, then the defendants' motion is governed by Court of Chancery Rule 23.1 and the implementing standard set forth in *Aronson v. Lewis.* [FN12]

   FN12. Del.Supr., 473 A.2d 805 (1984).

To survive a motion to dismiss under Rule 23.1, the plaintiffs' complaint must: (1) set forth well-pled facts creating reasonable doubt about whether a majority of the Salient 3 board could impartially consider a demand; or (2) make particularized allegations of fact supporting an inference that the board's approval of the Employment Benefits constituted a breach of fiduciary duty. [FN13] Thus, because it requires the plaintiff to plead a breach of fiduciary duty with particularity rather than under Rule 12(b)(6)'s liberal notice pleading standard, the Rule 23.1 burden is difficult for a plaintiff to meet where a majority of the board is disinterested and independent. [FN14]

   FN13. *Id.* at 814.

   FN14. *Brehm* 746 A.2d 244 at 254.

**\*6** In this case, the plaintiffs' allegation is that the Salient 3 board breached its fiduciary duties by awarding Cobb, Snyder, and Hafer excessive Employment Benefits. Because of these awards, they contend, the consideration that Salient 3 stockholders will receive in the liquidation is lower than it otherwise would have been.

As thus pled, the plaintiffs' claim is clearly derivative in nature. By its plain terms, the amended complaint alleges

2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

that Salient 3 suffered a balance sheet injury because of the Employment Benefits. That reduction in Salient 3's bottom line reduced the amount of net cash available for distribution in the liquidation, working a harm to the Salient 3 stockholders on a *pro rata* basis.

The amended complaint does not allege that the Employment Benefits had any effect on the terms of the sales of the Operating Subsidiaries. It does not allege that the price paid for the Operating Subsidiaries was unfair. Instead, it simply alleges that a portion of the proceeds of those sales was improperly diverted to Cobb, Snyder, and Hafer by way of the Employment Benefits.

Cases like *Parnes v. Bally Entertainment Corp.* [FN15] and *Kramer v. Western Pacific Indus., Inc.* [FN16] support the conclusion that the plaintiffs' claim is derivative. Under the reasoning of those cases, a claim that executives received improper employment benefits that decreased the consideration received by the target stockholders in a cash-out merger is not individual in nature unless the plaintiff alleges that the merger itself was unfair. The practical consequence of that teaching in the merger context is that the claims against the recipients of the excessive compensation are usually extinguished, because the target stockholders cashed-out in the merger lose standing and because arms-length acquirors rarely press claims against the departing executives of targets they acquire in friendly transactions. [FN17]

FN15. Del.Supr., 722 A.2d 1243 (1999).

FN16. Del.Supr., 546 A.2d 348 (1988).

FN17. *See Golaine v. Edwards,* Del. Ch., C.A. No. 15404, mem. op. at 10-14, Strine, V.C. (Dec. 21, 1999) (discussing this practical effect). The case of *Bershad v. Hartz,* Del. Ch., C.A. No. 6960, mem. op., Berger, V.C. (Jan. 29, 1987) illustrates the arguable harshness of this approach. In *Bershad,* the target company was bought by an acquiror who expressly agreed not to challenge the golden parachutes attacked by the target stockholders. The court held that the attack on the golden parachutes was, nonetheless, derivative and that, per the

reasoning of *Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984), the buyer is presumed to have agreed to honor the parachute because it made the economic judgment that the litigation challenge to the golden parachutes would fail and "not because it ha[d] already accounted for the [cost of the golden parachutes] by reducing the merger price." *Bershad,* mem. op. at 6.

In the circumstances of this case, the application of *Parnes* and *Kramer* has far less severe consequences. After the sale of the Operating Subsidiaries, the plaintiffs continue to have standing to press their derivative claim, but must satisfy the requirements of Rule 23.1 before proceeding.

Nor have the plaintiffs persuaded me that Salient 3's decision to liquidate transforms a garden-variety derivative claim of excessive compensation into an individual claim. *Kramer* and *Parnes* stand in part for the proposition that the mere fact that the corporation is undertaking an end-game strategy such as a cash-out merger does not change every claim for breach of fiduciary duty against the board into a direct claim. Whether it is liquidating or not, Salient 3 has a board of directors with the legal power to bring suit to recover the Employment Benefits on the grounds that those Benefits were wrongfully issued. It is not apparent to me why Delaware public policy would make it easier for plaintiffs to bypass normal board processes solely because a corporation is in the process of liquidating. [FN18]

FN18. I decline the plaintiffs' invitation to read the fact-intensive decision in the limited partnership case of *In re Cencom Cable Income Partners, L.P. Litig.,* Del. Ch., C.A. No. 14634, mem. op., Steele, V.C. (Jan. 27, 2000) broadly and to extend that broad reading into the corporate context.

**\*7** Likewise, the nature of any relief that might be granted in this action is not inconsistent with derivative treatment of plaintiffs' claims. If the plaintiffs were to succeed and Salient 3 were to recover the Employment Benefits, the result would be sensible. The Salient 3 board could add those proceeds to the funds available for distribution in the liquidation, thus benefiting each Salient 3 stockholder in proportion to her holdings. This would reap no windfall for

Not Reported in A.2d                                                                  Page 7
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

the defendants.

For all these reasons, I conclude that the plaintiffs' claims are derivative in nature.

### B. *Is Demand On The Salient 3 Board Excused?*

The plaintiffs essentially concede that they cannot satisfy the first prong of the *Aronson* demand excusal test. That prong focuses on the following question: is a majority of the Salient 3 board "incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by plaintiffs or otherwise remedy the alleged injury?" [FN19]

FN19. *Brehm,* 746 A.2d at 257.

Here, a majority of the Salient 3 board is comprised of outside directors. None of these directors are alleged to be materially dependent on the good graces of Cobb, Snyder, or Hafer and therefore incapable of exercising his independent judgment. Collectively, all of the outside directors own 23% of the Class B stock in Salient 3 and thus had a personal interest to maximize the liquidation proceeds. At most, the amended complaint pleads facts that suggest that Cobb, Hafer, and Snyder had a firm grip over their managerial subordinates, and that those subordinates were unlikely to resist their instructions. But these facts do not support an inference that the independent Salient 3 board majority was under the domination and control of Cobb, Hafer, and Snyder. The Salient 3 outside directors have no discernible reason to yield their independent judgment to company management. [FN20] As a result, the first prong of the *Aronson* test is not satisfied. [FN21]

> FN20. For the same reason, the amended complaint does not state particularized facts supporting a claim that the Salient 3 independent directors breached their fiduciary duties by acting under Cobb's, Hafer's, and Snyder's domination and control to benefit those top managers at the expense of the company.

> FN21. The fact that Cobb, Snyder, and Hafer control nearly half the company's voting stock and

therefore might have the practical power to decide who serves as a Salient 3 director is not sufficient under Delaware law to call into question the ability of the outside directors to consider a demand impartially. *Aronson,* 473 A.2d at 815; *see also In re Western Nat'l Corp. Shareholders Litig.,* Del. Ch., Cons.C.A. No. 15927, mem. op. at 41, Chandler, C. (May 22, 2000).

The plaintiffs' argument that the second prong of *Aronson* is satisfied turns on a simple chain of logic:

1) They plead facts that support the inference that the performance of Salient 3 has been poor during the time it has been managed by Cobb, Snyder, and Hafer.

2) In a far more conclusory way, the plaintiffs then attribute that poor performance to deficient management by Cobb, Snyder, and Hafer, and accuse Cobb, Snyder, and Hafer of misusing corporate reimbursement and employment policies for the benefit of themselves and their friends.

3) Based on 1) and 2), the plaintiffs then assert that the Salient 3 board must have breached its fiduciary duties by approving the Employment Benefits for Cobb, Snyder, and Hafer. Because Cobb, Snyder, and Hafer were so obviously incompetent and harmful to Salient 3, they argue, how could the board reward them with the Employment Benefits when their own deficiencies caused the need for the company to liquidate? [FN22]

> FN22. The plaintiffs' brief summarizes this reasoning:
>
> The Amended Complaint describes a company that never achieved competitive competence in its field under the stewardship of the Control Group, and that suffered a progressive deterioration in its financial condition during the tenure of defendant Cobb as President and Chief Executive Officer--a deterioration directly reflected in the steady decline of the one barometer used by every corporate director--Salient's stock price. (Am.Compl.¶¶ 38, 49, 51.) With this information readily available to them, the Individual Defendants carelessly endorsed the transactions complained of in the Amended Complaint while ignoring the Control

2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

Group's record of corporate futility and lavishing an excessive and unwarranted compensation package on each member of that Group.
Plaintiffs' Br. at 27-28.

**\*8** The amended complaint admittedly sets forth a factual scenario that is somewhat unsettling. Were poor managers permitted to stock their own larder at the shareholders' expense?

The problem for the plaintiffs is that our law requires them to plead specific facts that create a reasonable doubt that the Salient 3 board breached its fiduciary duties in approving the Employment Benefits. In a situation like this, where a compensation decision was made by a board comprised of a majority of independent directors, this burden is stringent:

Pre-suit demand will be excused in a derivative suit only if the Court of Chancery in the first instance ... conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, measured by concepts of gross negligence, included consideration of all material information reasonably available. [FN23]

FN23. *Brehm,* 746 A.2d at 259.

In this case, the amended complaint fails to set forth any facts at all about the decisionmaking process that the Salient 3 board undertook in awarding the Employment Benefits. Instead, it simply falls back on the accusation that Cobb, Snyder, and Hafer were poor managers who should not be rewarded with any remuneration at all. This is inadequate to meet the plaintiffs' burden.

As a general matter, it was unquestionably rational for a board in Salient 3's position to adopt employment policies that create an incentive for senior employees to stay in place during a sale of the company's operating businesses. Likewise, it is sensible for a board to adopt policies that create an incentive for top managers to assist in selling those businesses at the highest price. The plaintiffs do not quibble with these propositions, except to indicate that they do not reasonably apply to poor managers such as Cobb, Snyder, and Hafer.

The amended complaint, however, is wholly devoid of any facts relating to the board's own assessment of the performance of Cobb, Snyder, and Hafer. While the sharply declining performance of Salient 3 under their management is clearly relevant, the complaint does not plead particularized facts specifying how their decisions caused the company's problems. With the exception of the XEL purchase, the plaintiffs are unable to point to particular business decisions that did not work out--they simply point to Salient 3's descending fortunes and ask the court to infer that management deficiencies, rather than other market and financial developments, caused that plummet. Moreover, in the case of the XEL purchase, the amended complaint merely sets forth a cursory accusation that the purchase was poorly thought out and resulted in a sale at far less than the purchase price some five years after its acquisition by Salient 3.

As to the SAFCO acquisition, the amended complaint only suggests that SAFCO's management team turned out to be weaker than was required for success and that one Salient 3 manager thought in hindsight the acquisition "was possibly a serious mistake." [FN24] It does not allege that SAFCO was sold by Salient 3 at a loss or provide specifics on how the decision to acquire SAFCO was made. And the amended complaint's oblique insinuation that the company's decision to get out of the engineering decision many years ago was unwise--a decision that was apparently made when engineers had voting control of the company--is not the kind of particularized fact pleading that rationally creates a reasonable doubt whether the provision of the Employment Benefits to Cobb, Snyder, and Hafer in 1999 and 2000 was a proper exercise of fiduciary duty.

FN24. Am. Comp. ¶ 37.

**\*9** Without specific facts regarding the board's process in determining to award the Employment Benefits, the amended complaint fails to provide the court with any basis to infer that the independent directors on the Salient 3 board failed to consider the material facts in determining to award the Employment Benefits. It could be that the board carefully assessed the past (positive or negative) performance of Cobb, Snyder, and Hafer, concluded that their continued and enthusiastic assistance during the

Not Reported in A.2d                                                                                              Page 9
2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855
**(Cite as: 2001 WL 1360038 (Del.Ch.))**

liquidation process was beneficial (because of their past positive performance) or was necessary (in spite of their prior negative performance), and made a reasoned decision to award the Employment Benefits. The board could have also made the judgment that the non-compete agreements would be helpful in securing the best price for the Operating Subsidiaries. Or it could be otherwise.

But under our law, it is incumbent upon the plaintiffs to plead particularized facts that create a reasonable doubt that the board's decisionmaking process was grossly negligent. That burden has not been satisfied.

In a similar vein, the plaintiffs have not seriously attempted to show that the Employment Benefits constitute corporate waste. As noted, the Salient 3 board's decision to award the Employment Benefits had a plausible business purpose. Without particularized facts supporting an inference that Salient 3 board majority could not reasonably believe that the continued service and active assistance of Cobb, Snyder, and Hafer during the sale and liquidation process was of value to Salient 3, the amended complaint fails to satisfy the second prong of *Aronson.* [FN25]

    FN25. *Brehm,* 746 A.2d at 266.

V. *Conclusion*

For the foregoing reasons, the plaintiffs' amended complaint is dismissed without prejudice. [FN26] IT IS SO ORDERED.

    FN26. At oral argument, plaintiffs' counsel candidly admitted that they had yet to seek books and records under 8 *Del. C.* § 220, choosing instead to rely upon information provided by the plaintiffs themselves, most of whom are former employees. The plaintiffs' counsel asked for another opportunity to plead a claim. Because of the teaching of *Brehm* on this score, *see* 746 A.2d at 266-67, and the fact that this motion was being briefed as new Court of Chancery Rule 15(aaa) came into effect, I assent to that request. In so doing, I expect that plaintiffs' counsel will be mindful of the defendants' offer to share

information relating to the Salient 3 board's decisionmaking process regarding the Employment Benefits, and will take care not to replead if the information relating to that process does not sustain a claim that meets the test set forth in cases like *Brehm.*

2001 WL 1360038 (Del.Ch.), 27 Del. J. Corp. L. 855

END OF DOCUMENT

EXHIBIT 2

2004 WL 2735530                                                                    Page 1
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

**Briefs and Other Related Documents**

United States Court of Appeals,
Eighth Circuit.

In re: AMDOCS LIMITED SECURITIES LITIGATION
Kerry Chambers, on behalf of himself and all others
similarly situated;

Excalibur Management Corporation; Plaintiffs,
Jerry Fields, Fields Trust; Epsilon Mutual Funds
Management Co., Ltd.; Binmar
Investments, Ltd.; Altshuler-Shaham Mutual Fund;
Plaintiffs-Appellants,
Hindy Taub; Plaintiff,
Westgate Alpha Fund, L.P.; Westgate Premier Growth
Fund, L.P.; James Nicholson;
Plaintiffs-Appellants,
Myra Swee; Christopher Carmona, on behalf of himself and
all others similarly
situated; Andrew Schonzeit, on behalf of himself and all
others similarly
situated; Glen Hubbard, on behalf of himself and all others
similarly situated;
Market Street Securities, Inc., on behalf of itself and all
others similarly
situated; Plaintiffs,
v.
AMDOCS Limited; Defendants-Appellees,
Bruce K. Anderson; Robert A. Minucci; Defendants,
Avinoam Naor; Dov Baharav; Defendants-Appellees.
**No. 04-1100.**

Submitted: Oct. 19, 2004.
Filed: Dec. 2, 2004.

**Background:** Investors brought securities fraud action,
alleging misrepresentations of customer demand. The
United States District Court for the Eastern District of
Missouri, Henry Edward Autrey, J., dismissed complaint for
failure to state claim. Investors appealed.

**Holding:** The Court of Appeals held that statements
bespeaking caution rendered statements regarding customer
demand immaterial.
Affirmed.

Wollman, Circuit Judge, filed concurring opinion which
was adopted by the majority on an alternative basis.

**[1] Securities Regulation** ⚖️60.51
349Bk60.51 Most Cited Cases
While factual allegations in securities fraud complaint are
assumed to be true on motion to dismiss for failure to state
claim, Private Securities Litigation Reform Act (PSLRA)
requires court to disregard catch-all or blanket assertions
that do not live up to particularity requirements of the Act.
Securities Exchange Act of 1934, § 21D, as amended, 15
U.S.C.A. § 78u-4.

**[2] Federal Courts** ⚖️776
170Bk776 Most Cited Cases
Dismissal of securities fraud complaint for failure to satisfy
heightened pleading requirements of Private Securities
Litigation Reform Act (PSLRA) is reviewed de novo.
Securities Exchange Act of 1934, § 21D, as amended, 15
U.S.C.A. § 78u-4.

**[3] Securities Regulation** ⚖️60.51
349Bk60.51 Most Cited Cases
"The required state of mind" referred to by Private
Securities Litigation Reform Act (PSLRA) is scienter.
Securities Exchange Act of 1934, § 21D, as amended, 15
U.S.C.A. § 78u-4.

**[4] Securities Regulation** ⚖️60.28(11)
349Bk60.28(11) Most Cited Cases

**[4] Securities Regulation** ⚖️60.46
349Bk60.46 Most Cited Cases
Misrepresentation or omission is material, as required to
support claim of securities fraud, if there is substantial
likelihood that disclosure of omitted fact would have been
viewed by reasonable investor as having significantly
altered "total mix" of information made available.

**[5] Securities Regulation** ⚖️60.46
349Bk60.46 Most Cited Cases
Alleged misrepresentations can be immaterial, precluding
liability for securities fraud, if they: 1) are of such common
knowledge that reasonable investor can be presumed to
understand them; 2) present or conceal such insignificant
data that, in total mix of information, it simply would not
matter; 3) are so vague and of such obvious hyperbole that
no reasonable investor would rely upon them; or 4) are
accompanied by sufficient cautionary statements.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2735530                                                                                                    Page 2
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

**[6]** Securities Regulation ⚖60.46

349Bk60.46 Most Cited Cases

Corporation's statements regarding customer demand were accompanied by statements that bespoke caution, and thus were immaterial and could not form basis for securities fraud claim; corporation issued cautionary statements about market erosion in telecom industry, lowered its revenue projections, issued warnings in SEC 20-F report and conducted conference call with securities analysts in which it specifically discussed increasing impact of softening customer demand on revenues.

**[7]** Securities Regulation ⚖60.53

349Bk60.53 Most Cited Cases

Mere allegations of fraud are insufficient to satisfy Private Securities Litigation Reform Act's (PSLRA) heightened pleading standard for falsity; instead, complaint must indicate why alleged misstatements would have been false or misleading at the several points in time in which they were made. (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D, as amended, 15 U.S.C.A. § 78u-4.

**[8]** Securities Regulation ⚖60.53

349Bk60.53 Most Cited Cases

Complaint failed to show that corporation's statements regarding customer demand were misleading when made, as required to satisfy Private Securities Litigation Reform Act's (PSLRA) heightened pleading standard; complaint did not allege facts that were necessarily inconsistent with representations that demand was "strong" or that visibility was "high," rather, at best, facts alleged showed that one or two projects were not going well, that one geographic sector of the business was underperforming, that some offices were experiencing layoffs, and that some employees were unhappy. (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). 15 U.S.C.A. § 78u-4.

**[9]** Securities Regulation ⚖60.51

349Bk60.51 Most Cited Cases

Under Private Securities Litigation Reform Act's (PSLRA) heightened pleading standard, inferences of scienter will usually survive motion to dismiss only if they are both reasonable and strong; complaint must provide factual basis for allegations of scienter. (per concurring opinion of

Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D(b), as amended, 15 U.S.C.A. § 78u-4(b).

**[10]** Securities Regulation ⚖60.53

349Bk60.53 Most Cited Cases

Recklessness is basis for strong inference of scienter, required of securities fraud complaint by Private Securities Litigation Reform Act (PSLRA), where defendants make statements when they know or have access to information suggesting that statements were inaccurate. (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[11]** Securities Regulation ⚖60.51

349Bk60.51 Most Cited Cases

Insider trading activity may give rise to inference of scienter, required under Private Securities Litigation Reform Act's (PSLRA) heightened pleading standard, when trading pattern during class period is unusual. (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b).

**[12]** Securities Regulation ⚖60.53

349Bk60.53 Most Cited Cases

Allegation that corporate officers knew or recklessly disregarded contemporaneous facts indicating that demand was not "strong" and that visibility was not "high" did not establish strong inference of scienter, required under Private Securities Litigation Reform Act's (PSLRA) heightened pleading standard; complaint did not allege facts to show that officers' statements were necessarily false, and investors' allegations that certain "big bosses" in company told employees that company was in dire financial straits, and that management in Israel pressured certain executives fell short of allegation that officers themselves knew of any information that would render their statements false when made. (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D(b)(2), as amended, 15 U.S.C.A. § 78u-4(b)(2).

**[13]** Securities Regulation ⚖60.51

349Bk60.51 Most Cited Cases

Investors' conclusory allegations that officers' insider sales were suspicious did not meet scienter pleading standard

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2735530                                                                                    Page 3
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

under Private Securities Litigation Reform Act (PSLRA); even assuming that stock sales by independent trusts connected to corporation resulted in massive personal benefit to officers, without any allegations relating to officers' prior trading history or to number of total shares held by each defendant, it could not be determined whether or how trading activity was "unusual." (per concurring opinion of Circuit Judge Wollman, adopted by majority on alternative basis). Securities Exchange Act of 1934, § 21D(b), as amended, 15 U.S.C.A. § 78u-4(b).

Robert A. Wallner, argued, New York, NY (Howard K. Coates, Jr., Christopher S. Jones, Boca Raton, FL, Lionel Z. Glancy, Robin Howald, Los Angeles, CA, John T. Walsh, Christopher J. Petri, St. Louis, MO, on the brief), for appellant.

Bruce G. Vanyo, argued, Palo Alto, CA (Jerome F. Birn, Jr., Peri B. Nelson, Palo Alto, CA, Andrew Rothschild, David B. Helms, St. Louis, MO, on the brief), for appellee.

Before WOLLMAN, LAY, and MELLOY, Circuit Judges.

PER CURIAM.

**\*1** Investors in Amdocs Limited appeal the district court's [FN1] order dismissing their securities fraud complaint for failure to make a claim upon which relief can be granted. We affirm.

## I

The Defendant, Amdocs Limited (Amdocs), is a publicly-traded company specializing in computer systems for telecommunications firms such as Sprint PCS, Verizon, Nextel, Cingular, British Telecom, Bell Canada, Bell South, and SBC Communication. Jerry Fields is the lead plaintiff for a class of investors (together the Plaintiffs) who lost money by investing in Amdocs' stock during the class period of July 18, 2000 through June 20, 2002. The Plaintiffs' amended and consolidated class action complaint alleges that, in violation of the Securities Exchange Act of 1934 (the Securities Act), Amdocs defrauded the Plaintiffs by: 1) misleading Plaintiffs to believe that Amdocs' customer demand was stronger than it actually was; 2) providing false revenue projections for the third fiscal

quarter of 2002; 3) misleading Plaintiffs as to increased business with large telecom customers; and 4) making false statements regarding acquisitions of Clarify and Ceretin. Plaintiffs further allege that Amdocs' CEO, Avinoam Noar, and its CFO, Dov Baharav, are individually liable under the Securities Act as controlling persons. *See* 15 U.S.C. § 78t(a) and 17 C.F.R. § 240.12b-2.

Amdocs made its first public offering of stock in 1998 and thereafter experienced significant growth, reaching annual revenues of roughly $1.5 billion in 2001. During most of the class period, Amdocs published upbeat predictions of its prospects. This is not surprising; Amdocs' revenues grew significantly for the first seven of the eight quarters of the class period. In these predictions, Amdocs touted its "visibility;" a measurement that identifies what percentage of a future period's predicted revenues were attributable to signed contracts, letters of intent, or fixed customer relationships. The percent of sales for a future period that were "visible" were sales that Amdocs had already sold. During the class period, securities analysts and members of the media asked Amdocs' CEO and CFO about how well the company was weathering the high-tech recession. Until approximately April of 2002, Amdocs represented that its sales continued to expand, and that demand for Amdocs' products was not being negatively affected by the high-tech recession.

At various times during the class period, Amdocs and at least one independent securities analyst issued cautionary statements regarding Amdocs' business prospects. On July 11, 2001, an analyst from Morgan Stanley lowered Amdocs' stock rating from "strong buy" to "outperform," and opined that the "rapidly degrading carrier spending environment" would negatively impact Amdocs. On December 27, 2001, Amdocs filed its annual 20F report with the Securities and Exchange Commission (SEC) detailing Amdocs' historical performance and also providing projections of future results. In this filing, Amdocs identified "business risks" that the company could potentially face. Specifically, Amdocs identified that its sales were closely tied to the "global communications market," that the slow-down in spending has lengthened Amdocs' typical sales cycle, and that this trend could accelerate and "result in slower revenue growth

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2735530                                                                                          Page 4
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

rates" in the future. In a press release on April 23, 2002, Amdocs lowered its 2002 Q3 revenue projections by $60 million, or twelve and one-half percent. Later that day in a telephone conference with security analysts, Amdocs cautioned that the softening of demand reflected "a more prolonged and severe market deterioration than had been previously anticipated."

**\*2** For the first seven of the eight quarters in the class period, Amdocs' revenues grew steadily. It was not until the last quarter of the class period that revenues actually declined. On June 20, 2002, Amdocs reported its first ever decline in quarterly revenue. This quarterly revenue number of $380 million was ten percent below the already-lowered projection of $420 million. The following day, Amdocs' stock dropped forty percent on heavy trading volume; approximately four times higher than average. This suit followed.

The district court dismissed Plaintiffs' complaint on Amdocs' 12(b)(6) motion, holding that: 1) Amdocs' representations relating to customer demand were immaterial as a matter of law; 2) Amdocs' revenue projections for the third fiscal quarter of 2002 were forward-looking and protected by the "safe harbor" clause of the Private Securities Litigation Reform Act of 1995 (the Reform Act), *see* 15 U.S.C. § 78u-5(c); 3) representations of business with large telecom customers were immaterial as a matter of law; and 4) statements related to the acquisitions of Clarify and Certen simply were not actionable under the Securities Act. The district court dismissed the Plaintiffs' complaint with prejudice without reaching the issues of heightened pleading requirements of particularity and scienter required under the Reform Act. *See* 15 U.S.C. § 78u-4(b). Plaintiffs now appeal the district court's dismissal of their complaint related to Amdocs' representations of customer demand and statements of visibility, but abandon the remainder of their complaint.

The following are examples of statements that the Plaintiffs' complaint relies upon to establish its securities fraud claim: [FN2]

Management believes that demand for the company's systems remains strong and is growing in all business areas. (November 2, 2000 press release);

Amdocs continues to demonstrate excellence in its growth ... Management believes that the changing needs of communications providers are creating additional demand for Amdocs' market-leading customer care and billing solutions. "This growing demand is manifest in all segments--mobile, wireless and IP--and in all regions." (Naor quoted in January 23, 2001 press release);

We had 13 new business wins during the quarter, an unprecedented number for Amdocs. From our point of view, we don't see any slowdown. I would say a little bit the other way around. (Naor quoted in April 23, 2001 press release).

We continue to see demand for our products and services around the world and across our lines of business. We are optimistic regarding future deal flow as well. In addition, our existing customers are continuing with their system enhancement and expansion plans. We don't feel any pressure from our existing customers to decrease the level of service that we are providing today. We are very proud to have high visibility and we believe that we will continue to have high visibility. (Naor speaking on a July 11, 2001 conference call);

**\*3** Even in today's environment, we are experiencing strong demand for our offerings. Our ability to achieve stability and growth in the current business environment is based on our long-term relationships with the market leaders, which generate a solid, constantly expanding flow of recurring revenues. (Naor quoted in a November 6, 2001 press release);

Regarding the projections for next year, given the visibility that we have ... remember that the significant part of what we are going to do is out of our carrying revenue and existing customers so actually we built it from the bottom. It's not just a statistical number. It's not only a marketing and sales expectation, it's based on pipeline, on names, on plans that we're working on with our customers. So the numbers are the result of quite a detailed, solid work and we feel comfortable with those numbers. (November 2, 2000 press release);

**II**

[1][2][3] The Reform Act modifies the standard 12(b)(6) analysis in two ways: First, while we assume all factual

allegations in the complaint are true, the Reform Act requires us to disregard catch-all or blanket assertions that do not live up to the particularity requirements of the statute. *Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir.2001).* Second, even though the plaintiff is entitled to all reasonable inferences, the Reform Act requires a securities fraud claim to plead allegations that collectively add up to a strong inference of scienter. [FN3] *Id.* Congress adopted these special pleading standards in the Reform Act to curb abusive securities fraud litigation. *In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741 (8th Cir.2002).* Dismissal of a securities fraud complaint on a 12(b)(6) motion for failure to satisfy the heightened pleading requirements of the Reform Act is reviewed *de novo.* *Florida State Bd. of Admin., 270 F.3d at 661.*

To present an actionable claim for securities frauds, the alleged misstatements must be material. *Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir.1997)* (citation omitted). A complaint that alleges only immaterial misrepresentations presents an "insuperable bar to relief" and is properly dismissed. *Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir.1982).* While materiality is generally a question of fact reserved for the jury, alleged misrepresentations are immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation. *Parnes, 122 F.3d at 546.*

Plaintiffs argue that the district court erred when it found that Amdocs' statements regarding customer demand were too vague and non-specific to contain any useful information upon which a reasonable investor would rely, and thus were immaterial, as a matter of law, in the total mix of information available. While we do not agree that the statements were too vague to be actionable considering the context in which they were made, we agree with the district court's judgment that they were immaterial as a matter of law because they were accompanied by cautionary statements that bespeak caution.

*4 [4][5] A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Basic, Inc. v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).* Alleged misrepresentations can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements. *Parnes, 122 F.3d at 546-48.* Cautionary language which relates directly to that which the Plaintiffs claim to have been misled, if sufficient, renders the alleged misrepresentation or omissions immaterial as a matter of law. *Id. at 548.*

[6] As early as December 27, 2001, Amdocs began issuing cautionary statements about market erosion in the telecom industry. On April 23, 2002, Amdocs lowered its revenue projections, and again referenced its December 27, 2001 SEC 20-F and the warnings it contained. That same day, Amdocs conducted a conference call with securities analysts and specifically discussed the increasing impact of softening customer demand on Amdocs' revenues.

> We did experience increased timing delays during the quarter. While there is a lot of interest in the market, carriers are being very careful about committing to new capital expenditures. Several deals that we expected to sign during the quarter are still being finalized or awaiting approval. We see more decisions being made in a phased approach, with customers committing only to those parts of projects that are immediately essential. This reflects a more prolonged and severe market deterioration than had been originally anticipated .... (Naor, April 23, 2002 conference call with securities analysts.)

The gravamen of the Plaintiffs' claim is that Amdocs' representation of strong customer demand in conjunction with growing revenue projections and high visibility numbers led them to believe that Amdocs was successfully avoiding the high-tech recession. Put another way, the favorable representations qualified the doom and gloom warnings. Under the bespeaks caution doctrine, however, Amdocs merely needed to issue sufficient warnings that "relate[d] directly to that which the plaintiffs have been

2004 WL 2735530                                                                                          Page 6
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

misled." _Parnes, 122 F.3d at 548._ Amdocs' December 27, 2001 and April 23, 2002 warnings appear to have done just that. The warnings put Plaintiffs on notice that demand had softened and that Amdocs' customers were in fact altering their purchasing patterns with Amdocs. These statements related directly to an erosion in Amdocs' customer demand. Accordingly, Amdocs' statements regarding customer demand were immaterial as a matter of law.

**\*5** Because we affirm the district court's dismissal of the Plaintiffs' cause of action against Amdocs, we also affirm the dismissal of the Plaintiffs' causes of action against the individual Defendants Avinoam Noar and Dov Baharav as well.

We also concur in the concurring opinion of Judge Wollman relating to the pleading standards and scienter. We adopt his concurrence on an alternative basis. The order of the district court is AFFIRMED.

WOLLMAN, Circuit Judge, concurring.

I am not convinced that the "bespeaks caution" doctrine renders all of the challenged statements immaterial as a matter of law. It is clear, however, that the plaintiffs' complaint did not meet the pleading standards for falsity and scienter required by the Private Securities Litigation Reform Act of 1995 (Reform Act). Because we may affirm the district court's judgment on any basis supported by the record, _Migliaccio v. K-Tel Int'l, Inc. (In re K-Tel Int'l, Inc. Sec. Litig.), 300 F.3d 881, 889 (8th Cir.2002),_ I would affirm based upon the plaintiffs' failure to satisfy the Reform Act's pleading standards without reaching the closer question of the materiality of the alleged misstatements.

Congress adopted two heightened pleading standards unique to securities cases when it enacted the Reform Act. The first requires that a plaintiff's complaint show falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading. _15 U.S.C. § 78u-4(b)(1); Kushner v. Beverly Enters., Inc., 317 F.3d 820, 826 (8th Cir.2003)._ The second requires that the complaint show scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." _15 U.S.C. § 78u-4(b)(2); Kushner,_

_317 F.3d at 826._ The Reform Act requires that the complaint be dismissed if either of these standards is not met. _15 U.S.C. § 78u-4(b)(3); Kushner, 317 F.3d at 826._

[7] Mere allegations of fraud are insufficient to satisfy the heightened pleading standard for falsity. _Chen v. Navarre Corp. (In re Navarre Corp. Sec. Litig.), 299 F.3d 735, 742 (8th Cir.2002)._ Instead, a complaint must indicate why the alleged misstatements "would have been false or misleading at the several points in time in which they were made" in order to satisfy the standard. _Id. at 743_ (quoting _Fischer v. Vantive Corp. (In re Vantive Corp. Sec. Litig.), 283 F.3d 1079, 1086 (9th Cir.2002)_). The facts contained in the complaint must _necessarily_ show that the defendants' statements were misleading. _In re Vantive Corp., 283 F.3d at 1087._

[8] The complaint in this case fails to show that the defendants' statements were misleading when made. After detailing each challenged statement by the defendants, the complaint generally alleges that the statements were false and misleading. _See_ Compl. at 27, 35, 40, 47, 52, 64, 75, 82-83. The complaint also describes problems on individual projects staffed by Amdocs and a number of general impressions shared by lower-level employees and contractors. _See, e.g., id._ at 27-29 (problems at SBC site), 35-36 ("general feeling" that deals weren't being closed), 41 (decline in European region revenue from one quarter to the next). At no point, however, does the complaint allege facts that are necessarily inconsistent with the defendants' representations that demand was "strong" or that visibility was "high." At best, the facts alleged show that one or two projects were not going well, that one geographic sector of Amdocs' business was underperforming, that some offices were experiencing layoffs, and that some employees were unhappy. Without any allegations regarding the effect that these compartmentalized conditions had on the _overall_ demand and visibility experienced by Amdocs, the plaintiffs' complaint fails to meet the Reform Act's heightened standard for falsity.

**\*6** [9] The complaint also fails to satisfy the Reform Act's heightened standard for scienter. Although Congress did not codify any particular methods of showing the required strong inference, inferences of scienter will usually survive

2004 WL 2735530                                                                                    Page 7
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**

a motion to dismiss only if they are both "reasonable and strong." *Kushner, 317 F.3d at 827.* While scienter is normally a question of fact for the jury, the complaint must provide a factual basis for allegations of scienter. *In re K-Tel, 300 F.3d at 894.*

[10][11] The plaintiffs allege that a strong inference of scienter has been established in this case for two reasons: (1) defendants Naor and Baharav knew or recklessly disregarded contemporaneous facts indicating that demand was not "strong" and that visibility was not "high"; and (2) insider trading activity during the class period demonstrates the defendants' motive to make fraudulent statements. Recklessness is a basis for a strong inference of scienter where defendants make statements when they know or have access to information suggesting that the statements were inaccurate. *In re Navarre Corp., 299 F.3d at 746.* In addition, insider trading activity may give rise to an inference of scienter when the trading pattern during the class period is "unusual." *In re K-Tel, 300 F.3d at 895-96.*

[12] Here, neither of the plaintiffs' allegations provides a basis for a "strong inference" of scienter. The omission of any facts in the complaint to show that the defendants' statements were necessarily false prevents the plaintiffs from showing that the defendants knew or recklessly disregarded such facts. Furthermore, the investors' allegations that certain "big bosses" in the company told employees that Amdocs was in dire financial straits, *e.g.,* Compl. at 64, and that "Amdocs management in Israel" pressured certain executives, *e.g.,* Compl. at 35, fall short of an allegation that Naor and Baharav themselves knew of any information that would render their statements false when made. *See Kushner, 317 F.3d at 828* (assertions that someone who had knowledge of falsity of certain statements "reported" to defendant were not specific enough to support a strong inference of scienter). Although the plaintiffs allege that Naor had some knowledge of purportedly false sales forecasts prior to his statements in April of 2002, *see* Compl. at 79, this alleged knowledge is not inconsistent with the content of the April 2002 statement, i.e., that Amdocs' demand was "still there."

[13] Finally, the plaintiffs may not rely on the defendants' insider trading activity to raise a strong inference of

scienter. Even assuming *arguendo* that the stock sales by independent trusts connected to Amdocs resulted in massive personal benefit to Naor and Baharav, the investors have failed to include any allegations relating to the defendants' prior trading history or to the number of total shares held by each defendant. Without such allegations, we cannot determine whether or how the trading activity was "unusual." *In re K-Tel, 300 F.3d at 895-96.* The investors' conclusory allegations that the insider sales were suspicious thus fail to meet the scienter pleading standard. *Id.*

*7 Accordingly, I concur in the result reached by the majority.

> FN1. The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

> FN2. The Plaintiffs have not appealed the district court's dismissal of those portions of their complaint relating to: revenue projections for the period of April 23, 2002, through May 22, 2002; statements relating to increased business with large telecom customers; and statements relating to the acquisitions of Clarify and Certen. Accordingly, the volumes of statements relevant to those unappealed claims are not reproduced here.

> FN3. The Reform Act does not use the language "scienter." Instead, it refers to "the required state of mind." Our cases have made it clear that the required state of mind is scienter. *See Florida State Bd. of Admin., 270 F.3d at 653 n. 7; In re Navarre Corp. Sec. Litig., 299 F.3d at 742; Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 826 (8th Cir.2003).*

390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 2749660 (Appellate Brief) Plaintiffs/Appellants' Supplemental Brief (Sep. 09, 2004)Original Image of this Document (PDF)

• 04-1100 (Docket) (Jan. 13, 2004)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2735530                                                                                        Page 8
390 F.3d 542, 2004 WL 2735530 (8th Cir.(Mo.))
**(Cite as: 2004 WL 2735530 (8th Cir.(Mo.)))**


• [2004 WL 2738735](#) (Appellate Brief) Brief of
Defendants-Appellees (2004)Original Image of this
Document (PDF)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in A.2d                                                                              Page 1
1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

C
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

John Paul DECKER and International Apparel Associates,
Plaintiffs,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.
William STEINER, Plaintiff,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.

**Civ. A. Nos. 10,684, 10,685.**

Submitted: Sept. 8, 1989.
Decided: Nov. 6, 1989.

**\*\*1024** R. Bruce McNew, Pamela Tikellis, and Carolyn
Mack, Greenfield & Chimicles, Wilmington, Kenneth A.
Jacobsen, Greenfield & Chimicles, Haverford, Pa. and
Patrick J. Grannan, Greenfield **\*\*1025** & Chimicles, Los
Angeles, Cal., for plaintiffs Decker and International
Apparel Associates.

Joseph A. Rosenthal, Morris, Rosenthal, Monhait & Gross,
P.A., Wilmington, of counsel: Goodkind Labaton & Rudoff,
New York City, for plaintiff Steiner.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell,
Wilmington, for Individual defendants.

R. Franklin Balotti, Richards, Layton & Finger,
Wilmington, for defendant United Education Software.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor,
Wilmington, and Jack W. Londen, Morrison & Foerster,
San Francisco, Cal., for BankAmerica Corporation.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

**\*1** In the spring of 1989, several derivative actions were
filed by stockholders of BankAmerica Corporation ("BAC")
seeking recovery for alleged mismanagement of student
loans by BAC's subsidiary, Bank of America National Trust
& Savings Association (the "Bank"). Several actions were
filed in various state courts in California and at least one
remains pending in the Superior Court for the County of Los
Angeles (the "California action"). Two Delaware actions,
one brought by John Paul Decker and International Apparel
Associates (collectively, "Decker") and one by William
Steiner ("Steiner"), were filed at about the same time as the
earliest of the California actions.

Steiner has essentially abandoned his Delaware action in
favor of the California action (in which he is one of the
named plaintiffs), whereas Decker, who is not a party to the
California action, has been pursuing his claim in this
jurisdiction. Specifically, on June 6, 1989, Decker filed an
amended complaint that purports to allege three derivative
causes of action against the BAC directors, one derivative
cause of action against United Education & Software, Inc.
("United") and one individual cause of action against the
BAC directors. This is the decision, after briefing and
argument, on BAC and the defendant directors' motion to
dismiss the derivative allegations in the Decker action
[FN1].

**\*\*1026** The claims at issue center on the Bank's
involvement in a student loan program. The Bank,
allegedly, is the largest student loan lender in California
and, for several years, has been acting as trustee in
connection with more than $1 billion in student loans issued
by California Student Loan Finance Corp. ("CSLFC"), a
non-profit corporation in the business of packaging student
loans as securities for sale to institutional investors. The
student loans, which allegedly have a very high default rate,
were guaranteed by the U.S. Department of Education. That
guarantee formed a substantial part of the value of the
student loans, and was effective only if the lender complied
with federal regulations and procedures relating to the
servicing of the loans.

The Bank used United to service the student loans and to
perform the functions necessary for maintaining the federal
guarantees. However, an alleged computer breakdown at

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2
1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

United in 1987 left United unable to satisfy the federal loan servicing requirements. Both the Bank and United allegedly failed to rectify this problem and, as a result, the federal guarantees were withdrawn. The Bank has recognized that this series of events (which precipitated lawsuits against the Bank by other banks that had backed the student loans with letters of credit) has caused or is likely to cause substantial losses. In the fourth quarter of 1988, the Bank allegedly set aside a $98 million reserve in connection with the student loan program, and an additional undisclosed amount was reserved in the first quarter of 1989.

Based upon these facts (which are set out in greater detail in the amended complaint), Decker asserts three derivative causes of action against the BAC directors: (1) willful failure to control and manage BAC and the Bank, amounting to a fraud upon BAC and its stockholders; (2) negligent failure to exercise ordinary care; and (3) constructive fraud based upon the BAC directors' alleged concealment and misrepresentation of material facts. Decker's fourth cause of action charges that United breached its contractual obligations **1027 by failing to service the student loans properly, and that United fraudulently induced BAC and the Bank to enter into the loan servicing agreement by representing that United was ready, willing and able to service the loans when it knew that it was unable to fulfill those commitments.

*2 The amended complaint includes seven pages of reasons why Decker's failure to make presuit demand on the BAC directors would have been futile and should, therefore, be excused. Those reasons may be grouped into the following general categories: (1) the BAC directors participated in and/or approved the alleged wrongdoing; (2) the directors have taken no action in response to demands made by other stockholders, and the board's handling of other derivative claims has been inadequate; (3) the directors are actively defending law suits brought by other banks concerning the wrongs alleged in the Decker complaint; (4) the directors receive substantial salaries as directors and, thus, have benefitted from the wrongs alleged; and (5) the directors would not sue themselves.

Under Delaware law, the "demand requirement ... is a rule of substantive right designed to give a corporation the

opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 809 (1984). It is "inextricably bound to issues of business judgment," and is "a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Id.* at 812. Demand is excused where the complaint alleges, with particularity, facts that "raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988).

To succeed on the first prong of the demand futility test, Decker must show that the BAC directors may not have been disinterested or independent. The directors' independence could be challenged by alleging, with particularity, facts showing that they "were dominated or otherwise controlled by an individual or entity interested in the transaction." *Id.* at 189. As to disinterest, the Decker complaint must include particularized factual allegations showing entrenchment or a financial interest on the part of the BAC directors. *See id.* at 188.

None of the allegations in the amended complaint raises a reasonable doubt that the BAC directors were disinterested or independent. There is nothing in the nature of the loan servicing problems that would suggest either an entrenchment motive or any **1028 interest, in the sense of self-dealing, on the part of the directors. The amended complaint alleges that the BAC directors participated in and/or approved the alleged wrongs. However, such allegations, like the claim that demand would be futile because the directors would have to sue themselves, have been rejected consistently by our courts. *See Aronson v. Lewis,* 473 A.2d at 817; *see also Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Good v. Getty Oil Co.,* Del.Ch., 514 A.2d 1104, 1107-08 (1986).

Decker's allegation that BAC's liability insurance would not cover an action brought by the company against its own directors and the allegation that the directors recommended a charter amendment limiting their liability are but variations on the "directors suing themselves" and "participating in the wrongs" refrain. They provide no

Not Reported in A.2d    Page 3
1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

particularized facts creating a reasonable doubt that the directors are disinterested or independent. The fact that they receive salaries for serving as directors, likewise, is insufficient to excuse demand. *Grobow v. Perot,* 539 A.2d at 188. Finally, the suggestion that demand is excused because the directors did not respond to another stockholder's demand or because they are defending related litigation is without merit. *See Kaplan v. Peat, Marwick, Mitchell & Co.,* Del.Supr., 540 A.2d 726, 731 n. 2 (1988); *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1113 (D.Del.) *aff'd mem.,* 782 F.2d 1026 (3d Cir.1985).

**\*3** Decker seems to recognize that the list of reasons for demand futility contained in his amended complaint is insufficient. Instead, he argues that the directors are interested because the prospect is very good that they will be found liable. This argument draws on language in *Aronson* suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson v. Lewis,* 473 A.2d at 815. However, since a finding of director interest on this ground would require a finding that the second prong of the demand futility test had been satisfied, it seems more appropriate to address the question of the applicability of the business judgment rule directly.

To satisfy the second prong of the demand futility test, the factual allegations of the amended complaint must create a reasonable doubt that the BAC directors exercised proper business judgment. This analysis includes the question of whether the directors fulfilled their duty of procedural due care, by becoming fully informed, and their duty of substantive due care, by not engaging in, e.g., a waste **\*\*1029** of corporate assets. *See Grobow v. Perot,* 539 A.2d at 189. The amended complaint includes many allegations detailing United's failure to perform its student loan servicing tasks. It also details at least one method by which the Bank should have become aware of United's problems long before it did. As early as the spring of 1987, the Bank allegedly received monthly reports indicating that a substantial number of claims made with respect to the

student loans were being denied by the agencies responsible for the federal guarantees. This high denial rate should have alerted the Bank that United was not carrying out its loan servicing functions correctly. Other more specific aspects of United's operations also allegedly should have been known to the Bank. For example, for a five month period in 1988, more than 200,000 change-of-status notices were left unprocessed by United while that company was undergoing a computer conversion. The prompt processing of such status code changes is critical to the successful operation of the student loan program and the Bank allegedly knew of this problem or made no effort to discover it.

Whether these allegations would excuse demand if the defendants were the Bank and its directors would be a close question. The amended complaint alleges that serious problems existed with the student loan program and that the Bank either ignored those problems or was unaware of them for as much as a year. These allegations could possibly be enough to create a reasonable doubt that the directors of the Bank exercised due care in overseeing the student loan program.

That question need not be resolved, however, as neither the Bank nor the Bank's directors are defendants in this action. Rather, the defendants are the directors of the Bank's parent company, BAC. There are no allegations that the parent and subsidiary have the same or interlocking boards, and it appears from Decker's identification of the individual defendants that none of them is, in fact, a director of the Bank. Thus, it does not follow that any of the problems United was having, even if known to the Bank, were or should have been known to the directors of BAC. Under normal circumstances, a board of directors ought to be able to rely on its subsidiary's directors to oversee that subsidiary's management and attend to any problems that may arise. The amended complaint includes no factual allegations suggesting that the individual defendants here should not have relied upon the Bank's directors. Decker's conclusory allegations that the BAC directors "should have known" about problems with United and the student loans are unsupported and, therefore, do not create a reasonable doubt that the BAC **\*\*1030** directors neglected their duties or were grossly negligent in attempting to carry them out.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4
1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

**\*4** Based upon the foregoing, I find that the amended complaint fails to allege facts which, if true, would create a reasonable doubt as to the BAC directors' disinterest, independence or proper exercise of business judgment. Accordingly, the motion to dismiss Counts 1-4 of the amended complaint is granted. IT IS SO ORDERED.

> FN1. After this motion to dismiss had been briefed and argument had been scheduled, Steiner filed a motion to consolidate his action with Decker's and a motion to stay the consolidated actions. Both of those motions were opposed not only by defendants but also by Decker. The thrust of Steiner's argument was that, as a matter of judicial economy and comity, the same claims should not be litigated in two different jurisdictions. These, of course, are compelling considerations. However, in light of my disposition of the pending motion to dismiss all of the derivative claims in the Decker amended complaint, I conclude that the motions to consolidate and to stay are mooted.

1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Not Reported in F.Supp.2d                                                                 Page 1
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Jeffrey DOLLENS and Jeff Vukovich, derivatively on
behalf of Westell
Technologies, Inc., Plaintiffs,
v.
Marc ZIONTS, J. William Nelson, Howard L. Kirby, Jr.,
Thomas A. Reynolds, III,
Robert C. Penny, III and Melvin J. Simon, Defendants.

No. 01 C02826.

July 22, 2002.

Officers and directors moved to dismiss shareholders' derivative action. The District Court, Lefkow, J., held that: (1) shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile, and (2) except for one corporate insider, claims for breach of fiduciary duty were not sufficiently alleged since there was no basis to infer from the complaint that any of defendants was a declarant or otherwise involved in making false or misleading statements.

Motion granted in part and denied in part.

West Headnotes

**[1]** Corporations ⛤═320(5)
101k320(5) Most Cited Cases
Shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile; shareholders adequately pled that five of the eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. Fed.R.Civ.P. 23.1.

**[2]** Federal Civil Procedure ⛤═636
170Ak636 Most Cited Cases
Except for one corporate insider, claims against officers and directors for breach of fiduciary duty based on alleged misrepresentations they made to the public in order to artificially inflate company's stock price were not

sufficiently alleged since there was no basis to infer from the complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Fed.R.Civ.P. 9(b).

**[3]** Corporations ⛤═307
101k307 Most Cited Cases
Delaware law permitted a separate claim of breach of fiduciary duty against officers and directors based on insider trading.

**[4]** Corporations ⛤═320(2)
101k320(2) Most Cited Cases
Shareholders could not bring a derivative action to recover expenses from a pending securities action involving company until the case has proceeded to final judgment or settlement.

**[5]** Corporations ⛤═320(7)
101k320(7) Most Cited Cases
Shareholders' derivative claim against officers and directors for damages based on company's "integrity in the market" and "loss of goodwill" was conclusional and insufficient because shareholders did not apprise defendants of the basis and extent of the alleged damages.

*MEMORANDUM OPINION AND ORDER*
LEFKOW, J.

**\*1** This case is before the court on the motion of defendants Marc Zionts ("Zionts"), J. William Nelson ("Nelson"), Howard L. Kirby, Jr. ("Kirby"), Thomas A. Reynolds, III ("Reynolds"), Robert C. Penny, III ("Penny") and Melvin J. Simon ("Simon"), [FN1] who are or were officers or directors of Westell Technologies, Inc. ("Westell"), to dismiss the consolidated complaint brought by two individual shareholders, Jeffrey Dollens ("Dollens") and Jeff Vukovich ("Vukovich"), derivatively on behalf of Westell. In their motion to dismiss, defendants contend (1) that the complaint fails to adequately plead a prerequisite to suit, namely, that a demand by plaintiffs on Westell's board of directors to take action against defendants on behalf of the corporation would be futile, (2) that allegations of fraud underlying the claims in Counts I and II are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and (3) that Count II fails to plead a legally cognizable theory of damages. For the reasons articulated below, the court grants in part and denies in part defendants' motion to

Not Reported in F.Supp.2d                                                                 Page 2
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

dismiss.

> FN1. Defendants currently hold or held the following positions at Westell: Zionts was Chief Executive Officer ("CEO") from December 1997 until March 1, 2001 and a director from January 2000 until March 1, 2001; Nelson was President and Chief Operating Officer from December 1997 until March 1, 2001 when he became CEO succeeding Zionts and a director since January 2000; Kirby has been a director since March 2000; Reynolds has been a director since January 2000; Penny has been a director since 1998; and Simon has been the Assistant Secretary and Assistant Treasurer and a director since 1992.

MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kennedy v. Nat'l Juvenile Det. Ass'n,* 187 F.3d 690, 695 (7th Cir.1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999); *Zemke v. City of Chicago,* 100 F.3d 511, 513 (7th Cir.1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th

Cir.1990) ("Although states of mind may be pleaded generally [under Rule 9(b) ], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.").

FACTS

Plaintiffs' consolidated derivative complaint alleges the following facts, which are taken as true for purposes of this motion: Nominal defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, is a provider of Digital Subscriber Line ("DSL") technology, which allows high-speed data to be transported through local telephone lines. (Compl.¶ 13.) On May 9, 2000, financial analyst Charles Pluckhahn ("Pluckhahn") of Stephens, Inc., issued a report, stating "[o]n a conference call with analysts, Westell's management indicated that its largest customer of CPE [customer premises equipment] is still unannounced and this new customer would continue to be its largest during the coming fiscal year." Although this customer was "unannounced," Westell "leaked" to analysts that SBC Communications ("SBC"), was driving demand for Westell's DSL equipment. (*Id.* ¶ 14.) Specifically, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., reported on May 16, 2000 that:

> **\*2** Demand for DSL related equipment (about 44% of company revenues) continues to be very strong, with good visibility extending for the next three months. Accelerated deployment of DSL service by British Telecom and SBC Communications (an unannounced customer) are driving this performance.

(*Id.*) The net effect of these positive reports was that the price of Westell stock received a temporary bounce to close at $28 a share on May 17, 2000; on June 26, 2000, however, the price of stock closed at $14.6875 a share. (*Id.* ¶¶ 15-16.)

Despite the positive reports, defendants knew by late June 2000 that SBC would be cutting back its purchases of DSL modems from Westell. Defendants acquired this non-public information through their positions as directors and/or senior officers of Westell and their receipts of reports, attendance at meetings, and access to all of Westell's books, records and other proprietary information. (*Id* . ¶ 12.) Defendants realized that when this information became public, it would seriously affect Westell's revenues, earnings

Not Reported in F.Supp.2d                                                          Page 3
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

and price of common stock. (*Id.* ¶ 16.) Defendants thus embarked on a massive hype campaign to inflate the price of Westell's stock so that they could unload as much stock as possible before the news concerning SBC's cutbacks in purchases of Westell's DSL modems became public. (*Id.*)

For example, Westell announced on June 28, 2000 that it entered into a new partnership (although it did not specify with whom or what company) to meet the "expanding demand" for its products because it was "running at full capacity in its existing Aurora facility." (*Id.* ¶ 17.) On June 29, 2000, Barry Sine ("Sine"), an analyst at Kaufman Brothers, reported that he spoke with Westell and that "[b]ased on the massive demand for DSL services by Westell's customers," he expected Westell to report strong results for the June quarter. (*Id.* ¶ 18.) He further reported "we believe SBC Communications will again be the company's largest account, despite the fact that it is still an unannounced customer." Sine then issued a "Strong Buy" rating on Westell with a price target of $65 a share. (*Id.* ¶¶ 17-18.)

On July 7, 2000, Bellace issued a "Buy" rating on Westell with a $50 price target. (*Id.* ¶ 19.) As a result of his consultations with officers at Westell, he projected that Westell's 2001 revenues (for the period April 1, 2000 to March 31, 2001) would be $400 to $425 million. As with Sine, Bellace did not know about SBC's cutbacks. On the same day Bellace issued his Buy report, Westell stock increased by 25%, ending at $19 a share.

On July 18, 2000, Westell issued what one analyst called a "blockbuster announcement." (*Id.* ¶ 20.) Westell announced that it had established a supplier relationship with SBC. Analysts following Westell responded with uniformly positive reports. On July 20, 2000, an analyst at Kaufman Brothers issued a report reiterating its "Strong Buy" on Westell and $65 price target. The report stated:

**\*3** Westell Technologies followed yesterday's blockbuster announcement that it had won SBC Communications (SBC $43 5/8) as a customer with second quarter results that were well above our estimate, consensus, whisper and even telepathic expectations.... The key driver of revenue was the company's DSL customer premises equipment (CPE) business, which posted $61.9 million in revenue,

40% higher than our estimate and up 282% sequentially.

                         * * *

We are today more bullish on shares of Westell Technologies than ever.
(*Id.* ¶¶ 20-22.)

Similarly, on July 21, 2000 another analyst at Chase Hambrecht & Quist Inc. issued a report rating Westell a "Buy" with a $70 price target. The report stated that:

Growth was once again driven by rapid acceleration in the Company's DSL businesses; [w]e believe that the Company maintains numerous opportunities for additional upside as it continues to capitalize upon its strong relationships with its strategic partners....

                         * * *

It appears that Westell's DSL businesses continue to fire on all cylinders.
(*Id.* ¶ 23.) As a result of Westell's announcement, the market's reaction was swift and dramatic. (*Id.* ¶ 21.) The price of Westell's common stock rose up to $28.50 a share by July 21, 2000 and closed at $30 a share on July 25, 2000.

From July 21 to August 1, 2000, defendants sold about 450,000 shares of Westell stock total, reaping proceeds of almost $11.5 million. (*Id.* ¶ 24.) Specifically, between July 21 and August 1, 2000, Zionts, who had never sold any Westell stock before this time, sold 231,440 shares at between $28 and $29 a share or approximately 65% of his holdings, reaping proceeds of $5,557,730; on July 21, 2000, Nelson sold 100,000 shares at $27.38 a share or approximately 40% of his holdings, reaping proceeds of $2,738,000; between July 24 and August 1, 2000, Kirby, who had never sold any Westell stock before this time, sold 80,000 shares at between $22.79 and $29.09 a share or approximately 20% of his holdings, reaping proceeds of $2,057,700; on July 24, 2000, Reynolds sold 27,200 shares at $28.46 a share or approximately 30% of his holdings, reaping proceeds of $774,122; on July 25, 2000, Penny sold 4,098 shares at $30 a share, reaping proceeds of $122,940; and on July 25, 2000, Simon sold 5,000 shares at $30 a share, reaping proceeds of $150,000. (*Id.* ¶ 10(a)-(f).)

Only days after defendants unloaded their Westell stock, the

Not Reported in F.Supp.2d                                                                                                    Page 4
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

real story about SBC's cutbacks emerged. In early August, Bellace reported that SBC had, beginning in June 2000, changed its purchasing requirements for DSL modems, and thus would be ordering fewer modems in the future from Westell. (*Id.* ¶ 25.) The stock price tumbled right back to the mid-to-high teens immediately upon release of the news (which was admittedly known by Westell management six to eight weeks earlier). (*Id.*) As was later reported by Pluckhahn, it was not merely a decline in usage by SBC that had caused Westell's problems but also that SBC had begun purchasing more from Westell's main competitor, Efficient Networks. (*Id.*)

**\*4** On October 18, 2000, Westell admitted that the decline in orders from SBC would have a material negative effect on its revenues and earnings. Westell reported second quarter DSL revenues of $49.5 million, many millions lower than what it had assured analysts two months earlier. As a result of this announcement, Westell's stock price dropped to $5.94 a share on October 19, 2000.

Since the release of the various negative reports and with Westell's poor growth prospects, several Westell shareholders commenced a class action on or about October 27, 2000 against Westell (and others), alleging that Westell's public disseminations were materially false and misleading in violation of federal securities laws. [FN2] Further, on or about August 2, 2001, plaintiffs filed the instant derivative action against nominal defendant Westell and the six named defendants, alleging various breaches of fiduciary duties for insider trading and misappropriation of information under Count I and for exposing Westell to significant liability and damages under Count II.

> FN2. There is also the federal securities class action *In re Westell Technologies, Inc. Sec. Litig.*, No. 00 C 6735, which is related to the instant derivative action. (*See* Order, Sept. 4, 2001).

## DISCUSSION
### A. Dismissal for failure to plead demand futility

[1] In a derivative action, a shareholder plaintiff seeks to enforce a right that belongs to the corporation. *See Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 95, 111 S.Ct. 1711,*

114 L.Ed.2d 152 (1991). "[G]iven 'the basic principle of corporate governance that the decisions of a corporation-including the decision to initiate litigation-should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors." *In re Abbott Laboratories Derivative Shareholders Litig., 293 F.3d 378, 386* (7th Cir.2002), quoting *Kamen, 500 U.S. at 95*. A pre-suit demand "allows the directors to exercise their business judgment and determine whether litigation is in the best interest of the corporation." *In re Abbott, 293 F.3d at 386*.

Federal Rule of Civil Procedure 23.1 requires the derivative complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Because the requirement of a shareholder plaintiff to make a demand on the board of directors "is more than a pleading requirement, it is a substantive right of the shareholder and the directors[.] ... [T]he law of the state of incorporation ... controls these substantive rights and governs what excuses are adequate for failure to make a demand." *In re Abbott, 293 F.3d at 387*. Delaware is Westell's state of incorporation and the parties agree that Delaware law applies here.

Plaintiffs concede that they made no demand on Westell's board of directors prior to filing their complaint. However, they aver that a demand would have been futile because five of the eight directors on Westell's board personally benefitted from conduct alleged in their complaint and, therefore, were interested and could not have impartially responded to a demand. (Compl.¶¶ 11, 44.) In determining whether a demand would be futile, the court must consider whether

> **\*5** ... the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales v. Blasband, 634 A.2d 927, 933-34 (Del.1993).* [FN3]

Not Reported in F.Supp.2d                                                              Page 5
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

"To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility ... [n]or must plaintiffs demonstrate a reasonable probability of success on the merits." *McCall v. Scott,* 239 F.3d 808, 816 (6th Cir.2001), citing *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988) and *Rales,* 634 A.2d at 934.

> FN3. Because plaintiffs assert that they are not challenging a business decision by Westell's board of directors, the demand futility test in *Rales,* 622 A.2d at 934, and not *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), applies here. *See In re Abbott,* 293 F.3d at 387, 388 n. 3.

"[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together." *McCall,* 239 at 816-17. A director is interested when "he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders." *Id.* at 825, quoting *Rales,* 634 A.2d at 936. However, "the 'mere threat' of personal liability in the derivative action does not render a director interested[.]" *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Rather, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director." *McCall,* 239 F.3d at 825, citing *Rales,* 634 A.2d at 936. Moreover, "[e]ven if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons." *Seminaris,* 662 A.2d at 1354. A director is independent if he can make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Rales,* 662 A.2d at 936, quoting *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

Defendants assert that the complaint fails to plead a substantial likelihood of liability on the part of the director defendants (Nelson, Kirby, Reynolds, Penny and Simon) because it does not attribute any of the alleged

misrepresentations or knowledge of the SBC problems to these defendants. Defendants further contend the complaint alleges only that defendants are directors (with the exception of Nelson who also is CEO and Simon who also is the Assistant Secretary and Assistant Treasurer) and sold Westell stock, and rely primarily on *McCall,* 239 F.3d at 825. [FN4] Plaintiffs assert the director defendants were clearly interested because they knew public disclosure of the decline in orders by SBC would have a material effect on Westell's stock price and sold their stock from July 21 to August 1, 2000. Plaintiffs rely on *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115-16 (S.D.N.Y. Mar.9, 2000) and *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* No. 12584, 2000 WL 1664167, at *6-7 (Oct. 31, 2000).

> FN4. Moreover, defendants argue the complaint fails to plead that there is a substantial likelihood of liability on the part of the director defendants because it does not allege they engaged in conduct more egregious than mere or gross negligence and also point to Westell's Charter, which precludes directors' liability for actions based on negligence or gross negligence under Section 102(b)(7) of the Delaware Code, 8 Del. Laws 102(b)(7) (2000). Plaintiffs, however, apparently do not intend to pursue a claim for breach of duty of care (Resp. at p. 8) although they aver in their derivative complaint that "[t]he Director Defendants' sales of Westell stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties of loyalty, good faith, and *due care.*" (Compl.¶ 37) (emphasis added). Thus, the court does not consider whether plaintiffs adequately plead demand futility based on defendants' alleged breach of duty of care or other negligent conduct. See *McCall v. Scott,* 239 F.3d 808, *reh'g granted,* 250 F.3d 997 (6th Cir.2001), addressing the demand futility exception with respect to directors' liability based on a breach of duty of care claim.

**\*6** In *McCall,* the court held that the plaintiffs' derivative complaint did not adequately plead demand futility under

Not Reported in F.Supp.2d                                                              Page 6
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

Delaware law based on insider trading allegations because it did not link the directors' alleged acquisition of non-public material information with their stock sales. 239 F.3d at 825-26. The court recognized that "when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events." Id. at 825. As such, it concluded "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.... Further, fraudulent intent may be inferred from the timing and quantities of the trades." Id. (internal citations and quotations omitted).

In applying these standards, the *McCall* court looked at the plaintiffs' factual allegations of insider trading over a two year period or from January 1995 to April 1997 and found that the plaintiffs only generally averred that some of the directors sold millions of dollars of the company's stock "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." Id. Moreover, the court determined that some of these director defendants maintained their substantial holdings of company stock during this time period and that the plaintiffs also failed to plead, regarding certain directors, the "relative holdings or the timing of the transfers." Id. The court then concluded "[a]lthough relying upon the 'red flags' to allege that the directors knew or recklessly disregarded [the company's] improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to those warnings." Id. at 825-26.

In In re Oxford Health Plans, Inc., 192 F.R.D. at 115-16, the court held that the plaintiffs properly pled demand futility where the director defendants knew of management's misrepresentations to the financial markets concerning the company's financial crisis but feared that taking action would harm the company's market price, result in increased regulatory oversight, slow the growth of the company, and jeopardize their personal and financial interests and their personal ties to the company's CEO. It further determined that any independence or disinterested status of the directors was lost because two of the director defendants sold company stock when they were in possession of material non-public adverse information.... and another director

received substantial annual contract payments through the board.

In In re Cooper Companies, Inc. Shareholders Derivative Litig., 2000 WL 1664167, at *6-7, the court held that the plaintiffs properly pled demand futility because three directors including the co-chairman profited from and/or participated in a fraud scheme to profit from the purchase and sale of bonds based on inside information. Further, it concluded that two directors lacked independence because they were corporate inferiors to the co-chairman and absented themselves from an emergency board meeting.

**\*7** After a review of these cases, the court concludes that plaintiffs' allegations do create a reasonable doubt that a majority of Westell's board of eight directors could have exercised disinterested and independent business judgment in responding to a shareholder demand. Defendants attempt to distinguish *In re Oxford Health Plans, Inc.* and *In re Cooper Companies, Inc. Shareholders Derivative Litig.* by arguing that the plaintiffs in those cases pled more particularized facts. Plaintiffs' allegations here, however, are similar to the facts pled in those cases because, although plaintiffs do not specify the exact manner in which defendants knew SBC would order fewer modems from Westell (Compl ¶¶ 10, 12), plaintiffs allege the director defendants learned about this non-public information by late June 2000 and sold their Westell stock when the price was artificially inflated by Westell's "blockbuster announcement" that it won SBC as a customer. Further, right after the director defendants sold their stock, the negative news of SBC's cutbacks became public and Westell stock declined from a high of $30 a share to the mid-to-high teens.

Moreover, unlike the facts in *McCall* where the court examined insider trading allegations within a time period of over two years or from January 1995 to April 1997, here plaintiffs' allegations focus on a ten day time period during which the director defendants sold their Westell stock. Specifically, plaintiffs allege Nelson unloaded 40% of his holdings between July 24 and August 1, 2000; Kirby, who never sold Westell stock before, unloaded 20% of his holdings on July 24; and Reynolds unloaded 30% of his holdings on July 25. Although in smaller amounts, still

Not Reported in F.Supp.2d                                                    Page 7
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

coincident in timing, Simon sold 5,000 shares, and Penny sold 4,098 shares on July 25, realizing profits of $150,000 and $122,940, respectively. [FN5] As to Simon, a director and the Assistant Secretary and Assistant Treasurer, and Penny, an outside director, plaintiffs do not allege that Simon or Penny unloaded large amounts of their personal holdings of Westell stock or that prior to that time period, they never traded their Westell stock. However, Delaware law provides that "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information, ... the insider trading claims should be viewed collectively." *Strougo v. Carroll,* No. 8040, 1991 WL 9978, at *4, 17 Del. J. Corp. L. 352, 362 (Del. Ch. Jan. 29, 1991) (unpublished); *see also In re Gen. Instrument Corp. Sec. Litig.,* 23 F.Supp.2d 867, 874 (N.D.Ill.1998), quoting *Strougo.* As such, plaintiffs have adequately pled that five of Westell's eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. *See Strougo, 1991 WL 9978, at *4, 17 Del. J. Corp. L. at 362* ("Common sense suggests that, at a board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."). Accordingly, defendants' motion to dismiss for failure to plead demand futility is denied.

FN5. Plaintiffs include Zionts' sales of stock during that ten day period when arguing that the director defendants were interested. However, when plaintiffs filed their derivative complaint in August 2001, Zionts had not been a director for approximately five months or since March 2001. *Rales,* 634 A.2d at 934 (stating demand futility pled "as of the time the complaint is filed"); (*see also* Compl. ¶ 11.)

B. Dismissal for failure to plead fraud with particularity

*8 Alternatively, defendants argue that even if plaintiffs' demand is excused as futile, plaintiffs' complaint should be dismissed for failure to plead fraud with specificity in Counts I and II under Federal Rule of Civil Procedure 9(b).

Plaintiffs respond (in a footnote) that they do not need to plead their claims for breach of fiduciary duty under Rule 9(b) (Resp. p. 10 n. 5) but plaintiffs also rely on *In re Cendant Corp. Derivative Action Litig.,* in which the court applied the Rule 9(b) standard. 189 F.R.D. 117, 131 (D.N.J.1999) (holding the plaintiffs pled fraud with particularity in their insider trading claim under Delaware law because the plaintiffs alleged the defendants knew at the time of their stock sales that the company's earning reports were inflated by accounting improprieties, which would cause the inflated price of the company's stock to fall down).

Although plaintiffs claim they are only alleging that defendants engaged in insider trading, they also allege that defendants made misrepresentations to the public in order to artificially inflate Westell's stock price. [FN6] Indeed, plaintiffs' derivative complaint arises from the same operative facts as those identified in the class action complaint in *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735 (see Mem. Op. and Order, Oct. 26, 2001 at p. 20). [FN7] Therefore, the court will apply Rule 9(b). *See In re Gen. Instrument Corp. Sec. Litig.,* No. 96 C 1129, 1997 WL 610452, at * 10 (N.D.Ill. Sept.24, 1997).

FN6. Plaintiffs make the following allegations: Westell disseminated false and misleading information (Compl.¶ 4) and kept the public "in the dark about the nature and extent of the SBC problem" (*Id .* ¶ 19), and defendants engaged in "a massive hype campaign ... to inflate the price of the Company's stock[.]" (*Id.* ¶ 16.)

FN7. Whether plaintiffs meet the Rule 9(b) standard involves another argument raised by defendants in their motion to dismiss, which is that Nelson, Kirby, Reynolds, Penny and Simon be dismissed for the same reasons the court dismissed Nelson, Kirby and Reynolds as defendants in the *In re Westell Technologies, Inc. Sec. Litigation,* No. 00 C 6735. Therefore, the court addresses that argument here as well.

[2] In the class action, the plaintiff alleged that defendants Zionts, Nelson, Kirby, Reynolds and other defendants not

Not Reported in F.Supp.2d                                                                      Page 8
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

named in the instant derivative action violated the Securities Act of 1934 by knowingly and/or recklessly making false and misleading statements to the class plaintiffs through press releases and conversations with analysts. Further, the plaintiff alleged that some of these defendants personally profited from these misrepresentations by selling their personal holdings to the class plaintiffs after artificially inflating the price of Westell stock. On defendants' motion to dismiss, the court found it could be reasonably inferred from the plaintiff's class complaint that Westell's spokesperson made the allegedly false and misleading statements as authorized by Zionts and other Westell top management. However, the court dismissed Nelson, Kirby and Reynolds as defendants because there was no basis to infer from the class complaint that any of them was a declarant or otherwise involved in making false or misleading statements even though it found the plaintiff alleged a strong inference of scienter based on insider trading as to Nelson, Kirby and Reynolds as well as Zionts.

[3] For these same reasons, all of the defendants except for Zionts must be dismissed with respect to any claims of breach of fiduciary duty based on alleged misrepresentations they made to the public since there is no basis to infer from plaintiffs' derivative complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Nevertheless, Delaware law provides a separate claim of breach of fiduciary duty based on insider trading. *See In re Cendant Corp. Derivative Action Litig., 189 F.R.D. at 131 (D.N.J.1999); accord Oberly v. Kirby, 592 A.2d 445, 463 (Del.1991)* ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the fiduciary [,]" citing *Brophy v. Cities Serv. Co., 70 A.2d 5, 7 (Del.Ch.1949)*). Thus, for the same reasons plaintiffs adequately pled demand futility, the claim for insider trading will remain against each defendant. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity is granted in part and denied in part with respect to Counts I and II.

C. Dismissal for failure to plead a legally cognizable theory of damages under Count II

*9 Defendants next move to dismiss Count II, asserting plaintiffs fail to plead a legally cognizable theory of damages. Specifically, defendants argue that plaintiffs' claims for damages based on Westell's potential exposure in defending class actions including significant legal liability and costs is premature and damages based on harm to Westell's integrity in the market and goodwill is conclusional.

[4] With respect to plaintiffs' claim for damages based on Westell's exposure to defending class actions, plaintiffs cannot bring a derivative action to recover expenses from a pending securities action involving Westell until the case has proceeded to final judgment or settlement. *In re United Telecomm., Inc. Sec. Litig., No. 90-2251-EEO, 1993 WL 100202, at *3 (D.Kan. Mar.4, 1993); cf. In re Symbol Tech. Sec. Litig., 762 F.Supp. 510, 516-17 (E.D.N.Y.1991)* (holding that the derivative plaintiff could not seek litigation expenses associated with a securities class action that had not yet proceeded to final judgment or settlement under a claim for corporate waste). Thus, this claim for damages is premature and must be dismissed. *See In re Symbol, 762 F.Supp. at 516-17.*

[5] Moreover, with respect to plaintiffs' claim for damages based on Westell's "integrity in the market" and "loss of goodwill" (Compl.¶¶ 4, 27, 28, 41), this claim is conclusional and insufficient because plaintiffs do not apprise defendants of the basis and extent of the alleged damages. *In re United Telecomm., 1993 WL 100202, at *2; accord In re Symbol, 762 F.Supp. at 517* (rejecting an injury in the marketplace theory and stating "damages must be shown to directly flow from the wrongful acts of defendants, and not the mere commencement of legal proceedings against the corporation."). Therefore, this claim is dismissed. [FN8]

> FN8. However, where plaintiffs allege that defendants are liable to Westell under Count II (Compl.¶ 42), a claim for damages based on that allegation is legally cognizable since Delaware law "has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties." *In re Symbol, 762 F.Supp. at*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 9
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

517. Therefore, that claim for damages under Count II must remain.

Accordingly, defendants' motion to dismiss Count II for failure to plead a legally cognizable theory of damages is granted in so far as plaintiffs plead damages based on Westell's defending the pending federal securities action (Compl.¶¶ 4, 27, 41) and Westell's loss of integrity in the market (*id.* ¶¶ 28, 41) and goodwill (*id.* ¶ 41).

### ORDER

Wherefore, and for the reasons stated above, defendants' motion to dismiss plaintiffs' verified derivative complaint [# 26-1] is granted in part and denied in part.

2002 WL 1632261 (N.D.Ill.)

END OF DOCUMENT

# EXHIBIT 5

Westlaw.

Not Reported in A.2d                                                                                                Page 1
1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690
**(Cite as: 1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690)**

**H**
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

In re GRACE ENERGY CORPORATION
SHAREHOLDERS LITIGATION.

**Civ. A. No. 12,464.**

Submitted: June 18, 1992.
Decided: June 26, 1992.

On Plaintiffs' Motion for a Preliminary Injunction: Denied.

**691** Pamela S. Tikellis, Carolyn D. Mack, James C. Strum, and Robert J. Kriner, Jr., Greenfield **692** & Chimicles, Wilmington, Co-Lead and Co-Liaison Counsel; Joseph A. Rosenthal, and Kevin Gross, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Co-Liaison Counsel; of counsel: Berger & Montague, Philadelphia, Pa., Abbey & Ellis, Lowey, Dannenberg, Bemporad & Selinger, P.C., and Goodkind, Labaton, Rudoff & Sucharow, New York City, for plaintiffs.

R. Franklin Balotti, William F. Mongan, David L. Zicherman, Richards, Layton & Finger, Wilmington, of counsel: Cravath, Swaine & Moore, New York City, for defendants Grace Energy Corporation, Broun, Hutton and Moore.

Anthony W. Clark, Rodman Ward, Jr., Jay W. Eisenhofer, and Stuart M. Grant, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants W.R. Grace & Co. and Grace, Bolduc, Wright, Robbins and Grimm.

MEMORANDUM OPINION
HARTNETT, Vice Chancellor.

**\*1** Plaintiffs, minority shareholders of defendant Grace Energy Corporation, have moved to preliminarily enjoin the closing of a tender offer for the minority shares made by Grace Energy's majority stockholder, defendant W.R. Grace & Co. Because plaintiffs have failed to show the reasonable probability that facts essential to their claims are true, and

because the equities favor defendants, the motion for a preliminary injunction must be denied.

Grace Energy Corporation ("Energy") is a diversified energy holding company, comprised of seven individual companies: Grace Petroleum Company, Colowyo Coal Company, Support Terminal Services, Grace Drilling Company, Grace Offshore Company, Homco International, and Sea Oil Homco Limited. There are approximately 24.57 million shares of Energy outstanding, and defendant W.R. Grace & Co. ("Grace") owns 83.4% of those shares. The remaining 16.6% of Energy's shares are listed and traded on the New York Stock Exchange.

**\*\*693** Grace announced in mid-January 1991 that it planned a restructuring that would permit it to focus only on its core businesses of specialty chemicals and healthcare. One aspect of this restructuring would be the divestiture of Grace's interest in Energy. This was announced to Grace's shareholders in November 1991 as part of the company's new strategic plan.

On February 28, 1992, Grace's Board of Directors met to consider a recommendation by Grace management that Grace make a proposal to Energy's Board whereby Grace would acquire for cash all outstanding shares of Energy. After consulting with its legal advisors and its financial advisor, First Boston Corporation ("First Boston"), the Grace directors authorized an offer of $16.50 per share to the minority shareholders of Energy. Just prior to that authorization, Energy stock was trading at $12.50 per share.

J.P. Bolduc, President and Chief Operating Officer of Grace, contacted those directors of Energy who held no director or management positions with Grace and informed them of the terms of Grace's offer. Those directors are Edward L. Hutton, Edwin C. Broun, and Thomas P. Moore. Each owns stock in Energy.

Energy's Board of Directors met on March 5, 1992 in order to consider Grace's offer. Directors Hutton, Broun and Moore were appointed as a Special Committee that was charged with exploring Grace's offer and making recommendations to the full Board. The Board also authorized the Special Committee to engage its own legal

Not Reported in A.2d                                                                                    Page 2
1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690
**(Cite as: 1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690)**

and financial advisors to assist it. The Special Committee thus retained Cravath, Swaine and Moore as its legal counsel, and Goldman Sachs & Co. ("Goldman Sachs") and Simmons & Company International ("Simmons") as its financial advisors.

Goldman Sachs and Simmons conducted separate due diligence reviews of Energy and its component businesses, with members of the Special Committee periodically reviewing their work and offering additional guidance. After completion of the due diligence reviews, the Special Committee met with its legal and financial advisors on April 20 and 21, 1992 to discuss and evaluate the findings.

**\*2** After reviewing the Goldman Sachs and Simmons analyses, the Special Committee "concluded that the proposed price of $16.50 per share was not fair to the minority shareholders and that the Committee should endeavor to negotiate an improved transaction with Grace." The Special Committee advised Grace that the offered price of $16.50 per share was not fair to Energy's minority shareholders and that the offer was therefore rejected.

**\*\*694** Having rejected Grace's initial offer, the Special Committee then undertook to negotiate a higher price for the minority shares. Goldman Sachs and Simmons were advised to develop a range of values that the Special Committee could utilize in the negotiation process. The range developed by the financial advisors was "in the high teens to the mid-twenties per share." It remains disputed whether this range was an expression of fair value or whether it was simply meant to provide the Special Committee with leverage for the negotiations.

On April 22, 1992, senior executives of Grace and First Boston met with the Special Committee and its advisors, Goldman Sachs and Simmons. Each side presented its negotiation ranges and discussed their calculations. Due to the broad discrepancies between the ranges, the meeting was adjourned without further progress. Grace and the Special Committee authorized their respective financial advisors to continue meeting so that they could identify the source of the differences between the ranges.

In the ensuing weeks, the financial advisors resolved some

of those differences, which apparently resulted in First Boston's raising its negotiation range and Goldman Sachs and Simmons' lowering their range. This process was explained to the Special Committee in a meeting with its financial advisors on May 20, 1992.

Immediately after that meeting with its financial advisors, the Special Committee reconvened its negotiations with Grace. As was done before, each of the financial advisors presented their negotiation ranges. The Special Committee and its financial and legal advisors then met separately to discuss the presentations. The Special Committee then returned to the closed meeting with Grace and an offering price of $19.00 per share was tentatively agreed upon.

After receiving an offer of $19.00 per share from Grace, the Special Committee again met separately with Goldman Sachs and Simmons. Both financial advisors indicated that they would, after following their own mandated procedures, formally opine that the new offering price was fair to the Energy minority shareholders. The Special Committee felt it was unlikely that Grace would go any higher, and therefore determined to recommend the offer to the entire Energy Board.

On May 26, 1992, after Goldman Sachs and Simmons delivered their written opinions that the $19.00 per share offering price was fair to the minority shareholders, Energy signed the Merger Agreement with Grace. Grace announced the execution of the Merger Agreement that same day, and on June 1, 1992 commenced the Tender Offer **\*\*695** for the minority shares of Energy with the filing of its Schedule 14D-1 with the Federal Securities and Exchange Commission ("SEC").

II

**\*3** The genesis of this litigation is four class action suits that were filed by minority shareholders of Energy against Energy, its Board of Directors, and Grace when the initial $16.50 per share offer was announced. Those class actions were consolidated by this Court, and on June 3, 1992 plaintiffs filed a consolidated amended complaint. After expedited discovery, plaintiffs filed a motion to preliminarily enjoin the completion of Grace's Tender Offer,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3
1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690
**(Cite as: 1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690)**

that is now due to expire at midnight on June 26, 1992.

The issue underlying all of plaintiffs' claims is whether Grace and the Energy Board sufficiently disclosed to the minority shareholders of Energy the existence of certain third party offers and inquiries regarding the assets of Energy that were received by Grace after it announced the proposed divestiture of Energy in January 1991.

Grace's original disclosure documents filed with the SEC purported to include two lists of expressions of interest in Energy, as "Schedule 4.09" and "Schedule 5.05", but neither document was filed with the SEC at that time. Rather, those schedules were filed by Grace last week, and apparently will not be disseminated to the minority shareholders before the Tender Offer deadline, if at all.

Plaintiffs contend that due to an inadequate disclosure of third-party offers and inquiries, Grace's Offer to Purchase contains material omissions and misrepresentations. Plaintiffs also claim that the Special Committee's decision-making process was flawed and this flaw was not disclosed to the minority shareholders. Plaintiffs conclude that the minority shareholders are without adequate information and guidance to make an intelligent decision about whether to tender, and that Grace's offer should therefore be enjoined.

### III

Plaintiffs first allege that the members of the Special Committee breached their fiduciary duty of care in reaching the decision to recommend the $19.00 per share offer to Energy's full Board and that this breach was not disclosed in the Offer to Purchase materials. Plaintiffs claim that the Committee members failed to obtain from Grace a complete list of all third party expressions of interest in acquiring Energy or its component businesses. Plaintiffs rely exclusively **696 on language in the deposition testimony of one of the Special Committee members, Thomas Moore, wherein he indicated that the Committee had reviewed only one third party offer or inquiry, and that he had no recollection of ever seeing Schedules 4.09 or 5.05.

Plaintiffs have, however, taken Mr. Moore's remarks out of context. Earlier in his deposition Mr. Moore indicated that he had seen a list of third party expressions of interest in Energy, although perhaps not in the finalized form as it appears in Schedules 4.09 and 5.05. The most plaintiffs have shown therefore is that there appear to be some inconsistencies in his rather vague statements.

The Court, from the present record, cannot determine that the Special Committee was actually uninformed about outside offers for Energy. Plaintiffs have therefore failed to meet their burden of showing the reasonable probability of success on this claim. *See In re Mesa Limited Partnership Preferred Unitholders Litigation,* Del.Ch., C.A. No. 12,243-NC, Hartnett, V.C. (Dec. 10, 1991); *McConnell v. Emory,* Del.Ch., C.A. No. 10,678-NC, Hartnett, V.C. (Sept. 28, 1989). Plaintiffs' motion for a preliminary injunction therefore cannot be granted on this ground.

### IV

**\*4** Plaintiffs also allege that Mr. Moore and Mr. Hutton, members of the Special Committee, breached their fiduciary duty of loyalty by taking on the role of an independent negotiating committee when in fact they had conflicts of interest. Plaintiffs point to the fact that two directors from the Grace Board also serve as directors on the board of Chemed Corporation, a specialty chemical company whose President and Chief Executive Officer is Special Committee member Edwin Hutton. Chemed Corporation was financed by Peter Grace, a major stockholder of Grace, and Mr. Hutton is apparently a long time friend of the Grace family. Plaintiffs therefore conclude that Mr. Hutton is beholden to Grace.

Plaintiffs have failed, however, to carry their burden of showing that Mr. Hutton is currently financially beholden to the Grace family or that he would favor the financial interests of Grace over those of the Energy minority. Defendants have sufficiently demonstrated that whatever financial assistance the Grace family once provided Mr. Hutton has since been repaid. All that remains of plaintiffs' contentions of Mr. Hutton's interest in the transaction is the personal friendship he enjoys with the Grace family, and the Delaware Supreme Court has made it clear that conclusory allegations of such **697 personal affinity alone are not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 4
1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690
(Cite as: 1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690)

sufficient to establish director interest. Actual financial interest must be shown. *See Smith v. VanGorkom,* Del.Supr., 488 A.2d 858 (1985); *cf.* 8 *Del.C.* § 144(a).

Plaintiffs' next claim that a single ambiguous statement in Thomas Moore's deposition, taken out of context, reveals that Mr. Moore has an economic conflict of interest. The statement however, as defendants have demonstrated, does not show that Mr. Moore had any conflict.

Plaintiffs also find fault with the fact that Mr. Moore's employer, State Street Research and Management, controls over 700,000 shares of Energy. Plaintiffs have failed to show, however, how this would cause Mr. Moore to have any interest other than maximizing the value to be received by the minority shareholders of Energy, including his employer and himself.

Having failed to meet their burden of showing the reasonable probability that the Special Committee breached its duty of loyalty due to conflicts of interest, plaintiffs are not entitled to a preliminary injunction on that ground.

### V

In further support of their motion for a preliminary injunction, plaintiffs allege that Grace, as Energy's majority shareholder, has breached its fiduciary duty to Energy's minority. Plaintiffs claim that Grace's offer is not entirely fair to the minority shareholders because Grace is trying to eliminate the minority so that it can reap the profits of the subsequent divestiture of Energy. *See Roland International Corp. v. Najjar,* Del.Supr., 407 A.2d 1032, 1034 (1979). Plaintiffs maintain that Grace's Offer to Purchase omits and misrepresents material information in Grace's possession regarding the interest of third parties in acquiring Energy or its component businesses, as well as the Special Committee's lack of knowledge of those third party inquiries.

### VI

**\*5** Plaintiffs contend that Grace has breached its disclosure duties because Grace's Offer to Purchase misrepresents the Special Committee's knowledge of third partys' expressions of interest in acquiring Energy, in whole or in part. Plaintiffs cite the following language from the Offer to Purchase:

"[S]ince the Grace announcement in January 1991 that the Company ... would be divested, a number of parties had **\*\*698** indicated an interest in acquiring certain assets of the Company or its subsidiaries and in some cases indicated a potential price at which they would be interested. *The Company disclosed all such indications of interest to the Special Committee and its advisors prior to the delivery of the Special Committee's Financial Advisors' written fairness opinions and prior to the execution of the Merger Agreement.*

Offer to Purchase at 21 (emphasis added).

According to plaintiffs, this statement is false. This assertion seems to be based, at least in part, on Special Committee member Thomas Moore's deposition testimony that the Committee had reviewed only one third party offer or inquiry, and that he had no recollection of ever seeing Schedules 4.09 or 5.05.

When Mr. Moore's statement is read in connection with the rest of his deposition testimony, however, it is unclear exactly which of the third party inquiries were brought to the attention of the Special Committee. Furthermore, the deposition testimony of the representatives of the Special Committee's advisors is similarly unclear as to their knowledge of outside interest in Energy.

In short, plaintiffs have not adequately demonstrated that the Special Committee and its advisors were not aware of the indications of third party interest. That contention is simply not supported by the present factual record. Plaintiffs are therefore not entitled to a preliminary injunction on this ground.

### VII

Finally, plaintiffs allege that the Offer to Purchase is materially false and misleading because the Schedules 4.09 and 5.05 are not attached to the Merger Agreement despite that the Merger Agreement states that they are attached thereto. Even though the Schedules have since been filed with the SEC, defendants will apparently not be disseminating them directly to the shareholders. Plaintiffs argue that filing the documents only with the SEC is not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 5
1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690
**(Cite as: 1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690)**

effectively disclosing the information contained therein because in order to see them a shareholder would have to order copies at his own expense.

According to plaintiffs, the information contained in the Schedules regarding third party expressions of interest in Energy's assets is exactly the type of information a shareholder would want to possess when deciding whether to tender his stock. Because these Schedules were omitted from the Offer to Purchase, plaintiffs conclude that Grace has violated its duty to disclose this material information.

**\*\*699** Plaintiffs are correct that the disclosure of third party inquiries and informal offers for Energy or its components normally would have "significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976). The information contained in the Schedules is therefore material and should have been disclosed. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985).

**\*6** The difficulty with plaintiffs' argument that this failure of disclosure justifies enjoining the completion of the Tender Offer is the unusual fact that if the Schedules had been timely disseminated to the shareholders, the information would have encouraged them to tender their shares in response to Grace's offer. This is so because, as defendants have demonstrated, the informal third party offers that indicated an offering price would have yielded a value less than the $19.00 per share offered by Grace; in fact, they would have yielded much less. Any reasonably informed shareholder would therefore find Grace's offer more desirable, rather than less, against a background of the offers. Plaintiffs therefore have not demonstrated how the minority shareholders could suffer any harm if completion of the Tender Offer is not enjoined. *See Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987).

In fact, if the Court were to enjoin the completion of Grace's Tender Offer, it will be the minority shareholders who will suffer harm, not Grace. As plaintiffs themselves have noted, Grace will remain Energy's majority and controlling shareholder even if the offer is enjoined to allow for supplemental disclosures and it is highly unlikely that the $19.00 per share offer price will be increased. Any delay

therefore would result in injury to the minority shareholders because the distribution of their Tender Offer consideration of $19.00 per share will be delayed. A preliminary injunction is therefore inappropriate on these facts. *Allen v. Prime Computer, Inc.,* Del.Supr., 540 A.2d 417 (1988); *Eastern Shore Natural Gas Co. v. Stauffer Chemical Co.,* Del.Supr., 298 A.2d 322 (1972); *Data General Corp. v. Digital Computer Controls, Inc.,* Del.Supr., 297 A.2d 437 (1972).

VIII

In summary, plaintiffs have failed to carry their burden of demonstrating the reasonable probability of success of their claims that the Special Committee breached its duty of care in reviewing and recommending Grace's offer. They have also failed to show that the Special Committee had any real conflicts of interest when negotiating with Grace on behalf of the minority shareholders.

**\*\*700** Plaintiffs have shown that the Schedules 4.09 and 5.05 contained information that would ordinarily be material to the decision the minority must make about whether to tender in response to Grace's offer. That information, however, is more likely to encourage the minority shareholders to accept Grace's offer than to reject it and any delay in consummating the Tender Offer will only delay the receipt of the Tender Offer price by those who tender. The minority shareholders will, therefore, suffer harm if an injunction is granted, but none if it is not. Plaintiffs' motion for a preliminary injunction is therefore denied.

IT IS SO ORDERED.

1992 WL 145001 (Del.Ch.), 18 Del. J. Corp. L. 690

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Not Reported in A.2d                                                                                      Page 1

2002 WL 31058540 (Del.Ch.)

**(Cite as: 2002 WL 31058540 (Del.Ch.))**

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Demetrios B. HASEOTES and George Haseotes, individually and derivatively on behalf of Cumberland Farms, Inc., Plaintiffs, v.

Lily H. BENTAS and Cumberland Farms, Inc., a Delaware corporation, Defendants.

**No. Civ.A. 19155 NC.**

Submitted April 9, 2002.
Decided Sept. 3, 2002.

William D. Johnston, Danielle Gibbs and John J. Paschetto, of Young Conaway Stargatt & Taylor, LLP, Wilmington Delaware; Robert J. Valihura, Jr., of Robert J. Valihura, Jr., PA, Wilmington, Delaware; Rosanna Sattler, of Posternak Blankstein & Lund, LLP, Boston, Massachusetts; and William F. Griffin, Jr. and Thomas S. Fitzpatrick, of Davis Malm & D'Agostine, PC of Boston, Massachusetts; for Plaintiffs.

Jesse A. Finkelstein and Catherine G. Dearlove, of Richards Layton & Finger, P.A., Wilmington, Delaware; Jeffrey B. Rudman, John F. Batter, III and Peter J. Kolovos, of Hale and Dorr, LLP, Boston, Massachusetts; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*1** Pending is a motion to dismiss claims brought both individually and derivatively on behalf of Cumberland Farms, Inc. ("Cumberland Farms" or "the Company") in this action by two director-shareholders against the other two director-shareholders. The feuding directors and shareholders are all siblings. The defendants have moved to dismiss (i) for failure to satisfy the demand requirements of Court of Chancery Rule 23.1 and (ii) for failure to state cognizable claims under Rule 12(b)(6). For the reasons next

discussed, the Court denies the Rule 23.1 motion in its entirety and the Rule 12(b)(6) motion to dismiss as to the first cause of action (Counts I-IV). The Court grants, however, the Rule 12(b)(6) motion to dismiss the second cause of action (Counts V and VI) for failure to state a legally cognizable claim.

I. FACTS

A. The Parties

The facts recited below are derived from the well-pled allegations of the complaint. The plaintiffs, Demetrios B. Haseotes ("Demetrios"), a former Chief Executive Officer of the Company, and his brother, George Haseotes ("George") are directors and shareholders of Cumberland Farms. Each of the plaintiffs owns 2 shares of Cumberland Farms Class A voting common stock and 30,253.5 shares of its Class B non-voting common stock. Together, the plaintiffs together hold 50% of the issued and outstanding shares of each class of stock.

The defendants are Cumberland Farms and Lily Bentas ("Bentas"), the Company's current CEO and a director. Cumberland Farms is a closely-held, family-owned Delaware corporation in the business of operating and leasing gasoline stations and convenience stores throughout New England, the Mid-Atlantic states, and Florida. The Company's principal place of business is located in Canton, Massachusetts.

The Company has four directors: Demetrios, George, Bentas, and their brother, Byron Haseotes ("Byron"), who is not named as a defendant. Bentas is a shareholder, Chairman of the Board, CEO, and President of Cumberland Farms. She owns 2 shares of Class A voting common stock, and 7,566 shares of Class B non-voting common stock, representing 25% and 6.25%, respectively, of the issued and outstanding shares of each class. Together, Bentas and Byron own 50% of the Company's Class A voting stock.

The plaintiffs, Demetrios and George, have sued Bentas derivatively and individually. They claim that Byron is part of a "director faction" with Bentas, and that Bentas is attempting illegally to seize control of the board of directors and the Company.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2
2002 WL 31058540 (Del.Ch.)
**(Cite as: 2002 WL 31058540 (Del.Ch.))**

B. Background of the Dispute

In December 1993, the Company underwent a federal bankruptcy reorganization. Before that time, the Board consisted only of the four above mentioned "family directors." Under the approved terms of the Bankruptcy Court, the Company's certificate of incorporation was amended to add five "independent directors," who were selected by Bentas and the Creditors Committee. The non-family directors' terms expired when the Company's debt obligations were satisfied in December 1998. After the Company emerged from bankruptcy, the four family directors were, once again, the only members of the Board.

**\*2** Since at least 1998, there has been dissension among the four siblings about who should control the Company. Bentas proposed to create a Board structure that would include non-family directors and thereby eliminate the plaintiffs' ability to deadlock the Board. The plaintiffs rejected that proposal. After the bankruptcy was concluded and the Board returned entirely to the control of the four "family directors," the two opposing camps--with Demetrios and George on one side and Bentas and Byron on the other--could neither agree upon nor cooperate to resolve many critical issues. The result was a deadlock that prevented the Board from having a productive meeting at which meaningful decisions were made, from December 1998 until April 2000.

To end the Board deadlock, in June 1999, Bentas and Byron sought the appointment of a Court-appointed custodian in a previous action filed in this Court. [FN1] In November 1999, the Court in that action denied Bentas' and Byron's motion for summary judgment on the custodianship claim, and ordered the parties to conduct a stockholders' meeting for the purpose of electing a board of directors.

FN1. *Bentas v. Haseotes,* Civ. Action No. 17223.

Unfortunately, the Court-ordered shareholder meeting did not eliminate the deadlock. Bentas and Byron were reelected, because Demetrios and George voted for them. The plaintiffs, however, continued in office as holdover directors, because Bentas and Byron did not vote for them. Because it appeared likely that the Board impasse would

persist unchanged, this Court issued a Memorandum Opinion in March 2000 determining that a custodian should be appointed. Thereafter, in April 2000, R. Timothy Columbus, Esq. was appointed as Custodian.

In April 2000, the plaintiffs filed a lawsuit in the Superior Court of Massachusetts alleging claims similar to those pled here. [FN2] The defendants moved to dismiss that suit, and the Massachusetts Court dismissed the case on the grounds of *forum non conveniens,* to enable this Court to determine the claims.

FN2. *Haseotes v. Cumberland Farms,* Civ. Action No. 00-1435-H.

C. Facts Relevant to the Claims

1. *The Allegations of Wrongful Conduct*

The plaintiffs' claims center upon an alleged scheme by Bentas to entrench herself in her position as a director and officer, and to marginalize the voices and roles of Demetrios and George. The plaintiffs claim that Bentas attempted to carry out this plan in two ways: first, by wrongfully conditioning a refinancing of existing corporate debt upon the plaintiffs' agreeing to enlarge the Board, and second, attempting to obstruct the plaintiffs from obtaining corporate information to which they were entitled.

Specifically, the complaint alleges that in September 1998 the Company owed approximately $150 million in long-term debt to various creditors. That debt, which would mature in 2003, carried with it a weighted-average interest rate of approximately 10% per year. In early 1999, upon the recommendation of the plaintiffs, the corporation's officers were encouraged to explore refinancing alternatives to reduce the Company's interest expense. Proposals from several financial institutions were solicited and studied. In April 1999, Donald E. Holt, the Company's Chief Financial Officer, selected Freidman, Turbidy & Company ("Friedman, Turbidy") to carry out a private placement of $150 million of debt to refinance the older, higher interest debt. It is alleged that this private placement would have resulted in interest savings of approximately 3%, or $4.5 million per year, until maturity.

**\*3** According to the plaintiffs, after Mr. Holt initiated the refinancing plan, Bentas instructed him and other Company employees to abandon the refinancing effort and to suspend payments to Friedman, Turbidy. The plaintiffs claim that Bentas did that to further her scheme to expand the Board. Specifically, they claim that Bentas refused to allow the refinancing to proceed unless and until Demetrios and George agreed to add new members to the Board, which would dilute the plaintiffs' power as directors and the effectiveness of their dissenting voices.

After Bentas terminated the effort to refinance Cumberland Farms' debt, the plaintiffs sought to revive the process. They contacted corporate officers in an effort to obtain the information required for them to proceed. In response, Bentas, without Board approval and in her capacity as a corporate officer, promulgated a memorandum entitled "Procedures for Directors' Requests for Information and Operational Advice" (the "Memorandum"). The effect of those procedures was to require non-management directors to channel all requests for information through the corporate secretary, who would then determine whether it was in the "best interests" of the Company to divulge the information to the director who requested it.

A similar memorandum, distributed to all corporate vice presidents, prohibited all Company employees from providing information to non-management directors or from taking directions, suggestions, or advice from those directors, upon their request. These director requests were to be sent to the corporate secretary, who in turn would send them to Bentas. The Memorandum provided that the procedures would be "strictly enforced." This information policy directive, the plaintiffs claim, was essentially an effort by Bentas to coerce the plaintiffs into acquiescing in her plan to elect other like-minded directors who would be allied with her. The complaint does not allege that the plaintiffs were deprived of any essential information as a result of this new policy.

2. *The Causes of Action*

The Complaint alleges two claims. The first is derivative, and the second is an individual.

The First Cause of Action (Claims I-IV) charges the defendant, Bentas, with breaching her fiduciary duty to Cumberland Farms by preventing the refinancing of the Company's debt, in order to further her personal goal of entrenching herself at the Company's expense. The plaintiffs seek judgment in Cumberland Farms' favor against Bentas, in an amount equal to the lost interest savings, plus pre-judgment and post-judgment interest.

The Second Cause of Action (Claims V and VI), is an individual claim that seeks to nullify the 1999 Bentas information policy directive designed to prevent non-managerial directors (i.e., the plaintiffs) from seeking corporate information directly from officers and employees.

## II. THE APPLICABLE LAW AND THE PARTIES' CONTENTIONS

The defendants advance two separate grounds in support of their motion to dismiss. The first is that the complaint fails to comply with the demand requirements of the Court of Chancery Rule 23.1. The second is that the plaintiffs have not stated a claim upon which relief can be granted under Rule 12(b)(6).

**\*4** Under Rule 23.1, for the plaintiffs to demonstrate that they have standing to maintain a derivative action, they must first make a demand on the Board to provide the directors an opportunity to address the claim. [FN3] Failing that, the plaintiffs must show that they were excused from making a demand, on the basis that a demand would have been futile. [FN4] Because the plaintiffs here did not make a demand upon the Board, they must establish that a demand would have been futile. [FN5]

> FN3. *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988).

> FN4. *Id.*

> FN5. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

Where the lawsuit attacks a decision made by the board, the appropriate futility standard is that articulated in *Aronson v. Lewis.* [FN6] Here, however, no Board decision is being

Not Reported in A.2d                                                                 Page 4
2002 WL 31058540 (Del.Ch.)
**(Cite as: 2002 WL 31058540 (Del.Ch.))**

challenged. Rather, the decisions attacked were made by Bentas in her capacity as an officer. Therefore, the rule articulated in *Rales v. Blasband* is the appropriate standard for determining whether demand is excused. [FN7] That standard has been articulated by the Delaware Supreme Court thusly:

> FN6. *Id.* at 814.

> FN7. *Rales v. Blasband,* 634 A.2d 927 (Del.1993).

> [I]t is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider the merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time of the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN8]

> FN8. *Id.* at 934.

Thus, the plaintiff must plead with particularity facts creating a reasonable doubt that at the time the complaint was filed, the Board could have exercised a disinterested and independent business judgment in responding to a demand. [FN9] Whether or not a demand would have been futile is gauged solely from the non-conclusory factual allegations of the complaint. [FN10] A lack of independence may be shown where the particularized facts pled in the complaint establish a reasonable doubt whether the director is able to consider impartially a demand when "financial, familial, or other relationships" with the conflicted director are implicated. [FN11]

> FN9. *In re Cooper Companies, Inc. Shareholders Derivative Litigation,* 2000 Del. Ch. LEXIS 158 (Del. Ch. Oct. 31, 2000).

> FN10. *White v. Panic,* 783 A.2d 543, 548 (Del.2001).

> FN11. *Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996).

In short, the Rule 23.1 issue is whether the Complaint contains particularized factual allegations that establish that it would have been futile to make a demand. That issue is addressed in Part III A of this Opinion.

The defendants also seek dismissal under Rule 12(b)(6) for a failure to state a claim upon which relief can be granted. In considering that motion, the Court will assume that all well-pled allegations of the complaint are true and will give the plaintiff the benefit of all reasonable inferences that can be drawn from the pleading. [FN12] To obtain a dismissal, the movant must demonstrate that the non-moving party would not be entitled to relief under any of the facts (or reasonable inferences therefrom) alleged in the complaint. [FN13] Where the factual allegations are conclusory in nature, those allegations will not be accepted as true for purposes of the motion. [FN14]

> FN12. *Grimes* at 1213-14.

> FN13. *Siegman v. Tri-Star Pictures, Inc.,* 1989 Del. Ch. LEXIS 56 (Del. Ch. May 5, 1989, revised May 30, 1989), slip op. at 32 (*citing Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487, 502 (Del.1982).

> FN14. *Id.*

**\*5** The Rule 12(b)(6) motion is addressed in Parts III B 1 and B 2 of this Opinion.

### III. ANALYSIS

A. The Rule 23.1 Motion

I first consider whether the complaint must be dismissed for failure to make demand upon the family directors, in particular, Byron Haseotes. Thereafter, I address the demand issue as it relates to the Custodian.

1. *Demand upon the Family Directors*

The focus of the demand futility analysis is whether the complaint creates a reasonable doubt that, as of the time the

Not Reported in A.2d                                                                                                                Page 5
2002 WL 31058540 (Del.Ch.)
(Cite as: 2002 WL 31058540 (Del.Ch.))

complaint was filed, the Board could have properly exercised its independent and disinterested business judgment in responding to a demand. The Cumberland Farms Board consists of four members, two of whom are the plaintiffs. The third director, Bentas, must be assumed to be incapable of exercising independent and disinterested judgment on the issue of whether to cause Cumberland Farms to sue her. That leaves only the fourth director--Byron. If Byron would not have been capable of exercising a disinterested and independent judgment regarding whether to sue his sister, then the entire Board would be conflicted, indeed, deadlocked 2-2. Demand would therefore be futile and, thus, excused. Accordingly, the focus of the demand analysis is upon whether Byron was disinterested and independent.

I conclude that the facts alleged in the complaint create a reasonable doubt whether Byron could impartially consider a demand. The complaint alleges that Bentas and Byron have voted as a bloc on all issues that have come before the Board. Indeed, the complaint characterizes Bentas and Byron as a "faction." The complaint also describes Byron as a "lock-step ally" who in the past has refused to initiate litigation against his sister, while having no similar inhibition against suing his brothers, the plaintiffs. Specifically, in *Byron Haseotes v. V.S. Haseotes & Sons Limited Partnership et al.,* [FN15] Byron sued the family Partnership claiming that he was owed over $2 million. Byron sued Demetrios and George as general partners who were liable for the debts of the partnership. Byron did not, however, join Bentas as a defendant, even though she was also a general partner. Byron's lawsuit was initiated in January 2001, after the deadlock had occurred, and after the two opposing camps had formed within the Cumberland Farms Board.

FN15. Civ. Action No. 01-0086-A.

The defendants insist, that the plaintiffs have alleged no particularized facts that would establish that Byron had a conflicting interest or lacked independence. Because of Byron's substantial ownership interest in the Company, the defendants urge, Byron's interests are perfectly aligned with those of the firm. Accordingly, if the refinancing would be profitable to the Company, Byron would be capable of

objectively considering a lawsuit against Bentas for having blocked that refinancing. Furthermore, the defendants argue, there is no claim that Byron played any role in terminating the refinancing efforts or in implementing the new information procedures, or that Byron otherwise sought to entrench himself.

**\*6** I cannot agree with the defendants' arguments. The plaintiffs have pled facts from which it is reasonably inferable that Byron had countervailing interests which could disable him from disinterestedly and objectively considering a demand. If, as the plaintiffs allege, Bentas and Byron constituted a "faction" that voted together on all disputed issues, it is reasonable to conclude that Byron would be more strongly motivated to support his sister rather than oppose her to promote the short-term increase in the value of the Company. At least at the pleading stage, there is reason to doubt that Byron could have responded disinterestedly to a demand.

Regarding independence, the defendants contend that the facts do not show that Byron was dominated or controlled by Bentas. They brush aside any adverse inference that the plaintiffs draw from Byron's failure to sue Bentas in *Byron Haseotes v. V.S. Haseotes General Partnership,* arguing that that suit was against the partnership, of which Bentas was a general partner. Therefore, defendants urge that in substance, the litigation was as much a suit against Bentas as it was against Demetrios and George.

Again, I cannot agree. The complaint alleges that the Board was equally divided on virtually all issues that came before it, that Byron and Bentas consistently voted together, and that they share a common vision for the Company's future. Those factual allegations create a reason to doubt whether Byron could consider a proposal to sue an ally (Bentas) whose decisions would be directed towards accomplishing and implementing that common vision. Buttressing that doubt is Byron's suit against the family partnership, in which he named as a defendants all of the general partners except Bentas. If Bentas and Byron were as closely aligned as alleged here, there is reason to question whether Byron has ceded to Bentas his ability to vote independently. Therefore, a reasonable doubt has also been shown as to whether Byron could independently consider a demand.

Not Reported in A.2d                                                                      Page 6
2002 WL 31058540 (Del.Ch.)
**(Cite as: 2002 WL 31058540 (Del.Ch.))**

[FN16]

> FN16. The defendants also make a third argument regarding this issue of demand based on the "second prong" of the test articulated in *Aronson.* However, this argument lacks merit because, as already mentioned, *Aronson* is not the applicable futility standard.

2. *Demand upon the Custodian*

The defendants next argue that the Custodian was capable of considering a demand impartially and that the plaintiffs have failed to plead facts that would excuse a demand upon the Custodian. In my view, that argument lacks merit as well.

The flaw in this argument is that it rests upon an invalid premise. The Custodian was appointed by the Court and was vested with the power to vote on certain matters of corporate governance when the Board was deadlocked. The Amended Order Appointing the Custodian does not, however, require the Custodian to cast a tie-breaking vote on every issue. Rule 23.1 presupposes that the persons to whom a demand is addressed will actually vote to accept or reject a demand. Here, it is alleged that the Custodian has expressly disclaimed any authority to vote, and has taken the position that even if he did have the authority, he would not exercise it. That being the case, the issue of the Custodian's disinterestedness and independence is never reached. By definition, a demand upon the Custodian would be futile, because it is futile to demand that a person take action where that person has clearly and in advance declined to do so.

**\*7** Having concluded that a demand is excused, I next turn to the motion to dismiss the claims under Rule 12(b)(6).

B. The Rule 12(b)(6) Motion

1. *Counts I-IV*

In support of their Rule 12(b)(6) motion, the defendants contend that none of Counts I-IV states a cognizable claim that Bentas' actions breached a fiduciary duty to the Company, or inflicted any harm derivatively upon the

Company or individually upon the plaintiffs. I disagree with the defendants' analysis, and conclude those Counts do state a cognizable claim for relief.

The complaint alleges that (i) Bentas' decided to terminate prematurely the proposed refinancing project and (ii) Bentas issued an ultimatum to Demetrios that he agree to expand the Board in exchange for her reconsidering the refinancing proposal. The defendants urge that those allegations do not state valid cognizable claims. Rather, the defendants say, those actions represented the exercise by Bentas of her business judgment as CEO. That the plaintiffs disagree with that business decision does not constitute a basis for holding the decision-maker liable.

While that view of the matter might be adopted after a trial based on a full factual record, that view cannot be reached as a matter of law at this stage, where the only portion of the record being considered is the complaint. That complaint alleges that as of the end of September 1998, the Company had approximately $150 million in long-term debt at a weighted-average interest rate of 10% per year. The directors then studied and decided upon a plan to refinance the debt--a plan that, if adopted, would have saved the Company about $4.5 million in interest costs. Nonetheless, Bentas halted the transaction, specifically to further her personal goal of extracting a concession from the plaintiffs relating to her plan to restructure the Board.

These allegations state a cognizable claim because, if they are true, they would establish that Bentas breached her fiduciary duty of loyalty by placing her own personal interests and objectives ahead of the best interests of the corporation. [FN17] It is claimed that Bentas was holding up a refinancing plan that would benefit the Company, to obtain a concession that would benefit her personally. Specifically, it is alleged that Bentas told Demetrios that she would not allow any further exploration of a refinancing unless and until he agreed to increase the size of the Board. While Bentas may ultimately be able to show after a trial that she had a legitimate, unselfish motive for her actions, at this stage it must be concluded that the facts alleged in this complaint state a cognizable derivative claim for relief. Accordingly, the motion to dismiss Counts I-IV will be denied.

Not Reported in A.2d                                                        Page 7
2002 WL 31058540 (Del.Ch.)
**(Cite as: 2002 WL 31058540 (Del.Ch.))**

> FN17. To the extent that Bentas argues that she is exculpated by the Cumberland Farms charter provision modeled after 8 *Del.C.* § 102(b)(7), that argument need not be addressed because by its terms, § 102(b)(7) exculpates only a judgment for money damages based on a violation of the duty of care.

2. *Counts v. and VI*

The final two Counts are direct claims which the defendants urge must also be dismissed, because (i) the Bentas-promulgated Information Procedures did not violate 8 *Del.C.* § 141 or § 220(d) and (ii) it is not alleged that the plaintiffs were actually deprived of information that they needed in their capacity as directors. Therefore, because no harm has been suffered, there is no basis to award judicial relief.

**\*8** 8 *Del.C.* 220(d) gives directors the right to inspect corporate books and records for a proper purpose relating to their director roles. The complaint here does not allege any denial or unreasonable abridgement of the directors' statutory right of inspection. All that the complaint alleges is that Bentas adopted a policy that established procedures for non-management directors to obtain corporate information. Delaware law does not proscribe the imposition of reasonable conditions or limitations for obtaining access to corporate books and records, so long as those conditions do not deprive the directors of, or impermissibly infringe upon, their information rights.

The Court acknowledges that the plaintiffs are claiming that Bentas adopted the information policy to hinder the plaintiffs in their efforts to pursue a refinancing. But even if that is true, without a cognizable injury, there can be no remedy. In this case, there is no claim that the directors were actually deprived of information to which they are entitled, or that the plaintiff directors were hindered in the performance of their directorial duties. For these reasons, Counts V and VI fail to state a cognizable claim for relief.

### IV. CONCLUSION

For all of the reasons discussed, the defendants' Motion to Dismiss on Rule 23.1 grounds and their Rule 12(b)(6) motion as it relates to Counts I-IV, are denied. The Rule 12(b)(6) motion to dismiss is granted insofar as that motion relates to Counts V and VI, without prejudice to the plaintiffs' right to move for leave to amend. IT IS SO ORDERED.

2002 WL 31058540 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Slip Copy                                                                                    Page 1
2004 WL 1728521 (Del.Ch.)
(Cite as: 2004 WL 1728521 (Del.Ch.))

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Judith JACOBS, derivatively on behalf of Yahoo! Inc., Plaintiff,
v.
Jerry YANG, David Filo, Gary Valenzuela, Timothy Koogle, Eric Hippeau, Arthur H. Kern, Michael Moritz, Jeffrey Mallet, Edward R. Kozel, Defendants,
and
YAHOO! INC., Nominal Defendant.

**No. Civ.A. 206-N.**

Submitted May 26, 2004.
Decided Aug. 2, 2004.

Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Harnes Keller LLP, New York, New York, for the Plaintiff.

Arthur G. Connolly, Jr., Arthur G. Connolly, III, Brian M. Gottesman, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Brendan V. Sullivan, Jr., George A. Borden, Lynda, Schuler, Christian A. Weideman, Williams & Connolly LLP, Washington, D.C., for Defendants Jerry Yang, David Filo and Gary Valenzuela.

Alan J. Stone, Natalie J. Watson, Morris Nichols Arsht & Tunnell, Wilmington, Delaware; Norman J. Blears, Michael L. Charlson, Matthew A. Carvalho, Maren J. Clouse, Heller Ehrman White & McAuliffe LLP, Menlo Park, California, for the Director Defendants.

David C. McBride, Bruce L. Silverstein, Rolin P. Bissell, Danielle Gibbs, Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware; Jordan D. Eth, Judson E. Lobdel, Anna Erickson White, Morrison & Foerster LLP, San Francisco, California, for Nominal Defendant Yahoo! Inc.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

**\*1** The plaintiff, a shareholder of Yahoo!, Inc., brings this derivative action against all the current directors and certain former directors and officers of Yahoo!, and against Yahoo! as a nominal defendant. The defendants have filed two separate motions seeking (1) to dismiss the entire complaint under Court of Chancery Rule 23.1 for failure to adequately plead demand excusal; and (2) to dismiss Count II under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, the motion to dismiss the entire complaint for failure to make demand on the Yahoo! board of directors is granted. In light of that dismissal, the court declines to resolve the separate motion to dismiss Count II.

II. [FN1]

> FN1. All facts in this opinion, unless otherwise noted, are taken from the well-pleaded allegations in the complaint.

The plaintiff, Judith Jacobs, is a shareholder of Yahoo!. Defendant Yahoo! is a Delaware corporation. Yahoo! provides Internet products and services to consumers around the world. Defendants Timothy Koogle, Michael Moritz and Jeffrey Mallet are former Yahoo! directors. Defendants Eric Hippeau, Arthur H. Kern and Edward R. Kozel are current Yahoo! directors (collectively, with Koogle, Moritz and Mallet, the "Director Defendants").

Defendants Jerry Yang and David Filo founded Yahoo! in 1994. Yang is a current Yahoo! director and officer. Filo is a current Yahoo! officer but not a director. Both Yang and Filo are designated within the company as "Chief Yahoo." The complaint states that Filo "serves as a key technologist, directing the technical operations behind the company's global network of web properties." [FN2] The complaint does not describe Yang's duties as "Chief Yahoo," Yang owns approximately 6.7% of Yahoo! common stock. Filo owns approximately 7.9% of Yahoo! common stock.

> FN2. Compl. ¶ 6.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

Defendant Gary Valenzuela (collectively with Yang and Filo, the "Insider Defendants") served as Yahoo!'s Senior Vice President of Finance and Administration and CFO from 1996 to 2000. Valenzuela never served on Yahoo!'s board.

In 1996, Yahoo! retained The Goldman Sachs Group, Inc. to act as the managing underwriter in its initial public offering. Yahoo! raised $32.5 million through the IPO and paid Goldman approximately $1 million in fees.

Goldman's relationship with Yahoo! continued after the IPO. Yahoo! retained Goldman's services in connection with its October 1997 acquisition of the Four11 Corporation (a common stock exchange valued at $92 million), its July 1999 acquisition of broadcast.com (a common stock exchange valued at $5.7 billion), and its January 2002 acquisition of HotJobs.com (valued at $436 million). Goldman received over $10 million in underwriting, investment banking and advisory fees from Yahoo! over the course of the relationship.

During this time period, Goldman allegedly "rewarded" the Insider Defendants with allocations of thousands of shares in dozens of Goldman-managed IPOs at initial offering prices. Yang and Valenzuela were allocated shares in over 100 Goldman-managed IPOs. Filo was allocated shares in over 40 Goldman-managed IPO. The Insider Defendants allegedly reaped enormous, nearly risk-free profits as a result because the demand for IPO shares often caused the shares to double or triple in value in the first days of trading. The complaint alleges that Goldman allocated these shares to the Insider Defendants as incentive for Yahoo! to continue doing business with Goldman.

**\*2** The plaintiff brings this derivative action on behalf of nominal defendant Yahoo! pursuant to Court of Chancery Rule 23.1. Count I alleges that the Insider Defendants breached their fiduciary duty of loyalty by misappropriating a financial benefit that rightfully belonged to Yahoo!, the receipt of IPO allocations, by virtue of their relationship with Goldman. Count II alleges that the Director Defendants acted disloyally and in bad faith when they "acquiesced in" or "approved of" the IPO allocations that the Insider Defendants received.

At the time the complaint was filed, Yahoo!'s board of directors had nine members: five non-party directors, Terry S. Semel, Roy J. Bostock, Ronald W. Burkle, Robert A. Kotick, Gary L. Wilson, and four defendants, Hippeau, Kern, Kozel, and Yang (collectively the "current board"). The plaintiff has not made a demand upon the current board to pursue legal action against the Director Defendants or the Insider Defendants.

The Director Defendants move to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused, and move to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for which relief can be granted. The Insider Defendants move to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused. Nominal defendant Yahoo! moves to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused.

For the reasons discussed *infra,* the complaint will be dismissed for failure to comply with the demand requirement of Rule 23.1. The court does not reach the motion to dismiss Count II.

III.

A. *Demand Futility*

Court of Chancery Rule 23.1 requires that a plaintiff shareholder make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf. The demand requirement of Rule 23.1 allows for demand to be excused in two instances. First, demand is excused if a shareholder pleads *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested. [FN3] Second, demand is excused if a shareholder establishes a "reasonable doubt as to ... whether the directors exercised proper business judgment in approving the challenged transactions." [FN4] "Demand futility analysis is conducted on a claim-by-claim basis." [FN5]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 3
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

FN3. In considering whether demand is rightfully excused, the court will accept the well-pleaded allegations in the plaintiff's complaint as true, drawing reasonable inferences in favor of the plaintiff. *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *8 (Del.Ch. Jan.10, 2003); *see also Kaufman v. Belmont,* 479 A.2d 282, 285 (Del.Ch.1984) ("All well-plead facts must be assumed to be true. Allegations, however, will not be assumed to be true unless there exists specific facts which are sufficient to support the conclusions.") (citations omitted). The court, however, will not accept conclusory allegations of law or fact. *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

FN4. *Steiner v. Meyerson,* 1995 WL 441999, at *9 (Del.Ch. July 19, 1995). Referring to the second basis for excusing demand, former Chancellor Allen states that "the same directors [must] continue at the time of suit to constitute a majority of the board." *Id.* It follows that demand will be excused under the second prong of the demand futility analysis if a majority of the current board (those who should consider a demand) were the directors who failed to exercise proper business judgment in approving the challenged transaction.

FN5. *Beam v. Stewart,* 833 A.2d 961, 977 (Del.Ch.2003), *aff'd,* 845 A.2d 1040 (Del.2003).

A director is deemed interested "whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal benefit from the challenged transaction which is not equally shared by the stockholders." [FN6] A director is deemed independent if his or her "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN7]

FN6. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

FN7. *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

**\*3** The plaintiff's demand futility claims are based on four theories. First, the plaintiff contends that the current board is disqualified from considering a demand because of the current board's desire to avoid taking "an adversarial position to defendants Yang and Filo," two individuals that the plaintiff asserts are of paramount importance to Yahoo!. [FN8] Second, the plaintiff argues that the directors' compensation, coupled with their desire to retain their positions as Yahoo! directors, taints their ability to consider a demand independently and free from extraneous influences. Third, the plaintiff contends that as a result of certain business ties between Yahoo! and its directors, these directors are unable to consider a demand to pursue litigation against the defendants. Fourth, the plaintiff asserts that certain directors "acquiesced in" or "approved of" the IPO allocations at issue and, for that reason, they are deemed interested for purposes of a demand. [FN9]

FN8. Compl. ¶ 35.

FN9. The plaintiff asserts that directors Hippeau, Kern, and Kozel are interested for purposes of considering a demand to pursue Count II because they allegedly acquiesced in the receipt of the IPO allocations.

Since Yahoo!'s current board is composed of nine directors, the plaintiff has the burden of establishing that at least five directors are either interested or not independent. Yang is interested for purposes of demand because he is involved in the transactions at issue. For the reasons set forth below, the plaintiff has not met her burden with respect to the remaining directors, as the court concludes that Semel, Bostock, Burkel, Kotick, and Wilson are independent and disinterested for purposes of Rule 23.1.

*1. Adversarial Position*

The plaintiff asserts that Yahoo!'s current board is disqualified from considering a demand because of the current board's desire to avoid taking "an adversarial position to defendants Yang and Filo." [FN10] The plaintiff's argument boils down to an assertion that if the current board were to pursue litigation against the Insider Defendants, Filo and Yang would leave the company. In

support of this argument, the plaintiff points to Yahoo!'s filings with the SEC that state that Yahoo! is "substantially dependent on [the] two founders." [FN11] This, according to the plaintiff, illustrates that Yahoo!'s current board would avoid taking an adversarial position to the Insider Defendants.

> FN10. Compl. ¶ 35.

> FN11. *Id.*

This argument must be rejected. Simply because Yahoo! is alleged to be "substantially dependent" on Filo and Yang it does not follow that directors investigating allegations of misconduct by Filo and Yang would fail to fulfill their fiduciary duties to the corporation. [FN12] On the contrary, managing the relations of the corporation and its founders is an important aspect of the duties owed by the directors to Yahoo! and its stockholders. As this court has recognized in the past, "[p]otential negative side-effects from bringing a lawsuit ... do not constitute a personally disqualifying interest that might prevent the directors from freely assessing the benefits and detriments of bringing the suit in the first place." [FN13] Negative effects to the corporation might make the directors' discussion more difficult, but, without more, it hardly gives rise to a disqualifying interest.

> FN12. *See Apple Computer, Inc. v. Exponential Tech., Inc.,* 1999 WL 39547 (Del.Ch. Jan.21, 1999) (one co-founder capable of considering a demand to sue another).

> FN13. *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *7 (Del.Ch. June 21, 2000).

2. *Directors' Compensation And Continued Employment*

**\*4** Yahoo!'s directors are compensated through the Directors Stock Option Plan (the "DSOP"). [FN14] To retain the benefits under the DSOP, a director must remain on Yahoo!'s board, as the options vest only while a director serves on Yahoo!'s board. The plaintiff argues that the directors' compensation, coupled with their desire to retain their positions as Yahoo! directors, taints their ability to consider a demand to pursue litigation independently and free from extraneous influences.

> FN14. Upon the commencement of their directorships, each nonemployee director receives nonqualified stock options to purchase 100,000 shares of Yahoo! common stock. These options vest ratably over a period of 48 months. At each annual meeting, the nonemployee directors receive an additional 50,000 options to purchase Yahoo! common stock. 25% of these options vest after the first anniversary of the date of grant, while the remaining options become exercisable monthly over a period of 36 months after the anniversary of the date of grant. The exercise price of all stock options granted to nonemployee directors is the closing price of a share of Yahoo!'s common stock on the date of grant of the option.

As this court has stated, "[a]llegations as to one's position as a director and the receipt of director's fees, without more ... are not enough for purposes of pleading demand futility." [FN15] The weakness in the plaintiff's argument is that she offers no relevant facts to support her claim of demand futility aside from the fact that the directors receive substantial remuneration in return for their service on Yahoo!'s board. The plaintiff relies on *In re eBay Shareholders Litigation,* [FN16] but that decision is inapposite. She argues the directors' ability to enjoy the lucrative compensation they have received (and will continue to receive) is dependant upon their continued service as directors and that, as in *eBay,* the targets of an inquiry into the merits of a derivative action have the power to deprive them of that compensation by terminating their board service. While it is true that, if it were to happen, the Director Defendants would face a significant loss, the non-party directors constitute a majority of the current board, and the facts properly before the court show that Yang and Filo do not control the nomination process. On the contrary, a nominating committee of independent directors, Kern and Burkle, controls that process. [FN17] Kern is named as a Director Defendant while Burkle is not. Simply being named as a defendant does not destroy Kern's independence.

> FN15. *In re Ltd., Inc., S'holders Litig.,* 2002 WL

Slip Copy                                                                                                                    Page 5
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

537692, at *4 (Del.Ch. Mar.27, 2002).

FN16. 2004 WL 253521 (Del.Ch. Jan.23, 2004).

FN17. Gibbs Decl. Ex. E, May 15, 2003 (Yahoo! Definitive Form 14A) ("[t]he Nominating Committee consists of the Company's nonemployee directors: Messrs. Kern (Chair) and Burkle ... The Nominating Committee has authority (i) to review the size and composition of the board of directors and to recommend changes thereto; and (ii) to evaluate and recommend candidates for election of directors."). See *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *12 (Del.Ch. Sept.1, 1992) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.") (quotations and internal citations omitted).

The record illustrates clearly that the Insider Defendants are not in a position to control the other directors' tenure on the board, as was the case in *eBay*. [FN18] For example, the company conceded in its filings with the SEC that *defendants controlled* eBay. [FN19] In the present case, the Insider Defendants own approximately 14.7% of Yahoo!'s common stock, which is obviously insufficient to control an election of Yahoo!'s directors. [FN20] Moreover, Yahoo!'s public filings do not state, as was true in *eBay,* that the Insider Defendants control the company. In addition, the board has a nominating committee comprised of nonemployee directors who recommend board candidates. The nominating committee ensures that the Insider Defendants (particularly Yang) are incapable of controlling a director's nomination, election and continued tenure on Yahoo!'s board.

FN18. 2004 WL 253521, at * 3.

FN19. *Id.* ("eBay's form 10-K ... notes that eBay's executive officers and directors Whitman, Omidyar, Kagle and Skoll (and their affiliates) own about one-half of eBay's outstanding common stock. As a result, these eBay officers and directors

effectively have the ability to control eBay and direct its affairs and business, including the election of directors and the approval of significant corporate transactions.").

FN20. *Cf. Zimmerman v. Braddock,* 2002 WL 31926608, at *11 (Del.Ch. Dec.20, 2002) ("[A]n interest of less than 12% in [a] company, without more, fails to create a record from which one may conclude that he dominates the business affairs of [a company] or the employment of that company's employees."); *In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at * 6 (Del.Ch. May 22, 2000) ("Substantial non-majority stock ownership, without more, does not indicate control.").

The court notes that Semel, Yahoo!'s chairman and CEO, is not compensated through the DSOP. [FN21] Rather, Semel's compensation is based on his status as Yahoo!'s CEO and is a combination of cash and stock options with a vesting scheme similar to that of the DSOP. The plaintiff alleges that Semel is beholden to Yang because Yang was responsible for Semel's employment (and continued employment); and, therefore, because of this "powerful economic incentive," Semel is incapable of making an independent decision as to whether Yahoo! should pursue legal action against Yang and the other Insider Defendants. Specifically, the plaintiff points to the fact that Semel would lose at least $17,342,500 in options if his employment was terminated. [FN22] The plaintiff further asserts that Yang personally negotiated Semel's compensation package and, for that reason, Semel is beholden to Yang. Finally, as evidence of Yang's importance and power, the plaintiff points to the fact that he was the sole signatory on Semel's employment contract. For these reasons, the plaintiff argues that Semel is incapable of making an independent decision as to whether Yahoo! should pursue legal action against Yang, and, as a consequence, cannot consider a demand against the remaining Insider Defendants.

FN21. As part of Semel's compensation as CEO, he has received millions of dollars of unvested options that only vest while Semel remains an employee of Yahoo!.

Slip Copy                                                              Page 6
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

FN22. Compl. ¶ 55.

**\*5** The facts alleged in the complaint fail to raise a reasonable doubt as to Semel's independence. Although Semel stands to lose a significant amount of money in the form of unvested options if his employment is terminated, the complaint fails to allege facts from which the court could infer that any of the Insider Defendants, in particular Yang, control Semel's continued employment as CEO. Semel is Yahoo!'s highest-ranking officer and reports to the entire board, not Yang. [FN23] Moreover, Yang and the other Insider Defendants are not in a position to control Semel's reelection to the board, as was the case in *eBay.* [FN24] Likewise, the fact that Yang personally negotiated Semel's compensation package and is the sole signatory on Semel's employment contract does not establish that Semel is dominated or controlled by Yang.

> FN23. Gibbs Decl. Ex. K, Semel Letter Agreement at ¶ 2 ("You [Semel] shall report directly and solely to the Board of Directors."). *See In re Wheelabrator, 1992 WL 212595, at \*12* ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.") (quotations and internal citations omitted).

> FN24. 2004 WL 253521, at \*3.

The plaintiff also contends that under *Steiner v. Meyerson,* stock ownership is not the only way the Insider Defendants could "exert considerable influence" over a director to raise a reasonable doubt as to a director's independence. [FN25] In *Steiner,* however, the employee/director was the president and chief operating officer and was asked to consider a demand to sue his superior, the company's board Chairman and CEO. Here, Semel (or any of the five directors who could consider a demand) does not report to the Insider Defendants. Instead, Semel reports to Yahoo!'s entire board.

> FN25. 1995 WL 441999, at \*9.

For these reasons, the court finds that the assertion that Yahoo!'s current board members are not independent for purposes of considering a demand free from "extraneous considerations or influences" resulting from their compensation arrangements is not adequate grounds to excuse demand.

### 3. *Business Relationships*

The plaintiff next argues that, as a result of certain business relationships between Yahoo! and companies affiliated with directors Bostock, Burkle and Kotick, there exists a reasonable doubt as to the ability of Bostock, Burkle and Kotick to consider a demand independently and free from extraneous influences. The court disagrees.

Bostock was elected to Yahoo!'s board in May 2003. He also serves on the board of Unicast, Inc., a small technology company that entered into an advertising agreement with Yahoo! in 2002 whereby Yahoo! paid Unicast $206,000. The plaintiff argues that "[a]s a result of Bostock's position with Unicast and Unicast's dependence on Yahoo!, Bostock cannot exercise business judgment with respect to any determination to proceed or not to proceed with this action against Yang" [FN26] and the other Insider Defendants.

> FN26. Compl. ¶ 39.

Burkle has served on Yahoo!'s board since November 2001. Burkle is the managing partner of The Yucaipa Companies, an investment firm that holds a majority stake in Alliance Entertainment Corp. Burkle serves as Alliance's chairman of the board. Alliance owns All Media Group ("AMG"), which entered into an undisclosed licensing agreement with Yahoo!. The plaintiff contends that the AMG-Yahoo! licensing agreement is "crucial to AMG's continued viability" and, as a result, Burkle cannot act independently to determine whether Yahoo! should proceed in litigation against the Insider Defendants. [FN27]

> FN27. Compl. ¶ 40.

**\*6** Kotick has served as a director of Yahoo! since March 2003. Kotick is the chairman and CEO of Activision, Inc., an entertainment software publisher and controls 6.4% of Activision's common stock. In July 2002, Yahoo! and Activision executed a licensing and distribution agreement whereby Yahoo! paid Activision $100,000. Kotick also

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 7
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

owns 21,668 shares of Macromedia, Inc. and serves as a director. In September 2002, Yahoo! and Macromedia entered into an advertising services agreement valued at $75,000. Additionally, Yahoo! and Macromedia entered into an agreement to integrate Macromedia's streaming video services to Yahoo!.

Taken together, these factual allegations do not raise a reasonable doubt that the business ties between Yahoo! and companies that Burkle, Bostock, and Kotick are affiliated with would prevent them from considering a demand independently and "free from extraneous influences." This is so because the complaint fails to establish that Filo and Yang (the only two Insider Defendants still employed at Yahoo!) exercise control over Yahoo! or Yahoo!'s relationship with Unicast, AMG, Activision or Macromedia. Thus, the complaint does not allege sufficient facts to support the inference that Yang or Filo have the authority or ability to cause Yahoo! to terminate its relationships with the companies with which Burkle, Bostock, and Kotick are affiliated. Simply labeling Filo and Yang each "Chief Yahoo" is not enough. Similarly, merely asserting that the agreements were entered into at Filo and Yang's behest without factual support is insufficient to meet the particularity requirements of Rule 23.1. [FN28] Moreover, the existence of contractual relationships with companies that directors are affiliated with potentially makes the board's decision more difficult, "but it does not sterilize the board's ability to decide ." [FN29]

> FN28. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) ("Rule 23.1 is not satisfied by conclusory statements or mere *notice pleading* .... What the pleader must set forth are *particularized* factual *statements* that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates."). (emphasis added).

> FN29. *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *7 (Del.Ch. June 21, 2000). *See also Beam v. Stewart,* 845 A.2d 1040, 1051 (Del.2003) ("Mere allegations that they [the directors and Insider Defendants] move in the same

business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.").

The plaintiff also does not assert particularized facts establishing that the business relationships are material to Unicast, AMG, Activision or Macromedia. Merely stating that the agreements between Yahoo! and AMG are "crucial to AMG's continued viability" is not enough. There is no description of the terms of the AMG-Yahoo! agreement. Similarly, the facts alleged do not give rise to the inference that the value of these contracts was material to Activision or Macromedia. Moreover, simply asserting that the contracts increased the value of Kotick's holdings in these companies is insufficient to conclude that Kotick is incapable of considering a demand to pursue litigation against the Insider Defendants or Director Defendants.

4. *"Acquiescence In" Or "Approval Of" The IPO Allocations*

Finally, relying on the second prong of *Aronson,* the plaintiff argues that because the Director Defendants selected Goldman as Yahoo!'s investment banker, certain current board members "knew of and either specifically approved [or acquiesced in] the share allotments of IPOs." [FN30] This, according to the plaintiff, creates a reasonable doubt that the challenged transactions (the retention of Goldman and receipt of IPOs) are the product of a valid exercise of business judgment. [FN31]

> FN30. Compl. ¶ 27. The plaintiff asserts that because of this, Hippeau, Kern, and Kozel (the only Director Defendants who are still on Yahoo!'s board) are interested for purposes of considering a demand to pursue Count II.

> FN31. The court pauses here to address an issue raised in the plaintiff's complaint that was not addressed in their reply brief. The plaintiff asserts that the allegations of spinning were documented throughout the press since December 2002. *Id.* ¶ 30. The plaintiff asserts that because the current board had knowledge of the IPO allocations and failed to "recover on behalf of Yahoo! for any wrongdoing," the board "has breached its fiduciary

Westlaw.

Slip Copy                                                                                              Page 8
2004 WL 1728521 (Del.Ch.)
**(Cite as: 2004 WL 1728521 (Del.Ch.))**

duty by acquiescing to the wrongful conduct of the" Insider Defendants. *Id.* In the complaint, the plaintiff asserts that this is a basis to excuse demand as futile. The court disagrees. Demand is not *per se* futile merely because directors would be suing themselves. *Richardson v. Graves,* 1983 WL 21109, at *3 (Del.Ch. Mar.7, 1983) ("Merely naming all the members of the board is not in and of itself sufficient to excuse demand."). To hold so would eviscerate the demand requirement of Rule 23.1.

**\*7** Assuming *arguendo* that Kern, Hippeau and Kozel, the three Director Defendants who remain on Yahoo!'s current board, are interested and incapable of considering a demand, the remaining five directors (who together constitute a majority) are capable of considering a demand. Directors Semel, Bostock, Burkle, Kotick and Wilson, for example, all joined Yahoo!'s board *after* the Director Defendants allegedly "acquiesced in" or "approved of" the IPO allocations at issue. [FN32] As discussed in greater detail *supra,* directors Semel, Bostock, Burkle, Kotick and Wilson are deemed independent and disinterested for purposes of a demand. The fact that these directors would be asked to consider a demand to pursue litigation against fellow directors does not, standing alone, give rise to a lack of independence, as it is well settled that social and business ties alone do not give rise to a lack of independence. [FN33]

FN32. Directors Burkle and Wilson joined Yahoo!'s board in November 2001. The complaint does not allege that Burkle or Wilson approved Goldman's retention. Because of this, it is reasonable to infer that the board approved of Goldman's retention for the January 2002 acquisition of HotJobs.com before Burkle and Wilson joined Yahoo!'s board. The remaining three directors all joined Yahoo!'s board in 2003.

FN33. *Orman v. Cullman,* 794 A.2d 5, 27 (Del.Ch.2002) ("The naked assertion of previous business relationships is not enough to overcome the presumption of a director's independence."), *Cal. Pub. Employees Ret. Sys. v. Coulter,* 2002 WL 31888343, at *9 (Del.Ch. Dec.18, 2002) ("Our

cases have determined that personal friendships, without more; outside business relationships, without more; *and approving of or acquiescing in the challenged transactions, without more,* are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.") (emphasis added).

For these reasons, defendants' motion to dismiss pursuant to Rule 23.1 must be granted.

B. *Motion To Dismiss Count II*

Because the entire complaint is dismissed under Rule 23.1 for failure to comply with the demand pleading requirements, the court does not reach the merits of the separate motion to dismiss Count II of the complaint.

IV.

For the foregoing reasons, the court finds that the plaintiff does not have standing to pursue this derivative action, as she has not pleaded particularized facts that raise a reasonable doubt as to a majority of the current board's independence and disinterestedness. Therefore, the complaint is DISMISSED. IT IS SO ORDERED.

2004 WL 1728521 (Del.Ch.)

END OF DOCUMENT

# EXHIBIT 8

Not Reported in F.Supp.2d                                                                    Page 1
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

C
**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Peter KALTMAN, Plaintiff,
v.
Sanjiv S. SIDHU, Gregory A. Brady, Harvey B. Cash,
Robert L. Crandall, Michael
H. Jordan, and William M. Beecher, Defendants,
and
I2 TECHNOLOGIES, INC., Nominal Defendant.

**No. Civ. 3:03-CV-1057-H.**

Feb. 26, 2004.

Tom A. Cunningham, Richard J. Zook, Cunningham,
Darlow, Zook & Chapoton, Houston, TX, Marian P. Rosner,
Robert C. Finkel, Wolf Popper, New York, NY, for
Plaintiff.

Michael A. Swartzendruber, Fulbright & Jaworski, Edward
S. Koppman, Akin, Gump, Strauss, Hauer & Feld, Aimee
Williams Moore, Baker Botts, Dallas, TX, Michael P. Lynn,
Lynn, Tillotson & Pinker, Warren Lewis Dennis, Proskauer
Rose, Washington, DC, for Defendants.

Robert W. Coleman, Brown McCarroll, Dallas, TX, John P.
Stigi, III, Wilson, Sonsini, Goodrich & Rosati, Palo Alto,
CA, for Interested Party.

*MEMORANDUM OPINION AND ORDER*
SANDERS, Senior J.

**\*1** Before the Court are Defendants Harvey B. Cash, Robert
L. Crandall, and Michael H. Jordan's Motion to Dismiss,
filed October 17, 2003; Nominal Defendant i2
Technologies, Inc., and Defendants Sanjiv S. Sidhu and
William M. Beecher's Motion to Dismiss, filed October 17,
2003; Defendant Gregory A. Brady's Motion to Dismiss,
filed October 17, 2003; Plaintiff's Response, filed
November 24, 2003; Defendants' Cash, Crandall, and

Jordan's Reply, filed December 19, 2003; Nominal
Defendant i2 Technologies, Inc., and Defendants Sidhu,
Brady, and Beecher's Reply, filed December 19, 2003;
Plaintiff's Supplemental Authority, filed January 7, 2004;
and Nominal Defendant i2 Techonologies, Inc., and
Defendants Sidhu, Brady, and Beecher's Response to
Plaintiff's Supplemental Authority, filed January 23, 2004.
Also before the Court is Nominal Defendant i2
Technologies, Inc., and Defendants Sidhu and Beecher's
Request for Judicial Notice, filed October 17, 2003.
Defendants seek dismissal of Plaintiff's Consolidated
Shareholder Derivative Complaint. Upon review of the
pleadings, briefs, and relevant authorities, the Court is of the
Opinion for the reasons stated below that Defendants'
Motions to Dismiss should be GRANTED and Nominal
Defendant i2 Technologies, Inc., and Defendants Sidhu and
Beecher's Request for Judicial Notice should be DENIED as
moot.

I. BACKGROUND

This is a shareholder derivative suit filed by Peter Kaltman
on behalf of Nominal Defendant i2 Technologies, Inc.
("i2"). Plaintiff filed his Amended Derivative Complaint
("Complaint") on September 12, 2003, seeking to recover
$556,281,110.00 in bonuses, equity-based compensation, and
profits realized from the sale of i2 Technologies
securities by Defendants Sidhu, Beecher, and Brady.
(Compl. at 2). Plaintiff brings his claims pursuant to Section
304 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley")
and Delaware common law. (*Id.*). Plaintiff is, and was
during the time the acts complained of occurred, a
shareholder. (Compl. at 8). Defendants are, or were at the
time the complaint was filed, directors and/or officers of i2.
(Compl. at 8-13).

Plaintiff's complaint stems from a re-audit i2 performed in
2003 for financial years 1999, 2000, and 2001, which
resulted in a restatement of i2's financial statements for
those years and a loss in its stock price. (Compl. at 13-16,
18- 24). Plaintiff alleges that the restatement was the result
of "misconduct" on the part of Defendants, and, therefore,
Defendants Sidhu, Beecher, and Brady must reimburse i2
for all bonuses and incentive-based compensation and for all
profits earned on stock trades during 1999, 2000, and 2001.

Not Reported in F.Supp.2d                                                    Page 2
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

(*Id.* at 2-3). Plaintiff also makes claims against the three officer defendants, Sidhu, Beecher, and Brady, for insider trading. (*Id.* at 3). Plaintiff does not state a specific cause of action against the three director defendants, Cash, Crandall, and Jordan. (*See generally,* Compl.).

**\*2** All Defendants, including Nominal Defendant i2, move to dismiss Plaintiff's complaint. Defendants argue that Plaintiff failed to establish demand futility pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law; that the complaint does not meet the particularity requirements of Federal Rule of Civil Procedure 9(b); that Plaintiff's action is barred by i2's Certificate of Incorporation; and that the Sarbanes-Oxley Act claim fails as a matter of law. The Court will address these arguments below.

## II. ANALYSIS

Defendants first argue that Plaintiff lacks standing to sue derivatively because he did not make demand on i2's Board of Directors. (Def. Cash, Crandall, and Jordan's Mot. at 2-3). Defendants argue that if demand is not made on the Board prior to filing a derivative suit, the complaint must comply with the requirements of Federal Rule of Civil Procedure 23.1 and Delaware law and plead with particularity the reasons demand is excused. (*Id.*). In a derivative action, Rule 23.1 requires that the complaint "shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R .Civ.P. 23.1. Because i2 is a Delaware corporation, "the substantive corporation law of Delaware determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied ." *Rales v. Blasband,* 634 A.2d 927, 932 n. 7 (Del.1993). Delaware law requires a stockholder to make a demand on the Board of Directors to pursue the corporate claim "[b]ecause directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 Del.C. § 141(a)." *Id.* at 932.

In the instant case, Defendants argue that the test articulated by the Delaware Supreme Court in *Rales v. Blasband,* 634 A.2d 927 (Del.1993), is the appropriate test to use in determining whether demand in this case is excused as futile. Defendants argue the *Rales* test is appropriate because Plaintiff is not challenging a business decision made by the Board. (*See* Def. Cash, Crandall and Jordan's Mot. at 4). *Rales* requires the Court to determine whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales,* 634 A.2d at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the Plaintiff would need to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935. The *Rales* test is employed where "directors are sued because they have failed to do something ... demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand." *Id.* at 934 n. 9.

**\*3** Plaintiff argues that he is challenging a business decision of the Board, and thus, the Court should use the test developed in *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), to determine if demand is excused. (Pl.'s Mot. at 14). *Aronson* requires the Court to determine whether "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson,* 473 A.2d at 814. Therefore, the Court must make two inquiries, "one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof." *Id.* The basic difference between the *Rales* test and the *Aronson* test is the second inquiry the Court makes under the *Aronson* test that the Court does not make under the *Rales* test.

After examining the Complaint, the Court concludes that the *Rales* test is appropriate in the instant case because Plaintiff does not challenge any conscious business decision of the Board. [FN1] The only action of the Board that Plaintiff

Westlaw.

Not Reported in F.Supp.2d                                                                            Page 3
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

challenges in the instant case is the failure of the Board to "pursue its remedies and seek disgorgement of those monies" made by Defendants Sidhu, Beecher, and Brady from allegedly trading on inside information and from receiving bonuses as a result of financial misconduct. (*See* Compl. at 24-29). The *Rales* test is appropriate where the allegation is that the Board failed to do something. *See Rales,* 634 A.2d at 924, n. 9.

> FN1. The Court has considered Plaintiff's argument "that director conduct falls outside the protection of the business judgment rule if all of the alleged facts, if true, imply that the defendant directors knew they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss. *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch.2003)." (Pl.'s Response at 14-15). The Court does not find that Plaintiff's Complaint alleges any facts that would imply that the Outside Directors acted without adequate information or deliberation. The Complaint is devoid of facts regarding how the directors made any decisions, and thus fails to show that the directors' conduct falls outside the protection of the business judgment rule. Therefore, the Court's decision in the instant case would be the same even if the Court analyzed whether demand is excused using the *Aronson* test.

In the instant case, therefore, the Court must consider whether "the particularized factual allegations of [the] derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the plaintiff needs to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935.

In the instant case, when the complaint was filed the Board of Directors of i2 consisted of Sanjiv S. Sidhu, Harvey B. Cash, Robert J. Crandall, and Michael H. Jordan. (*See* Def. Cash, Crandall, and Jordan's Mot. at 6-7). Defendants concede that Sidhu, as i2's President and Chief Executive Officer, is an insider and, thus, could arguably be considered interested. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7). The remaining directors, Cash, Crandall, and Jordan, however, are outsiders, meaning they are not also officers of the company and so are not automatically considered interested or not independent. (*See id.*). Defendants argue that because the majority of the Board is comprised of outside directors, pre-suit demand would be excused if a majority of the Board meets the *Rales* test. (*Id.*). The Court agrees and will therefore only consider whether Plaintiffs' Complaint meets the test of disinterested and independent as to the three outside directors, Cash, Crandall, and Jordan.

**\*4** "A director is interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936. "To establish lack of independence, [Plaintiff] must show that the directors are 'beholden' to the [interested director] or so under [his] influence that their discretion would be sterilized." *Id.*

In the instant case, Plaintiff offers eight reasons why the Board is not independent or disinterested. (Compl. at 30-32). Plaintiff argues 1) that Defendant Sidhu cannot be reasonably expected to argue against his own interests by authorizing the company to seek reimbursement from him; 2) that Defendant Sidhu dominates the Board and owns approximately 27% of the company's outstanding shares; 3) that Defendants Crandall and Jordan are not disinterested because they were appointed to the Board, not elected, and that Defendants Cash, Crandall, and Jordan comprised the Audit Committee and would not sue themselves because of their potential liability for their business decisions regarding the investigations of accounting improprieties; 4) that all individual Defendants signed at least one Form 10-K or 10-Q that has since been restated; 5) that the directors

Not Reported in F.Supp.2d                                                    Page 4
2004 WL 357861 (N.D.Tex.)
(Cite as: 2004 WL 357861 (N.D.Tex.))

cannot be expected to pursue these claims because one of the directors is also a defendant in a securities fraud class action; 6) that Defendants Sidhu and Brady have close ties, evidenced by their joint ownership of a yacht; 7) that the directors allowed the Officer Defendants to sell stock and to receive bonuses while there were allegations of financial impropriety pending; and, 8) that the Board has failed to act. (Compl. at 30-32).

Defendants argue that Plaintiffs' assertions as to why demand is excused fall into four basic categories: "1) [the Outside Directors] were complicit in the alleged wrongdoing; 2) [the Outside Directors] are dominated and controlled by other persons; 3) [the Outside Directors] would not pursue derivative claims because of parallel securities litigation; and 4) [the Outside Directors] have failed to take action." (*See* Def. Cash, Crandall, and Jordan's Mot. at 8). The Court agrees with Defendants' characterization of Plaintiffs' arguments and will use these characterizations to address whether demand is excused.

1. The Directors' Potential Liability

The Delaware Supreme Court has explained that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Rales,* 634 A.2d at 936. Only when the potential for liability rises from a mere threat of personal liability to a substantial likelihood of personal liability will directors be considered interested. *Id. See also Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984). In the instant case, Plaintiff asserts that the outside Directors were interested because they faced potential liability on the wrongs Plaintiff alleges in the Complaint. [FN2] However, Plaintiff has alleged no particularized facts that raise his assertion from a mere threat to a substantial likelihood of personal liability. Plaintiff has pleaded no particularized facts which create a reasonable doubt that Defendants Cash, Crandall, or Jordan's actions were not valid exercises of business judgment. *See Rales,* 634 A.2d at 936. In fact, Plaintiff has not even stated a particular claim against the Outside Directors in his complaint or stated particular facts regarding the Outside Directors' actions on the Board. (*See generally,* Compl.). This is not sufficient to conclude that

the majority of the Board is interested.

FN2. Plaintiff relies on *McCall v. Scott,* 239 F.3d 808 (6th Cir.2001). Plaintiff argues that allegations of a breach of the duty of care will amount to a substantial likelihood of director liability for corporate losses where directors have "exhibited intentional ignorance of and willful blindness to red flags signaling fraudulent practices throughout the corporation." (Pl.'s Response at 16). The Court notes that the Sixth Circuit also cited with approval a case holding "that when director liability is predicated upon ignorance of liability creating activities only a sustained or systematic failure of the board to exercise oversight--such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." *McCall,* 239 F.3d at 817 (*citing In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 971 (Del.Ch.1996)). In the instant case, the Court finds that the Complaint makes no allegations that would show that the Outside Directors "exhibited intentional ignorance of or willful blindness to red flags" or of a sustained failure to exercise oversight, such that the Outside Directors face a substantial likelihood of liability.

2. Domination and Control of the Board

*5 "To establish a lack of independence, [Plaintiff] must show that the [outside] directors are 'beholden' to [Sidhu] or so under [his] influence that their discretion would be sterilized." *Rales,* 634 A.2d at 936. Plaintiff must "allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" *Aronson,* 473 A.2d at 816. In the instant case, Plaintiff alleges that Defendant Sidhu dominates and controls the Board such that the Outside Directors are not independent. Plaintiff makes a conclusory statement that Sidhu dominates the Board and that he owns 27% of the company's shares. (Compl. at 30). Plaintiff also seems to argue that Defendants Crandall and Jordan lack independence because they were appointed to the Board, not

Not Reported in F.Supp.2d                                                    Page 5
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

elected. (*Id.*). Plaintiff also argues that Sidhu and Brady have close personal ties as evidenced by their joint ownership of a yacht. [FN3] (*Id.*). None of Plaintiff's allegations are sufficient to excuse demand. The Delaware Supreme Court found a similar argument in *Aronson* to be insufficient to prove a lack of independence. *See Aronson, 473 A.2d at 815-16.* Plaintiff in the instant case has failed to "allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Id.* at 816 (citations omitted). The Court cannot conclude "that the complaint factually particularizes any circumstances of control and domination to overcome the presumption of board independence, and thus render demand futile." *Aronson, 473 A.2d at 817.*

> FN3. The Court finds the last argument to be inapposite because Brady is not on the Board and his relationship with Sidhu is not relevant to the present inquiry. Additionally, there is no allegation that Brady dominates or controls any of the Outside Directors.

3. Parallel Securities Litigation

Plaintiff argues that the directors cannot be expected to pursue these claims because one of the directors is also a defendant in a securities fraud class action. (Compl. at 30). The only director to be named as a defendant in the securities fraud class action is Defendant Sidhu. *See Scheiner v. Sidhu, et al.,* 3:01-CV-418-H, currently pending in this Court. Plaintiff argues that if the other directors were to pursue the derivative claims he alleges in his complaint, that this would be "an acknowledgment of the merits of the shareholders' claims." (Compl. at 30). Similar allegations have been held to be insufficient to create a reasonable doubt that directors are interested or not independent. *See Seminaris v. Landa,* 662 A.2d 13.50, 1355 (Del. Ch.1995). The Court finds Plaintiff's conclusory allegation insufficient to render demand futile.

4. Board's Failure to Take Action

Plaintiff argues that demand is futile because the Board has failed to take action to seek reimbursement of the profits,

bonuses, and compensation. (Compl. at 31-32). The Court agrees with Defendants that Plaintiff has failed to allege with particularity what information the Outside Directors knew, who knew it, when they knew it, or how they "abdicated their investigation to management." (*See* Def. Cash, Crandall, and Jordan's Mot. at 15). This allegation is, therefore, insufficient to excuse demand. In an unpublished opinion, the Delaware Court of Chancery stated, "The mere fact that [the Board] has elected not to sue before the derivative action was filed should not of itself indicate 'interestedness." ' *Richarson v. Graves,* C.A. No. 6617, 1983 WL 21109, *3 (Del.Ch. March 7, 1983).* The Court of Chancery went on to explain that "it is the Board's inaction in most every case which is the *raison d'etre* from Rule 23.1." *Id.* In the instant case, the Court agrees that Plaintiffs' assertions are not indicative of interestedness. Plaintiffs assertions here are insufficient to create a reasonable doubt and thus excuse demand.

III. CONCLUSION

**\*6** The Court concludes that Plaintiff has not created a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences," and has thus failed to demonstrate that demand is excused. *Rales, 634 A.2d at 935.* In light of this conclusion, the Court does not need to address Defendants' other arguments for why the case should be dismissed. Because Plaintiff did not make demand on the Board and failed to allege with particularity why demand was excused, as required pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law, the Court GRANTS Defendants' Motions to Dismiss.

For the reasons stated above, Defendants' Motions to Dismiss are GRANTED and Plaintiff's Complaint is DISMISSED pursuant to Fed.R.Civ .P. 12(b)(6). Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu and Beecher's Request for Judicial Notice is DENIED as moot.

SO ORDERED.

2004 WL 357861 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 6
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**


• 3:03CV01057 (Docket) (May. 16, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Not Reported in A.2d                                                                Page 1

1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Harry LEWIS, Plaintiff,

v.

Donald V. FITES, George A. Schaefer, James W. Wogsland, Charles E. Rager, Frank N. Grimsley, R.R. Thornton, Lilyan H. Affinito, John W. Fondahl, Louis V. Gerstner, Jr., Robert E. Gilmore, James P. Gorter, Walter H. Helmerich, III, Jerry R. Junkins, Charles F. Knight, Lee L. Morgan, and Rawleigh Warner, Jr., Defendants, and Caterpillar, Inc., Nominal Defendant.

**Civ. A. No. 12566.**

Submitted: Nov. 10, 1992.
Decided: Feb. 19, 1993.

**\*\*1048** Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, of counsel: Stanley M. Grossman, Marc I. Gross, and Judith R. Schneider, of Pomerantz Levy Haudek Block & Grossman, New York City, and Norman Berman, of Berman DeValerio & Pease, Boston, MA, for Plaintiff.

Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, of counsel: Douglas A. Poe, Franklin P. Auwarter, and Mitchell D. Raup, of Mayer, Brown & Platt, Chicago, Ill, for defendants.

MEMORANDUM OPINION

BERGER, Vice Chancellor.

**\*1** In this derivative action, a stockholder of defendant, Caterpillar Inc. ("Caterpillar"), alleges that the company's officers and directors breached their fiduciary duties in connection with the dissemination of periodic financial reports. In addition to Caterpillar, the complaint names as defendants thirteen directors, including three present or former officers, and three other Caterpillar officers who are not directors of the company. This is the decision on defendants' motion to dismiss for failure to make demand pursuant to Chancery Court Rule 23.1.

The facts, summarized below, are drawn from the complaint and a consent order, referred to in the complaint, entered by the Securities and Exchange Commission ("SEC") on March 31, 1992 (the "Consent Order"). Caterpillar, a Delaware corporation with operations throughout the world, manufactures heavy industrial machinery. The claims in this case relate to Caterpillar's Brazilian subsidiary, Caterpillar Brazil, S.A. ("CBSA"). In 1989, CBSA accounted for approximately 23% of Caterpillar's net profits, although CBSA's revenues represented only 5% of Caterpillar's total revenues. CBSA's exceptional 1989 results were based largely on non-operating factors such as Brazil's high inflation and a favorable currency exchange rate. In December, 1989, Brazil **\*\*1049** elected a new President who was expected to institute economic reforms to curb inflation.

Caterpillar's management recognized that changes implemented by the new administration in Brazil could have a significant impact on CBSA's 1990 performance. Caterpillar reports its financial results on a consolidated basis and historically management had not viewed each subsidiary's profits as reliable indicators of its contribution to the parent company. In January of 1990, however, Caterpillar's accounting department began to analyze CBSA's performance separately. Management's analysis was reported to Caterpillar's board at the February 1990 board meeting. Caterpillar's directors were told that the situation in Brazil was "volatile" and that operations in Brazil would have a significant negative impact on Caterpillar's overall results for 1990.

Approximately two weeks after the February board meeting, Caterpillar filed its 1989 Form 10-K. As in prior years, the 1989 financial results were reported on a consolidated basis. As a result, CBSA's disproportionate impact on Caterpillar's overall profits was not disclosed. The Management Discussion and Analysis ("MD & A") section of the Form 10-K did not provide very much information about Brazil. It stated:

Not Reported in A.2d                                                                                    Page 2
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)

Sales rose 14% in 1989 [in Latin America], the sixth consecutive year of improvement. The biggest gain was in Brazil, where very high inflation rates increased demand for hard goods, including earth moving equipment. (Given the extraordinarily high rate of inflation in Brazil, many contractors preferred to own hard assets, such as equipment, rather than depreciating cruzados.) Toward yearend, however, sales growth in Brazil moderated as interest rates rose.

**\*2** OUTLOOK

... Sales in Brazil, however, could be hurt by post-election policies which will likely aim at curbing inflation.

Consent Order, p. 6.

On March 15, 1990, Fernando Collor de Mello, Brazil's newly elected President, took office. President Collor immediately instituted sweeping economic changes, including an 80% reduction in the amount of currency in circulation and a plan to devalue the Brazilian currency. The Consent Order describes these reforms as creating an "economic crisis [where] even large companies were unable to meet their payrolls or pay normal trade payables." Consent Order, p. 4. However, the impact of these changes on CBSA did **\*\*1050** not become manifest until after the close of its first quarter on March 31, 1990.

At Caterpillar's April 1990 board meeting, management advised the directors that profits in Brazil would be substantially lower in 1990 than they had been in 1989. Management discussed the likely negative effects of President Collor's new programs, but the 1990 forecast was not revised because management considered the situation in Brazil too volatile and difficult to predict. On May 9, 1990, Caterpillar filed its Form 10-Q for the first quarter of 1990. The MD & A section of that report did not disclose anything about CBSA's anticipated performance. It stated only that demand in Brazil had increased but that Caterpillar continued to be concerned about Brazil's uncertain economic situation.

Caterpillar continued to monitor the impact of Brazil's new policies on CBSA throughout April and May of 1990. By June, Caterpillar had concluded that CBSA would suffer significant losses in 1990 as a result of the Brazilian economic reforms. Accordingly, on June 25, 1990,

Caterpillar issued a press release announcing that results for 1990 would be substantially lower than previously projected. Later that day, Caterpillar also disclosed CBSA's importance to the company's 1989 earnings and advised stock analysts that Caterpillar's disappointing results for the second quarter of 1990 were caused largely by circumstances in Brazil. The next day, Caterpillar stock opened at 51 3/4 , down 9 5/8 points from the previous day's opening price.

Following these disclosures, the SEC began an investigation and two class action law suits were filed. The class action suits charged Caterpillar and its management with violations of federal securities laws based upon alleged false statements and omissions in the company's 1989 Form 10-K and first quarter 1990 Form 10-Q. On March 31, 1992, the SEC investigation was concluded by the issuance of the Consent Order in which the SEC found that Caterpillar violated Section 13(a) and Rules 13a-1 and 13a-13 of the Exchange Act. As part of the Consent Order, Caterpillar voluntarily implemented procedures to ensure future compliance with MD & A requirements. The federal court actions are still pending.

Plaintiff claims that the alleged misstatements and omissions in Caterpillar's SEC filings have exposed the company to significant potential liability and that the company is already being injured by the cost of defending the pending class actions. Plaintiff alleges that the individual defendants breached their fiduciary duties by failing to fully disclose material information concerning CBSA and by failing **\*\*1051** to maintain adequate controls to assure proper disclosure of the same information. Plaintiff made no demand on Caterpillar's board before instituting this action. Rather, plaintiff alleges that demand would have been futile and, therefore, demand is excused pursuant to Chancery Court Rule 23.1. Defendants moved to dismiss on several grounds. However, in light of my conclusion that plaintiff has not adequately pled demand futility, I will not reach the alternative grounds for dismissal urged by all defendants or the jurisdictional argument raised by those individual defendants who are not also directors of Caterpillar.

**\*3** The test for determining whether a derivative plaintiff

Not Reported in A.2d                                                                                      Page 3
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

has adequately alleged demand futility is well settled:

> (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for more than two years but have taken no action because they participated in and approved the alleged wrongs and would have to sue themselves. Allegations of this sort offered as an excuse for failure to make demand have been rejected repeatedly. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815, 818 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Haber v. Bell,* Del.Ch., 465 A.2d 353, 359, 360 (1983). Plaintiff offers two additional factors to buttress his claim that defendant directors are interested for purposes of the demand requirement. In the complaint, he notes that defendants agreed to the entry of the Consent Order. Since the Consent Order establishes a violation of federal securities law, plaintiff argues that defendant directors are much more likely to be held liable in this case than in a case where there has been no finding of wrongdoing. This heightened threat of personal liability, according to plaintiff, creates a reasonable doubt that Caterpillar's directors are disinterested. Plaintiff also suggested, at oral argument, that several of Caterpillar's directors were interested in withholding information about CBSA because they were then standing for re-election and the undisclosed information would reflect poorly on them.

Neither of these additional facts excuse demand. The Consent Order does not contain any admission of wrongdoing and it does **\*1052** not include any findings concerning Caterpillar's directors. Thus, the Consent Order does not create a substantial likelihood of director liability. *See Aronson v. Lewis,* 473 A.2d at 815. The fact that three directors were being considered for re-election at the time of the alleged wrongdoing, likewise, fails to excuse demand. First, a majority of the Caterpillar directors were not slated for election at that time and, therefore, were not interested in avoiding disclosures in order to continue on the board.

Second, the complaint contains no allegations suggesting that the positions of those directors who were seeking re-election were actually threatened. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Alternatively, plaintiff argues that demand should be excused because there is a reasonable doubt that the directors' conduct was the product of a valid exercise of business judgment. He argues that Caterpillar's directors engaged in a knowing violation of federal securities laws. Before the two financial statements at issue were filed, the Caterpillar board knew that CBSA's profits in 1990 would be substantially lower than in 1989. Plaintiff describes this as being "obviously" material information that should have been fully disclosed. Plaintiff's Memorandum of Law, p. 15. Plaintiff acknowledges that Caterpillar's general counsel opined on the adequacy of the disclosures before the board approved filing the 1989 Form 10-K. However, plaintiff contends that reliance on outside opinions and reports is not sufficient to insulate the directors as a matter of law. *See Avacus Partners, L.P. v. Brian,* Del. Ch., Civil Action No. 11,001, Allen, C. (October 24, 1990), Mem.Op. at 16. Here, plaintiff suggests that the board's reliance was misplaced in light of the information known to the directors. Accordingly, plaintiff argues that there is a reasonable doubt that the directors' conduct will be protected by the business judgment rule.

**\*4** The problem with this argument is that it is premised on an assumption that I am not prepared to make. Plaintiff seems to be arguing that because the directors knew of the economic problems affecting CBSA, they also must have known that Caterpillar's MD & A disclosures were inadequate and misleading. The facts set forth in the Consent Order suggest the opposite:

> The MD & A sections of the 1989 10-K and 10-Q for the first quarter of 1990 were drafted by employees in Caterpillar's accounting department. Prior to the issuance of those reports, the language of the MD & A was reviewed by the Controller, Financial Vice President, Treasurer, and **\*1053** the company's legal, economic, and public affairs departments. After that, the language of the MD & A was reviewed by the top officers of the Company.

Westlaw.

Not Reported in A.2d                                                                                      Page 4
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

> The board of directors reviewed the final draft of the 1989
> Form 10-K, including the MD & A, at the February 1990
> board meeting. At that time, the board, including top
> management who were members of the board, received a
> written opinion of the company's independent auditor that
> the financial statements complied with the rules and
> regulations of the Commission, and also an opinion of the
> company's General Counsel that the Form 10-K complied
> with all the rules and regulations of the Commission.

Consent Order, p. 5 (footnotes omitted). While it is true, as
plaintiff suggests, that the directors' reliance on these reports
does not totally insulate them from potential liability, that
reliance certainly is a factor to be considered in deciding
whether there is a reasonable doubt as to the applicability of
the business judgment rule. Here, there is nothing in the
complaint to suggest that the directors' reliance was
unreasonable. Accordingly, I conclude that the complaint
fails to satisfy the second prong of the demand futility test
and that the complaint, therefore, must be dismissed for
failure to make demand.

IT IS SO ORDERED.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Slip Copy                                                                    Page 1
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Virginia.

In re PEC SOLUTIONS, INC. SECURITIES LITIGATION

**No. 03-CV-331.**

May 25, 2004.

John Christopher Pasierb, Cohen, Gettings & Caulkins, PC, Arlington, VA, Conor R. Crowley, Finkelstein, Thompson & Loughran, Washington, DC, for Plaintiffs.

Lyle Roberts, Gregory A. Harris, Wilson, Sonsini, Goodrich & Rosati, Reston, VA, for Defendants.

*MEMORANDUM OPINION*

LEE, J.

**\*1** THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint. This case concerns a federal securities class action on behalf of all persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003. The question before the Court is whether the Complaint demonstrates securities fraud in that the Defendants recklessly made false and misleading statements regarding the financial condition of PEC Solutions, Inc. that damaged the Plaintiffs. The Court concludes that the Plaintiffs' securities fraud and control person liability claims must be dismissed because: (1) the Defendants' statements are protected by the safe harbor provision of the Reform Act because they were accompanied by meaningful cautionary language and they were not worded as guarantees; (2) Plaintiffs' fail to plead fraud with particularity because there are insufficient details and the Plaintiffs do not show that many of the statements made were false; (3) Plaintiffs' fail to establish scienter because the Complaint does not show how the Defendants' acted outside the standard of ordinary care; and (4) without facts to support claims of securities fraud, there can be no liability based upon control person liability.

**I. BACKGROUND**

Plaintiffs are persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003 (the "Class Period"). Defendant PEC Solutions, Inc. (hereinafter "PEC" or the "Company") is a Delaware Corporation with its principal offices in Fairfax, Virginia. PEC is in the business of providing secure, interoperable technology solutions for clients in law enforcement, intelligence, defense, and civilian agencies within the federal government and at state and local levels. Defendants David Karlgaard ("Karlgaard"), Paul Rice ("Rice"), Stuart Lloyd ("Lloyd"), and Alan Harbitter ("Harbitter"), collectively the "Individual Defendants", are the officers and directors of PEC.

This action stems from problems related to PEC's subcontract with NCS/Pearson, Inc., later known as Pearson Government Solutions, Inc. ("Pearson"), a contractor with the U.S. Government responsible for the recruitment, assessment, and selection of federal air travel passenger screeners. The Transportation Security Administration ("TSA") was the government agency that awarded Pearson a general contract. The TSA was created by Congress in the aftermath of September 11, 2001, and was responsible for establishing a federal security workforce to screen air travel passengers in all of the nation's 429 commercial airports. Pearson's responsibilities under the contract with the TSA included finding and assessing qualified candidates and providing the day-to-day servicing in human resource support for the 45,000 federal screeners to be hired and deployed nationwide. Pearson entered into a subcontract with PEC (hereinafter the "Pearson subcontract"), which was responsible for the electronic capture and transfer of the applicants' fingerprints and the collection of the applicants' biographical information.

**\*2** The cost of the TSA's contract with Pearson was originally estimated at $104 million. Ultimately, more than $700 million was required to complete the contract. These cost overruns became the subject of an audit by the Defense Contract Audit Agency ("DCAA") and several investigations, including one by the Inspector General of the United States Department of Transportation. Additionally, the government investigated Pearson's performance under

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                                    Page 2
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

the contract because the press reported that several of the people hired as federal airport screeners had criminal records. Pending the completion of the investigations, the government suspended payment under the contract with Pearson.

The Defendants are alleged to have violated the duty to investors to promptly provide accurate and truthful information with respect to PEC's financial condition and performance, growth, and operations. Plaintiffs contend that the Defendants were aware of the problems that Pearson was having in relationship to its contract with the TSA. However, PEC issued several press releases during this period that, Plaintiffs argue, did not accurately reflect how Pearson's problems affected PEC's earnings and financial health. The result of the Defendants' alleged breach is that the Plaintiffs were induced to purchase PEC's common stock at inflated market prices. The Defendants are accused of not only deceiving and defrauding the investing public, but also of selling their personally held shares of PEC common stock in violation of federal securities laws.

## II. DISCUSSION

### A. Standard of Review

1. *Federal Rule of Civil Procedure 12(b)(6)--Failure to State a Claim Upon Which Relief Can be Granted*

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)*. When considering a motion to dismiss for failure to state a claim upon which relief can be granted, a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. *See In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620, 627 (E.D.Va.2000)*. However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir.1997)*; *Gasner v. County of Dinwiddie, 162 F.R.D. 280 (E.D.Va.1995)*. All reasonable inferences must be made in

favor of the nonmoving party. *See In re MicroStrategy, 115 F.Supp.2d at 627* (citing *Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992)*). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *Id*.

2. *Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)*

**\*3** To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages." *Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir.1999)*; *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

When proceeding under a fraud on market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.1968)*; *Miller v. Asensio, 101 F.Supp.2d 395 (D.S.C.2000)*.

In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstance constituting fraud ... be stated with particularity" in the complaint. Fed.R.Civ.P. 9(b). Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss--the Private Securities Litigation Reform Act.

3. The Private Securities Litigation Reform Act (the "PSLRA" or "Reform Act")

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 3
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement. *Borow v. nView Corp., 829 F.Supp. 828, 833* (E.D.Va.1993); *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir.1999)* (finding that as to scienter, plaintiffs are required to plead who, what, when, where, and how). Additionally, unlike Rule 9(b), which permits scienter to be averred generally, the PSLRA requires that the complaint in a securities fraud case "state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (*emphasis added* ). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15 U.S.C. § 78u-4(b)(3)(A).

The Fourth Circuit has chosen not to focus the scienter inquiry on categories of facts such as motive and opportunity. *See Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338 (4th Cir.2003)*. Rather, courts must conduct a case-specific analysis examining all of the allegations in order to determine whether they collectively establish a strong inference of scienter. *Id.* The Court in *In re MicroStrategy* concluded that in reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind," a court must "(1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by the these allegations, and (3) determine whether these inferences, individually or cumulatively provide a strong--or persuasive and cogent-- inference that the defendant possessed the requisite state of mind." 115 F.Supp.2d at 627. While the existence of particular facts demonstrating motive and opportunity to commit fraud may be relevant to the scienter inquiry, the weight accorded to those facts depends upon the circumstances of each case. *Ottmann, 353 F.3d at 345-46*. Accordingly, the totality of the circumstances alleged must demonstrate a strong

inference of the requisite state of mind. *In re MicroStrategy, 115 F.Supp.2d at 627*.

**\*4** The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness. *See Ottmann, 353 F.3d at 344; Phillips, 190 F.3d at 620*. Intentional misconduct encompasses deliberate illegal behavior. *See City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1260 (10th Cir.2001)*. Recklessness is a slightly lesser species of intentional misconduct and must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips, 190 F.3d at 621; Ottmann, 353 F.3d at 343-44; accord In re MicroStrategy, 115 F.Supp.2d at 633; Arnlund v. Deloitte & Touche, LLP, 199 F.Supp.2d 461, 474 (E.D.Va.2002)*.

B. Analysis

Plaintiffs' securities fraud claims must be dismissed because the Plaintiffs': (1) fail to plead fraud based upon the Defendants' statements regarding PEC's financial condition with the requisite particularity; (2) fail to properly plead loss causation; (3) fail to plead fraud based upon GAAP violations with sufficient particularity; and (4) fail to allege facts establishing a strong inference of scienter.

1. *Statement-by-Statement Analysis*

Plaintiffs' claims based upon the Individual Defendants' statements regarding PEC's financial condition made in press releases, conference calls, and newspaper articles must be dismissed because the Plaintiffs fail to allege fraud with the particularity required by Rule 9(b) and the Reform Act. Specifically, Plaintiffs do not allege facts that demonstrate how the Individual Defendants' statements are false and/or misleading. Additionally, the Individual Defendants forward-looking statements cannot be a basis for the Plaintiffs' fraud claims because the statements are either: (1) inactionable and immaterial as a matter of law because they are not worded as guarantees or (2) protected by the safe harbor provision of the Reform Act because they are

accompanied by meaningful cautionary language.

Courts have employed a statement-by-statement analysis in evaluating whether the complaint "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b); *see also* Arnlund v. Smith, 210 F.Supp.2d 755, 762-63 (E.D.Va.2002); *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 889 (W.D.N.C.2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. *Borow,* 829 F.Supp. at 833.

Rule 9(b) requires that allegations of fraud be pled with specificity. Fed.R.Civ.P. 9(b). Along these lines, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false. *In re First Union,* 128 F.Supp.2d at 886. Group pleading fails to satisfy the requirement that the who, what, when, where, why, and how be specified. *Id.*

**\*5** Additionally, actionable false or misleading statements must also be material. *See* In re First Union, 128 F.Supp.2d at 884; *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993) (finding optimistic predictions about the future inactionable and immaterial as a matter of law). A fact is a material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.,* 97 F.3d 675, 682-83 (4th Cir.1999). However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether "no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor." *In re MicroStrategy,* 115 F.Supp.2d at 657 (quoting *Press v.*

Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir.1999)). Furthermore, under the Reform Act, when statements are forward-looking, they are not actionable, even though they may be material, if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ. 15 U.S.C. § 78u-5(c)(1).

a. *Press release and conference call on October 22, 2002.*

In October of 2002, PEC reported its financial results for the third quarter, issued press releases, and held conference calls in order to discuss these results. Plaintiffs' claims based upon these statements must be dismissed because: (1) the Defendants cannot be held liable for failing to disclose facts that did not exist; (2) Plaintiffs do not plead that the statements were false or misleading with the required particularity; and (3) the Defendants' forward-looking statements are immaterial and protected by the safe harbor provision of the Reform Act.

On October 22, 2002, the Company issued a press release announcing its financial results for the third quarter of 2002, which was the period ending September 30, 2002. The Company posted an earnings per share of $0.25, which exceeded analysts' projections of $0.17 per share. In this press release, Defendant Rice commented on the results by stating "over the third quarter, PEC experienced significant acceleration in certain engagements related to the federal government's homeland security mission, and in the application of biometric identification technologies to various mission requirements...." Compl. ¶ 48. The press release also quoted Defendant Rice on several key business developments focusing on the Pearson subcontract. "Significant incremental orders were received for PEC's transportable automated fingerprint capture and biometric identification systems (called PACTS)." Compl. ¶ 48.

Also, during a conference call with analysts on October 22, 2002, Defendant Lloyd represented that "the Company's Day Sales Outstanding ("DSO") for the third quarter were 88 days, down from last quarter's 91 days." Compl. ¶ 50. During the same call, Defendant Rice explained that PEC's ongoing business in the current government spending environment by stating that PEC's "ongoing business is not

Slip Copy                                                                                              Page 5
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

directly impacted by a continuing resolution funding requirement ... because we have largely the long-term engagements that are incrementally authorized and funded on a regular basis." Compl. ¶ 50. In this call, Defendant Karlgaard touted the results for the quarter and stated that based on the growth in the Pearson subcontract, the Company was poised to grow and meet its revenue objectives for the year. For instance, Defendant Karlgaard mentioned revenue growth and that the Company should meet its revenue objectives for the year. Compl. ¶ 50. Defendant Karlgaard stated among other things that "this was truly an exceptional quarter for PEC. We experienced a very strong quarter partly because of quick-response orders for mobile biometric solutions relating to homeland security...." Compl. ¶ 50.

**\*6** Plaintiffs allege that the statements made by Defendants on October 22, 2002, were false and misleading because they failed to disclose: (1) that Pearson had stopped paying PEC on the Pearson subcontract in August; (2) that by December 2002, PEC was owed $15.6 million on the Pearson subcontract; (3) that Pearson and PEC were the subject of a DCAA audit due to huge cost overruns and wasteful billing; (4) that TSA had stopped paying Pearson pending the completion of the audit; and (5) that PEC might be forced to refund some of their earnings once the audit was completed. Compl ¶¶ 41, 68, 31, and 33. In other words, at base Plaintiffs' allegation is that the statements made in the press release gave the impression that there were no problems with one of the Company's largest sources of revenue, the Pearson subcontract, when indeed there were major problems that ultimately led to substantial losses for the Plaintiffs.

First, the Defendants's statements of October 22, 2002, are not actionable because the Defendants cannot be held liable for failing to disclose facts that did not exist. For instance, Plaintiffs state that the Defendants' October statements are false and misleading because "by December 31, 2002, PEC had a receivable of $15.6 million from Pearson." Compl. ¶ 68. However, Defendants' cannot be held liable based upon a statement made in October when there is no proof that the fact existed until December. Even if PEC had accounts receivable on the Pearson subcontract in August,

September, or October, Plaintiffs do not allege the specific amount owed at that time. The Court cannot find that statements regarding the circumstances of Pearson's payments to PEC are false, where there is insufficient information regarding the amount owed. In fact, the Defendants allege that Pearson continued to make payments under the contract, including a $10 million payment in January 2003. Moreover, this payment is important because it demonstrates that Plaintiffs' contention that Pearson would not pay PEC until the conclusion of the audit is false because the DCAA's audit of Pearson began in June 2003 and, as far as Defendants are aware, is still ongoing. Mot. to Dismiss at 10 n. 7.

Moreover, Plaintiffs cannot demonstrate that the DCAA was conducting an audit of PEC at the time the October statements were made. The Plaintiffs basis for this allegation is the congressional testimony of Mac Curtis, President of Pearson, and Kenneth Mead, Inspector General of the U.S. Department of Transportation. Regarding Mr. Curtis, Plaintiffs' quote him as saying "the DCAA has come in and audited a lot of our subcontractors, starting in August-September [2002] time frame,...." Compl. ¶ 31. However, Mr. Curtis never mentions PEC in the context of an audit. Furthermore, Mr. Mead is quoted as saying that the DCAA "questioned over $124 million of almost $620 million audited." Again, there is no mention of PEC. Given that these two statements are the only support for Plaintiffs' allegations regarding an audit of PEC, there is no basis for Plaintiffs' claims based upon a DCAA audit of PEC. Accordingly, Plaintiffs' claims of fraud based upon allegations of audit must be dismissed.

**\*7** Second, Plaintiffs do not plead that the Defendants' statements were false and misleading with particularity. With respect to Defendants' statements regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs, Plaintiffs fail to demonstrate how these statements were false. Plaintiffs do not plead facts that demonstrate how PEC's reports regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs are inconsistent or misstated. Furthermore, Plaintiffs do not mention when each of the Individual Defendants learned when each statement was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

false or how they learned the statement were false. Additionally, Plaintiffs make conclusory statements regarding the misleading nature of the October statements, but do not state with specificity how the statements were misleading.

Third, the Court finds that the statements made on October 22, 2002, inactionable because they are immaterial as a matter of law. When determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips,* 109 F.3d at 615 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The "total mix" of information includes publicly available information. *Id* at 615, 617. As in *Phillips,* Plaintiffs in the instant action rest their Complaint "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statement[s] from [their] context and from the wealth of information publicly available when [they] were made." 4 F.3d at 615. For instance, Plaintiffs allege that PEC failed to disclose that the Pearson subcontract was experiencing problems or no growth. Compl. ¶ 51(a). However, PEC disclosed that "future revenues based on the Pearson contract were uncertain" and that "the Company would have to start speculating more as we talk about the future and what other elements of it [the project] they're [Pearson] going to engage us on." Mot. to Dismiss at 13; 10/22/02 Call. Tr. at 20.

Fourth, to the extent that the Defendants' statements are forward-looking, they are protected by the Safe Harbor provision of the Reform Act. The Reform Act's safe harbor provision shields defendants from liability where the alleged materially false and misleading statements are forward-looking and accompanied by meaningful cautionary language or where the plaintiff fails to plead specific facts showing that the defendants had actual knowledge that each forward-looking statement was false or misleading when made. 15 U.S.C. § 78u-5(c)(1). A statement is forward-looking if it concerns a projection of financial items and if its truth or falsity is discernible only after it is made. 15 U.S.C. § 78u-5(i)(1); *Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 722 (E.D.Va.2003)(citing *Harris v. Ivax*

*Corp.,* 182 F.3d 799, 805 (11th Cir.1999)). Additionally, cautionary language is meaningful if it conveys information about factors that could realistically cause results to materially differ from those projected. *See In re Humphrey Hospitality Trust, Inc. Sec. Litig.,* 219 F.Supp.2d 675, 683-84 (D.Md.2002).

**\*8** For example, Defendants' statements regarding expected revenue growth, Compl. ¶ 48, and expected earnings per share, *id,* are forward-looking statements because they involve financial projections that will not be determined to be true or false until some point in the future. Moreover, these statements are protected by the safe harbor provision because at the beginning of all of PEC's investor calls, including the one in October 2002, investors are given a warning about factors that could materially alter the projections given. The warning states that "we may make forward-looking statements that involve risks and uncertainties. These risks and uncertainties could cause PEC Solutions' results to differ materially from management's current expectations and adversely affect the financial condition of the Company." *See* 10/22/02 Call Tr. at 1; Mot. to Dismiss at 12. Similarly, all press releases state that "This press release may contain forward-looking information ... and is subject to the safe harbor created by [the Reform Act]." *See* Mot. to Dismiss at 12. Accordingly, the Defendants' forward-looking statements are not actionable pursuant to the safe harbor provision of the Reform Act. 15 U.S.C. § 78u-5.

b. *November 14, 2002, quarterly report*

On November 14, 2002, PEC filed its quarterly report for the period ending September 30, 2002. Plaintiffs' claims based upon the statements made in this report must be dismissed because Plaintiffs fail to allege fraud with particularity and the forward-looking statements are protected by the safe harbor provision of the Reform Act. The report reiterated the Company's earnings and accounts receivables published in the October 22, 2002, press release, and stated, among other things, that "Management believes the effect of audit adjustments, if any, on periods not yet audited, will not have a material effect on the financial statements." Compl. ¶ 53.

Slip Copy                                                                                          Page 7
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

Plaintiffs allege that the statements contained in the November 2002 quarterly report were false and misleading because the Company failed to disclose: (1) that TSA had stopped paying Pearson; (2) that Pearson had stopped paying PEC; and (3) the true effects of the government's audit on its revenue. Compl. ¶ 51. These statements are forward-looking within the meaning of the safe harbor provision because they are financial projections. Additionally, it is protected by the safe harbor provision of the Reform Act because it is accompanied by meaningful cautionary language that stated "Payments to the Company on contracts with agencies and departments of the U.S. Government are subject to adjustment upon audit by the U .S. Government." Compl. ¶ 53. The language is meaningful because it advises the investor that adjustments may have to be made. Moreover, without facts to support the existence of a DCAA audit, Plaintiffs do not have a basis to state that this statement is false. Furthermore, to the extent that this and other statements in the quarterly report are fraudulent, Plaintiffs' claims based upon these statements nevertheless fail because Plaintiffs do not plead with particularity. For instance, there are no facts alleged that discuss who made these statements. Accordingly, Plaintiffs' claims based upon these statements must be dismissed as inactionable.

c. *February 11, 2003, press release and conference call and February 12, 2003, news article.*

**\*9** Plaintiffs' claims based upon the statements made in the February press release, conference call, and news article must be dismissed because: (1) the Plaintiffs fail to plead fraud with particularity; (2) the Defendants' forward-looking statements are either immaterial or protected by the safe harbor provision of the Reform Act; and (3) the Defendants cannot be held liable based upon statements made by third parties.

On February 11, 2003, PEC filed its 10-K form, which announced the financial results for the fourth quarter of 2002 and the fiscal year 2002, ending December 31, 2002. The Company reported earnings of $0.20 per share for the quarter and $0.75 per share for the year. Compl. ¶ 55. Additionally, the Company missed its projected revenues because it posted revenues of $48.3 million for the quarter as opposed to the $51 million forecasted.

Defendant Karlgaard commented on the results in a press release dated February 11, 2003. He said "PEC is pleased to report that fiscal year 2002 was a record year in growth and profitability for the company ... We think these numbers demonstrate a strong, consistent record of performance...." Compl. ¶ 55. Plaintiffs quote the text of the press release in paragraph 55 and then simply state in paragraph 59 that these statements are false and misleading for the same "reasons set forth in ¶ 49." [FN1] Compl. ¶ 59. Plaintiffs do not specifically state why Defendant Karlgaard's statement was false or how it was misleading. Moreover, Plaintiffs fail to identify the specific statements that are allegedly misleading and to identify how the omitted facts made those statements misleading. *See Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir.1999); see also Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir.1990)* (duty to disclose facts under the securities laws "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.") (internal quotations and citations omitted). Without an explanation as to how these general statements are incomplete or misleading, other than to say that a certain disclosure should have been made, Plaintiffs' claims of fraud based upon Defendant's Karlgaard's February 11, 2003, statement must fail.

> FN1. Paragraph 49 of the Complaint states that the statements are materially false and misleading because the Defendants failed to disclose: (1) that Pearson and PEC were being investigated and audited; (2) that there were cost overruns on the TSA contract; (3) that as a result of the cost overruns TSA stopped paying Pearson and Pearson stopped paying PEC; (4) that work had halted on the TSA contract and would not continue until the completion of the audit; (5) that PEC might be forced to refund a portion of its fees; (6) that PEC's financial results were materially inflated because of a failure to maintain a proper reserve for uncollectible receivables; and (7) that given the foregoing PEC had no basis for its revenue projections. Compl. ¶ 49.

Plaintiffs' securities fraud claims based upon Defendant Lloyd's statements must fail because these statements are immaterial as a matter of law and protected by the safe harbor provision of the Reform Act. In the same press release dated February 11, 2003, Defendant Lloyd stated that "revenue is expected to be between $48 to $49 million for the first quarter 2003, and diluted EPS should be between 17 and 18 cents for the quarter. Guidance for 2003 is for revenue to grow between 30 percent and 40 percent, resulting in revenue between $240 to $255 million. EPS is estimated to be between 85 to 92 cents for the full year 2003." Compl. ¶ 55. This statement contains financial projections, which are "not actionable under federal securities laws." *Raab, 4 F.3d at 290* (quoting *Krim v. Banctexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir.1993)*). Moreover, statements such as this one lack materiality because "the market price of a share is not inflated by vague statements predicting growth." *Id.*

*\*10* Additionally, Defendant Lloyd's statements are protected by the safe harbor provision of the Reform Act because the statement was accompanied by meaningful cautionary language. The press release noted that "This press release may contain forward-looking information ... and it subject to the safe harbor created by the [Reform Act]." Compl. ¶ 55. Furthermore, the Company warned investors about certain risks in the 2002 Form 10-K, which is incorporated by reference. *See In re Humphrey Hospitality Trust, 219 F.Supp.2d at 684* (noting that SEC filings incorporated by reference are adequate to invoke safe harbor protection). For example, PEC disclosed that "if the Federal government does not adopt a budget ... Federal agencies may be forced to suspend our contracts due to a lack of funding." 2002 Form 10-K. This statement constitutes meaningful cautionary language because it warns the investor that PEC's projections may be subject to fluctuation. In the same Form 10-K, PEC disclosed that "An audit could result in a substantial adjustment to our revenues because any costs found to be improperly allocated to a specific contract will not be reimbursed, while improper costs already reimbursed must be refunded." *Id.* Similarly, this disclosure warns investors that audits are routine and that the results can materially affect revenue projections. Given that Defendant Lloyd's statements were

forward-looking financial projections accompanied by meaningful cautionary language, these statements are inactionable as a matter of law because they are protected by the safe harbor provision of the Reform Act. *See 15 U.S.C. § 78u-5.*

Also, PEC's conference call conducted on February 11, 2003, cannot be a basis for Plaintiffs' claims of securities fraud because Plaintiffs fail to plead fraud with specificity. PEC's Director of Corporate Communications, John McNeilly, stated towards the beginning of the phone call that PEC's revenue for the fourth quarter "was down 3% under planned departments." Compl. ¶ 56. He also said that PEC was experiencing "temporary discontinuity" in one of its biometric contracts. Compl. ¶ 56. Defendant Rice expounded on that point and indicated that the Company's shortfall was "related to [the] biometrics program and sort of spinning one phase of that effort down and not spinning up the next phase of that effort in the manner that we expected...." Compl. ¶ 56. Plaintiffs assert that these statements were false and misleading because the Defendants did not disclose the problems associated with the Pearson subcontract.

Plaintiffs do not specify how the exclusion of additional information about the biometrics contract renders the Company's statements misleading or false. Simply mentioning biometrics products does not trigger a duty to disclose "every tangentially related fact that might interest investors" about the biometrics contract. *See Anderson v. Abbott Labs., 140 F.Supp.2d 894, 903 (N.D.Ill.2001),* aff'd, *Gallagher v. Abbott Labs., 269 F.3d 806 (7th Cir.2001).* Moreover, the Company disclosed in its 2002 Form 10-K that future revenues based upon the Pearson subcontract were uncertain noting that "if any ... prime contractors eliminate or reduce their engagements with us, or have their engagements eliminated or reduced by their end-clients, we will lose a source of revenues, which if not replaced, will adversely affect our operating results." 2002 Form 10-K at 10. PEC also noted that following termination, "if the client requires further services of the type provided in the contract, there is frequently a competitive rebidding process ... Even if we do win the rebid, we may experience revenue shortfalls ... [which] could harm operating results for those

Slip Copy                                                                                                              Page 9
2004 WL 1854202 (E.D.Va.)
(Cite as: 2004 WL 1854202 (E.D.Va.))

periods." *Id.* Plaintiffs do not present facts that demonstrate that PEC's statements were false and misleading despite the Defendants' disclosure warning investors that the figures associated with the biometrics contract were subject to change. Without specific facts demonstrating how the statements in the February 2003 conference calls were false or misleading, Plaintiffs securities fraud claims based upon these statements must be dismissed.

**\*11** The statements discussed in the February 11, 2003, press release and conference call were analyzed in an article published by the Dow Jones Business News on February 12, 2003. This article also mentioned several analysts' opinions that PEC's projections would be difficult to meet. The Individual Defendants cannot be held liable for securities fraud based upon the article published by the Dow Jones Business News because the Individual Defendants do not control what is published by this third party.

Plaintiffs argue that the statements made in the Dow Jones Business News were false and misleading because the Defendants misrepresented that the Pearson contract would continue to contribute to the company's future earnings. The issue is whether companies can be held liable based upon statements contained in articles published by the news media or other third-parties. It is well settled that companies cannot be held liable for the independent statement of a third party, where the company does not exercise control over the third party. *See Raab,* 4 F.3d at 288. Without control over the third party publication, the company's statements can be taken out of context, misquoted, or stripped of important qualifiers. *Id.* Accordingly, the Plaintiffs' allegations with respect to the February 12, 2003, article published by the Dow Jones Business News are insufficient to establish liability.

2. *Failure to allege loss causation*

Plaintiffs do not show that the Defendants' alleged misrepresentations caused their damages. Specifically, Plaintiffs do not sufficiently allege that the price of the stock was artificially inflated due to a fraudulent misrepresentation. In order to establish loss causation for a securities fraud claim, the plaintiff must allege: (1) that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation and (2) that the artificial inflation was actually lost due to the alleged fraud. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir.2003). In other words, the Plaintiffs must show that the stock decline occurred as a result of the disclosure of the misrepresentations. *Id.*

Plaintiffs' single statement regarding loss causation is in response to the Defendants' guidance that the revenue for the fourth quarter, the fiscal year, and earnings per share would be lower than expected. This guidance was stated in a press release dated March 14, 2003, where PEC announced that its financial projections would be lower than expected due to "anticipated delays in new government awards stemming from the unusually late passing of the 2003 Federal civilian agency budget." Compl. ¶ 60. Plaintiffs aver that this announcement "shocked the market, causing the stock to lose over 40% of its market value by dropping more than $6 per share on 17-times its average daily volume, falling to a fraction of its $37.25 Class Period high and causing damage to Plaintiff and the Class." Compl. ¶ 61. However, Plaintiffs never mention how the Defendants' alleged misrepresentations led to the fall of the stock price. A conclusory statement that the stock price fell as a result of a company's guidance is not enough to show that the decline in the stock price was due to a defendant's fraud or misstatements.

3. *Failure to sufficiently allege Generally Accepted Accounting Principles (GAAP) violations*

**\*12** Similar to Plaintiffs' general allegations of securities fraud, Plaintiffs' claims of accounting fraud are not sufficiently particular as required by Rule 9(b) and the Reform Act. *See* Fed.R.Civ.P. 9(b); 15 U.S.C. § 78u-4(b)(1). For instance, Plaintiffs cite Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Compl. ¶ 63. Also, Plaintiffs mention that "GAAP requires that financial statements account for existing uncertainties as to probable losses." Compl. ¶ 64. Then, Plaintiffs allege PEC's reported earnings during the quarter ending September 30, 2002, were materially

Slip Copy                                                                                                          Page 10
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

understated because "Defendants knew, or recklessly disregarded, that PEC Solutions' reserve for uncollectible receivables at September 30, 2002 was materially understated...." Compl. ¶ 64. In addition, during this quarter, PEC's "accounts receivables increased by more than 38% ... However, during this same period, PEC Solutions' reserve for uncollectible accounts actually declined, to $322,000 from $325,000." Compl. ¶ 64. Based upon these facts and given that (1) PEC had egregious billing practices; (2) the DCAA commenced an audit of PEC's billing practices; and (3) PEC was not receiving payment on Pearson subcontract, Plaintiffs allege that PEC failed to reserve for its uncollectible accounts.

Plaintiffs cite the language of the applicable standard, then make conclusory allegations regarding the Defendants' violations of the standard without supporting their claims with documentation or statements regarding how the Company violated the standard. However, Plaintiffs fail to allege why PEC's reports are violations of GAAP and how the reports violated the rules. These details are necessary to adequately plead a fraud claim based upon GAAP violations. *See* _In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 893 (8th Cir.2002)_ (finding that in order to plead a violation of FAS 5, plaintiffs must identify the contracts in question, the terms of the contracts, the approximate amount of any misstatement, and the source for the misstated amount); _Smith, 286 F.Supp.2d at 718_ (finding no violation of GAAP where Plaintiffs failed to cite documents, meetings, or individuals in support of their GAAP claim).

First, Plaintiffs state no facts to support their claims that PEC had egregious billing practices, that DCAA was conducting an audit of PEC, or that PEC had not been paid by Pearson at the time the figures were reported to the SEC. Second, Plaintiffs do not state how PEC's reported uncollectible reserve amount is fraudulent or misleading. There are no documents, meetings, or individuals cited to back up Plaintiffs' claims. On the other hand, Defendants' financial statements were reviewed by independent auditors, who provided an opinion that the Company's financial statements were fairly prepared in accordance with GAAP. Plaintiffs do not challenge this opinion and "a failure to challenge the independent auditors' opinions weakens an

allegation that a defendant violated GAAP." _Smith, 286 F.Supp.2d at 719_. Given that Plaintiffs do not provide sufficiently particular information regarding how PEC's financial statements violated GAAP, Plaintiffs' claims based upon allegations of accounting fraud must be dismissed.

4. *Failure to allege facts establishing a strong inference of scienter*

**\*13** The Reform Act requires that, with respect to each allegation, the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *See* _Ottmann, 353 F.3d at 344; 15 U.S.C. § 78u-4(b)(2)_. A plaintiff may allege the required state of mind, or scienter, by pleading either intentional misconduct or recklessness. *See* _Ottmann, 353 F.3d at 344_. Intentional misconduct encompasses deliberate illegal behavior. *See* _Fleming, 264 F.3d at 1260_. On the other hand, recklessness must be based upon highly unreasonable acts that the defendant knew or obviously must have known would present a danger of misleading the plaintiff. *See* Phillips, 190 F.3d at 321. Additionally, "allegations of scienter must be based on a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required state of mind." _Phillips, 190 F.3d at 621_ (quoting _Zeid v. Kimberley, 973 F.Supp. 910, 918 (N.D.Cal.1997)_). Moreover, "a court should not consider each relevant factual allegation solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint." _In re MicroStrategy, 115 F.Supp.2d at 631_; *see also* _Ottmann, 353 F.3d at 345_ (finding that in each case the court should examine all of the allegations to determine whether they collectively establish a strong inference of scienter). Specific facts demonstrating motive and opportunity may be relevant, but are typically insufficient to establish a strong inference of scienter by themselves. *See* _Ottmann, 353 F.3d at 345-46; Fleming, 264 F.3d at 1262_.

Plaintiffs allege that the Individual Defendants, by virtue of their association with and control over PEC, received information reflecting the "true facts" regarding PEC's business operations such that they (1) knew the public documents and statements were materially false and misleading and (2) knowingly participated in the issuance of these statements to the public in violation of federal

Slip Copy                                                                                    Page 11
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

securities laws. Compl. ¶ 76. Additionally, Plaintiffs allege that the Defendants knew or recklessly disregarded material facts including: (1) the DCAA's audit and investigation of PEC; (2) substantial cost overruns associated with the contract with the TSA; (3) Pearson stopped paying PEC under the subcontract; (4) PEC might be forced to refund a portion of the fees that it received for its work on the Pearson subcontract; (5) and PEC's accounts receivables were materially understated.

First, Plaintiffs fail to establish the existence of fraud and where there is no fraud, there can be no state of mind for fraud. *See* *San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., 75 F.3d 801, 813-14 (2d Cir.1996).* As stated above, Plaintiffs present no facts that demonstrate that PEC was the subject of a DCAA audit at the time the alleged false and misleading statements were made. Furthermore, Plaintiffs do not allege how the Defendants' statements are false and misleading based upon the alleged overbilling. Similarly, with respect to Pearson's nonpayment of PEC, Plaintiffs do not state with particularity why the Defendants' alleged non-disclosure of this fact renders all of the Defendants' statements about PEC's financial condition false or misleading. Plaintiffs cannot show that the Defendants' statements are false and misleading based upon the failure to disclose information regarding the possibility of being required to refund money to the TSA because the Defendants did disclose that the refunding of fees earned was a possibility in PEC's financial statements. Lastly, Plaintiffs do not provide sufficiently particular information regarding how the alleged material understatement of accounts receivables is false or misleading. Therefore, Plaintiffs fail to demonstrate a strong inference of scienter because Plaintiffs' allegations of fraud have been shown to be insufficiently supported by factual information.

**\*14** Second, Plaintiffs' allegations of scienter fail because the Court cannot simply infer or imply knowledge of material facts based upon conclusory allegations. *See* *Fleming, 264 F.3d at 1264; In re Criimi Mae, Inc. Sec. Litig., 94 F.Supp.2d 652, 661 (D.Md.2000)* (noting that merely implying the Defendants must have known of false and misleading statements regarding the financial condition

of the company is insufficient to raise a strong inference of scienter). The mere fact that a defendant occupied a senior position in the company is not sufficient to impart knowledge of the specific fact of materiality. *See* *Fleming, 264 F.3d at 1264.* Plaintiffs simply state that the Defendants knew or recklessly disregarded material facts based upon their positions in the Company. Compl. ¶ 76. Plaintiffs do not show how the Defendants deliberately engaged in illegal behavior or knew, or obviously should have known, that facts not disclosed by PEC regarding PEC's financial condition during the periods it was actively working on the Pearson subcontract were material. Allegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *Fleming,* 264 F.3d at 1364 (quoting *In re Advanta, 180 F.3d at 539).* Without particularized facts giving rise to a strong inference of scienter, Plaintiffs' claims of securities fraud must be dismissed.

Third, Plaintiffs fail to demonstrate the existence of a motive and opportunity to commit fraud. Although the presence of facts demonstrating motive and opportunity alone may not be sufficient to give rise to a strong inference of scienter, such facts are nonetheless relevant to the question of whether the required state of mind exists. *See* *Ottmann, 353 F.3d at 345-46.*

Plaintiffs allege that the Individual Defendants were motivated to overstate PEC's costs on the Pearson subcontract because the Company's accounting policies allow the Company to "recognize revenues on cost reimbursement contracts as services are provided," which "are equal to the costs incurred in providing these services plus a proportionate amount of [the] fee earned." Compl. ¶ 78. In other words, Plaintiffs allege that the Individual Defendants were "motivated to overbill on the Pearson Subcontract so that PEC Solutions could inflate the amount of its reported revenues and profits during the Class Period." Compl. ¶ 78.

The first issue with Plaintiffs' allegation regarding overbilling is that the Plaintiffs fail to plead with

Westlaw.

Slip Copy                                                                                                    Page 12
2004 WL 1854202 (E.D.Va.)
(Cite as: 2004 WL 1854202 (E.D.Va.))

particularity the facts creating a strong inference that *each* of the Individual Defendants had the motive and opportunity to commit fraud or consciously or recklessly made material statements or failed to disclose material information. *In re Trex Co. Sec. Litig., 212 F.Supp.2d 596 (W.D.Va.2002).* Without information regarding how each of the Individual Defendants had the required state of mind, Plaintiffs allegations of scienter cannot be a basis for Plaintiffs' claims of securities fraud. *Id.* Second, the general motive that the Individual Defendants were motivated to inflate the amount of revenues and profits is an insufficient motive for fraud under the circumstances. *See id* at 607 (finding that the general motive of a corporation or its officers to increase share price and to paint a favorable business picture of the corporation are not sufficient motives for fraud). Consequently, Plaintiffs have not shown a sufficient motive for the Individual Defendants to have committed fraud based upon the overstatement of costs and overbilling.

*15 Fourth, Plaintiffs' principal allegations regarding scienter refer to the Individual Defendants' alleged insider trading; however, these allegations are insufficient because Plaintiffs fail to show that the insider trading was unusual or suspicious. A plaintiff attempting to show the required state of mind based upon allegations of insider trading must show that (1) the individual defendants were engaged in insider trading and (2) the trading was unusual or suspicious. *See In re MicroStrategy, 115 F.Supp.2d at 643* (citing *Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir.1999)*). As a part of this inquiry, courts consider several factors, including the insider's previous trading history, the amount and percentage of shares sold by insiders, and the timing of the sale. *See, e.g., Roncini v. Larkin, 253 F.3d 423, 435 (9th Cir.2001)* ("Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (internal quotations and citations omitted).

Plaintiffs simply list the dates trades were made, the number of shares sold, the price per share, and the value of the shares, and then make the conclusory statement that the timing was unusual and suspicious because the Individual Defendants knew about the problems associated with the

Pearson subcontract. *See* Compl. ¶ 47. Plaintiffs do not mention the Individual Defendants previous trading history or the percentage of stock sold. Accordingly, these allegations are insufficient to support an inference of scienter because Plaintiffs do not allege the context or the scope of the Individual Defendants' trading. *See In re Advanta, 180 F.3d at 540* ("If the stock sales were unusual in scope or timing, they may support an inference of scienter.").

Similarly, in order to survive a motion to dismiss, Plaintiffs must allege, for *each* Defendant, facts regarding overall stock holdings, the percentage of stock sold, how the proceeds compared to their overall compensation, and how these sales compare to their previous trading history. *See Glaser v. Enzo Biochem, Inc., 303 F.Supp.2d 724, 747 (E.D.Va.2003).* Since Plaintiffs do not allege facts with respect to the how the Individual Defendants engaged in unusual or suspicious insider trading, Plaintiffs allegations of insider trading are insufficient to demonstrate the required state of mind.

In fact, a closer look at the scope and context of the Individual Defendants' trades actually negates the inference of scienter. With the exception of Defendant Lloyd, the amount of stock sold during the Class Period constituted less than two percent of the total holdings of the Individual Defendants. *See* Mot. to Dismiss at 15. With respect to Defendant Lloyd, the percentage of stock sold was 13 percent of his total holdings. *See id.* These percentages are not of the sort usually considered suspicious by courts. *See, e.g., In re First Union, 128 F.Supp.2d at 898* (finding disposal by corporate officers of less than 5% of total holdings insufficient to plead scienter as "such a trivial amount of trading affirmatively demonstrates the absence of scienter."); *In re E. spire Communs., Inc. Sec. Litig., 127 F.Supp.2d 734, 743 (D.Md.2001)* ( "fact that an individual defendant sold so little stock can be construed as negating the inference that there was fraud."); *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1094 (9th Cir.2002)* (finding sale of 13 percent not suspicious). The Individual Defendants' failure to significantly profit from allegedly fraudulent insider trading negates the idea that they had a motive to commit fraud.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 13
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

**\*16** Moreover, the fact that three of the four Individual Defendants acquired PEC stock during the class period, further negates any idea that the Individual Defendants had a motive to commit fraud. On February 13, 2003, Defendants Karlgaard and Rice exercised options for 32,046 shares of PEC stock. *See* Mot. to Dismiss at 25. On the same date, Defendant Lloyd exercised options for 48,978 shares of PEC stock. These exercises of stock options took place less than one month before the stock price declined as a result of the guidance announcement of May 14, 2003. Defendants Karlgaard, Rice, and Lloyd made no sales between the time period when they exercised options in February and the May announcement. Without factual support to negate the inference that the Individual Defendants did not have a motive to inflate the price of the stock given that they purchased the stock just before the guidance was revised, Plaintiffs' claims based upon the allegation of insider trading must be dismissed.

5. *Plaintiffs' claim pursuant to Section 20(a) of the Exchange Act must be dismissed*

Where claims pursuant to Rule 10b-5 do not lie, nor may claims pursuant to Section 20(a). *See Longman*, 197 F.3d at 686. Given that Plaintiffs' claims based upon securities fraud fail, there is insufficient evidence upon which to base Plaintiffs' Section 20(a) claim for "control person" liability; accordingly, this claim shall be dismissed.

III. CONCLUSION

Plaintiffs' claims of securities fraud must be dismissed because the complaint fails to: (1) plead fraud with the requisite particularity and specificity; (2) properly allege loss causation; and (3) demonstrate that the Defendants' forward-looking statements are actionable given that they are immaterial either because they are not worded as guarantees or because they are protected by the safe harbor provision of the Reform Act. Additionally, Plaintiffs' claim based upon control person liability must be dismissed because where there is no claim based upon securities fraud, a claim for control person liability cannot lie.

Furthermore, Plaintiffs Motion for Leave to Amend the Consolidated Class Action Complaint is denied because

Plaintiffs have had opportunities to plead a proper cause of action and the Court finds that further amendment would be futile for the reasons stated above.

A separate judgment order pursuant to Rule 58 of the Federal Rules of Civil Procedure will issue shortly.

The Clerk is directed to forward this Opinion to the counsel of record.

2004 WL 1854202 (E.D.Va.)

**Motions, Pleadings and Filings (Back to top)**
• 1:03CV00331 (Docket) (Mar. 18, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

2001 WL 812082                                                                                                   Page 1
2001 WL 812082 (E.D.La.)
**(Cite as: 2001 WL 812082 (E.D.La.))**

**H**
**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

UNITED STATES
v.
Jon QUINONES

**No. CRIM. 00-336.**

July 18, 2001.

*ORDER AND REASONS*
CLEMENT, Chief J.

**\*1** Before the Court is defendant Jon Quinones' Motion for Correction of Recommended Sentencing Guidelines. For the following reasons, the defendant's motion is DENIED.

BACKGROUND

Jon Quinones was indicted in a three-count superseding indictment on charges of distribution of cocaine base and cocaine hydrochloride. Quinones has pled guilty to the indictment and is scheduled to be sentenced on July 18, 2001. On October 25, 2000, Mary Gay, a forensic chemist for the Drug Enforcement Agency, weighed the drugs seized from Quinones. Gay found that the weight of the cocaine base charged in Count One was 3.5 grams, the cocaine hydrochloride charge in Count Two was 51.5 grams, and the cocaine base charge in Count Three was 52.9 grams. On January 18, 2001, Quinones pled guilty to all counts of the superseding indictment and signed a factual basis which set forth the drug weights as determined by Gay.

For purposes of sentencing, Quinones contests the accuracy of the Government's determination that the cocaine base charged in Count Three weighs 52.9 grams. [FN1] On June 28, 2001, Quinones retained Dr. Augustine S. Aruna, Doctor of Pharmacy, to re-weigh the contested drugs. Aruna determined that the crack cocaine involved in Count Three weighs 46.82 grams. The Government argues that Aruna's measurement is inaccurate because (1) a significant amount

of water evaporated from the crack cocaine between the time it was originally weighed in October 2000 and the time it was re-weighed in June 2001, (2) a portion of the crack was used for testing at the DEA laboratory and could not be replaced, (3) mass was lost each time the cocaine was removed from its packaging to be re-weighed, and (4) the scale used by Dr. Aruna was not calibrated.

> FN1. Although Quinones did not challenge the drug weight at his rearraignment, he is entitled to do so at sentencing. *See United States v. Naranjo,* 755 F.Supp. 46 (D.R.I. Feb. 1, 1991) (holding that the quantity of cocaine in defendant's possession was not critical for purposes of trial or entry of guilty plea, but became important only for purposes of sentencing, at which time it could be contested).

LAW AND ANALYSIS

"At sentencing, the Government bears the burden of proving by a preponderance of the evidence the quantity of drugs chargeable to a defendant or defendants." *United States v. Thomas,* 11 F.3d 620, 631 (6th Cir.1993). *See also United States v. Rios-Quintero,* 204 F.3d 214, 219 (5th Cir.2000) (holding that the Government bears the burden of proving drug quantity). The Government has submitted the affidavit of Mary Gay, the forensic chemist at the DEA who originally weighed the crack cocaine involved in Count Three of the superseding indictment. Gay received a Bachelor of Science Degree in Chemistry from the University of Texas in 1997, has participated in several DEA chemistry training courses, has testified as an expert witness numerous times over the past two years, and has analyzed over 800 drug exhibits. The Court finds that Gay is qualified as an expert in forensic chemistry.

In her affidavit, Gay states that (1) a substantial amount of water is used to convert cocaine hydrochloride and that it is common for that water to evaporate over time causing a loss of mass, (2) a portion of the cocaine base was used for testing could not be replaced for reweighing, (3) mass was lost each time the cocaine base was removed from its packaging to be reweighed, and (4) the scale used by Dr. Aruna for re-weighing was not calibrated. In response to

2001 WL 812082                                                                    Page 2
2001 WL 812082 (E.D.La.)
**(Cite as: 2001 WL 812082 (E.D.La.))**

Gay's findings, Quinones argues that (1) there is no evidence that evaporation did in fact occur, (2) that nine-tenths of a gram was used for testing and can be added to Aruna's measurement, (3) that Gay was present at the reweighing to witness whether any drugs were lost, and (4) that Aruna's scale only exhibited a variance of .03 grams.

**\*2** In light of the fact that Dr. Aruna weighed the drugs over eight months after Gay, the Court accepts Gay's opinion that evaporation and water caused the discrepancy between the first and second weighing. Accordingly, Quinones' Motion for Correction of Recommended Sentencing Guidelines is DENIED.

2001 WL 812082 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**
• 2:00CR00336 (Docket) (Oct. 19, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Not Reported in A.2d                                                             Page 1
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Barbie RATTNER, Plaintiff,

v.

D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David
J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James
M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L.
Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants,
and
VERISIGN, INC., a Delaware corporation, Nominal Defendant.

No. Civ.A. 19700.

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.

David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.

**\*1** Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H. Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L. Evan ("Evan"), Kevin R. Compton ("Compton"), William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of the Board and Bidzos is the Vice Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the "Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed [FN2] is Sclavos, who is also VeriSign's President and Chief Executive Officer. [FN3] Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.

> FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

**\*2** The remaining Individual Defendants, with the exception of Tomlinson, [FN4] are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice

President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion. [FN5] The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

Not Reported in A.2d                                                                                      Page 3
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . [FN6] Thus, Rattner concludes that because the Company failed to record revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and]

(iii) the Company would need to massively increase its allowance for doubtful accounts. [FN9]

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. [FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems

Not Reported in A.2d                                                                Page 4
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:

108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.

Amended Compl. ¶ 108.

I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;

b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

**\*4** d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001;

25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000. [FN12]

FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500. [FN13]

FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market

Not Reported in A.2d                                                  Page 5
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading. [FN14] Moreover, it is alleged, the Individual Defendants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

    FN14. *Id.* ¶ 94.

D. *Subsequent Events*

**\*5** In February 2002, rumors began circulating as to the accounting practices employed by VeriSign. [FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. [FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89. [FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. [FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

    FN15. *Id.* ¶ 71.

    FN16. *Id.* ¶¶ 72-73.

    FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.

    FN18. Amended Compl. ¶ 79.

II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed

Not Reported in A.2d                                                                                      Page 6
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company. [FN20]

> FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

> FN20. These claims will be referred to collectively as the "Insider Trading Claims."

**\*6** Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company. [FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties. [FN23]

> FN21. Amended Compl. ¶¶ 98, 101.

> FN22. *Id.* ¶ 100.

> FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to

VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. [FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

> FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

**\*7** Court of Chancery Rule 23.1 requires that, in derivative

2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. [FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit. [FN26]

> FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

> FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.

> Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates. [FN27]

> FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. [FN28] While I am unable to accept cursory contentions of wrongdoing in

light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

> FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

> FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

> FN30. *Aronson,* 473 A.2d at 812.

> FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

> FN32. *Aroson,* 473 A.2d at 813.

> FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

**\*8** If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated

Not Reported in A.2d                                                                     Page 8
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

under that test announced in *Aronson v. Lewis.* [FN34]
Under the *Aronson* test, "[t]o determine whether demand
would be futile, the Court must determine whether the
particular facts, as alleged, create a reason to doubt that: '(1)
the directors are disinterested and independent' or '(2) the
challenged transaction was otherwise the product of a valid
exercise of business judgment." ' [FN35] Thus, *Aronson*
adopted a two-pronged analysis for determining whether
demand is futile: the first prong inquires into the
independence and disinterestedness of the directors, and the
second prong focuses on the substantive nature of the
challenged transaction and the directors' approval thereof.
[FN36]

> FN34. *Rales, 634 A.2d at 933* ("The essential
> predicate for the *Aronson* test is the fact that a
> *decision* of the board of directors is being
> challenged in the derivative suit."); *Haseotes v.
> Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3,
> 2002).

> FN35. *In re Walt Disney Co. Deriv. Litig.,* 825
> A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,*
> 473 A.2d at 814).

> FN36. *Pogostin v. Rice,* 480 A.2d 619, 624
> (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does
not challenge any particular action undertaken by the Board
as a whole, the standard established in *Rales v. Blasband*
governs the determination of demand futility. Thus, under
the *Rales* test,

> a court must determine whether or not the particularized
> factual allegations of a derivative stockholder complaint
> create a reasonable doubt that, as of the time the
> complaint is filed, the board of directors could have
> properly exercised its independent and disinterested
> business judgment in responding to a demand. If the
> derivative plaintiff satisfies this burden, then demand will
> be excused as futile. [FN37]

> FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of

directors, a premise of the *Aronson* test, that of the
application of the business judgment rule, is lacking, and
accordingly it is under the *Rales* test that the fundamental
right of boards of directors to manage the affairs of
corporations is recognized. [FN38] Thus, in examining
"whether the board that would be addressing the demand
can impartially consider its merits without being influenced
by improper considerations," [FN39] the focus is upon the
disinterestedness and the independence of a majority of the
board of directors in responding to a demand.

> FN38. *In re Fuqua Indus., Inc. S'holders Litig.,*
> 1997 WL 257460, at *13 (Del.Ch. May 13, 1997);
> *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000);
> *see also Rales,* 634 A.2d at 933 ("[t]he absence of
> board action ... makes it impossible to perform the
> essential inquiry contemplated by
> *Aronson*--whether the directors have acted in
> conformity with the business judgment rule [in
> consciously deciding to act or refrain from
> acting]").

> FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized
facts of the Amended Complaint create a reasonable doubt
that, at the time the original complaint was filed, a majority
of the Board could have exercised disinterested and
independent business judgment in responding to Rattner's
demand. Rattner does not challenge the independence of any
Director Defendant; thus, the inquiry turns to the
disinterestedness of the Director Defendants at the time this
action was filed. Directors are considered disinterested for
purposes of determining demand futility when they "appear
on both sides of a transaction [or] expect to derive any
personal financial benefit from it in the sense of
self-dealing, as opposed to a benefit which devolves upon
the corporation or all stockholders generally." [FN40]
Directorial interest may also be said to exist when " 'a
corporate decision will have a materially detrimental impact
on a director, but not on the corporation and the
stockholders." ' [FN41]

> FN40. *Aronson,* 473 A.2d at 812; *see also Orman
> v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

Not Reported in A.2d                                                                                                    Page 9
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

FN41. *Orman,* 794 A.2d at 23 (quoting *Rales, 634 A.2d at 936).*

**\*9** Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.

The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. [FN42]

FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. [FN43] "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson* [FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at \*14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354

(Del.Ch.1995) (quoting *Rales, 634 A.2d at 936;* see also *Benerofe v. Cha,* 1996 WL 535405, at \*6 (Del.Ch. Sept.12, 1996).

FN45. See, e.g., *Malpiede, 780 A.2d at 1085; Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test."* ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at \*8-\*9 (Del.Ch. Feb.5, 1996).

FN46. See, e.g., *Rales, 634 A.2d at 936; In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal

Not Reported in A.2d                                                                                      Page 10
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

> FN48. *See In re The Limited, Inc. S'holders Litig., 2002 WL 537692, at \*7 (Del.Ch. Mar.27, 2002); Beneville v. York, 769 A.2d 80, 85-87 (Del.Ch.2000).* Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

> FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

> FN50. *See supra* note 11.

> FN51. Amended Compl. ¶ 102(d)

A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

> FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

> FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
> 33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business,

Not Reported in A.2d                                                                                      Page 11
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.

Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part: 34. It is appropriate to treat the Individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

FN54. *Guttman,* 823 A.2d at 503.

FN55. *See* *id.* at 503-04.

FN56. Amended Compl. ¶ 85(c).

FN57. *See* *Guttman,* 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their

stock. [FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

FN58. *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8 (Del.Ch.1949).

**\*11** As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces--including the criminal laws--to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information. [FN59]

FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
*Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

FN60. *Stepak v. Ross,* 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985); *see also* *Guttman,* 823 A.2d at 505 ("Delaware case law makes the same

Not Reported in A.2d                                                                                      Page 12
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit" " ') (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board. [FN61]

> **FN61.** As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares

were all sold at one time. [FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. [FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> **FN62.** Amended Compl. ¶ 63.

> **FN63.** *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was "unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).

> **FN64.** Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

> **FN65.** Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

**\*12** Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, [FN66] the Amended

Not Reported in A.2d                                                                                          Page 13
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. [FN67] Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman.* It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. *See supra* notes 53-55 and accompanying text.

> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at *4-*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." [FN68]

> FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* [FN69] claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. [FN70] In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." [FN71] Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

> FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

> FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.

> FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. [FN72] The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial

Not Reported in A.2d                                                                                      Page 14
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

information to the market.

> FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman, 823 A.2d at 498*.

**\*13** Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45--50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. [FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

> FN73. Amended Compl. ¶ 62.

> FN74. *Id.* ¶ 70.

> FN75. *See In re Citigroup Inc. S'holders Litig., 2003 WL 21384599, at \*2 (Del.Ch. June 5, 2003).*

> FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. [FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

> FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.

> FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only

Not Reported in A.2d                                                                                    Page 15
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

**\*14** Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." [FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. [FN80] In her brief, Rattner noted:

FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at \*1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel

requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information. [FN81]

FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. [FN82] In particular, the books and records provisions of 8 Del. C. § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately--at least in this venue--unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at \*1; *Guttman,* 823 A.2d at 504.

FN83. *See e.g., In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. [FN84] An order will be entered in accordance with this Memorandum Opinion.

FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of

Not Reported in A.2d                                                                                        Page 16
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**


even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled
action be, and the same hereby is, dismissed. This dismissal
is with prejudice as to Plaintiff Bobbie Rattner.

2003 WL 22284323 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

Slip Copy                                                                    Page 1
2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4
**(Cite as: 2004 WL 1982508 (Md.Cir.Ct.))**

Circuit Court of Maryland,
Baltimore City.

SEKUK GLOBAL ENTERPRISES PROFIT SHARING
PLAN, Plaintiff,
v.
Herve A. KEVENIDES, et al., Defendants.
Charles D. Hoffman, et al., Plaintiffs,
v.
Donald J. Rechler, et al., Defendants.
Robeta Chirko, Plaintiff,
v.
Reckson Associates Reality Corp., et al., Defendants.

**Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010.**

May 25, 2004.

### MEMORANDUM OPINION

EVELYN OMEGA CANNON, Judge.

**\*1** This is a shareholder derivative action challenging the
business judgment of the Independent Directors in
approving a series of transactions involving the sale of a
New York industrial portfolio to members of the Rechler
family (herein referred to as the "Transaction"). The action
is the consolidation of three lawsuits brought on behalf of
shareholders of Reckson Associates Reality Corp.
("Reckson Associates") alleging substantially the same facts
and claims. [FN1] On October 29, 2003, Plaintiff Sekuk
Global Enterprises Profit Sharing Plan ("Sekuk"), which
brought the first of these actions, moved for a temporary
restraining order or preliminary injunction to enjoin the
Transaction but decided not to forward on the motion.

> FN1. On October 16, 2003, Plaintiff Sekuk Global
> Enterprises Profit Sharing Plan filed a complaint.
> On October 27, 2003, Charles D. Hoffman and
> Lydia J. Hoffman filed a complaint and on October
> 30, 2003, Roberta Chirko filed her complaint. On
> October 31, 2003, the cases were designated for the
> Business and Technology Case Management
> Program.

On January 20, 2004, Plaintiffs in all the actions filed a
Consolidated Amended Complaint ("Complaint") alleging

that Defendants breached their fiduciary duties of care,
reasonable inquiry, oversight, good faith, supervision and
loyalty. [FN2] The Independent Directors, Chairman of the
Board Emeritus Walter Gross, and nominal defendant
Reckson Associates Realty Corp. have filed Motions to
Dismiss alleging that all of the claims are derivative and that
Plaintiffs failed to make a demand on the Board to take
remedial action before filing suit and failed to allege facts to
show that making a demand would have been futile.

> FN2. The first of several shareholder derivative
> suits in response to the sale of certain industrial
> properties to the Rechlers was filed in the Supreme
> Court of New York, County of Nassau, on
> September 16, 2003. *Lowinger v. Rechler, et al.,*
> Index No. 03-014162 (Warshawsky, J.). Two
> additional suits were filed in Supreme Court of
> New York, County of Suffolk, on October 2 and 3,
> 2003. There are three consolidated actions pending
> in the United States District Court for the Eastern
> District of New York, the first of which was filed
> on September 26, 2003. *Tucker, et al. v. Rechler, et
> al.,* Case Nos. 03-CV-4917, 03-CV-4917,
> 03-CV-5008 and 03- CV-5718 (Platt, J.).

### STATEMENT OF FACTS

Reckson Associates, along with Reckson Operating
Partnership, L.P. and its affiliates, operates as a real estate
investment trust that owns, develops and manages offices
and industrial properties in New York Tri-State area. The
Rechler family founded Reckson Associates which is a
Maryland Corporation. Plaintiffs Sekuk, Charles D. and
Lydia J. Hoffman, and Roberta Chirko have owned equity
securities in Reckson Associates at all times relevant to this
action.

As of September 10, 2003, Reckson Associates had eleven
voting directors. Five of those directors--Donald Rechler,
Gregg Rechler, Roger Rechler, Mitchell Rechler, and Scott
Rechler (the "Rechler Defendants")--were part of the
Rechler family and served as executive officers of Reckson
Associates. The Independent Directors, who were not
members of the Rechler family, included Ronald H.
Manaker ("Menaker"), Peter Quick ("Quick"), Herve A.

Kevenides ("Kevenides"), Conrad D. Stephenson ("Stephenson"), Lewis S. Ranieri ("Ranieri"), and John V.N. Klein ("Klein"), and Walter Gross ("Gross"), who has served as Chairman of the Board Emeritus since the formation of Reckson Associates. Thus the Independent Directors made up a majority of the eleven-member Board of Directors.

On September 10, 2003, Reckson Associates announced a strategic plan that involved the sale of certain industrial properties to the Rechler family, the resignation of several Rechler family members from executive management and board positions, and various other corporate governance changes. In connection with this strategic plan, the Reckson Operating Partnership agreed to sell 95 industrial properties on Long Island (the "industrial properties") to the Rechler family for approximately $315.5 million--roughly $225.1 million in cash and debt assumption and $90.4 million in Reckson Operating Partnership units (3,932,111 units, valued by Citigroup at $23,00. per unit). The Transaction provided that the Rechler family would no longer own any Reckson Operating Partnership units. In addition, Gregg, Roger, and Mitchell Rechler were to resign as officers and directors, and Donald Rechler was to resign from management but still serve as non-executive Chairman of the Board. Reckson Associates was to settle some pre-existing financial obligations to the four resigning Rechlers.

**\*2** The Transaction was reviewed by the Independent Directors, who, in turn, engaged Citigroup to provide a detailed fairness opinion for a special committee of the Board. All of the Directors voted to approve the Transaction.

### DISCUSSION

"**In reviewing the grant of a motion to dismiss pursuant to Maryland Rule 2- 322(b),**" the Court must assume "**the truth of all well pleaded facts and all inferences that can reasonably be drawn from [them].**" *Bennett Heating & Air Conditioning, Inc. v. Nations Bank,* 103 Md.App. 749 (1995), *rev'd in part on other grounds,* 342 Md. 169 (1996). "**Any ambiguity or want of certainty in [the] allegations must be construed against the pleader,**"

*Manikhi v. Mass Transit Admin.,* 360 Md. 333,345 (2000) (internal citations omitted) because in "**moving to dismiss, a defendant is asserting that, even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law.**" *Hrehorovich v. Harbor Hosp. Ctr., 93 Md.App. 772, 784 (1992).* "**Thus, in considering a motion to dismiss for failure to state a claim, the circuit court examines only the sufficiency of the pleading.**" *Id.* "**The complaint should not be dismissed unless it appears that no set of facts can be proven in support of the claim set forth therein.**" *Bennett,* 103 Md.App. at 749. Thus, all of the facts considered in this Opinion are drawn from the Complaint and the Court did not consider any of the documents or affidavits filed by any of the parties.

It is well-established that courts will not ordinarily consider a derivative action by a shareholder on behalf of a corporation "until it appears that the intra corporate remedies have been unsuccessfully pursued by the complaining stockholder," which means that "generally speaking, the complaining stockholder must make a demand upon the corporation itself to commence the action, and show that this demand has been refused or ignored." *Parish v. Milk Producers Assn.,* 250 Md. 24, 81-82 (1968). Because no such demand was made by Plaintiffs, Defendants urge that the complaint must be dismissed.

Noting that a shareholder derivative suit "necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors," and because such actions may be abused by "disgruntled shareholders," the Court of Appeals recently adopted a strict pre-suit demand requirement for derivative actions. *Werbowsky v. Collomb,* 362 Md. 581, 600 (2001). The Court noted that in most instances, the pre-suit demand "is not an onerous requirement" and explained that the demand requirement provides an opportunity for the directors--"even interested, non-independent directors" to consider, or reconsider the disputed issue. *Id. at 619.* After receiving a demand, the Directors may decide "to seek the advice of a special litigation committee of independent directors ... or they may decide ... to accede to the demand rather than risk embarrassing litigation." *Id. at 619.*

**\*3** The Court noted that a futility exception often "assures extensive and expensive judicial wrangling over a peripheral

Slip Copy                                                                 Page 3
2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4
**(Cite as: 2004 WL 1982508 (Md.Cir.Ct.))**

issue that may result in preliminary determinations
regarding director culpability that, after trial on the merits,
turn out to be unsupportable," *id.* at 600-02, whereas if a
demand is made and refused, it can be reviewed under the
business judgment rule standard. *Id.* In recognition of this
fact, the Court crafted a "very limited" exception, *id.,* and
held that a demand is futile only when the allegations
"clearly demonstrate, in a very particular manner" that:

   (1) making a demand, or the delay in waiting for a
   response to the demand, "would cause *irreparable harm
   to the corporation;* " or

   (2) a majority of the directors are *so personally and
   directly conflicted or committed* to the disputed decision
   that they cannot reasonably be expected to respond to a
   demand in good faith and in accordance with the business
   judgment rule.

*Id. at* 620. (emphasis added).

In *Werbowsky,* the Court affirmed the trial court's grant of
summary judgment on the basis that a demand was not
excused. Although *Werbowsky* involved a summary
judgment, the Court made clear that the same standard
applies to a motion to dismiss: "[o]bviously, if the complaint
fails to allege sufficient facts which, if true, would
demonstrate the futility of a demand, it is entirely
appropriate to terminate the action on a motion to dismiss."
*Id.* at 620-21.

Thus in determining whether to grant the motion to dismiss,
the Court must determine whether Plaintiffs have alleged
facts that "clearly demonstrate, in a very particular manner"
that: (1) the issuance of a demand, or the delay in waiting
for a response to the demand would have caused irreparable
harm to Reckson Associates, or (2) a majority of the
directors were "so personally and directly conflicted or
committed to the decision ... that they could not have
reasonably been expected to respond to a demand in good
faith and within the ambit of the business judgment rule."
*Id.* at 620.

1. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY
DEMONSTRATE THAT MAKING A DEMAND OR
AWAITING THE BOARD'S RESPONSE WOULD HAVE
CAUSED IRREPARABLE HARM.

It is unclear whether Plaintiffs contend that making a
demand, or awaiting the Board's response would have
caused irreparable harm, but it is clear that the Complaint
fails to clearly demonstrate "irreparable harm." Parties may
not create their own irreparable harm. *See, e.g., Quince
Orchard Valley Citizens Ass'n v. Hodel,* 872 F.2d 75,79 (4th
Cir.1989)* (affirming district court's denial of a preliminary
injunction because "much of [plaintiffs'] potential harm was
a product of its own delay in pursuing this action."). *See
also, e.g., Vantico Holdings S.A. v. Apollo Mgmt,* 247
F.Supp.2d 437, 454 (S.D.N.Y.2003)* (asserting that
"[plaintiff] cannot rely on its own actions to create the risk
of irreparable injury which it then seeks to avoid by the
issuance of a preliminary injunction."); *Minzer v. Keegan,*
1997 U.S. Dist LEXIS 16445, at *18 (E.D.N.Y. Sept. 22,
1997) ("Because preliminary injunctions are predicated
upon 'urgent need for speedy action,' delay in seeking the
remedy suggests that the remedy is not really needed or that
the harm is not really irreparable.") (citations omitted).

**\*4** The sale of the industrial properties was announced on
September 10, 2003, with an expected closing date in the
fourth quarter of 2003. Plaintiffs could have made a demand
on the Board on September 11th or shortly thereafter.
Instead Plaintiffs filed the first of these consolidated cases
on October 16th, over five weeks later and over four weeks
after another Reckson Associates shareholder brought
virtually the same derivative suit in New York (*see* note 2.).
When Plaintiffs decided to not go forward on their request
for injunctive relief, they effectively conceded that there
was no irreparable harm.

Finally, "irreparable injury is suffered whenever monetary
damages are difficult to ascertain or are otherwise
inadequate," and Plaintiffs have failed to allege that they
could not be adequately compensated for any breach
through an award of money damages. *Chestnut Real Estate
P'ship v. Huber,* 148 Md.App. 190, 205 (2002)* (citation
omitted)). *See also Coster v. Department of Personnel,* 36
Md.App. 523, 526 (1977)* ("an injury is irreparable ... where
... it cannot be readily, adequately, and completely
compensated for with money") (citation omitted).

In sum, Plaintiffs have failed to "clearly demonstrate, in a
very particular manner" that "a demand, or a delay in

Slip Copy                                                                                                          Page 4
2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4
**(Cite as: 2004 WL 1982508 (Md.Cir.Ct.))**

awaiting a response to a demand, would [have] cause[d] irreparable harm to the corporation." *Werbowsky,* 362 Md. at 620.

2. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A MAJORITY OF THE DIRECTORS ARE SO PERSONALLY AND DIRECTLY CONFLICTED THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

In support of their argument that Defendants were conflicted, Plaintiffs allege that Defendants were hand picked to sit on the Board by the Rechlers; had social and business relationships with the Rechlers; had a history of taking steps to protect the interests of the Rechlers at the expense Reckson Associates; and that after approval of the Transaction, the Board instituted a number of corporate governance changes to protect the Company from these alleged conflicts.

*Werbowsky* makes clear that a demand will not be excused lightly. Thus a conflict is not shown simply by alleging that the directors "were chosen ... at the behest of controlling stockholders." 362 Md. at 618. Nor will it be excused because "a majority of the directors approved or participated in some way in the challenged transaction or decision," or based on "allegations that [the directors] are conflicted or are controlled by other conflicted persons." *Id.* In fact a simple allegation that the directors will be "hostile to the action" is not sufficient to excuse a demand. *Id.* Because "[d]irectors are presumed to act properly and in the best interest of the corporation," *id.* at 618-19, a conflict will not be found based on "non-specific or speculative allegations of wrongdoing." *Id.* at 619.

**\*5** As the Court noted in *Danielewicz v. Arnold,* 137 Md.App. 601, 631 (2001), *Werbowsky* requires that a complaint "demonstrate, [any alleged conflict by the directors] ... '*in a very particular manner.*' " (emphasis added). In *Danielewicz,* the directors were the plaintiff's husband, a director the Court assumed *arguendo* was conflicted, and the alleged conflicted director's son. *Id.* at 629. The Court held that the allegations of a conflict were

"conjecture and speculation ." *Id.* at 631. The Court assumed the plaintiff's husband would have responded to her demand, and in reference to the conflicted director's son held that the plaintiff "has not presented sufficient evidence indicating that he would not have responded to [the plaintiff's] demand." *Id.* at 631. Thus evidence of familial relations, without more, is not sufficient to excuse a demand.

Nor is "[e]vidence of personal and/or business relationships" sufficient to excuse a demand even under the more permissive Delaware standard. [FN3] *Kohls v. Duthie,* 765 A.2d 1274, 1284 (Del.Ch.2000) (citation omitted). There the Court held that the fact that the company's president, CEO, and inside director provided a summer job to an outside director when he was in business school and also played a role in his board appointment, did not show that the outside director lacked independence. *Id.* Nor was a conflict shown by alleging that a director had previously voted in favor of a generous cash severance payment that was paid to the CEO, despite the fact that the latter did not leave or change his job with the company. *Kohls v. Duthie,* 765 A.2d 772, 781 (Del. Ch.2000). *See also Orman v. Cullman,* 794 A.2d 5, 28 (Del. Ch.2002) (holding that outside director's former affiliation with the underwriter of a company's initial public offering and its present investment bank did not render director non-independent).

> FN3. Because the requirement for pleading and proving demand futility articulated in *Werbowsky* is so recent, there are few Maryland cases applying it. The Delaware cases holding that a demand was not futile are helpful because the Delaware standard is more permissive and excuses a demand where Maryland would not. Delaware looks to determine if the facts alleged create a reasonable doubt that "(1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment." *Werbowsky,* 362 Md. at 593 *citing Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984).

The requirement of specific evidence of an actual conflict was recently reiterated in *Beam v. Stewart,* 845 A.2d 1040 (Del.2004). In rejecting the plaintiff's argument that a

demand was futile because of an alleged conflict the Court stated that "to render a director unable to consider a demand, a relationship *must be of a bias-producing nature.* Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Id.* at 1050 (emphasis added). One of the allegations in *Beam* was that one of the directors (i) was a long-standing personal friend of the controlling stockholder and the president and chief operating officer; (ii) had a prior business relationship with the company (through his position at Sears, which marketed a substantial volume of the company's products); and (iii) was recruited for the board by a longtime personal friend of the controlling director. *Id.* at 1045. The Court held that "[a]llegations that Stewart [the controlling stockholder] and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power," failed to rebut the presumption of independence. *Id.* at 1051. The Court made clear that an inference of a conflict that excuses a demand must be such that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Id.* at 1052.

PLAINTIFFS' ALLEGATIONS OF ALLEGED CONFLICT

**\*6** Plaintiffs allege that four of the seven Independent Directors had specific conflicts and that all seven were conflicted because they had a history of approving financial deals and payments to the Rechlers that favored the Rechlers and harmed Reckson Associates.

MENAKER

Plaintiffs allege that Menaker worked for JP Morgan & Co. Inc. ("JP Morgan") from 1966-99 holding various positions, including president, and that when he retired in 1999 he was managing director and head of Corporate Services of JP Morgan & Co. Inc. of New York. J.P. Morgan is the administrative agent that oversees the group of 14 banks that provides Reckson Associates a $500 million line of credit. A portion of the proceeds of the sale of the industrial

properties was earmarked by Reckson Associates to pay down a portion of that outstanding credit facility. Assuming that J.P. Morgan benefitted from the Transaction because of a pay down of the credit facility, these facts do not show that Menaker had a conflict.

QUICK

Plaintiffs allege that Quick worked for Quick and Reilly, Inc. from 1982 to 2000, and that Quick and Reilly is now an affiliate of Fleet Boston Financial which does mortgage and financial business with Reckson Associates. This past and indirect business relationship fails to establish a conflict.

RANIERI

Plaintiffs allege that Ranieri was a former vice president of Salomon Brothers, Inc., which was one of the underwriters of Reckson Associates' 1996 public offering, and that Salomon Smith Barney (Salomon Brothers' successor), later merged into Citgroup, which participated in the valuation of the industrial properties. Plaintiffs also allege that a company related to Ranieri is a tenant in one of Reckson Associates' 178 properties. There are no allegations that the terms of the lease were unfair or not at arm's length. Plaintiffs also allege that Ranieri was "hand-picked" by the Rechlers. None of these allegations provide a factual basis of a conflict that would excuse a demand.

KLEIN

Plaintiffs allege that Klein assisted the late William Rechler and Defendant Gross in developing the first industrial park on Long Island when Klein was Smithtown's Supervisor in the 1960s, and that from 1988 Klein served as counsel to the Association for a Better Long Island (the "Association"), an organization founded by Donald Rechler, of which he was a former president and chairman of the board. The fact that 40 years ago, Mr. Klein, in his capacity as a town administrator, may have helped another Rechler family member--who is now deceased--and defendant Gross--in their pursuit of a successful business venture is not evidence of a conflict. Nor does the fact that he is or was counsel to an organization founded by Donald Rechler. [FN4]

FN4. Plaintiffs allegation that "from at least 1988,

Klein acted" as counsel, makes it impossible to determine if Plaintiffs are alleging that he is still counsel. Thus, for purposes of this motion, the Court assumes that he still is counsel.

GROSS

As discussed in the proceeding paragraph, Plaintiffs allege that in 1961, Gross together with the late William Rechler, and Defendant Klein, conceived and developed Vanderbilt Industrial Park on Long Island. This allegation is not sufficient to show a conflict

HAND-PICKED BY THE RECHLERS AND HISTORY OF APPROVING FINANCIAL TRANSACTIONS

**\*7** Plaintiffs allege Gross, Klein, Kevenides, Stephenson and Ranieri were "hand-picked" by the Rechlers. For the reasons discussed above, that allegation does not show that there was a conflict. Plaintiffs also allege that Gross, Kevenides, Stephenson and Ranieri had a history of consistently approving financial deals, and the payment of millions of dollars in employment benefits to the Rechlers, which served no legitimate business and hurt the company. These allegations do not show a conflict under the cases discussed above and are simply an indirect way to attack the business judgment of these Directors, which is not properly considered in determining demand futility. *See* discussion below at **page 14.**

NO ALLEGATIONS OF A CONFLICT

In sum, Plaintiffs have failed to "clearly demonstrate, in a very particular manner" that the Directors were "so personally and directly conflicted" that they could not have been reasonably "expected to respond to a demand in good faith." *Werbowsky,* 362 Md. at 620.

3. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A MAJORITY OF THE DIRECTORS WERE SO COMMITTED TO THE DECISION THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

Plaintiffs argue that the Directors were "so ... committed to the decision ... that they could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky,* 362 Md. at 620. In support of their arguments, Plaintiffs allege that the Defendants acted in bad faith and outside the ambit of the business judgment rule; that they had already committed the proceeds of the Transaction; and that the Directors would have been subject to personal liability if they did not go forward on the Transaction.

BAD FAITH AND OUTSIDE BUSINESS JUDGMENT RULE

The *Werbowsky* Court held that in determining if a demand was futile, a court should not address "issues that go to the merits of the complaint B whether there was, in fact, self dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." 362 Md. at 620. Thus a demand is not excused by allegations that the "[d]efendants' approval of the [t]ransaction constitutes a breach of both their common law and statutory duties." Therefore, Plaintiffs' allegations that the Transaction was "facially inadequate, and unfair to Reckson" is not properly considered in determining the narrow issue of demand futility.

THE PROCEEDS WERE ALREADY COMMITTED

Plaintiffs argue that a demand was too late once the decision was announced because Reckson Associates was committed at the time of the September 10th announcement to use the funds received to purchase 1185. According to Plaintiffs, "Defendants are asking the Court to find that the decision and subsequent negotiations to purchase 1185 occurred only after the September 10th announcement of the Transaction, and therefore, reflected a wholesale change in Reckson's business strategy concerning use of the Transaction's proceeds." To the contrary, Plaintiffs argue that the decision to buy 1185 was "irretrievably" made before the proposed Transaction.

**\*8** Because this is a Motion to Dismiss, the Court is not basing its decision upon either of those suppositions but only on the allegations in the Complaint. In Paragraph 15,

Westlaw.

Plaintiffs allege that an agreement to purchase 1185 was made on November 10th:

> On November 10, 2003, Defendants entered into an agreement to purchase the office building at 1185 Avenue of the Americas in New York ("1185"), which it could not otherwise close upon without the proceeds from the sale of the Industrial Portfolio, which were used as a contract deposit for the purchase of that property.

Arguing that in order to sign a contract on November 10th for property in Manhattan, the deal had to have been negotiated long before then, Plaintiffs ask this Court to ignore the allegation in Paragraph 15 of the Complaint. As further evidence that the deal was complete at the time of the September 10th announcement, Plaintiffs point to an alleged representation made on November 4, 2003 by one of Defendants' attorneys at a scheduling conference. [FN5]

> FN5. Plaintiffs claim that one of the Defendants' attorneys represented to the Court at the November 4, 2003 scheduling conference that absent an injunction, the Transaction was scheduled to close immediately due to the necessity to use the funds to purchase 1185. Defendants dispute this allegation. Because this was not a hearing, and no request was made, the scheduling conference was not recorded. For the reasons discussed above, the Court finds it unnecessary to decide what was or was not said.

However, neither the facts alleged in the Complaint nor the facts that Plaintiffs ask the Court to assume show that Defendants were so committed to the decision that they could not respond to a demand in good faith and within the ambit of the business judgment rule. Under the facts alleged in the Complaint, which the Court must accept as true for purposes of ruling on a motion to dismiss, the contract to purchase 1185 was entered into on November 10th, which was *after* the suit was filed and 2 months after the announcement of the Transaction. Under the facts Plaintiffs ask the Court to assume that negotiations to purchase property is not an "irretrievable commitment." Defendants may well have decided to purchase 1185 with the proceeds of the Transaction but that "decision" would not have prevented the Board from responding to a demand in good faith and within the ambit of the business judgment rule.

[FN6] Finally, Plaintiffs fail to explain how they were excused from making a demand on September 11th based on facts they learned on November 4th.

> FN6. Frankly it would be difficult to conclude that Defendants were "irretrievably committed" even if there had been a contract to purchase 1185 signed simultaneously with the contract to enter into the Transaction. Contracts are broken regularly.

The *Werbowsky* Court noted that "a pre-suit demand on the directors is not an onerous requirement." 362 Md. at 619. In fact, the making of such a demand is far less onerous than the preparation and filing of a shareholder derivative complaint B a task that lawyers for nine different plaintiffs, including the three Plaintiffs before this Court, managed to accomplish in far less than two months.

LACK OF FIDUCIARY OUT CLAUSE

Plaintiffs point out that the Transaction with the Rechlors had no fiduciary out clause that would allow the Directors to exit the contract if faced with a challenge to the Director Defendants' decision to approve the sale. If the Directors subsequently terminated the contract, the beneficiaries of the contract, in particular the Rechler family members who were not directors of Reckson Associates, could have brought suit against Reckson Associates for breach of contract. And if such a suit was filed and won, Plaintiffs contend that Reckson Associates would in turn sue the Independent Directors for contribution and the Directors' and Officers' ("D & O") insurance coverage would probably not cover any judgement against the directors and officers because D & O policies commonly contain an "insured versus insured" exclusion. That exclusion would preclude the insurance carrier from paying for any breach of contract claim by Reckson Associates against its own directors. Thus, such a suit would expose the Independent Directors to "ruinous personal liability," and thus they would not respond to any demand in good faith and within the ambit of the business judgment rule.

**\*9** In *Werbowky* one of the allegations was that "it was likely that, by reason of language in the corporation's directors' and officers' liability insurance policies, the

Westlaw.

corporation would be precluded from bringing an action against the directors." *362 Md. at 590*. *See also id.* at 592. Although the issue was not directly addressed by the appellate court, that Court noted that the trial court had "rejected the notion, drawn from *Edge Partners, L .P. v. Docksar,* 944 F.Supp. 438 (D.Md.1996), that a lack of insurance coverage for named directors can excuse a demand." *362 Md. at 594*. Based on the rationale of *Werbowsky,* this Court concludes that that when it does directly address the issue, the Court of Appeals will most likely follow the lead of other courts which have held that an insured-versus-insured provision does not excuse a pre-suit demand. *See, e.g., In re Prudential Ins.Co. Derivative Litig.,* 659 A.2d 961, 973 (N.J. Ch. Ct.1995) ("routine excuse of demand based on the existence of such standard exclusions would eviscerate the demand requirement"); *Stoner v. Walsh,* 772 F.Supp. 790, 805 (S.D.N.Y.1991) (rejecting argument that liability insurance policy exclusion rendered board "interested").

Plaintiffs' reliance on *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993) does not suggest a different result. First, as discussed previously Delaware excuses a demand where one would be required by Maryland. *See* note 3. Second, even the *Rales* Court recognized that the "mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors...." *Id.* at 936 (citing *Aronson v. Lewis,* 473 A.2d 805, 815 (1984)). Third, the Plaintiffs do not include allegations concerning the lack of a fiduciary out clause and the inclusion of an insured-versus-insured provision.

Finally this argument is based on a lot of "ifs," "ands,' and "buts." It assumes that *if* a demand had been made, the Outside Directors would have decided to delay or terminate the contract with the Family Group [FN7]; if the contract with the Family Group was delayed or terminated, the Family Group would not renegotiate the contract, but file suit to enforce the contract; *if* suit were filed, Reckson Associates would be found liable for the contract damages; *if* Reckson Associates were found liable, it would sue the directors for contribution; *if* Recskon Associates sued the Directors for contribution, the suit would be successful; and

*if* it is successful the Directors would not be covered by insurance. And finally and most importantly based on that potential liability, the Directors would not have considered a demand in good faith and within the ambit of the business judgment rule. Well as my mother often said, "if 'if' were a skiff, we'd all drown."

> FN7. The Family Group is members of the Rechler family who, according to the allegations in the Complaint, "controlled" Reckson Associates' Board.

### CONCLUSION

For all the reasons stated above, the Court will enter an order granting the Independent Director Defendants' and Walter Gross's Motion to Dismiss and Reckson Associates Realty Corporation's Motion to Dismiss.

2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4

END OF DOCUMENT

# EXHIBIT 14

Slip Copy                                                                                                      Page 1
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

Superior Court of Massachusetts.

In re SONUS NETWORKS, INC. DERIVATIVE
LITIGATION. [FN1]

FN1. See Pre-Trial Order No. 1 consolidating
*Tillman v. Ahmed et al.,* Suffolk No. 04-0754 BLS
with *Palina v. Ahmed et al.,* Suffolk No. 04- 0753
BLS and re-defining the caption of the
consolidated action as "In re Sonus Networks, Inc.
Derivative Litigation."

No. 040753BLS.

Sept. 27, 2004.

*MEMORANDUM AND ORDER ON MOTIONS TO
DISMISS*

ALLAN VAN GESTEL, Justice.

*1 This matter is before the Court on the defendants'
motions pursuant to Mass.R.Civ.P. Rule 12(b)(6) and Rule
23.1 to dismiss this consolidated action. The grounds for the
motions are, among others, that the now-consolidated
complaints do not comply with Rule 23.1 because the
plaintiffs failed to make a pre-suit demand upon the board
of directors and because the plaintiffs have failed to allege
with particularity sufficient grounds to excuse their failure
to make such demand. Additionally, the defendants move
for dismissal on grounds that the complaints fail to state a
claim, and because any claims for damages are premature.

BACKGROUND

Sonus Networks, Inc. ("Sonus") is a Delaware corporation,
said to be headquartered in Westford, Massachusetts. Sonus
is a provider of voice-over-IP infrastructure solutions that
enable voice services to be delivered over packet-based
networks.

The plaintiffs purport to be Sonus shareholders and have
brought their derivative suits against most members of
Sonus's board of directors and certain of its executive
officers. The essence of the complaints are: that six
members of Sonus's board of directors and certain of its
executive officers, despite their responsibility for
maintaining and establishing internal controls and ensuring

that Sonus's financial statements were based on accurate
financial information, permitted Sonus to issue false press
releases regarding its financial statements; that the
defendant Hassan Ahmed ("Ahmed"), Sonus's President and
CEO, made false statements in three interviews regarding
Sonus's financial condition, and he signed Sonus's allegedly
incorrect financial statements; and that three of the directors,
who served as members of the Sonus Audit Committee,
approved the incorrect financial statements and, therefore,
are direct participants in the wrongdoing. The complaints
further charge that the defendant directors failed to prevent
and permitted Sonus to file improper financial statements
with the Securities and Exchange Commission and
elsewhere. Allegedly, once the true condition of Sonus's
financial situation came to light in January 2004, and
thereafter, the Sonus stock price is said to have plummeted,
erasing over $1 billion of the Company's market
capitalization.

On February 20, 2004, the plaintiffs filed these derivative
actions. The suits were not preceded by any demand, written
or oral, that the board take any particular action with respect
to the plaintiffs' allegations. Instead, the plaintiffs assert that
any demand upon the members of the board would have
been a "futile, wasteful and useless act."

Five of the seven present directors of Sonus are outside
directors, [FN2] meaning they are not otherwise employees
of Sonus. One of the outside directors, H. Brian Thompson
("Thompson"), has not been named as a defendant. [FN3]

FN2. Ahmed and defendant Rubin Gruber are
conceded by Sonus to be "inside
directors/officers."

FN3. The plaintiffs ask this Court not to consider
the public filing by Sonus of Form 3 with the
Securities and Exchange Commission ("S.E.C.")
reflecting that Sonus's board of directors has seven
members. The Court declines to cast a blind eye to
this established fact. The plaintiffs' request is
unusual, to say the least, given that this is a
situation presenting the determination of whether
pre-suit demand on the directors should be
excused. Should the Court not be told how many

directors there are? And, if so, why do the plaintiffs themselves, in the very first sentence of the Statement of Facts portion of their opposition, state: "The Complaint names an overwhelming majority--six out of seven--of the members of the Board of Directors as defendants ... ?" Is the Court not entitled to know that there are seven?

The complaints themselves are lengthy and detailed, with allegations contained in 95 numbered paragraphs, many with subparagraphs and lengthy quotations from written materials, spread over 41 pages. The authors seem to have overlooked the dictates of _Mass.R.Civ.P. Rule 8(a)(1)_ calling for a short and plain statement of the claim.

## DISCUSSION

**\*2** Given Sonus's status as a Delaware corporation, much of the argument for and against the motions to dismiss cites to Delaware law. The law of a corporation's state of incorporation provides the circumstances under which a pre-suit demand would be futile. _Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95-96 (1991)_; _Harhen v. Brown, 431 Mass. 838, 844 (2000)_; _Bartlett v. New York, N.H., & H.R.R. Co., 221 Mass. 530, 538 (1915)_. Thus, this Court will begin by reciting some general principles of Delaware law that apply here.

The focus, principally, is on the issue of the absence and alleged futility of making a pre-suit demand on the Sonus board of directors.

> A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation ... The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders ... Moreover, a stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management. The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it. The nature of the action is two-fold.

First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

> By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery _Rule 23.1_ exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits. Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

_Aronson v. Lewis, 473 A.2d 805, 811-12 (Del.Supr.1984)_. See also _Brehm v. Eisner, 746 A.2d 244, 253 (Del.Supr.2000)_.

Whatever the underlying allegations, if a derivative plaintiff fails to carry the burden of demonstrating that demand should be excused, the complaint must be dismissed. _Kaufman v. Belmont, 479 A.2d 282, 286 (Del.Ch.1984)_.

If a plaintiff does not actually make demand prior to filing suit, he or she "must set forth ... particularized factual statements that are essential to the claim." _Brehm, supra, 746 A.2d at 254_. The pleading requirements of _Rule 23.1_ are "an exception to the general notice pleading standard" and "more onerous than that required to withstand a _Rule 12(b)(6)_ motion to dismiss." _Levine v. Smith, 591 A.2d 194, 207, 210 (Del.Supr.1991)_.

**\*3** The plaintiff is required to plead with particularity that "reasonable doubt" exists either that: (1) a majority of the board is disinterested and independent; or (2) that the challenged transaction was a valid exercise of business judgment. _Aronson, supra, 473 A.2d at 814; Rales v. Blasband, 634 A.2d 927, 933 (Del.Supr.1993)_. Thus, in determining demand futility, the Court "must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof." _Id._

> To satisfy [the] requirement [of alleging with particularity the reasons for the plaintiff's failure to demand action from the board], the "stockholder plaintiff[ ] must

Slip Copy                                                                                                      Page 3
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
(Cite as: 2004 WL 2341395 (Mass.Super.))

overcome the powerful presumptions of the business judgment rule" by alleging sufficient particularized facts to support an inference that demand is excused because the board is "*incapable* of exercising its power and authority to pursue the derivative claims directly." In *Aronson v. Lewis,* we held that a demand on the board is excused only if the complaint contains particularized factual allegations raising a reasonable doubt that either: (1) "the directors are disinterested and independent" or (2) "the challenged transaction was other than the product of a valid exercise of business judgment."
*White v. Panic,* 783 A.2d 543, 551 (Del.Supr.2001).

However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.
*Aronson, supra,* 473 A.2d at 815.

"The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction."
*Pogostin v. Rice,* 480 A .2d 619, 624 (Del.Supr.1984).

The Court looks then at the question of whether a reasonable doubt is created that the challenged transactions were other than the product of valid exercises of business judgment.

The challenged transactions relate to: (1) Sonus's maintaining and establishing internal controls to ensure that Sonus's financial statements were based on accurate financial information; Sonus's issuance of press releases regarding its financial statements; the defendant Ahmed's statements, in three interviews, regarding Sonus's financial condition, and his signing of Sonus's allegedly incorrect financial statements; the fact that three of the directors, who served as members of the Sonus Audit Committee, approved the financial statements; and the fact that the defendant directors failed to prevent and permitted Sonus to file improper financial statements with the S.E.C. and elsewhere.

*4    [There] is a very large--though not insurmountable--burden on stockholders who believe they should pursue the remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from office.
Delaware has pleading rules and an extensive judicial gloss on those rules that must be met in order for a stockholder to pursue a derivative remedy. Sound policy supports these rules, as we have noted. This Complaint, which is a blunderbuss of a mostly conclusory pleading, does not meet that burden, and it was properly dismissed.
*Brehm, supra,* 746 A.2d at 267.

What is challenged in the complaint are not specific actions by the board, but rather generalized allegations reflecting poor supervision over financial statements, particularly with regard to the controls over how they were prepared and the publication thereof to the S.E.C. and the investing public. There are no particularized allegations as to any specific act by any particular board member individually or by the board as a whole. See *Rales, supra,* 634 A .2d. at 933.

Thus, here, a reading of the complaints, however lengthy, cannot be said to provide to the Court--and it is the Court, not the plaintiffs, that must harbor this doubt--a "reasonable doubt" that any activities by the directors, individually or as a group, were other than the product of valid exercises of business judgment. [FN4]

> FN4. If the test was whether "there is a *reasonable inference* that the business judgment rule is not applicable" [emphasis added], as applied below in *Aronson* by the Vice Chancellor, this Court might well reach a different conclusion. But the Vice Chancellor was specifically overruled on that issue by the Delaware Supreme Court. See *Aronson, supra,* 473 A.2d at 814.

The Court next turns to the issue of the disinterestedness and independence of the board members. A presumption of propriety must be the starting point in the absence of clear allegations to the contrary. *Aronson, supra,* 473 A.2d. at 812, 815. See also *Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996).

Slip Copy                                                                                        Page 4
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
(Cite as: 2004 WL 2341395 (Mass.Super.))

As noted above, the Sonus board has seven members, five outside directors and Ahmed and Gruber. One of the outside directors, Thompson has not been named as a defendant. [FN5] Consequently, he must be deemed disinterested without further discussion. The Court will, therefore, consider the status of the pleadings relating to the remaining four outside directors: Edward T. Anderson ("Anderson"), Paul J. Fern ("Fern"), Albert A. Notini ("Notini") and Paul J. Severino ("Severino").

> FN5. The complaints were each filed on February 20, 2004, and the defendants' motions to dismiss revealing Thompson's existence as a director were served on March 22, 2004. The plaintiffs have yet, however, to take any steps to add Thompson as a party. Apparently, they prefer to have this Court decide the present motions and thereafter seek leave to amend their complaints. That is not the order of preference for this Court. The complaints will live or die as written when the arguments were presented to the Court.

It is alleged that Anderson sold certain Sonus stock, allegedly at a significant profit and on insider information. The details, however, are scant. "[T]he mere fact that stocks were traded by ... [a] director does not establish a breach of the duty of loyalty." *McCall v. Scott,* 239 F.3d 808, 825 (6th Cir.2001); *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1224 (1st Cir.1996).

Further, according to Form 4 filed with the S.E.C. on July 22, 2003, Anderson's stock sale occurred on July 18, 2003, and was stock "held in trust for the benefit of his family and minor children," not shares personally held by him. This sale was over six months before the January 2004 announcement of Sonus's financial reporting problems. And the complaints contain no particularized allegations of facts that would demonstrate any impropriety with Anderson's stock sale. Consequently, this Court cannot, on this charge, conclude that Anderson lacks the independence necessary, or is too interested, to be considered other than a disinterested and independent director of Sonus.

**\*5** As to all of the directors, there is an absence of specific or particularized allegations regarding how they would have

been put on notice of any accounting problems or improprieties. Thus, again, this is no basis for excusing a demand. See, e.g, *Guttman v. Huang,* 823 A.2d 492, 498 (Del.Ch.2003).

There are allegations that Fern and Severino, by virtue of their positions on Sonus's Compensation Committee, exert control over fellow board members. Again, however, there are no particularized allegations of any interest on the part of these allegedly controlling directors that would render them less than disinterested and independent. See *Brehm, supra,* 746 A.2d at 258. See also *White v. Panic,* 793 A.2d 356, 366 (Del.Ch.2000); *Langner v. Brown,* 913 F.Supp. 260, 266 (S.D.N.Y.1996).

Again there are some allegations about different business relationships shared among or between some of the directors. Directors are not, however, interested or lacking in independence merely because they share outside professional associations or relationships. *Kohls v. Duthie,* 765 A.2d 1274, 1284 (Del.Ch 2000); *Green v. Phillips,* C.A. No. 14436, 1996 WL 342093, at \*5 (Del.Ch. June 19, 1996). "There is nothing sinister or corrupt in the single fact of association or affiliation in financial matters. There must be some further fact before there is anything wrong about it." *Bartlett, supra,* 221 Mass. at 537. No reasonable doubts are raised by the relationships alleged here.

Lastly, the conclusory allegations about generalized misconduct establishing personal liability and those about insurance coverage are insufficient to excuse the demand requirement. See *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995); *Rales, supra,* 634 A.2d at 936; *Kaufman, supra,* 479 A.2d at 287; *Aronson, supra,* 473 A.2d at 817-18. "Demand is not excused simply because plaintiff has chosen to sue all directors ... To hold otherwise would permit plaintiffs to subvert the particularity requirements of Rule 23.1 simply be designating all directors as targets." *Grimes, supra,* 673 A.2d at 1216 n. 8.

Demand has not been shown to be excused in these cases.

The Court does not assess in any way the other contentions by the defendants in support of their motions to dismiss.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                                    Page 5
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

As a result of the foregoing analysis of Delaware law and a review of the complaints, this Court concludes that the complaints must be dismissed. Further, the Court accepts the Delaware Supreme Court's reasoning that such dismissal ought to be without leave to further amend. See *White, supra,* 783 A.2d at 555.

ORDER

For the foregoing reasons, the Defendants' Motions to Dismiss the Complaint, as amended (Paper # 11 in case No. 04-0753 BLS and Paper # 13 in case No. 04-0754 BLS), are *ALLOWED,* without leave to amend. Final judgment shall enter accordingly, dismissing the cases, with each party to bear his or its own costs.

18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 15

Not Reported in F.Supp.2d                                          Page 1
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Alan SPECTOR, Derivatively on Behalf of Nominal
Defendant i2 Technologies,
Inc., Plaintiff,
v.
Sanjiv S. SIDHU, Gregory A. Brady, William M. Beecher,
David C. Becker, Harvey
B. Cash, Robert L. Crandall, and Michael H. Jordan,
Defendants,
and
I2 TECHNOLOGIES, INC., Nominal Defendant.

**No. Civ.3:03-CV-0841-H.**

Jan. 26, 2004.

William B. Federman, Federman & Sherwood, Oklahoma City, OK, John G. Emerson, Jr., Emerson Poynter, Houston, TX, for Plaintiff/Consol Plaintiff.

Michael A. Swartzendruber, Fulbright & Jaworski Edward S. Koppman, Akin, Gump, Strauss, Hauer & Feld, Michael P. Lynn, Lynn, Tillotson & Pinker, George Edward Bowles, Locke, Liddell & Sapp, Brian R. Becker, Brian Becker & Associates, Robert W. Coleman, Joel E. Geary, Brown McCarroll, Aimee Williams Moore, Baker Botts, Dallas, TX, Warren Lewis Dennis, Proskauer Rose, Jenifer Berger, Bryan Cave, Washington, DC, Bruce C. Oetter, Bryan Cave, St Louis, MO, John P. Stigi, III, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*
SANDERS, Senior J.

**\*1** Before the Court are Defendants Harvey B. Cash, Robert L. Crandall, and Michael H. Jordan's Motion to Dismiss, filed September 30, 2003; Nominal Defendant i2 Technologies, Inc., and Defendants Sanjiv S. Sidhu, William M. Beecher, and David C. Becker's Motion to Dismiss, filed September 30, 2003; Defendant Gregory A.

Brady's Motion to Dismiss, filed September 30, 2003; Plaintiffs' Response, filed October 31, 2003; Defendants' Cash, Crandall and Jordan's Reply, filed November 26, 2003; Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu, Beecher, and Becker's Reply, filed November 26, 2003; Plaintiff's Supplemental Memorandum, filed December 18, 2003; and Defendants Cash, Crandall, and Jordan's Response to Plaintiff's Supplemental Memorandum, filed December 30, 2003. Also before the Court is Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu, Beecher, and Becker's Request for Judicial Notice, filed September 30, 2003. Defendants seek dismissal of Plaintiffs' Consolidated Shareholder Derivative Complaint. Upon review of the pleadings, briefs, and relevant authorities, the Court is of the Opinion for the reasons stated below that Defendants' Motions to Dismiss should be GRANTED.

**I. BACKGROUND**

This is a shareholder derivative suit filed by Alan Spector and Thomas C. Olson, Jr., on behalf of nominal defendant i2 Technologies, Inc.("i2"). [FN1] Plaintiffs filed a Consolidated Shareholder Derivative Complaint ("Complaint") on July 24, 2003, which alleges the Board of Directors and certain executive officers breached their fiduciary duties and violated common law from March 31, 1999 to the present ("Relevant Period"), and seeks remedies for these alleged breaches and violations and for remedies pursuant to the Sarbanes-Oxley Act of 2002. (Compl. at 2). Plaintiffs are, and were during the Relevant Period, shareholders. (Compl. at 4). Defendants are, or were at the time the complaint was filed, directors and/or officers of i2.

> FN1. Thomas C. Olson, Jr.'s case was originally filed as *Olson v. Sidhu,* Civil Action Number 3:03-CV-0869-H, but was consolidated under the instant caption by Court Order on June 23, 2003.

Specifically, Plaintiffs allege that the named individual defendants, Sanjiv S. Sidhu, Gregory A. Brady, William M. Beecher, David C. Becker, Harvey B. Cash, Robert L. Crandall, and Michael H. Jordan, "caused [i2] to improperly recognize revenue in violation of Generally Accepted Accounting Principals ("GAAP") and to falsely publicize

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the integration capabilities and performance of its software product TradeMatrix." (Compl. at 2). Plaintiffs' complaint stems from a re-audit i2 performed in 2003 for financial years 1999, 2000, and 2001, which resulted in a restatement of i2's financial statements for those years and a loss in stock price. (Compl. at 32).

All Defendants, including nominal defendant i2, move to dismiss Plaintiffs' complaint. Defendants argue that Plaintiffs failed to establish demand futility pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law; that the complaint does not meet the particularity requirements of Federal Rule of Civil Procedure 9(b); that Plaintiffs' action is barred by i2's Certificate of Incorporation; that Plaintiffs' product-related action is barred by res judicata; and that the Sarbanes-Oxley Act claim fails as a matter of law. The Court will address these arguments below.

## II. ANALYSIS

**\*2** Defendants first argue that Plaintiffs lack standing to sue derivatively because they did not make demand on i2's Board of Directors. (Def. Cash, Crandall, and Jordan's Mot. at 2-3). Defendants argue that if demand is not made on the Board prior to filing a derivative suit, the complaint must comply with the requirement of Federal Rule of Civil Procedure 23.1 and Delaware law plead with particularity the reasons demand is excused. (*Id.*). In a derivative action, Rule 23.1 requires that the complaint "shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Because i2 is a Delaware corporation, "the substantive corporation law of Delaware determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied." *Rales v. Blasband,* 634 A.2d 927, 932 n. 7 (Del.1993). Delaware law requires a stockholder to make a demand on the Board of Directors to pursue the corporate claim, or to show why demand is excused "because the directors are incapable of making an impartial decision regarding such litigation." *Id.* at 932.

In the instant case, both sides agree that the test articulated

by the Delaware Supreme Court in *Rales* is the appropriate test to use in determining whether demand in this case is excused as futile. (*See* Def. Cash, Crandall and Jordan's Mot. at 5; Pl.'s Mot. at 9). The *Rales* test is employed where "directors are sued because they have failed to do something ... demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand." *Rales,* 634 A.2d at 934 n. 9. In the instant case, the Court must consider whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the Plaintiff would need to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935.

In the instant case, when the complaint was filed the Board of Directors of i2 consisted of Sanjiv S. Sidhu, Harvey B. Cash, Robert J. Crandall, and Michael H. Jordan. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7). Both sides agree that Sidhu, as i2's President and Chief Executive Officer, is an insider and, thus, could arguably be considered interested. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7; Pl.'s Mot. at 10). The remaining directors, Cash, Crandall, and Jordan, however, are outsiders, meaning they are not also officers of the company and so are not automatically considered interested or not independent. (*See id.*). Defendants argue that because the majority of the Board is comprised of outside directors, pre-suit demand would be excused if a majority of the Board meets the *Rales* test. The Court agrees and will therefore only consider whether Plaintiffs' Complaint meets the test of disinterested and independent as to the three outside directors, Cash, Crandall, and Jordan.

**\*3** "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or "where a corporate decision will have a materially detrimental impact

Not Reported in F.Supp.2d                                                                                         Page 3
2004 WL 350682 (N.D.Tex.)
(Cite as: 2004 WL 350682 (N.D.Tex.))

on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936. "To establish lack of independence, [Plaintiff] must show that the directors are 'beholden' to the [interested director] or so under their influence that their discretion would be sterilized." *Id.*

In the instant case, Plaintiffs offer eight reasons why the Board is "incapable of making an independent and disinterested decision to institute and vigorously prosecute this action." (Compl. at 38). Plaintiffs argue 1) that each of the individual Defendants "participated in, approved or recklessly disregarded the wrongs complained of" in the complaint; 2) that Defendants Sidhu and Brady are not disinterested or independent because they are officers of the company, have personally engaged in the wrongful actions, have personally benefitted from such wrongful actions, and are named as defendants in the securities fraud class actions; 3) that Defendants Sidhu, Brady, Cash, Crandall, and Jordan approved and signed the allegedly false and misleading Annual Reports and so are not disinterested or independent; 4) that Defendants Sidhu, Brady, Cash, Crandall, and Jordan received but dismissed credible information regarding the violations of GAAP and abdicated their role in investigating those claims; 5) that the directors would be required to sue themselves and/or their fellow directors "who are their friends and with whom they have entangling alliances and interlocking business relationships, interests, and dependencies"; 6) that the directors have not taken any action to seek redress for the wrongdoing alleged in the Complaint, although they knew of it, that the Board approved filing a motion to dismiss the Scheiner class action, and that the Board is dominated and controlled by Sidhu and Brady; 7) that Defendants Sidhu and Brady have not offered to reimburse i2 for their bonuses and incentive-based compensation or to turn over their profits from the alleged insider trading; 8) that the Board's insurance coverage has an "insured vs. insured" exclusion clause, so the directors will not sue the officers or directors because then they would not be covered by their insurance. (Compl. at 38-41).

Defendants argue that Plaintiffs' assertions as to why demand is excused fall into four basic categories: 1) that the directors face potential liability on Plaintiffs' claims; 2) that the Board is dominated and controlled by Defendants Sidhu and Brady, who face potential liability; 3) that the Board has so far failed to take action by either filing suit against the wrongdoers, voluntarily returning the monies sought in the instant case, or by endorsing the filing of the motion to dismiss in the fraud class action; and 4) that the insurance clause precludes coverage if the directors filed against themselves or the officers. (*See* Def. Cash, Crandall, and Jordan's Mot. at 8). The Court agrees with Defendants' characterization of Plaintiffs' arguments and will use these characterization in addressing whether demand is excused.

1. The Directors' Potential Liability

**\*4** The Delaware Supreme Court has explained that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Rales,* 634 A.2d at 936. Only when the potential for liability rises from a mere threat of personal liability to a substantial likelihood of personal liability will directors be considered interested. *Id. See also* Aronson v. Lewis, 473 A.2d 805, 815 (Del.1984). In the instant case, Plaintiffs assert that the outside Directors were interested because they faced potential liability on the wrongs Plaintiffs allege in the Complaint. However, Plaintiffs have alleged no particularized facts that raise their assertion from a mere threat to a substantial likelihood of personal liability. Plaintiff has pleaded no particularized facts which create a reasonable doubt that Defendants Cash, Crandall, or Jordan's actions are not valid exercises of business judgment. *See* Rales, 634 A.2d at 936. This is not sufficient to conclude that the majority of the Board is interested.

2. Domination and Control of the Board

"To establish a lack of independence, [Plaintiffs] must show that the [outside] directors are 'beholden' to [Sidhu and Brady] or so under their influence that their discretion would be sterilized." *Rales,* 634 A.2d at 936. Plaintiffs must "allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' " *Aronson,* 473 A.2d at 816. In the instant case, Plaintiffs allege that Defendants Sidhu and Brady, insiders,

Not Reported in F.Supp.2d                                                                 Page 4
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

dominate and control the Board such that the outside Directors are not independent. However, Plaintiffs offer nothing more than the bare assertion that the directors have "entangling alliances and interlocking business relationships, interests, and dependencies." (Compl. at 39). Plaintiffs allege no specific facts in support of this assertion, and therefore, the Court cannot conclude "that the complaint factually particularizes any circumstances of control and domination to overcome the presumption of board independence, and thus render demand futile." *Aronson*, 473 A.2d at 817.

3. Board's Failure to Take Action

Plaintiffs also argue that demand is futile because the Board has not taken action to stop the allegedly wrongful action, nor has the Board taken action to seek recompense for the allegedly wrongful action. (Compl. at 40). This allegation is insufficient to excuse demand. In an unpublished opinion, the Delaware Court of Chancery stated, "The mere fact that [the Board] has elected not to sue before the derivative action was filed should not of itself indicate 'interestedness.' " *Richarson v. Graves*, C.A. No. 6617, 1983 WL 21109, *3 (Del.Ch. March 7, 1983). The Court of Chancery went on to explain that "it is the Board's inaction in most every case which is the *raison d'etre* from Rule 23.1." *Id.* In the instant case, the Court agrees that Plaintiffs' assertions are not indicative of interestedness. Plaintiffs assertions here are insufficient to excuse demand.

**\*5** Plaintiffs also assert that demand is futile because Sidhu and Brady have not volunteered to reimburse i2 for their profits from the alleged insider trading and the Board has not sought reimbursement from them. (Compl. at 40- 41). The inquiry for the Court remains whether such allegations create a reasonable doubt that the Board cannot act independently or disinterestedly. *See Guttman v. Huang*, 823 A.2d 492, 502 (Del.Ch.2003). "[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Id.* Plaintiffs here, however, have not even alleged that the outside Directors participated in the alleged insider trading. (*See* Compl. at 40). The argument, therefore, must be that

the outside Directors are not independent from Sidhu, the insider Director accused of insider trading. As discussed above, however, Plaintiffs have alleged no particularized facts to support their assertion that the Board lacked independence. Therefore, the mere allegation of insider trading by one insider Director is not sufficient to excuse demand on the entire Board.

4. "Insured vs. Insured" Exclusion Clause

Plaintiffs' final argument is that demand should be excused because i2's directors' and officers' liability insurance coverage contains an "insured vs. insured" exclusion clause, thus preventing the Board from suing itself because then they would lose their liability coverage. (Compl. at 41). Many courts have found the mere existence of this clause, without more, to be insufficient to excuse demand. *See Matter of Prudential Ins. Co. Litigation*, 282 N.J.Super. 256, 659 A.2d 961, 973 (N.J. Super Ct. Ch.Div.1995) (citing cases from the Delaware Court of Chancery, the Southern District of New York, and the Eleventh Circuit holding that the existence of an insured vs. insured exclusion clause is insufficient to excuse demand, explaining that it would eviscerate the demand requirement in almost all cases). The Court finds no reason to view Plaintiffs' argument as anything more than an argument that the Directors would be forced to sue themselves, and, as discussed above, this argument fails to excuse demand in the instant case.

III. CONCLUSION

The Court concludes that Plaintiffs have not created a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences," and have thus failed to demonstrate that demand is excused. *Rales*, 634 A.2d at 935. In light of this conclusion, the Court does not need to address Defendants' other arguments for why the case should be dismissed. Because Plaintiffs did not make demand on the Board and failed to allege with particularity why demand was excused, as required pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law, the Court GRANTS Defendants' Motions to Dismiss.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 5
2004 WL 350682 (N.D.Tex.)
(Cite as: 2004 WL 350682 (N.D.Tex.))

*6 For the reasons stated above, Defendants' Motions to Dismiss are GRANTED and Plaintiffs' Complaint is DISMISSED pursuant to Fed.R.Civ .P. 12(b)(6).

SO ORDERED.

2004 WL 350682 (N.D.Tex.)

   **Motions, Pleadings and Filings (Back to top)**
• 3:03CV00841 (Docket) (Apr. 23, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

Not Reported in F.Supp.                                                    Page 1
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

⚑

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

In Re STRATUS COMPUTER, INC. SECURITIES
LITIGATION, Defendant.

**CIV. A. 89-2075-Z.**

March 27, 1992.
Recommendations on Motions to Dismiss Dec. 10, 1991.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, Mass., for plaintiffs.

Maynard Mohan Kirpalani, Parker, Coulter, Daley & White, Boston, Mass., for defendant Stratus Computer, Inc.

Peter M. Saparoff, Palmer & Dodge, Helen A. Robichaud, Gaston & Snow, Boston, Mass., for defendants Status Computer, Inc., William E. Foster and Gary Haroian.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, for defendants William H. Thompson, Robert E. Donahue and Robert A. Freiburghouse.

Peter J. MacDonald, Hale & Dorr, Boston, Mass., for defendants Alexander V. D'Arbeloff, Robert M. Morrill, Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson.

ZOBEL, District Judge.

**\*1** The Objection to the recommendation pertaining to Counts I, II and IV are overruled. Plaintiff does not object to the recommendation pertaining to Count III. The Court accepts the Magistrate Judge's findings and recommendations and allows the motion to dismiss. The complaint shall be dismissed as to all defendants. Donald Oldham having never been served, the complaints against him is dismissed for failure to make service.

*FINDINGS AND RECOMMENDATIONS ON
DEFENDANTS MOTIONS TO DISMISS*
ALEXANDER, United States Magistrate Judge.

These motions have been referred to this Court by Order of

Reference. The defendants move to dismiss each count of the plaintiffs' Consolidated Amended Complaint on a various grounds. The factual background is culled from the allegations of the complaint, which the Court takes as true for the purposes of the motions to dismiss under Fed.R.Civ.P. 12(b)(6). *See Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989) (citations omitted). This Court will not dismiss a count for failure to state a claim unless "it appears beyond doubt that [plaintiffs] can prove no set of facts [that] would entitle [them] to relief." *Id.* (citations omitted).

FACTUAL BACKGROUND

*Plaintiffs*

Plaintiff Laurel Catania purchased 500 shares of stock in the defendant Stratus Computer, Inc. (Stratus) on August 23, 1989. Plaintiff Stephen DelGrasso purchased 200 shares of Stratus stock on August 18, 1989. Plaintiff John Garabidian purchased 200 shares of Stratus stock on August 28, 1989. Plaintiff Bruce Wilhelmy purchased 1,000 shares of Stratus stock on September 15, 1989. Plaintiff Elliot Shwartz purchased 100 shares of Stratus stock on August 9, 1989. These plaintiffs bring suit on behalf of themselves and a class of all who purchased shares of Stratus stock between July 25, 1989, and September 19, 1989. Plaintiff Steven D. Bergman brings his action as a derivative suit on behalf of Stratus.

*Defendants*

Stratus is a Massachusetts corporation. It manufactures and sells fault tolerant computer systems, used in automatic teller machine networks and securities trading systems, among other applications. Defendant William E. Foster is President, Chief Executive Officer and Chairman of the Board of Stratus. Defendant Gary E. Haroian is Senior Vice President of Finance and Administration, Chief Financial Officer and Treasurer. Defendant Robert Freiburghouse is Senior Vice President of Engineering. Defendant Robert Donahue is Vice President and Controller. Defendant William H. Thompson is Senior Vice President of Marketing. Defendant J. Donald Oldham is Vice President. Defendants Alexander V. D'Arbeloff, Robert M. Morrill,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                           Page 2
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson are directors of Stratus.

*Facts*

Stratus has been a highly successful company in the computer industry. Stratus sells its products both internationally and domestically. The domestic channels for its sales are under distribution agreements with IBM Corporation (IBM) and Olivetti & Co., S.P.A. (Olivetti). In 1988, the sales to IBM accrued to 32% of Stratus's revenues, while the sales to Olivetti made up 8% of revenues.

**\*2** Since 1982, Stratus has grown annually from 40% to 50%. In the April 3, 1989, edition of *Business Week,* defendant Foster predicted 30% growth for the third quarter of 1989. In a Letter to Shareholders in the Annual Report for the fiscal year ended January 1, 1989, which was disseminated in late March of 1989, defendant Foster expressed confidence and optimism in Stratus's performance and growth. The statement mentioned historical increases in growth and emphasized the unique aspects of Stratus, as well as its relationship with IBM, as attributes. The statement discussed efforts to build sales through product development. The statement highlighted the telecommunications industry, declaring that Stratus expected to exceed the projected industry growth rate of 25%, due to its unique attributes. The statement recounted past international growth, and expressed the expectation that the same international growth rate would continue in 1989. The statement represented that Stratus's "products are in greater demand than ever before," and asserted as "fact" that Stratus was "positioned to achieve even greater long term success." *Consolidated Amended Complaint* ¶ 36. On March 27, 1989, Prudential-Bache Securities, Inc. issued a report quoting defendant Haroian as stating that "the company feels that a 40%-60% [annual growth] is sustainable for the long term." *Id.* ¶ 37.

As growth had continued in the first quarter, defendant Foster made statements to the *Origin Universal News Service* on April 25, 1989, and to *The Boston Globe* on April 26, 1989, discussing that growth. He emphasized Stratus's international performance, noting that it offset softness in the domestic market. He stated that "we remain confident in our continued growth both domestically and internationally." *Id.* ¶ 38.

Stratus's Form 10-Q for the quarter ended April 2, 1989, depicted an increase in net revenues of 41%. The defendants attributed the increase to "the growth in the marketplace" and "the rapidly growing customer base." Financial analysts stated that the first quarter results concurred with their projections.

On May 2, 1989, defendant Foster represented to *The Boston Globe* that domestic sales had slowed, but that the strength of Stratus's other markets was such that there would be no overall slowing down. On May 15, 1989, *Computer World* reported Stratus's growth in the Pacific Rim, noting that Stratus expected the same growth in 1989.

In a July 29, 1989, press release announcing earnings for the second quarter of 1989, Foster emphasized those aspects that had contributed to the growth, noting an increase in customer accounts, both domestically and internationally. The plaintiffs contend that this statement, coupled with projections of a 30% increase in earnings, was materially misleading, because Stratus knew or recklessly disregarded indications that a decrease in the domestic market would make the overall business outlook inaccurate.

**\*3** Revenues and income for the second quarter and for the six months of the first two quarters of 1989 increased by greater than 30%. On August 4, *Value Line* estimated that Stratus's 1989 sales would reflect a 34% increase over 1988 sales. It noted a 25% rate of growth in the United States, stating that sales through IBM were expanding at a rate of approximately 45%.

The complaint alleges that, during the class period, Stratus was in contact with professional participants in the stock market and that the individual defendants periodically provided information to analysts at meetings. Stratus confirmed the reasonableness of the analysts' estimates for 1989, at these meetings, including at a meeting on September 12, 1989, at Cowen & Co., in New York City. On September 17, 1989, *The New York Times* estimated revenues at $360 million for the year. By late July of 1989, the complaint alleges, the defendants knew or recklessly

Not Reported in F.Supp.                                                                 Page 3
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

disregarded that projected levels of sales were not attainable.

On September 18, 1989, the defendants announced that revenues and earnings for the third quarter would not meet expectations, due to weakness in the domestic market. They indicated a 20% to 25% rate of growth in the short term. Dow Jones, *Business Week* and *McGraw Hill News* reported this information. *Value Line* reduced its earnings estimates for 1989. The price of Stratus's stock fell from $33- 1/2 on September 15, 1989 to $26. Third quarter earnings ultimately released on October 20, 1989, indicated an increase in earnings of only 12%, due to a weak domestic market.

Plaintiffs allege that the directors made several sales of Stratus stock with material knowledge of the decline in growth. Defendant Oldham sold 2,825 shares on September 5 and 14. Defendant Thompson sold 3,000 shares on August 25. Defendant Donahue sold 1,807 shares on August 24. Defendant Freiburghouse sold 28,938 shares on August 1 and 30,000 shares on May 12.

ANALYSIS

*Count I*

Count I alleges that the defendants made materially misleading statements that would create the impression that Stratus was growing at a 30% rate, when the defendants knew or recklessly disregarded indications that such a growth rate was not attainable. Count I claims that these misleading statements, made with knowledge of their falsity or reckless disregard for the truth, violated sections 10(b) and 20 of the Securities and Exchange Act, as well as Rule 10b-5, promulgated by the Securities and Exchange Commission. Stratus and each of the individual defendants, except defendant Oldham move to dismiss this count. Their primary contention is that the count fails to satisfy the pleading requirements of Rule 9(b).

According to Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The First Circuit has

identified three purposes behind this rule:

**\*4** (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations.

*New England Data Services., Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987). Because the danger of strike suits is great in cases alleging securities fraud, this circuit will construe Rule 9(b) strictly in that context. *Id.* at 288; *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991).

Under Rule 9(b), while the pleadings need not prove the case, they "must 'specif[y] ... the time, place and content of .. [each] alleged false representation.' " *Konstantinakos v. Federal Deposit Ins. Corp.,* 719 F.Supp. 35, 38 (D.Mass.1989) (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 229 (1st Cir.1980)). The First Circuit has stated that Rule 9(b) "requires specification of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty,* 633 F.2d at 228, *quoted in New England Data Services,* 829 F.2d at 288. The pleadings, however, must provide a minimal foundation of indicia as to the misleading qualities of the statements. *See id.* (pleadings failed to satisfy Rule 9(b), because "the complaint does not explain what was misleading about any of the challenged statements"); *Wittenberg v. Continental Real Estate Partners, LTD-74A,* 478 F.Supp. 504, 508 (D.Mass.1979) (complaint must "state how each statement amounted to a misrepresentation." (citation omitted), *aff'd per curiam,* 625 F.2d 5 (1st Cir.1980). The First Circuit has recently stated that the complaint must include "factual allegations that would support a reasonable inference that adverse circumstances existed ... and were known and deliberately disregarded by defendants." *Romani,* 929 F.2d at 878. "The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.* (citing *Wayne Investment v. Gulf Oil Corp.,* 739 F.2d 11, 13-14 (1st Cir.1984); *New England Data Services,* 829 F.2d at 288); *see also In re Healthco International, Inc.,* Civil Action No. 91-10710-MA,

Not Reported in F.Supp.                                                                                       Page 4
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

Memorandum and Order at 14 n. 9 (D.Mass. Nov. 7, 1991). Thus, the complaint may not rest on mere allegations and conclusions, *Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir.1985);* nor may it be so groundless in fact that it proceeds only on mere "information and belief." *See Driscoll v. Landmark Bank for Sav., 758 F.Supp. 48, 51 (D.Mass.1991)* (citing *Wayne, 739 F.2d at 14).*

The complaint alleges statements attributable to the nominal defendant Stratus and defendants Foster and Haroian that are sufficiently specific to satisfy the time, place and content requirements. As to defendants Donahue, Freiburghouse and Thompson, however, the complaint does not allege anything except vague connections by virtue of their positions. Merely being a director or officer is not ground for imposition of liability under § 10(b). *Loan v. Federal Deposit Ins. Corp., 717 F.Supp. 964, 968 (D.Mass.1989).* *Rule 9(b)* requires specification of which defendants are accused of performing what acts. *Hayduk, 775 F.2d at 443; Loan, 717 F.Supp. at 968* ("[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy *Rule 9(b)*"); *see also Konstantinakos, 719 F.Supp. at 39* (complaint dismissed, *inter alia,* because there were no allegations as to the roles of each individual defendant). On this basis, alone, this Court should dismiss Count I as to defendants Donahue, Freiburghouse and Thompson.

**\*5** As to the other defendants, while the statements alleged to be fraudulent are set out in the complaint according to the time, place and content requirements, they do not meet the standard recently set by the First Circuit in *Romani.* Beyond the time, place and content requirement, the complaint must allege adverse circumstances that were known and disregarded. *Romani, 929 F.2d at 878.* The plaintiffs, here, do not state any facts that would serve as a starting point on which to build a case of knowing or reckless disregard of adverse circumstances. [FN1] Rather, the complaint is alleged on mere "information and belief." The First Circuit has circumscribed the use of this manner of pleading fraud in the most explicit terms. [FN2]

As Magistrate Judge Ponsor recently noted in a similar case:

The allegations of fraud here are so generic that [they] could

have been drafted by any competent practitioner generally familiar with securities fraud case law, without any independent knowledge of defendants' conduct, simply by collating language from leading cases with excerpts from defendants' ... 10-Q forms, annual reports and press releases.

*Wilkes v. Heritage Bancorp, Inc., 1990 WL 263612 (D.Mass.1990).* Courts in this district have repeatedly dismissed complaints that merely quote company statements or predictions as supporting facts for fraud. *See, e.g., Driscoll, 758 F.Supp. 48; Akerman v. Bankworcester Corp., 751 F.Supp. 11 (D.Mass.1990); Loan, 717 F.Supp. at 967.* Such an exiguous body of factual support will not pass muster. Count I fails to meet the requirements of *Rule 9(b).*

*Count II*

Count II alleges that the defendants Donahue, Freiburghouse, Oldham and Thompson traded Stratus stock on inside information, in contravention of sections 10(b) and 20(A)(a) of the Securities and Exchange Act and Rule 10b-5. Defendants Donahue, Freiburghouse and Thompson move this Court to dismiss Count II.

The defendants first contend that the Court should dismiss Count II for failure to comply with *Rule 9(b).* This Court finds persuasive the defendants' argument that *Rule 9(b)* is applicable. In *Hayduk,* the First Circuit indicated that *Rule 9(b)* applies in any case where " *'fraud lies at the core of the action.'* " *Hayduk, 775 F.2d at 443* (quoting *Lopez v. Bulova Watch Co., Inc., 582 F.Supp. 755, 766 (D.R.I.1984)*) (emphasis in original). The plaintiff is essentially arguing that the defendants engaged in a conspiracy to defraud. As Rule 10b-5 states, it is unlawful:

(c) To engage in any act, practice, or course of business which operates or would operate as a *fraud or deceit* upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5* (emphasis added). As one court noted, "Congress ... amended the Exchange Act to expressly provide a private right of action for contemporaneous buyers and sellers asserting *claims of fraud committed through insider trading.*" *Elysian Federal Savings Bank v.*

Not Reported in F.Supp.                                                                        Page 5
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

*First Interregional Equity Corp., 713 F.Supp. 737 (D.N.J.1989).* Thus, it would appear that insider trading claims demand application of Rule 9(b).

**\*6** Having determined that Rule 9(b) applies, Count II should be dismissed against defendants Donahue, Freiburghouse and Thompson for the same reasons as Count I. [FN3] The factual allegations simply do not make reference to them, except to identify their status. There is no allegation as to what information they knew but did not disclose.

Defendants Donahue, Freiburghouse and Thompson also argue for dismissal on the grounds that none of the plaintiffs traded securities "contemporaneously" with them, as required under the Securities and Exchange Act. *See* 15 U.S.C. § 78t-1(a). Judge McNaught has ruled out an interpretation of "contemporaneous" that would include purchases by the plaintiffs *before* the defendants. *Backman v. Polaroid Corp., 540 F.Supp. 667, 670 (D.Mass.1982); see also Abelson v. Strong, 644 F.Supp. 524, 527 (D.Mass.1986)* (allegations that plaintiffs purchased "during the period of market manipulation" were not sufficient to confer standing on plaintiffs to bring insider trading suit). He also refused to include within that term purchases that occurred four days (two trading days) after a defendant's sale. *Backman, 540 F.Supp. at 671.* The facts of that case would bar all claims except plaintiff Garibidian's claim against defendant Thompson, as Garibidian purchased within three days (one trading day) of Thompson's sale. The defendants argue persuasively, however, that the logic of Judge McNaught's decision requires an interpretation of "contemporaneous" to mean "same day." [FN4] Under such an interpretation, none of the plaintiffs would have standing to bring the class suit under Count II.

*Count III*

Count III is a more cursory version of Count I, alleging that the defendants other than the derivative director defendants engaged in negligent misrepresentation by refusing to exercise reasonable care in the statements they made. This assertion appears to relate back to the allegations that the defendants acted in reckless disregard of indications that earnings would decrease. What these indications were is not

clear. Count III is even less particular than Count I. The defendants move to dismiss it.

This district has clearly held that Rule 9(b) applies to claims of negligent misrepresentation. *Howard v. Cycare Systems, Inc., 128 F.R.D. 159 (D.Mass.1989); Morgan v. Financial Planning Advisors, 701 F.Supp. 923 (D.Mass.1988); Flier v. Billingsley, 1988 WL 92465 (D.Mass.1988).* The same rule against pleadings on "information and belief" and the same policy against allowing "strike suits" apply to negligent misrepresentation claims as apply to outright claims of fraud. *Howard, 128 F.R.D. at 162* (quoting *Wayne, 739 F.2d at 13-14); Simcox v. San Juan Shipyard, Inc., 754 F.2d 430, 439 (1st Cir.1985).* Furthermore, without the duties imposed by the securities laws, it is unclear upon what this claim is based. The factual statements appear to have been true when made, and the other statements are "statements of opinion [or] of conditions to exist in the future," which are not actionable under Massachusetts law. *Morgan, 701 F.Supp. at 927* (quoting *Pepsi Cola Metropolitan Bottling Co. v. Pleasure Island, Inc., 345 F.2d 617, 622 (1st Cir.1965)).* Massachusetts law, moreover, generally imposes a requirement of privity in order to bring a claim of negligent misrepresentation. *Capitol Indemnity Corp. v. Freedom House Development Corp., 487 F.Supp. 839, 842 (D.Mass.1980).* It is unclear how the plaintiffs in this case could meet that requirement, given that they are merely purchasers on a public stock exchange. *See, e.g., In re Consumers Power Company Securities Litigation, 105 F.R.D. 583, 596-98 (E.D.Mich.1985)* (stock purchasers lacked privity and, thus, could not sue for negligent misrepresentation). Thus, Count III should be dismissed.

*Count IV*

**\*7** Count IV is a derivative suit brought by plaintiff Bergman on behalf of Stratus for breach of fiduciary duty to Stratus by the individual defendants. The defendants invoke four grounds for dismissal of this count: (1) failure to meet Rule 9(b)'s particularity requirement; (2) failure to meet Rule 8(a)'s pleading requirement; (3) failure of the plaintiff to plead with particularity the circumstances excusing demand on the corporation, as required by Rule 23.1; and (4) failure to verify the complaint, as required by Rule 23.1. Each of these grounds supports dismissal.

Not Reported in F.Supp.                                                    Page 6
1992 WL 73555 (D.Mass.)
(Cite as: 1992 WL 73555 (D.Mass.))

The defendants' first argument is that Rule 9(b) applies and that plaintiff Bergman has not complied with it. Oddly, plaintiff Bergman does not respond to this argument, but merely incorporates by reference the arguments of the other plaintiffs with regard to Rule 9(b) under the other counts of the complaint. This Court sees nothing to rebut the defendants' arguments.

Judge Keeton has stated that Rule 9(b)'s particularity requirement "extends to averments of fraud or mistake, whatever may be the theory of legal duty-- statutory, tort, contractual, or *fiduciary.* " *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979) (emphasis added); *see also Hayduk,* 775 F.2d at 443 ("where fraud lies at the core of the action, Rule 9(b) applies"). If the breach of fiduciary duty derives from conduct that is negligent, rather than fraudulent, however, Rule 9(b) would not apply. *Shapiro,* 84 F.R.D. at 236. That the breach of fiduciary duty alleged here derives from conduct that is fraudulent, and not merely negligent, is plain from the complaint. Plaintiff Bergman claims: that each of the directors "participated in, knew of, and was on notice of the wrongful and illegal conduct" (*Consolidated Amended Complaint* ¶ 82(e)); that the directors "knowingly engaged in self-dealing from which they profited personally" (*Id.* ¶ 82(f)); and that the defendants' conduct violated their fiduciary duties of candor and loyalty "requir[ing] them to disseminate truthful information" (*Id.* ¶ 83). The derivative count plainly asserts the sort of claim for which Rule 9(b) contemplates the application of its particularity requirement.

Having determined that Rule 9(b) applies, it is immediately apparent that Count IV does not comply with the rule. The allegations are vague and amorphous. It is not at all clear which defendants are alleged to have performed what specific acts that would constitute a violation of fiduciary duty. *See Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 31 (D.Mass.1989) ("Where multiple defendants are involved, each defendant's role in the fraud must be particularized.... This requirement serves to place each defendant on notice of what role he is alleged to have played in the fraud.") (citations omitted); *Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983) ("In a securities

fraud case ..., it is clear that the complaint should 'particularize as to each ... of the defendants the activities for which the plaintiff seeks to hold them accountable.' ") (quoting *Lerman v. ITB Management Corp.,* 58 F.R.D. 153, 156 (D.Mass.1973)). Count IV only discusses the defendants in collective terminology, making no reference to any particular act of any individual defendant.

**\*8** Beyond the vague allegations of participation, implication, knowledge and dissemination there is no reference to adverse circumstances that would provide a foundation upon which to build these charges. While the charges seem to stem from Counts I through III, five of the six directors sued under Count IV are in no way implicated in Counts I through III. It is, thus, by no means clear whom plaintiff Bergman alleges to have done what. Not only does Count IV fail to provide the defendants with the notice requisite to the preparation of meaningful responses, but the danger of holding the individual defendants *in terrorem* and subjecting them to a frivolous suit that might likely injure their reputations is high. *See New England Data Services,* 829 F.2d at 289; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539, 552 (1975), *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Thus, Count IV warrants dismissal under Rule 9(b).

The defendants also argue that Count IV fails to comply even with the basic pleading requirements of Rule 8(a) and, thus, should be dismissed under Rule 12(b)(6) for failure to state a claim. Their argument on this ground is also persuasive. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a). As the First Circuit has stated:

While a complaint need only set out 'a generalized statement of facts,' there must be enough information 'to outline the elements of the pleaders' claim.' ... More detail is required than a plaintiff's bald statement 'that he has a valid claim of some type,' and courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened....' "

*Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977)

Not Reported in F.Supp.                                                                                      Page 7
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

(quoting Wright & Miller, Federal Practice and Procedure: Civil § 1357). The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

Nowhere does Count IV charge the outside directors with any specific wrongdoing. Rather, Count IV seems to implicate them only because of their status as directors. That tenuous connection, however, is an insufficient basis for alleging a cause of action. *Cf. Konstantinakos,* 719 F.Supp. at 39 (mere status as directors is insufficient basis to support cause of action for securities fraud in which directors did not participate); *Schmid v. National Bank of Greece, S.A.,* 622 F.Supp. 704, 712 (D.Mass.1985), *aff'd,* 802 F.2d 439 (1st Cir.1986) ("An officer of a corporation does not incur personal liability for a tort committed by the corporation or by another corporate officer merely by virtue of the office which he holds in the corporation.") (citations omitted). As Judge Tauro has noted, where a complaint alleges "violation of ... fiduciary duties" without "attempt[ing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit," it does not give the defendants the notice required of either Rule 8(a) or Rule 9(b). *Lerman,* 58 F.R.D. at 155 & n. 2 (D.Mass.1973).

**\*9** Yet another reason for dismissing Count IV is the failure of plaintiff Bergman to make a demand on the board of directors that the corporation bring the lawsuit. Rule 23.1 requires that, in a derivative action, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ..., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The First Circuit has explained:

The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

*Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977).

Thus, the particularity requirement under Rule 23.1 "is not a technical rule of pleading, but one of substantive right." *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.1973), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973) (quoting *Bartlett v. New York, N.H. & H.R.R.,* 221 Mass. 530, 538, 109 N.E. 452, 456 (1915)).

There are two phases of the demand requirement. Not only must any reasons excusing demand satisfy the substantive state law, but Rule 23.1 imposes an independent federal requirement that such reasons be pled with particularity. *Tural v. Rogatol Distributors, Inc.,* No. 91-1472 (1st Cir. Nov. 27, 1991). In pleading the reasons excusing demand, the particularity rule requires more specificity of the complaint than mere allegations of "participation" or "acquiescence" in the challenged conduct. *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.1982), *cert. denied, Grossman v. Fidelity Municipal Bond Fund, Inc.,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982), *reh'g denied,* 459 U.S. 1138, 103 S.Ct. 774, 74 L.Ed.2d 986 (1983). The factual allegations of the complaint must describe misconduct with specificity. *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977)).

Much of the rationale behind this Court's finding that Count IV does not satisfy the Rule 9(b) particularity requirement applies *a fortiori* to the Rule 23.1 particularity requirement. In vague and conclusory fashion, Count IV asserts six reasons justifying demand futility, none of which have specific factual support in the complaint and one of which contradicts an earlier count in the complaint. According to the complaint, demand would be futile because:

(a) The acts complained of herein constitute violations of the federal securities and other federal laws and fiduciary duties owed by directors and officers and these acts are incapable of ratification;

(b) Each of the directors is implicated in the dissemination of the false and misleading statements and omissions alleged herein;

**\*10** (c) Each member of the Board of Directors had access to confidential financial information indicating Stratus' true

Not Reported in F.Supp.                                                                                      Page 8
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

and [sic] financial condition and prospects.

(d) Social, business and other relationships tie the officers and directors of Stratus to one another, and any legitimate 'independent' action by Stratus against any of the individual defendants would be impossible;

(e) Each of the current directors participated in, knew of, and was on notice of the wrongful and illegal conduct alleged herein; and

(f) Five of the six directors who comprise Stratus' board have been involved in trading in Stratus' common stock on the basis of material non-public information and will be personally liable for any wrongdoing, in that they knowingly engaged in self-dealing from which they profitted [sic] personally.

*Consolidated Amended Complaint* ¶ 82.

Starting with the most egregious deviation from Rule 23.1, item (f) stands in peculiar contrast to the conspicuous absence of five of the six directors from any of the other counts of the complaint, including Count II--the count alleging insider trading. Such a mysterious and vague assertion cannot satisfy the particularity requirement. Count II, moreover, fails to state a claim or meet the particularity requirement of Rule 9(b). *See supra.* Item (a) is also suspect, as this complaint fails to allege particular conduct that would violate the federal securities laws. What other federal laws may be implicated is unclear. [FN5]

Finally, allowing a complaint to circumvent the demand requirement through allegations as vague and conclusory as items (b) through (e) would render the demand requirement nugatory. These items, in light of the factual allegations of the complaint, cannot be understood to allege particular misconduct by the individual directors nor particular circumstances specific to each director. "[S]tripped of these conclusory allegations, the facts set forth in the complaint" fail to "make out with sufficient particularity misconduct that would excuse a demand on directors." *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977).

These allegations are similar to the one Judge Tauro found

insufficient to satisfy Rule 23.1's particularity requirement in *Lerman.* In that case, the plaintiff alleged:

Demand upon the Fund to bring this action would be futile because those in control of the Fund are alleged wrongdoers. Statutes place such decisions in the directors and control of such an action would be subject to control of the wrongdoers, preventing diligent prosecution.

*Lerman,* 58 F.Supp. at 156 (quoting *Complaint* ¶ 24). The allegations in the case at bar have the same degree of particularity as the allegation in *Lerman. Kauffman* and *Heit* require more than such vague and conclusory allegations. [FN6]

Yet another ground for dismissing Count IV is Rule 23.1's verification requirement. Rule 23.1 states, in part: "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... the complaint shall be verified...." Fed.R.Civ.P. 23.1. Verification is another safeguard to ensure that complaints in derivative suits are well-grounded in fact and to prevent frivolous litigation. *Smachlo v. Birkelo,* 576 F.Supp. 1439, 1442 (D.Del.1983) (citations omitted). Plaintiff Bergman contends that his verification of the first complaint should excuse verification of the Consolidated Amended Complaint. The case law, however, stands against him. *See, e.g., Federal Deposit Ins. Corp. v. Kerr,* 637 F.Supp. 828, 843 (W.D.N.C.1986) (requiring verification of Second Amended Complaint); *Stein v. Aldrich* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,473, at 92,781 (S.D.N.Y.1980) (amended complaint "must be verified by plaintiff"). In this case, verification of the Consolidated Amended Complaint might have eliminated some of the discrepancies. Thus, on any of these grounds, Count IV should be dismissed.

*Conclusion*

*11 In light of these findings, this Court recommends that Counts I, II, III and IV be dismissed as to all defendants except defendant Oldham, who has not filed a motion to dismiss.

FN1. The complaint offers several statements of

Not Reported in F.Supp.                                                           Page 9
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

accurate historical facts regarding past growth, products and performance. These statements place Stratus in a positive light. There are also many statements of opinion and predictions offering an optimistic prognosis on the expected rate of growth. Some of the opinions and predictions are specifically quantifiable. *See Priest v. Zayre,* Civil Action No. 86-2411-Z, Memorandum of Decision at 5 (D.Mass. May 1, 1987). Nonparty statements by the media and financial analysts bolstered this optimistic impression. While the complaint gives the times, places and contents of statements made expressing confidence in the projected rate of Stratus's growth, it does not allege quantifiable information that the defendants could have known and disregarded. *Cf. Healthco,* Civil Action No. 91-10710-MA, Memorandum and Order at 14, n. 9 ("Plaintiffs aver no facts as to how Defendants' accounting system would or should have made them aware of any concrete financial figures for the fourth quarter before ... [defendant] announced its expected losses for the fourth quarter.") Without allegations of lack of reasonable basis, knowing falsehood or recklessness that satisfy Rule 9(b), the predictions are not actionable. *See Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1453-54 (D.Mass.1989).

The complaint merely leaves this Court to infer adverse circumstances from the rather vague charges of insider trading (which, as will be discussed *infra* under Count II, are inadequate). Notably, however, there are no allegations of sales of stock by defendants Foster and Haroian, the only defendants to whom the plaintiffs have attributed representations that would satisfy the time, place and content requirements. Charges that some defendants sold stock, while other defendants made optimistic projections about the company, clearly will not, without a particularly pled conspiracy, satisfy Rule 9(b). *Fingar v. Prudential-Bache Securities, Inc.,* 662 F.Supp. 1119, 1124 (E.D.N.Y.1987). Here, the plaintiffs seem to plead a conspiracy by knowledge, which is inadequate. *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th

Cir.1990), *cert. denied,* 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986) ("the case 'against an aider, abettor, or conspirator may not rest on a bare inference that the defendant must have had knowledge of the facts....' ").

FN2. *Romani,* 929 F.2d at 828 ("Where allegations of fraud are ... based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."); *Hayduk,* 775 F.2d at 444 ("Without supporting facts regarding the circumstances surrounding the formation of the conspiracy to defraud plaintiffs or plaintiffs' basis for believing that a conspiracy existed for the purpose of defrauding them, the allegation becomes a conclusional accusation of the sort that is proscribed by Rule 9(b)."); *Wayne,* 739 F.2d at 14 (complaint may not proceed on mere "information and belief" without some independent factual basis for alleging fraud--"even when the fraud relates to matters peculiarly within the knowledge of the opposing party"); *see also Driscoll,* 758 F.Supp. at 51 ("Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting facts surrounding the scheme to defraud or a basis for believing such a scheme existed.") (citing *Hayduk,* 775 F.2d at 444; *Wayne,* 739 F.2d at 14). As Judge Caffrey has stated: "Rule 9(b) does not require the plaintiff to present specific evidence; however, the plaintiff must identify some facts or circumstances to support the allegations of fraud...." *Id.* at 52.

FN3. This Court has not received a motion from defendant Oldham.

FN4. As Judge McNaught noted, the rationale for limiting recovery to those who traded during the same period of insider trading is that " '[n]on-contemporaneous traders do not require the special protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of

Not Reported in F.Supp.                                                                                    Page 10
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

trading with someone who has superior access to information.' " *Id.* at 670 (quoting *Fridrich v. Bradford,* 542 F.2d 307, 326-27 (6th Cir.1976) (Celebrezze, concurring)); *see also Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94-95 (2d Cir.1981) (same). Judge Skinner cited *Backman* and *Wilson* with approval in *Abelson,* 644 F.2d at 527. In a more open-ended violation, such as large scale "tipping," this rationale would not apply, and the rule might be less restrictive. *See Backman,* 540 F.Supp. at 670 n. 1.

**FN5.** Item (a) would also encounter difficulties in the substantive prong of the demand analysis. The assertion that the defendants violated federal statutes is an insufficient basis for excusing demand, at least under federal law. *Lewis v. Sporck,* 612 F.Supp. 1316, 1322-23 (N.D.Cal.1985). Nor does it matter that the directors would essentially have to sue themselves. *Id.*

**FN6.** Insofar as five of the six defendants are not named in the count alleging insider trading and insofar as that count does not pass muster, the substantive prong of the demand requirement also poses a major difficulty. The complaint fails to implicate a majority of the directors in wrongdoing. *See Datz v. Keller,* 347 Mass. 766, 196 N.E.2d 922, 923 (1964) (dismissing complaint for insufficiently making "allegations of fact that both a majority of the directors and the holders of a majority stock interest are in the group of wrongdoers, or under their control"), *cited in Houle v. Low,* 407 Mass. 810, 813 n. 3, 556 N.E.2d 51, 53 n. 3 (1990); *accord Jackson v. Stuhlfire,* 28 Mass.App.Ct. 924, 926, 547 N.E.2d 1146, 1148 (1990); *see also Hayden v. Perfection Cooler Co.,* 227 Mass. 589, 593, 116 N.E. 871, 873 (1917) (derivative plaintiff must make "specific allegations that the majority of the directors were wilfully disregardful of the interests of the corporation"). The language of these cases indicates that Massachusetts law would only

excuse demand for harm caused to the corporation by a majority of the directors. Here, the complaint fails to allege conduct beyond "mere approval of corporate action, absent self-interest or other indication of bias." *Kauffman,* 479 F.2d at 264; *see also Heit,* 567 F.2d at 1162 ("As the complaint fails to set forth facts showing that a majority of the directors ... engaged in a facially improper transaction, we hold that the failure of the plaintiff to make a demand on the directors before commencing this suit was unexcused, and dismissal of the case for noncompliance with Rule 23.1 was proper."); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983) ("absent specific allegations of self-dealing or bias on the part of a majority of the board, mere approval and acquiescence are insufficient to render demand futile").

1992 WL 73555 (D.Mass.)

END OF DOCUMENT

# EXHIBIT 17

Westlaw.

Not Reported in F.Supp.                                                                     Page 1
1993 WL 100202 (D.Kan.)
**(Cite as: 1993 WL 100202 (D.Kan.))**

H

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

In re UNITED TELECOMMUNICATIONS, INC.,
SECURITIES LITIGATION.
Relates to All Actions.

**No. 90-2251-EEO.**

March 4, 1993.

Eric C. Sexton, Don R. Lolli, Beckett, Lolli, Bartunek &
Beckett, Kansas City, MO, Stephen D. Ramos, Berger &
Montague, Philadelphia, PA, Lee S. Shalov, Milberg,
Weiss, Bershad, Spectbrie & Lerach, New York City,
Steven M. Steingard, Dianne M. Nast, Kohn, Savett, Klein
& Graf, Philadephia, PA, Steven J. Toll, Cohen, Milstein,
Hausfeld & Toll, Washington, DC, Arnold Levin, Levin,
Fishbein, Sedran & Berman, Philadelphia, PA, David
Jaroslawicz, Law Offices of David Jaroslawicz, New York
City, Richard Dannenberg, Lowey, Dannenberg, Bemporad,
Brachtl & Selinger, P.C., New York City, for plaintiffs.

Arthur L. Liman, Allan Blumstein, Paul, Weiss, Rifkind,
Wharton & Garison, New York City, Stephen D. Oestreich,
Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New
York City, for William T. Esrey and Arthur B. Krause.

Lawrence Kill, Anderson, Kill, Olick & Oshinsky, P.C.,
New York City, for Paul H. Henson.

Heather Suzanne Woodson, Stinson, Mag & Fizzell,
Overland Park, KS, Brant M. Laue, George E. Feldmiller,
Mark S. Foster, Stinson, Mag & Fizzell, Kansas City, MO,
Laura L. Ozenberger, Arthur A. Chaykin, Kansas City, MO,
for United Telecommunications, Inc.

MEMORANDUM AND ORDER
EARL E. O'CONNOR, District Judge.

**\*1** This matter is before the court on defendants' motion to
dismiss Plaintiff's Second Amended Consolidated
Derivative Complaint (the "complaint"). For the reasons
stated below, defendants' motion is granted, and the

complaint is dismissed without prejudice.

This derivative action is brought on behalf of United
Telecommunications, Inc. ("United"), asserting claims
against United's directors for breach of fiduciary duty.
Specifically, the complaint alleges that the United
directorate is responsible for gross mismanagement of the
company, and for participating in and allowing
dissemination by the company of public statements that
were fraudulent and misleading. United is being sued in a
related class action for securities fraud arising out of the
same conduct that in this suit the directors are charged with
having committed or recklessly disregarded. It is the
position of the derivative plaintiffs that the directors should
answer for any damage the corporation sustains as a result
of the class action. The class action, having withstood
defendants' motion to dismiss for failure to state a claim, has
been consolidated with the instant derivative action and is
pending before this court.

The allegations of the derivative complaint are similar in
many respects to those of the class action complaint. The
derivative complaint alleges that United management,
including the directors, made optimistic predictions about
the company's prospects, which were fraudulent and
misleading in light of material, undisclosed information
about United's substantial financial difficulties. Derivative
plaintiffs allege that the directors participated in or
recklessly disregarded (and therefore failed to prevent)
issuance of the fraudulent public statements, even though
they were in possession of information that revealed these
statements were untrue or misleading.

Plaintiffs allege that the directors' mismanagement and
breach of duty has damaged the corporation. The complaint
states that, as a result of the directors' wrongful actions, "the
company has been named as a defendant in actions brought
by purchasers of its securities, who suffered as a direct
consequence of the individual defendants' conduct," and
"[t]o the extent that United Telecommunications is found
liable for the damages alleged by the purchasers of its
securities, such liability will be the direct consequence of
the acts and/or omissions of the individual defendants."
Complaint ¶ 173. In the section of the complaint entitled
"Futility of Demand," the plaintiffs also assert that they are

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

excused from making demand on the board of directors to bring the suit. One of the plaintiffs' purported grounds for excusing demand on the board of directors is the allegation that "as a result of the acts of unfair competition against other, honest telecommunications companies, and because of the severe damage to United Telecommunication's credibility and ability to conduct business, United Telecommunications has suffered and will continue to suffer millions of dollars of lost revenue, increased expenses, and increased costs in gaining access to capital markets."

**\*2** Defendants argue that the complaint should be dismissed for failure to state a claim, in that the complaint fails to adequately plead damages. Defendants argue that because the class action is still pending, the derivative claim seeking recovery from the directors of a judgment the company has not yet been ordered to pay is premature. Defendants suggest that at this point, damage to the company is only speculative. Plaintiffs respond that where a defendant has caused the difficulty in assessing damages, it cannot defend on the grounds that damages are somewhat speculative.

In analyzing the issue presented, *i.e.,* whether or not the complaint must be dismissed for failure to adequately plead a claim for damages, the court will begin with the plaintiffs' allegations that United has suffered and will continue to suffer injury as a result of its own acts of unfair competition and from damage to its credibility and ability to conduct business. First, it is not at all clear from the complaint whether plaintiffs intend these statements to be a claim for damages. The allegations, which appear in a section of the complaint headed "Futility of Demand," occupy the fifth spot in a list of seven reasons offered to show why demand on the board to bring this suit would have been futile. Notwithstanding this ambiguity, and giving plaintiffs every benefit of the doubt, the court must still find that the allegations are deficient. With respect to the charge of unfair competition, the complaint pleads no facts which, if true, would support a finding that the company has been harmed by the supposed acts of unfair competition. *See Swanson v. Bixler,* 750 F.2d 810, 813 (all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true). The plaintiffs' assertion that the company's acts of

unfair competition have caused it to suffer lost revenue and increased costs is conclusory and, in the absence of factual allegations to back it up, insufficient to state a claim. Equally deficient is the allegation that United has been harmed by damage to its credibility and ability to conduct business. By way of comparison, we note that the court in *In re Symbol Technologies Securities Litigation,* 762 F.Supp. 510 (E.D.N.Y.1991), was asked to dismiss allegations very similar to those before the court today. The derivative plaintiffs in *Symbol* alleged that "the director defendants' acts have undermined Symbol Technologies' credibility in the securities market and have jeopardized the continued public acceptance and marketability of its stock to the injury of the Company." *Id.* at 517. Dismissing the complaint, the court held that "this type of boilerplate language is not sufficient to withstand a motion to dismiss. Defendants are entitled to know more specifically what damages are being claimed, as well as the extent of those damages." *Id.* In the instant case, plaintiffs' allegations that the company has suffered injury to its credibility and ability to conduct business are conclusory and not supported by pleaded facts that, if true, would demonstrate that United has indeed sustained injury, financial or otherwise, due to a loss of credibility or ability to conduct business. This sort of conclusory allegation, as the *Symbol* court observed, does not adequately apprise the defendants of the basis for the damages claimed or the extent of those damages. *See Conley v. Gibson,* 355 U.S. 41, 47 (1957) (complaint must give the defendant "fair notice" of the plaintiff's claim). As such, the allegations are insufficient to withstand defendants' motion to dismiss.

**\*3** The remaining claim for damages arises out of the plaintiffs' contention that the directors are responsible for any judgment the company might be ordered to pay in the class action. The amount of these damages is, obviously, contingent upon the outcome of the pending class action.

In order to invoke the jurisdiction of the federal courts, a party must meet the threshold requirement imposed by Article III of the Constitution that there be a case or controversy. "While more than an abstract injury must be shown, it is enough if the plaintiff ' "has sustained or is immediately in danger of sustaining some direct injury" as

Not Reported in F.Supp.                                                                 Page 3
1993 WL 100202 (D.Kan.)
**(Cite as: 1993 WL 100202 (D.Kan.))**

the result of the challenged ... conduct and the injury must be both "real and immediate," not "conjectural" or "hypothetical." ' " *Professional Service Indus. v. Kimbrell, 766 F.Supp. 1557, 1559 (D.Kan.1991)* (alteration in original) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02)) (other citations omitted). Courts do not decide cases based upon " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* (quoting *Thomas v. Union Carbide Agr. Products Co.,* 473 U.S. 568, 580 (1985) (quoting 13A Wright & Miller, *Federal Practice and Procedure* § 3532 (1984))).

Courts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit; one example is the case of *Lincoln House, Inc. v. Dupree,* 903 F.2d 845 (1st Cir.1990). In *Lincoln,* plaintiff's federal RICO claim was premised on allegations that the defendant diverted assets in an effort to avoid paying plaintiff on a judgment plaintiff was then seeking in a pending state court suit against the defendant. Thus, the only injury alleged was the defendant's inability to satisfy a prospective state court judgment against the defendant, *if* the plaintiff happened to succeed in its pending action. The court held that the damages were wholly contingent upon the plaintiff's success in a separate case, making the plaintiff's claim of damages, at that point, purely speculative and not ripe for resolution. *Id.* at 847. The court noted that since the only damages alleged could not yet be proved, having never been incurred, the plaintiff could hardly claim hardship if consideration of the case was presently withheld. The court affirmed dismissal of the complaint without prejudice.

In the instant case, plaintiffs assert on behalf of the corporation damages that are speculative and contingent upon the outcome of the class action. This conclusion is suggested even by the language of the complaint, which states that the director defendants should be held liable "*to the extent that* United Telecommunications is held liable for the damages alleged by the purchasers of its securities." Complaint ¶ 173. Additionally, the complaint asserts that the defendants, by their acts of mismanagement and misconduct, have exposed the company to "*potential* damages" in connection with the class action. Complaint ¶

178(e). Where, as here, the claim of damages is contingent on the outcome of a separate, pending lawsuit, the claim is not ripe and the complaint must be dismissed. *Lincoln,* 903 F.2d at 847, *accord Banker's Trust Co v. Rhoades,* 859 F.2d 1096, 1106, (2d Cir.1988) (since alleged damages depend on the outcome of pending bankruptcy proceeding, claim for damages must be dismissed as premature); *In re: Symbol,* 762 F.Supp. at 516 (derivative plaintiffs claimed directors were liable for damages company might have to pay as a result of pending securities fraud class action; court held no injury had been sustained for which plaintiff could recover, cause of action had not yet accrued, and complaint must be dismissed); *Prosoco, Inc. v. Stonewall Surplus Linesinuane Co., Inc.,* 1989 WL 58989, at *1 (D.Kan 1989) (where all of plaintiff's claims arose out of pending state court action, damages were purely speculative and claim was not ripe). Accordingly, the court finds that the derivative action is not ripe and the complaint must be dismissed, without prejudice. With respect to the allegations of damage premised on unfair competition and loss of credibility and ability to conduct business, the court has found that the allegations are conclusory and insufficient to state a claim for these damages. Because plaintiffs have already taken two opportunities to amend their complaint, and because plaintiffs (with the benefit of discovery) have spared the court no detail in their pleadings to date, the court is of the view that further amendment to the unfair competition and business credibility allegations would be futile and the same will not be allowed. Plaintiffs should have been aware of the court's concerns about these allegations, which the court pointed out in its opinion dismissing the class action complaint for failure to plead fraud with particularity. *See In re United Telecommunications,* 781 F.Supp. 696, 703, n. 3 (D.Kan.1991).

**\*4** Finally, while this motion has been pending, the court has received correspondence from counsel in the form of letter-briefs, in which counsel present additional argument and authority pertaining to issues before the court. The parties are advised that the proper procedure for submitting additional argument and authority to the court is to file a pleading with the Clerk of the Court. See D.Kan.R. 206. While the court does not wish to deter counsel from

Westlaw.

Not Reported in F.Supp.                                                        Page 4
1993 WL 100202 (D.Kan.)
**(Cite as: 1993 WL 100202 (D.Kan.))**

submitting additional authority or argument when appropriate, counsel should be aware that from this point forward, the court will not consider any argument or authority presented by way of letter to the court.

IT IS THEREFORE ORDERED BY THE COURT that Defendants' Motion to Dismiss the Second Amended Consolidated Derivative Complaint is granted, and the derivative complaint is dismissed without prejudice.

1993 WL 100202 (D.Kan.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 18

Not Reported in A.2d                                                                            Page 1

2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856

**(Cite as: 2002 WL 31926608 (Del.Ch.))**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Mark ZIMMERMAN, Derivatively on behalf of Nominal Defendant Priceline.com Incorporated, Plaintiff,

v.

Richard S. BRADDOCK, Jay S. Walker, Daniel H. Schulman, Paul A. Allaire, Ralph M. Bahna, Paul J. Blackney, William E. Ford, Marshall Loeb, N.J. Nicholas, Jr. and Nancy B. Peretsman, Defendants,

and

PRICELINE.COM INCORPORATED, a Delaware corporation, Nominal Defendant.

**No. Civ.A. 18473-NC.**

Submitted April 23, 2002.
As Corrected Dec. 31, 2002.
Decided Dec. 20, 2002.

R. Bruce McNew, of Taylor & McNew, Greenville, Delaware; Robert B. Weiser, and Eric L. Zager, of Schiffrin & Barroway, LLP, Bala Cynwyd, Pennsylvania, for Plaintiff.

Bruce L. Silverstein, Christian Douglas Wright, and Danielle Gibbs, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Evan R. Chesler, and Daniel Slifkin, of Cravath, Swaine & Moore, New York, New York, for Defendants priceline.com incorporated, Richard S. Braddock and Daniel H. Schulman.

Anne C. Foster, and Catherine G. Dearlove, of Richards, Layton & Finger, Wilmington, Delaware, for Defendants Jay S. Walker, Paul A. Allaire, Ralph M. Bahna, Paul J. Blackney, William E. Ford, Marshall Loeb, N.J. Nicholas, Jr. and Nancy B. Peretsman.

Martin Glenn, of O'Melveny & Myers LLP, New York, New York, for Defendant Jay S. Walker.

Steven B. Rosenfeld, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for Defendant William E. Ford.

Sheldon H. Elsen, of Orans, Elsen & Lupert LLP, New York, New York, for Defendant Marshall Loeb.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

**\*1** Plaintiff Mark Zimmerman (the "Plaintiff") initiated this shareholder derivative action on behalf of the Nominal Defendant priceline.com Incorporated ("priceline" or the "Company") against Defendants Richard S. Braddock ("Braddock"), Jay S. Walker ("Walker"), Daniel H. Schulman ("Schulman"), Paul A. Allaire ("Allaire"), Ralph M. Bahna ("Bahna"), Paul J. Blackney ("Blackney"), William E. Ford ("Ford"), Marshall Loeb ("Loeb"), N.J. Nicholas, Jr. ("Nicholas"), and Nancy B. Peretsman ("Peretsman") (collectively, the "Individual Defendants"), who along with Heidi G. Miller ("Miller"), constituted priceline's board of directors (the "Board") at the time of the original complaint. [FN1]

> FN1. Plaintiff is, and has been at all relevant times, a shareholder of priceline.

Plaintiff alleges in his June 21, 2001, Amended Derivative Complaint (the "Complaint") that Braddock, Walker, and Nicholas (collectively, the "Selling Defendants") breached their fiduciary duties by engaging in insider trading and misappropriating confidential corporate information. Furthermore, the Complaint asserts that the Individual Defendants, in their failure to exercise good faith and loyalty in the performance of their duties, including the dissemination of misleading information regarding the Company, have proximately caused significant harm to the Company in litigation claims, the repricing of certain warrants, and the loss of goodwill in the marketplace. Finally, the Plaintiff claims that, as no consideration was received, the Selling Defendants' use of priceline's confidential information during the course of their alleged insider trading, and the Individual Defendants' failure to act, constituted corporate waste. Because of the damages sustained by the Company, Plaintiff seeks the imposition of

Not Reported in A.2d                                                                                    Page 2
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

a constructive trust over the profits reaped by the Selling Defendants and damages from the Individual Defendants for the alleged breaches of fiduciary duties and acts of corporate waste.

The Individual Defendants have moved to dismiss this action pursuant to Court of Chancery Rules 23.1 ("Rule 23.1) and 12(b)(6) ("Rule 12(b)(6)"). They contend that the Plaintiff has failed to plead particularized facts excusing his failure to make a demand upon the Board. Furthermore, even if demand is excused, the Individual Defendants argue that the allegations of the Complaint fail to state a claim upon which relief can be granted.

As set forth in this memorandum opinion, I conclude that the Plaintiff has not alleged sufficient facts with particularity to excuse demand and, therefore, this action must be dismissed under Rule 23.1.

### 1. BACKGROUND

*A. The Company*

Priceline, a Delaware corporation with executive offices in Connecticut, was founded by Walker in July 1997 and began operations in April 1998. The Company principally provides a self-described "Name Your Own Price" Internet pricing system. Using this system, customers can establish the price of travel, automotive, home finance, and telecommunications products they seek to purchase. The Company's stock, since a successful March 1999 initial public offering, has been traded on the NASDAQ.

**\*2** The origins of the "Name Your Own Price" technology lie in another Walker-founded venture. In 1998, Walker Digital Corporation ("Walker Digital"), a privately-held "think tank" founded by Walker, developed and patented the "demand collection system," an e-commerce pricing system that is the basis of the "Name Your Own Price" technology. [FN2] After being licensed to priceline by Walker Digital, the technology was first harnessed to sell airline tickets, a product which by May 2001 still generated 98% of priceline's revenues. The demand pricing system purportedly creates value by "enabl[ing] consumers to use the Internet to save money on products and services while at the same time enabling sellers to generate increased

incremental revenue." [FN3]

>        FN2. Through the demand collection system, as implemented with the "Name Your Own Price" technology, priceline satisfies consumer demand collected over the Internet. Customers convey offers, guaranteed by a credit card and held open for a specified period of time, for a particular product or service. Priceline then communicates such offers directly to participating sellers or determines, from accessing participating sellers' private databases, whether the offer can be met.

>        FN3. Pl.'s Compl. ¶ 27.

*B. Individual Defendants and Interconnected Companies*

The licensing of the demand collection system by Walker Digital to priceline is not the only instance of a connection between priceline and a business entity of one of the Individual Defendants. In fact, a review of the myriad linkages alleged among priceline, the Individual Defendants, and companies affiliated with the Individual Defendants, is necessary to understand the basis for the Plaintiff's claims and my decision regarding whether demand is excused.

*1. Walker*

Walker was the driving force in the evolution of priceline. In addition to founding priceline, Walker served as the Company's Chief Executive Officer (until August 1998) and Vice Chairman of the Board (from August 1998 until January 2001). Walker, also, was the founder of and "is the largest equity owner and the Chairman of the Board [of Directors] of Walker Digital." [FN4] In turn, Walker Digital owned approximately 35% of priceline at the time (November 1, 2000) the initial complaint was filed in this action. [FN5] In addition to his ongoing involvement with Walker Digital, Walker serves as the non-executive Chairman of the Board of Directors of the Synapse Group, Inc. ("Synapse"). Synapse, co-founded as NewSub Services, Inc. ("NewSub") in 1992 by Walker and Michael Loeb, [FN6] is a privately-held direct marketing firm through which priceline offers magazine subscription services.

Not Reported in A.2d                                                                 Page 3
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

Walker owns approximately 11.5% of Synapse. [FN7]

> FN4. *Id.* ¶ 7. Significantly, the Plaintiff never states what percentage of Walker Digital equity is controlled by Walker.

> FN5. *Id.* ¶ 6.

> FN6. *Id.* ¶ 13. Michael Loeb is the son of Defendant Loeb.

> FN7. *Id.* ¶ 8.

2. *Braddock*

Braddock, one of priceline's original investors, has served as Chairman of the Board (since August 1998) and as Chief Executive Officer (resuming his duties after the termination of Schulman in May 2001). Braddock had previously served as Chief Executive Officer from August 1998 through May 2000, when he resigned as Chief Executive Officer to spend more time with Walker Digital. "Braddock is a director and one of the largest equity owners of Walker Digital, having personally invested at least $20 million in Walker Digital." [FN8] Like Walker, in addition to his involvement with Walker Digital, "Braddock is also a substantial equity owner and director of [Synapse]." [FN9] In 1999, Braddock received options to purchase an underlying 35,000 shares of Synapse common stock, at a strike price of $8.00 per share (the "Synapse Options").

> FN8. *Id.* ¶ 6. Again, significantly, the Plaintiff fails to note the percentage of Walker Digital equity controlled by Braddock.

> FN9. *Id.*

**\*3** Braddock's involvement with the connected business entities does not end with Walker Digital and Synapse. Braddock also serves as a director of WebHouse Club, Inc. ("WebHouse"), a privately-held, "Name Your Own Price" website for groceries and other retail items which figured significantly in priceline's attempt to diversify the products it offered. WebHouse was an independent licensee of priceline; in consideration for the Company's licensing its name and business model, WebHouse agreed to a royalty

arrangement and granted a fully-vested, non-forfeitable warrant to the Company to acquire a majority stake of WebHouse, exercisable under certain conditions (the "WebHouse Warrant"). Walker Digital owned a 34% stake in WebHouse. [FN10] Braddock also served as a special advisor to General Atlantic Partners, LLC ("General Atlantic"), and invested (as a limited partner) in several General Atlantic partnerships. [FN11]

> FN10. *Id.*

> FN11. Braddock's relationship with General Atlantic is significant because Ford, another priceline director, is Managing Member of General Atlantic. In addition, Braddock and Ford serve together as directors of E*Trade Group, Inc., a company that has a marketing agreement with priceline.

3. *Nicholas*

Nicholas, the third of the Selling Defendants, is connected to both the Company and Synapse. He is been a director of priceline since July 1998. Additionally, he serves a director of Synapse and, either personally or through affiliated entities, "is also a substantial equity owner of Synapse." [FN12] Like Braddock, Nicholas was granted the Synapse Options. [FN13]

> FN12. Pl.'s Compl. ¶ 8.

> FN13. Nicholas also serves on the board of directors of Xerox Corporation ("Xerox"). Allaire, another priceline director, is the Chairman of Xerox's board of directors and its Chief Executive Officer.

4. *Blackney*

Blackney has been a director of priceline since July 1998. Furthermore, Blackney serves as President and Chief Executive Officer of Worldspan LP ("Worldspan"), a position he has held since October 1999. Worldspan is a privately-held, global travel distribution system ("GDS") and was the exclusive GDS booking agent for customers of priceline. [FN14] "Priceline entered into an amendment to

Not Reported in A.2d                                                                                              Page 4
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
(Cite as: 2002 WL 31926608 (Del.Ch.))

its subscriber agreement with Worldspan pursuant to which Worldspan paid [p]riceline three million dollars ... in exchange for [p]riceline's committing to a certain minimum volume of bookings for the five year term of the agreement." [FN15] As such, priceline remains one of Worldspan's "biggest clients." [FN16]

> FN14. During the period 1998-2000, priceline sold in excess of 6,000,000 airline tickets through Worldspan. In 1998, Worldspan's revenues equaled $637.3 million.

> FN15. Pl.'s Compl. ¶ 11.

> FN16. Id.

5. *Ford*

Ford has been a director of priceline since July 1998, and also serves on the boards of both Walker Digital and Synapse. [FN17] Additionally, he is Managing Member of General Atlantic. General Atlantic has actively invested in priceline and entities connected to various Individual Defendants. During the course of 1998, General Atlantic purchased 21,581,059 shares of priceline stock. [FN18] It then sold 6,567,130 shares of priceline common stock, for $356,555,000, during January and February of 2000. [FN19] General Atlantic also owns 17.5% of privately-held Synapse. [FN20] Finally, General Atlantic also has invested in privately-held priceline.com Europe.

> FN17. Like Braddock and Nicholas, Ford received the Synapse Options.

> FN18. This investment occurred in three separate transactions. In February 1998, an affiliate of General Atlantic purchased from priceline 2,854,875 shares of priceline common stock at $.70 per share. Next, in August 1998, "two partnerships affiliated with General Atlantic purchased 17,288,684 of [p]riceline stock" during the Company's second round of private financing at a price per share of $1.16. Lastly, in December 1998, "two partnerships affiliated with General Atlantic purchased 1,437,500 shares of [p]riceline stock" in the Company's third round of private financing at a

per share price of $4.00. Pl.'s Compl. ¶ 12.

> FN19. Id.

> FN20. Id. General Atlantic affiliates had invested in excess of $59 million in NewSub. Id.

6. *Peretsman*

While Peretsman has served as a director of the Company since February 1999, the Plaintiff alleges that her principal professional occupation is that of Managing Director and Executive Vice-President of Allen & Company, Inc. ("Allen & Co."), an investment banking firm. Peretsman had previously served as a director of NewSub and currently serves as a director of Synapse. [FN21]

> FN21. Peretsman, along with Braddock, Wallace, Nicholas and Ford, collectively constitute a majority of the Synapse board of directors. Peretsman, as did Braddock, Nicholas, and Ford, received the Synapse Options.

**\*4** Allen & Co. has had significant financial dealings with priceline and companies connected to the Individual Defendants. It purchased 275,000 shares of priceline stock, at $4.00 per share, in priceline's third round of private financing (completed on December 8, 1998), and received $850,000 in consulting fees from the Company in 1999. Allen & Co. has also provided services to Synapse. It was scheduled to be one of the lead underwriters in the initial public offering planned for Synapse, an offering eventually canceled in December 2000. Synapse also generated for Allen & Co. $750,000 in consulting fees. Finally, "Allen & Co[.] was an investor in NewSub and, along with Peretsman, is one of the largest equity owners of Synapse." [FN22]

> FN22. Pl.'s Compl. ¶ 14.

Peretsman, and the entities with which she is affiliated, sold 204,641 shares of priceline common stock, for proceeds of $15,225,807 in March and April of 2000.

7. *Loeb*

Not Reported in A.2d                                                                                              Page 5
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

Loeb has been a director of the Company since July 1998. Additionally, Loeb was an equity investor in NewSub, a company that his son, Michael Loeb, co-founded with Walker, who is now its chairman, Michael Loeb is now an employee of Synapse. Loeb has also invested in excess of $3 million in Synapse. Both Loeb and his son are affiliated with the Loeb Family Limited Partnership, an entity that owns approximately 8.23% of Synapse. [FN23]

> FN23. *Id.* ¶ 13.

### 8. *Schulman*

Schulman served as President, CEO and director of priceline until his termination in May 2001. [FN24] Upon starting work at the Company, on June 14, 1999, Schulman and priceline entered into an employment agreement (the "Schulman Agreement"). The terms of the Schulman Agreement established that Schulman reported directly to Braddock, was to receive a minimum base salary of $300,000 annually, was granted 3,000,000 options to purchase priceline common stock, and was loaned $6,000,000 by priceline. [FN25]

> FN24. Schulman, who was appointed Chief Executive Officer in June 2000, had served as a director of priceline starting in July 1999.

> FN25. Priceline subsequently (during the fourth quarter of 2000) forgave the loan in its entirety.

### 9. *Miller*

Miller, who is not a defendant in this action, served as the Chief Financial Officer and as a director of priceline for the period of February through November 2000, when she resigned. Plaintiff alleges that at the time of the filing of the original complaint, this employment at priceline was Miller's principal profession. Miller entered into an employment agreement with the Company on February 18, 2000 (the "Miller Agreement"). The Miller Agreement provided that Miller would report directly to Braddock, would receive a minimum base salary of $300,000 annually, would receive 2,500,000 options to purchase priceline common stock, and would be loaned $3,000,000 by priceline. [FN26]

> FN26. This loan, like that to Schulman, was forgiven in its entirety in November 2000.

### 10. *Allaire*

Allaire has served as a director of priceline since February 1999. He also is the Chairman of the Board and Chief Executive Officer of Xerox.

### 11. *Bahna*

Bahna has served as a director of the Company since July 1999.

\* \* \*

Thus, many of the Individual Defendants can be connected to one another through various entities outside of priceline. These entities, in turn, often have significant business dealings with, or own a percentage interest in, priceline.

### C. Problems Emerge

**\*5** Although priceline enjoyed initial success, at least as measured by the market's reception of its initial public offering and subsequent trading activity, the Company soon recognized that it would need to diversify the product base embraced by its "Name Your Own Price" system to encompass more than airline tickets. [FN27] Therefore, during September 1999, it was announced that groceries would be available for "Name Your Own Price" purchasing at WebHouse, starting November 1, 1999, in New York City. Walker publicly commented on the future growth prospects of priceline and WebHouse, noting that priceline "will continue its rapid growth in the travel, financial services and automotive sectors while the WebHouse Club focuses its resources entirely to the retail-store segment of buyer-driven commerce." [FN28] WebHouse's strategic role went beyond that of diversifying the product base; Wall Street analysts and Company executives viewed WebHouse as a test for the scalability of the priceline business model. Positive remarks flowed from priceline management. [FN29]

> FN27. In September 1999, airline tickets accounted for 92% of priceline's revenue.

Not Reported in A.2d                                                                                          Page 6
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

FN28. Pl.'s Compl. ¶ 34 (quoting Sept. 21, 1999, Company press release).

FN29. Walker publicly stated that " '[t]he rapid expansion of [WebHouse]'s grocery service ... demonstrates the scalability of [WebHouse]." ' *Id.* ¶ 37 (quoting a June 8, 2000, Company press release). A July 25, 2000, priceline press release claimed that WebHouse was " 'America's leading Internet service for groceries." ' *Id.* ¶ 44. Walker also noted during an August 1, 2000, conference call that "WebHouse would achieve positive gross margins in both groceries and gasoline by the end of the year," and that he believed that " '[WebHouse] demonstrates yet again just how scalable the [priceline] business model really is." ' *Id.* ¶ 45.

While self-congratulatory praise abounded, what investors could not gather were hard facts regarding the financial condition of WebHouse. Despite only realizing $33,777 in revenues from royalties pursuant to the WebHouse licensing structure, priceline recognized $188.8 million in income (the WebHouse Warrant's estimated fair value) upon the receipt of the WebHouse Warrant in the fourth quarter of 1999. Because WebHouse was privately-held, investors (and those interested in priceline's convertible interest in WebHouse) needed to rely solely upon information provided by priceline. And what that information allegedly masked was the failure of WebHouse. Around January 2000, senior management at WebHouse and Braddock voiced concerns regarding technological, financial, and conceptual problems with WebHouse. [FN30] Yet, WebHouse's launch continued at its scheduled pace. The Plaintiff alleges that the reason why WebHouse was launched, and the reason why the Synapse-WebHouse Agreement was entered into, was that, "despite the serious concerns raised by both senior WebHouse management and Braddock ... due to the power that Walker exercised over both [p]riceline and WebHouse, his vote was the only vote that counted." [FN31]

FN30. An example of the troubles plaguing WebHouse cited by the Plaintiff was the "partnership agreement" entered into between

WebHouse and Synapse (the "Synapse-WebHouse Agreement"). Synapse was to solicit consumers into trial magazine subscriptions in exchange for tokens redeemable for savings at WebHouse. Yet while customers signed up, and thus received the tokens for WebHouse, they did not renew their subscriptions. Furthermore, these "token users" were not returning to WebHouse once the "token savings" were expended. This deal was struck at Walker's insistence and despite the objections of WebHouse managers. *Id.* ¶¶ 48-50.

FN31. *Id.* ¶ 47.

Adding to priceline's woes was increased competition from the airlines themselves. On June 29, 2000, six major carriers announced the creation of a new online ticket service at Hotwire.com ("Hotwire"). While essentially offering surplus airline seats at cheap prices, much like priceline, Hotwire allowed greater consumer choice as now customers could designate the specifics of their flight and dictate a set price. [FN32] Other travel websites that did not use the "Name Your Own Price" bidding concept also arose. [FN33]

FN32. Priceline "require[d] customers to commit to purchasing tickets before knowing the exact scheduled time of departure, scheduled time of arrival, and other material details." *Id.* ¶ 52.

FN33. Examples include Expedia.com and Travelocity.com.

*D. The Alleged Wrongful Conduct*

The Plaintiff contends that from March 1999 through September 2000, "the Individual Defendants made a series of inaccurate and misleading public statements regarding [p]riceline's financial condition, business, and future growth prospects," [FN34] allegedly in the face of the known reality that the Company "could not match the hyper-aggressive public guidance ... provided to Wall Street." [FN35] Walker is alleged to have minimized the threat of the increased competition from Hotwire and other travel websites. [FN36] Plaintiff contends that, while stating publicly that priceline would achieve profitability imminently or in the near future,

Not Reported in A.2d                                                                                    Page 7
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

[FN37] the Individual Defendants "knew that [p]riceline's revenues and earnings were under tremendous pressure due to, *inter alia,* increased competition and loss of customers." [FN38] Also regarding priceline's business condition, the Plaintiff alleges that the Individual Defendants portrayed the Company's customer base as satisfied and growing, [FN39] when in fact the Individual Defendants knew of increasing customer dissatisfaction and a shrinking customer base. Moreover, the Individual Defendants allegedly made misleading public misstatements regarding the prospects of the critical WebHouse venture; the Individual Defendants publicly stated that WebHouse had been successful, thereby demonstrating the scalability of the priceline business model. [FN40] In fact, the Individual Defendants were aware of technological, financial and conceptual problems experienced by WebHouse. Thus, the Plaintiff complains that numerous misleading statements were made to the public regarding the business condition and prospects of priceline. [FN41]

> FN34. Pl.'s Ans. Br. in Opp'n to Defs.' Joint Mot. to Dismiss at 3.

> FN35. *Id.* at 4.

> FN36. For example, Walker predicted that "Hotwire would 'not really' compete with [p]riceline because Hotwire 'is not a name your own price website." ' Pl.'s Compl. ¶ 54 (quoting a June 29, 2000, interview on the Fox News Network).

> FN37. For example, Schulman claimed that priceline was " 'rounding the final turn and on the home stretch towards profitability." ' *Id.* ¶ 58. Miller told *Bloomberg News* that " '[p]riceline could be profitable now, but we are investing in our growth." ' *Id* . ¶ 59.

> FN38. Pl.'s Ans. Br. in Opp'n to Defs.' Joint Mot. to Dismiss at 3.

> FN39. For example, Schulman noted that priceline " 'continue[d] to attract record new customers, but even more importantly, our loyalty among existing

customers is accelerating." ' Pl.'s Compl. ¶ 58. He later noted in a July 24, 2000, interview with Fox News, that priceline is " 'really focused on assuring that we have the best value proposition-a unique one that generates great satisfaction for customers." ' *Id.* ¶ 60.

> FN40. *See supra* note 29. Additionally, Schulman claimed " '[p]riceline has a wonderful model.... That type of model would play exceptionally well in a downturned economy." ' Pl.'s Compl. ¶ 59 (quoting a July 24, 2000, appearance on CNBC financial news network).

> FN41. Plaintiff also complains that the Individual Defendants made misleading public statements that they were " 'very comfortable'" with priceline's condition and future. *Id.* ¶ 71(f).

**\*6** This series of misleading statements ultimately afforded the Selling Defendants the opportunity about which Plaintiff now principally complains. In August and September of 2000, the Selling Defendants collectively sold in excess of 10 million shares of the Company's stock, reaping collective proceeds of more than $247 million. [FN42] These sales were executed based on material, non-public information concerning the truth about the Company's profitability and customer base, the increased competition facing the Company, and the troubles besetting WebHouse. In particular, it is alleged that Walker needed to inflate the market value of his priceline holdings in order to use the proceeds from the sales executed at artificially high levels to support WebHouse. [FN43]

> FN42. The Plaintiff alleges that on August 1, 2000, Walker sold 8 million shares of priceline's common stock, netting $190 million. That same day, Nicholas exercised 200,000 priceline options (at $0.80 per share), and then sold 100,000 shares of priceline's common stock for $2,519,000. The following day, acting as trustee of a family trust, Nicholas sold another 100,000 shares of priceline's common stock, earning $2,532,000. On August 15, 2000, Braddock exercised his priceline options (at $0.80 per share) and then sold 72,000 shares of

Not Reported in A.2d                                                                                    Page 8
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

priceline's common stock, for proceeds of $1,764,720. The next day, Braddock again exercised priceline options (at $0.80 per share) and sold 28,000 shares of priceline's common stock for proceeds of $692,160. Walker sold another 2 million shares of priceline's common stock, this time for a total of $50 million, on September 11, 2000. *Id.* ¶¶ 61, 62, 69, 70.

FN43. *Id.* ¶ 55.

Soon after the completion of the alleged insider trading by the Selling Defendants, the market learned the truth regarding the Company's condition. On September 27, 2000, the Company warned that its revenues and earnings would fall short of Wall Street's projections. [FN44] On October 5, 2000, priceline announced that WebHouse would be suspending operations for 90 days. [FN45] Therefore, the Plaintiff concludes that because of the materially inaccurate and misleading statements made by the Individual Defendants, priceline has suffered damages in the form of the profits reaped by the Selling Defendants who allegedly engaged in insider trading, liability and costs incurred in connection with defending securities suits, and a deterioration of the Company's goodwill. [FN46]

FN44. Upon this release, priceline's stock plummeted 42% to establish a 52-week low of $10.75 per share.

FN45. The day of this release, priceline's stock plunged another 38% to close at 5 13/16.

FN46. Plaintiff contends that another consequence of the misleading stockholders was a $9 million charge absorbed by priceline for re-pricing warrants held by Delta Airlines. Pl.'s Compl. ¶ 92.

## 2. ANALYSIS

Plaintiff's failure to make a demand upon the Board prior to initiating this action necessitates a threshold inquiry into whether the particularized facts alleged in the Complaint demonstrate that demand would have been futile. A fundamental precept of Delaware corporate law is that the board of directors, not the shareholders, manages the

corporation; [FN47] this managerial autonomy for decision-making extends to the determination to initiate litigation to vindicate the rights of the corporation. [FN48] Rule 23.1, regulating the encroachment on management's sphere of decision-making presented by shareholder derivative suits, has been characterized as the "procedural embodiment of this substantive principle." [FN49]

FN47. 8 *Del. C.* § 141(a).

FN48. *White v. Panic,* 783 A.2d 543, 546-47 (Del.2001)

FN49. *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993).  Rule 23.1 is designed, among other things, to provide the corporation with the opportunity to address the alleged wrong without litigation and to bestow control over the litigation if such litigation is indeed brought for the corporation's benefit. *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

Rule 23.1, in pertinent part, provides:
In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall ... *allege with particularity* the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort. [FN50]

FN50. Emphasis added.

However, a complaining shareholder need not always make a demand upon a corporation's board of directors. In this case, because the Complaint alleges that the Company's directors breached their fiduciary duties by failing to act, as opposed to a conscious decision to act or abstain from acting, the proper test for determining demand futility is "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt

Not Reported in A.2d                                                    Page 9
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." [FN51]

> FN51. *Rales,* 634 A.2d at 934.

**\*7** Critical to my resolution of this case is the particularity requirement of Rule 23.1. "Pleadings in derivative suits ... must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)." [FN52] In deciding whether demand is excused, I am limited to those particularized facts alleged in the Complaint, not those set forth only in the briefs. [FN53] Furthermore, at this stage in the proceedings, I accept as true the particularized facts of the Complaint, and the Plaintiff is entitled to all reasonable logical inferences drawn from those particularized facts. [FN54] However, "conclusory allegations are not considered as expressly pleaded facts or factual inferences." [FN55] With these standards in mind, I turn to deciding whether the Complaint has set forth such particularized facts so as to excuse the demand requirement of Rule 23.1.

> FN52. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (citations omitted).

> FN53. *Orman v. Cullman,* 794 A.2d 5, 28 n. 59 (Del.Ch.2002). For example, Plaintiff asserts in his brief that he "has alleged that Walker is the ... *majority* equity owner of Walker Digital." Pl.'s Ans. Br. in Opp'n to Defs.' Mot. to Dismiss at 13 (citing Pl.'s Compl. ¶¶ 6-7) (emphasis added). The paragraphs of the Complaint referenced by Plaintiff allege, instead, only that Walker is the "largest equity owner" of Walker Digital.

> FN54. *Pogostin v. Rice,* 480 A.2d 619, 622 (Del.1984), *overruled on other grounds, Brehm,* 746 A.2d 244.

> FN55. *Brehm,* 746 A.2d at 255.

At the time of the filing of the original complaint, the Company's board consisted of eleven directors. [FN56]

Thus, in order to excuse demand as futile, Plaintiff must allege particularized facts raising a reasonable doubt as to the independence or disinterestedness of at least six of the Company's directors. Because I find that the allegations set forth in the Complaint have not done so, Defendants' motion to dismiss under Rule 23.1 is granted. [FN57]

> FN56. In addition to the ten directors named as defendants in this case, the eleventh director of priceline at the time this action was initiated was Miller.

> FN57. Thus, I need not address Defendants' motion to dismiss under Rule 12(b)(6).

"Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." [FN58] Defendants do not dispute for the purposes of this motion that the three Selling Defendants are interested in light of the Complaint's allegations that they wrongfully profited by trading on inside information. Because Plaintiff does not argue that any of the eight remaining directors are interested for purposes of demand excusal analysis, [FN59] I turn to an assessment of the particularized facts in the Complaint to determine if they raise a reasonable doubt as to the independence of those directors from the interested Selling Defendants. [FN60]

> FN58. *Pogostin,* 480 A.2d at 624 (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)).

> FN59. *See* Pl.'s Ans. Br. in Opp'n to Defs.' Joint Mot. to Dismiss at 11-28.

> FN60. Plaintiff does not offer any argument that the alleged misstatements of the Individual Defendants affect the determination of whether demand was necessary. *See id.*

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN61] In arguing that at least six of the remaining eight directors are not dependent for the purposes of this inquiry, Defendants

Not Reported in A.2d                                                                    Page 10
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

assert that Plaintiff has failed to demonstrate that the interested directors held the power to control "unilaterally" the positions, dealings, and holdings of many of the remaining directors. In support of this argument, Defendants point to *Orman v. Cullman* for the proposition that:

FN61. *Aronson,* 473 A.2d at 816.

A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the *unilateral* power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively. [FN62]

FN62. *Orman,* 794 A.2d at 25 n. 50 (emphasis added).

**\*8** Contrary to Defendants' unduly restrictive reading of the above quoted passage, *Orman* is clear in providing that a director's independence may be called into question when the allegedly controlling director has the power, whether solely in his own capacity or in conjunction with others who share his purpose, to exert pressure on the challenged director of such a nature as to compromise that challenged director's ability to consider the merits of a demand for suit objectively. [FN63]

FN63. *Id.; see also Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002).

The Plaintiff's arguments can be generally characterized as asserting that the Selling Defendants exerted control over a majority of the Board through various interconnected entities controlled or dominated by the Selling Defendants. Of course, this line of argument presumes that the *particularized facts* of the Complaint establish that such entities were, in fact, controlled or dominated by the Selling Defendants, individually or collectively. Thus, my resolution of demand futility begins with a determination of

which, if any, entities have been shown by the Plaintiff's particularized facts to be controlled or dominated by the interested Selling Defendants. [FN64]

FN64. As stated previously, the Defendants do not contest that Walker and Braddock, along with Nicholas, are interested for the purposes of this motion. The discussion that follows focuses on the allegations in the Complaint as to Walker and Braddock's investments, positions, relationships, and dealings in order to lay the necessary foundation for my analysis of the independence of the remaining directors vis-à-vis Walker and Braddock. Because Plaintiff does not seriously argue that Nicholas controlled or dominated the business affairs of priceline or the members of the Company's board, the specific allegations as to Nicholas' dealings are not discussed separately in this section. Instead, any relevant allegations about Nicholas are explored in my analysis of the director defendants who are alleged to have been under the control of the Selling Defendants, including Nicholas.

*A. Entities Controlled by the Selling Defendants*

The particularized facts of the Complaint, and the reasonable inferences drawn therefrom, fail to establish that the Selling Defendants directly or indirectly controlled priceline. The Plaintiff alleges in the Complaint that Walker was the Company's founder and that he served first, as the Company's Chief Executive Officer until August 1998, and, second, as the Vice-Chairman of the Board from August 1998 until January 2001. The Complaint, however, is silent as to Walker's personal equity interest in priceline. The Complaint also sets forth that Braddock, a long-serving director of priceline who has served as the Company's Chairman of the Board since 1998, is the Company's Chief Executive Officer, having resigned in May 2000, and having been subsequently reinstated approximately six months before the initiation of this action. Additionally, he is also alleged to have been one of the Company's "original investors." However, the Complaint, as with its treatment of Walker, contains no allegations as to Braddock's specific personal equity interest in priceline. Finally, Nicholas is

merely alleged to serve as a director of the Company. As such, the Complaint fails to state any particularized facts from which I can draw the inference that the Selling Defendants directly controlled priceline. I am unable even to fathom a guess as to what percentage of priceline is owned by the three interested directors. Furthermore, their positions alone are not sufficient to exert control over the Company. [FN65] Therefore, it must be determined whether the Selling Defendants controlled priceline through their control of other, connected entities, namely Walker Digital and Synapse.

> FN65. I note that this determination is in light of the fact that Walker's tenure as priceline's CEO ended in August 1998, more than two years before Plaintiff initiated this action.

Were the Selling Defendants sufficiently alleged to control Walker Digital, an entity that owns 35% of priceline, it could be argued that they indirectly control priceline. [FN66] While the Complaint does allege that Walker "is the largest equity owner" of Walker Digital, and sets forth that Walker Digital owns approximately 35% of priceline, the Complaint is devoid of any allegation as to Walker's specific personal interest in Walker Digital. The bald allegation that Walker "is the largest equity owner" of Walker Digital does not provide the factual predicate necessary for an inference that he was the controlling equity holder of that company. [FN67] In an even weaker fashion, the Complaint also alleges Braddock to have been "one of the largest equity owners of Walker Digital." Thus while Braddock is detailed to have "personally invested at least $20 million in Walker Digital," no facts are plead that could establish his percentage ownership in that entity. Therefore, given the positions of Walker and Braddock, and the absence of any particularized facts as to their holdings in Walker Digital as pleaded in the Complaint, I am unable to conclude that the Selling Defendants controlled Walker Digital, an entity that arguably could be said to exert material influence over priceline.

> FN66. As the Plaintiff has alleged no relationship between Nicholas and Walker Digital, I will only address the possible control exerted by Walker and Braddock over Walker Digital.

FN67. He could, for example, be a 5% owner in Walker Digital, and the other investors in that entity be owners of yet smaller stakes. *See, e.g., Moran v. Household Int'l, Inc., 490 A.2d 1059, 1070 (Del.Ch.1985)* (noting that the defendant corporation's largest shareholder held "approximately 5% of its stock").

**\*9** Shortcomings of the Complaint also prevent me from ascertaining that the Selling Defendants, through their involvement with Synapse, control priceline. The Complaint sets forth that Walker is the non-executive Chairman of Synapse's board of directors and the owner of 11.5% of Synapse. Additionally, the Plaintiff alleges that Braddock is "a substantial equity owner" as well as a director of Synapse. Finally, like Braddock, Nicholas is alleged to be a director and "a substantial equity owner of Synapse." [FN68] However, the particularized facts of the Complaint fail, on two levels, to demonstrate that the Selling Defendants could exert control over priceline. Even assuming that the Selling Defendants were able to control Synapse, an assumption that is not supported by the allegations of the Complaint, I cannot conclude that control of Synapse would have enabled the Selling Defendants to exert material influence over priceline and its directors. [FN69] More specifically, there simply are no allegations as to Synapse's equity interest in priceline from which one can conclude that the individuals in control of that company could influence the affairs or directors of priceline.

> FN68. The Complaint also specifies the Braddock and Nicholas were each granted the Synapse Options.

> FN69. I note, by way of example, the absence of any particularized allegations addressing Synapse's equity interest in, or business dealings with, the Company (i.e., that Synapse's marketing services were material to the affairs, success, or viability of priceline).

Accordingly, I am of the opinion that the Complaint alleges insufficient particularized facts from which a reasonable inference may be drawn that the interests and positions of the interested directors, whether individually or collectively,

Not Reported in A.2d                                                                                  Page 12
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

empowered them with the means to dominate and control the Board and affairs of priceline, Walker Digital or Synapse. [FN70]

> FN70. Having concluded that the record before me precludes a finding for this motion's purposes that Walker and Braddock in their individual capacities could control priceline and its board, I acknowledge the possibility that the two individuals (along with Nicholas for that matter) could collectively dominate the affairs of the Company. Based on the allegations of the Complaint, however, Plaintiff has failed to plead particularized facts calling into question the interested directors' collective abilities to do so for most, if not all, of the same reasons set forth in the above analysis of those directors in their separate capacities.

*B. The Independence of Individual Defendants*

1. *Peretsman*

Plaintiff argues that the independence of Peretsman, a director of the Company since 1999, is called into question on account of (1) her substantial and material investments in and directorial positions with entities controlled by Walker and Braddock and (2) her principal employment as a managing director and executive vice-president of Allen & Co., an investment banking firm that purchased and sold shares of the Company's stock, received consulting fees from the Company averaging $800,000 in 1999 and 2000, and was scheduled to be one of the lead underwriters for Synapse's since cancelled initial public offering.

The Complaint alleges that Peretsman previously served as a director of NewSub and now serves as a director of Synapse. Peretsman is further alleged to have been granted the Synapse Options in connection with her board position with that company. Having previously concluded that the Complaint's allegations as to Walker and Braddock's relationships with Synapse were insufficient to conclude that either could, or collectively could, unilaterally influence that company's affairs, I fail to see how the Complaint's allegations regarding Peretsman's options in Synapse and

dealings with that company call into question her ability to act independently of Walker and Braddock. Moreover, a director's holdings in a given company do not *ipso facto* cast into doubt that director's ability to act independently of an allegedly dominating director and/or shareholder of that company. If anything, "[t]he only reasonable inference that ... can [be] draw[n] ... is that [the shareholder-director in question] is an economically rational individual whose priority is to protect the value of his ... shares." [FN71] Of course, this discussion presupposes that Walker, Braddock, or Nicholas controlled the companies that Peretsman is alleged to have substantially invested in.

> FN71. *In re the Walt Disney Co. Deriv. Litig., 731 A.2d 342, 356- 57 (Del.Ch.1998)*, *rev'd on other grounds sub nom. Brehm v. Eisner, 746 A.2d 244 (Del.2000)*.

**\*10** If one concludes for the purposes of this motion, as I have, that the Complaint contains insufficient particularized facts from which an inference may be drawn that Walker and Braddock controlled priceline, the allegations as to Peretsman's principal employment with Allen & Co. and the consulting fees that Allen & Co. received from priceline fail to rebut the presumption that Peretsman would have acted independently as well. Even assuming that the fees were material to Allen & Co. or that Peretsman derived a material personal benefit from them, however, the Plaintiff must demonstrate that Peretsman was beholden to Walker or Braddock on account of their supposed ability to affect the continued services generating those fees. Because of my finding that Plaintiff has failed to set forth particularized facts establishing Walker and Braddock's control over the affairs of priceline, I find that the Complaint's allegations fail to raise a reasonable doubt as to Peretsman's ability to act independently and impartially in her capacity as a director of priceline.

2. *Ford*

Plaintiff argues that Ford, who serves as Managing Member of General Atlantic, lacks independence for the purposes of this motion on account of the Synapse Options granted to him in connection with his directorship with that company and the fact that General Atlantic and its affiliates have

invested heavily in priceline, Synapse and Walker Digital. Specifically, the Complaint alleges that General Atlantic invested over $59 million in NewSub, owns approximately 17.5% of Synapse, and is "one of the largest equity owners of Walker Digital." Ford also serves as a director of Walker Digital and Synapse.

Having found the absence of particularized facts from which one may reasonably conclude that Walker or Braddock controlled Synapse, there is no factual predicate from which one may infer that the options granted to Ford are attributable to the control of either of those individuals. As such, Ford's receipt of the Synapse Options fails to establish that either Braddock or Walker had the power to assert control or domination over him as a director of priceline. Moreover, the allegation that General Atlantic and its affiliates invested heavily in priceline (or entities with interests in priceline) does not militate in favor of Plaintiff's requisite showing because the mere investment in those companies does not suggest that the Walker or Braddock had dominion over Ford. With respect to Ford's directorships with Walker Digital and Synapse, allegations as to one's position on multiple boards does not in and of itself call into question one's independence from an interested director sitting with him on such boards. Accordingly, Plaintiff has failed to set forth particularized facts raising a reasonable doubt as to Ford's ability to act objectively as a director of priceline.

3. *Loeb*

The Complaint alleges that Loeb was an equity investor in Synapse and that company's predecessor (NewSub). The Complaint further alleges that Michael Loeb, Loeb's son, co-founded NewSub in 1992 with Walker and that his position with Synapse serves as his principal employment.

**\*11** As stated previously, the Complaint's allegations as to Walker's position as the non-executive Chairman of Synapse with an interest of less than 12% in that company, without more, fails to create a record from which one may conclude that he dominates the business affairs of Synapse or the employment of that company's employees. The same holds true of Braddock who, like Walker, is alleged to be a substantial equity owner of Synapse. [FN72] Having already

found that Peretsman and Ford are not beholden to the Selling Defendants, Plaintiff's argument that Loeb's son is "beholden to defendants Walker, Braddock, Nicholas, Ford and Peretsman, who collectively make up a majority of the Synapse Board," [FN73] is unpersuasive. Even if Loeb's son were somehow "beholden" to all five individuals collectively, the Plaintiff has not alleged any basis for the Court to conclude that Ford and Peretsman, who are not under the control of the Selling Defendants, based on the allegations of the Complaint, would join with the Selling Defendants in any effort within Synapse that would somehow adversely affect Loeb's son and, thus, affect Loeb's independence as a priceline director. Consequently, Loeb's son's position with Synapse does not call into question Loeb's ability to act independently of Walker, Braddock or Nicholas for the purposes of this motion. Regarding Loeb's investments in Synapse, as stated in my analysis of Peretsman and Ford, a director's investment in another company allegedly controlled by the same individual who is said to be a dominating force in the company under analysis does not suggest, without more, that the investing director lacks independence. As such, I conclude that Plaintiff has alleged insufficient particularized facts to raise a reasonable doubt as to Loeb's independence.

> FN72. The Complaint alleges that "Walker, Braddock, Ford (through General Atlantic), ... Nicholas (and/or entities with whom he is affiliated), and Peretsman are all substantial equity owners of Synapse, each having invested millions of dollars in Synapse." Pl.'s Compl. ¶ 100(e).

> FN73. *Id.*

4. *Miller*

The Complaint alleges that priceline served as Miller's principal employment and that "at the time this action [was] initiated, ... [she] was preparing to leave her employment with [p]riceline and was beholden to defendants Braddock and Walker to approve the terms of her departure." [FN74] Having previously found that Plaintiff has alleged insufficient particularized facts from which a reasonable inference can be drawn that Braddock or Walker exerted control over the Company, I fail to see how Miller could be

Not Reported in A.2d                                                                                                      Page 14
2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856
**(Cite as: 2002 WL 31926608 (Del.Ch.))**

beholden to them, especially considering that Miller was leaving her position with the Company. While Plaintiff argues that Miller was beholden to Walker and Braddock on account of their influence over her departing compensation package, again, Plaintiff has alleged insufficient particularized facts calling into question their ability to dominate or control the terms of her departure. For this reason, the Complaint's allegations as to priceline's forgiveness of $3 million of Miller's personal debt (and the options granted to her by the Company to purchase priceline stock) also fail because there are insufficient allegations from which one can conclude that Walker or Braddock had the power to compromise the presumptive independence of Miller.

> FN74. *Id.* ¶ 100(d).

5. *Bahna*

**\*12** The Complaint merely alleges that Defendant Bahna has served as a director or the Company since July 1999. With nothing more, this fact fails to impugn the independence of Bahna with respect to evaluating any demand to vindicate the Company's rights. Plaintiff does not contend that Bahna is not independent.

6. *Allaire*

While the Complaint notes that Defendant Allaire is a director of the Company and also serves as Chairman of the Board of Directors and CEO of Xerox Corporation, an entity for which Nicholas serves as a director, nothing in the Complaint or the Plaintiff's arguments can be viewed as seriously contending that the Selling Defendants exerted material influence over Allaire. Thus, on these limited allegations, I consider Allaire to be independent for purposes of determining whether demand is excused. As with Bahna, the Plaintiff does not challenge Allaire's independence.

* * *

Because the Plaintiff has failed to allege particularized facts raising a reasonable doubt as to the independence or disinterestedness of at least six of priceline's eleven directors, the Plaintiff has not met his burden under Rule

23.1 to justify excusing his failure to make a demand on the Board. [FN75]

> FN75. My finding that the Plaintiff has not met his burden with respect to the independence or disinterestedness of six of priceline's eleven directors obviates the need to consider the status of Schulman and Blackney.

3. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss under Rule 23.1 for the Plaintiff's failure to make pre-suit demand on the Board is granted. Dismissal is without prejudice. [FN76] An order will be entered in accordance with this memorandum opinion.

> FN76. I conclude that dismissal with prejudice would not "be just under the circumstances" because of the complex and intertwined relationships among priceline, the Individual Defendants, and the various entities with which they are associated and because of the apparently non-public status of certain facts, the absence of which may have materially affected the outcome. Court of Chancery Rule 15(aaa). It is appropriate to remember the admonition of Justice Hartnett in his concurring opinion in *Brehm v. Eisner:* "Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge." 746 A.2d at 268 (Hartnett, J., concurring).

ORDER

AND NOW, this *20th* day of December, 2002, for the reasons set forth in the Court's Memorandum Opinion of even date,

IT IS HEREBY ORDERED that Plaintiffs' Amended Derivative Complaint be, and the same hereby is, dismissed, without prejudice.

2002 WL 31926608 (Del.Ch.), 28 Del. J. Corp. L. 856

END OF DOCUMENT