## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEVE SACHS, | ) | Lead Civil Action No. 04-30032-MAP |
| | ) | |
| Plaintiff, | ) | Consolidated with 04-30038-MAP |
| | ) | 04-30044-MAP |
| vs. | ) | |
| | ) | |
| STEVEN SPRAGUE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFFS' RESPONSE AND OBJECTION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

I.    FACTUAL ALLEGATIONS ...........................................................1

    A.    Background and Pre-Relevant Period Statements and Events.........................1

II.   DEMAND IS EXCUSED.............................................................7

    A.    Plaintiffs Have Alleged Facts Sufficient to Demonstrate Demand Futility..........8

        1.    Plaintiffs Have Alleged with Particularity that There Is Reason to Doubt a Majority of the Board Is Disinterested..........................................9

        2.    Plaintiffs Have Alleged with Particularity that There Is Reason to Doubt a Majority of Wave's Directors Are Independent...............................11

III.  PLAINTIFFS SUFFICIENTLY PLEAD ALL CAUSES OF ACTION...................20

    A.    Applicable Legal Standards for a Motion to Dismiss Under Rule 12(b)(6)........20

    B.    Plaintiffs Have Adequately Pled Their Insider Selling Cause of Action...........21

        1.    Rule 9(b) Is Not Applicable to This Matter as Plaintiff Does Not Allege Fraud......................................................................21

        2.    Plaintiffs Have Adequately Pled Insider Selling............................21

        3.    Plaintiffs Adequately Allege a Claim for Breach of Fiduciary Duty.......23

        4.    Plaintiffs Adequately Allege a Claim for Waste of Corporate Assets......24

        5.    Plaintiffs Adequately Allege a Claim for Unjust Enrichment..............25

        6.    Wave's Certificate of Incorporation Does Not Immunize Defendants from Their Breach of the Duty of Loyalty and Good Faith .......................26

        7.    Plaintiffs' Claim for Non-Speculative Damages Is Ripe....................27

        8.    Separate Participation.....................................................29

IV.   CONCLUSION....................................................................30

# TABLE OF AUTHORITIES

## Cases

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
  845 A.2d 1040 (Del. 2004) ................................................................................ passim

*Biondi v. Scrushy*,
  820 A.2d 1148 (Del. Ch. 2003) .................................................................................. 16

*Brophy v. Cities Servs. Co.*,
  70 A.2d 5 (Del. Ch. 1949). ......................................................................................... 10

*Canal Capital Corp. by Klein v. French*,
  No. 11,764, 1992 WL 159008 (Del. Ch. July, 2, 1992) ........................................... 11

*Cantor Fitzgerald, L.P. v. Cantor*,
  724 A.2d 571 (Del. Ch. 1998) .................................................................................... 28

*Conley v. Gibson*,
  355 U.S. 41(1957) ...................................................................................................... 22

*Cooperman v. Individual, Inc.*,
  171 F.3d 43 (1st Cir. 1999) ........................................................................................ 22

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
  624 A.2d 1199 (Del. 1993) ......................................................................................... 29

*Dollens v. Zionts*,
  No. 01 C02826, 2002 WL 1632261 (N.D. Ill. July 22, 2002) .................................. 31

*Emerald Partners v. Berlin*,
  787 A.2d 85 (Del. 2001) .................................................................................. 10, 12, 29

*Grace Bros., Ltd. v. Uniholding Corp.*,
  No. 17612, 2000 WL 982401 (Del. Ch. July 2, 2000) .............................................. 22

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ...................................................................................... 11

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) ........................................................................................... 8

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988), *overruled on other grounds sub nom. Brehm*, 746 A.2d 805 ........... 8

*Guttman v. Huang,*
  823 A.2d 492 (Del. Ch. 2003) ............................................................... 12

*In re Caremark International, Inc. Deriv. Litig.,*
  698 A.2d 959 (Del. Ch. 1996) ............................................................... 11

*In re Cendant Corp. Deriv. Action Litig.,*
  189 F.R.D. 117 (D.N.J. 1999) ................................................... 12, 30, 31

*In re eBay, Inc. S'holders Litig.,*
  No. 19988-NC, 2004 WL 253521 (Del. Ch. Jan. 23, 2004) ...................... 21

*In re New Valley Corp. Derivative Litig.,*
  No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ............................. 16

*In re Oracle Corp. Deriv. Litig.,*
  824 A.2d 917 (Del Ch. 2003) ......................................................... 12, 13

*In re Ply Gem Indus., Inc. S'holders Litig.,*
  No. 15779-NC, 2001 WL 1192206 (Del. Ch. Oct. 3, 2001) ..................... 16

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d Cir. 2001) ................................................................... 11

*In re Stratus Computer, Inc. Securities Litigation,*
  No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1992) ..................... 33

*In re Symbol Techs. Sec. Litig.*
  762 F. Supp. at 510 (E.D.N.Y. 1991) ................................................... 31

*In re United Telecomm., Inc. Sec. Litig.,*
  No. 90-2251-EEO, 1993 WL 100202 (D. Kan. Mar. 4, 1993) ................. 32

*In re Walt Disney Co. Deriv. Litig.,*
  825 A.2d 275 (Del. Ch. 2003) ....................................................... 10, 12

*Int'l Equity Capital Growth Fund, L.P. v. Clegg,*
  No. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) ...................... 13, 19

*Jackson Nat'l Life Ins. Co. v. Kennedy,*
  741 A.2d 377 (Del. Ch. 1999) ......................................................... 26, 30

*Jenkins v. McKeithen,*
  395 U.S. 411 (1969) ........................................................................... 22

*Kahn v. Tremont Corp.,*

694 A.2d 422 (Del. 1997) .......................................................................................... 17

*LaSalle Nat'l Bank v. Perelman,*
    82 F. Supp. 2d 279 (D. Del. 2000) ..................................................................... 28

*Lewis v. Vogelstein,*
    699 A.2d 327 (Del. Ch. 1997) ...................................................................... 27, 28

*Medina-Claudio v. Rodriguez-Mateo,*
    292 F.3d 31 (1st Cir. 2002)................................................................................ 22

*Michelson v. Duncan,*
    407 A.2d 211 (Del. 1979) ........................................................................... 27, 28

*Mills Acquisition Co. v. MacMillan, Inc.*
    559 A.2d 1261 (Del. 1989) ............................................................................... 12

*Mitchell v. Newryder,*
    245 F.Supp.2d 200 (D. Me. 2003) .................................................................... 23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ............................................................................ 11

*Oberly v. Kerby,*
    592 A.2d 445 (Del. 1991) ................................................................................. 10

*O'Reilly v. Transworld Healthcare, Inc.,*
    745 A.2d 902 (Del. Ch. 1999) ...................................................................... 26, 30

*Parfi Holding AB v. Mirror Image Internet, Inc.,*
    794 A.2d 1211 (Del. Ch. 2001), *rev'd,* 817 A.2d 149 (Del. 2002) ..................... 13

*Pepper v. Litton,*
    308 U.S. 295 (1939) ......................................................................................... 26

*Provenz v. Miller,*
    102 F.3d 1478  (9th Cir. 1996); ........................................................................ 11

*Rales v. Blasband,*
    634 A.2d 927 (Del. 1993). .................................................................................. 9

*Rattner v. Bidzos,*
    No. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ................................... 9

*Roskos v. Shearson/Am. Exp., Inc.,*
    589 F. Supp. 627 (E.D. Wis. 1984) ................................................................... 24

*Sanders v. Wang,*
   No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 10. 1999) ........................................ 29

*Seidel v. Pub. Serv. Co.,*
   616 F. Supp. 1342 (D. N.H. 1985) ........................................................................ 24

*Seminaris v. Landa,*
   662 A.2d 1350 (Del. Ch. 1995) ............................................................................ 10

*Steiner v. Meyerson,*
   No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995) ........................................ 21

*Swierkiewicz v. Sorema N. A.,*
   534 U.S. 506 (2002) ............................................................................................ 23

*Telxon Corp. v. Meyerson,*
   802 A.2d 257 (Del. 2002) .............................................................................. 13, 17

*Watterson v. Page,*
   987 F.2d 1 (1st Cir. 1993) .............................................................................. 22, 23

**Statutes**

8 Del. C.
   §102(b)(7) ........................................................................................................ 29

Fed. R. Civ. P.
   8(a)(3) ............................................................................................................... 32
   8(a)(2) ............................................................................................................... 23
   9(b) ............................................................................................................... 23, 33
   12(b)(6) .......................................................................................................... 22, 33

**Other Authorities**

A. Gilchrest Sparks, III, et. al.,
   *Trends in the Delaware Law:  Director Liability and Indemnification*, 1405 PLI/Corp. 331
   (Jan. 14, 2004) ............................................................................................... 8, 15

John L. Reid, Bruce N. Teles, Matthew M. Rosini,
   *Directors Liability for Y2K:  A Corporate Governance Litigation Bear and A Securities*
   *Litigation Bull*, 24 Del. J. Corp. L. 835 (1999) ................................................ 10

Louis F. Herzeca & Ruke Ku,

*Directors Take a Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight,* 230 NYLJ 9 (Sept. 29, 2003).............................................................. 8

Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J. Corp. L. 625, 645 (Spring 2004). ....................................................................................................... 7

Plaintiffs, Steve Sachs, Jeff Swanson and Charlene Harvey (collectively, "Plaintiffs"), respond and object to Defendants' Steven Sprague ("Sprague"), Gerald K. Feeney ("Feeney"), John E. Bagalay ("Bagalay"), Noland Bushnell ("Bushnell"), George Gilder ("Gilder"), and John E. McConnaughy, Jr. ("McConnaughy") (collectively, the "Individual Defendants"), Motion to Dismiss the Consolidated Amended Complaint ("Motion"). Defendants' Motion should be denied. Plaintiffs have alleged with particularity claims for breach of fiduciary duty against some or all of the Individual Defendants and facts raising a reasonable doubt whether a majority of the directors of Nominal Defendant Wave Systems Corp. ("Wave" or the "Company") are capable of objectively and impartially determining whether to sue the Individual Defendants, particularly Sprague.

## I.      FACTUAL ALLEGATIONS

### A.      Background and Pre-Relevant Period Statements and Events

Although Wave had been in business more than 16 years, it described itself as a "development stage company." ¶5.[1]   Wave has yet to successfully complete the commercial marketing of any products its business model relies upon. ¶5.  It has never realized any significant revenues, its largest development contract was cancelled in 2002, it suffered losses of over $40 million in each of the years 2000, 2001 and 2002. ¶¶5, 48-49. Its independent auditor, KPMG, warned that there was substantial doubt about the Company's ability to continue as a going concern beyond the second quarter of 2003. *Id.* Without any significant revenue during its history, Wave raised the majority of its funding through equity offerings. ¶¶42-43, 49.

As reported in the Company's filings with the Securities and Exchange Commission ("SEC"), as of December 31, 2002, Wave had an accumulated deficit of approximately $233

---

[1] All paragraph ("¶" or "¶¶") references are to the Verified Consolidated Shareholder Derivative Complaint ("Complaint").

million and working capital of only $8.8 million, requiring an additional $11 million in cash to keep its doors open through the end of December 31, 2003. ¶6. Desperate for funds and with no significant revenue stream in sight, on April 30, 2003, the Company closed a private placement of Series H (preferred) Stock and Warrants (the "Series H Placement" or "Placement") for gross proceeds of $5,485,000, less fees and commissions. ¶¶7, 49. Out of desperation, the Company also agreed to pay the preferred shareholders dividends at an annual rate of 10% in 2003, increasing to 12% on April 30, 2004. ¶¶7, 50-52. Significantly, the Placement terms also greatly limited Wave's ability to raise additional funds through equity offerings, by giving the Series H shareholders a right of first refusal. ¶¶7, 51.

Even with the additional funding, as of June 30, 2003, the Company had accumulated a deficit of $245.8 million and working capital of only $2.6 million. ¶9. Without the financial wherewithal to pay the dividends due, or to redeem the preferred stock, Wave had tied the Company's hands financially. ¶8, 51-52. Wave's only escape route was to trigger the automatic conversion of the preferred shares to the Company's Class A Common Stock, under the terms of the Placement, by causing Wave stock to trade above $1.90 per share for 15 of 20 consecutive trading days. ¶8, 52-53. If the defendants were successful in doing this, not only would the Company escape the onerous preferred stock dividends and position itself for future equity offerings, but certain of the Individual Defendants would be able to sell the Company's shares at prices the market otherwise would not bear. ¶¶10, 43, 51.

To this end, the defendants primed the market to expect a major development in the Company's 16 year history - - a significant revenue stream. ¶11. In its Form 10-K/A filed on June 30, 2003, the Individual Defendants and the Company expanded on comments made by

Sprague in a May 15th press release concerning the fruition of Wave's "long-held vision of revenue-producing trusted computing services." ¶¶12, 45, 54. The Form 10-K/A stated in part:

> During 2002, several manufacturers of semiconductors for the PC industry announced products that have the capability to function as TPM's (Trusted Platform Modules) that meet the TCPA []standard for trusted computing. (Compaq Computer, Hewlett-Packard, IBM, Intel and Microsoft established the TCPA in an effort to define and promote trusted computing....) The offering of these products by major suppliers of semiconductors to the PC market is an important development in the creation of the market for hardware based trusted computing. *As a result of this development, Wave has begun executing a strategy to leverage the work it has done in developing a hardware trusted computing platform toward becoming a major developer of services to this market, the development of which is beginning to be driven by some of the major suppliers of semiconductors to the PC industry. Wave is actively pursuing business relationships with these companies in an effort to become a developer of applications that will be essential to the deployment of these new products, thereby creating a substantial new revenue opportunity for Wave.*

¶12. In this same filing, the Company made the following forecast for revenue growth in FY:03:

> *Wave does not foresee that it will achieve significant revenues at least until the latter part of 2003. Our sales forecast for the year ended December 31, 2003 approximates $5 million in gross margin contribution.*
>
> *However, this forecast is not supported by a backlog of orders at this time, but rather the anticipation that various deals that we are currently pursuing will close.*

¶54.

**B.    Defendants' Misleading Statements and Sprague, Bushnell, Feeney and Peter J. Sprague's[2] Improper Insider Stock Sales During the Relevant Period**

In apparent fulfillment of defendants' touted anticipation of revenue growth on July 31, 2003, Wave announced a purported licensing agreement with Intel Corporation, followed soon thereafter by an announcement on August 4, 2003 that Wave had entered into a purported partnership arrangement with IBM. ¶¶13, 55, 61. The market reacted favorably to defendants' seemingly positive announcements, which were also reported in the financial media. On August

---

[2] Peter J. Sprague ("P. Sprague"), the founder of the Company, and its former longtime Chairman of the Board and CEO, is the father of Sprague.

1, 2003, *CBS MarketWatch* reported that "demand for Wave Systems shares soared again Friday, a day after the developer of computer security technology more than doubled on news of an important partnership with chip heavyweight INTEL....   Financial terms of the partnership weren't disclosed."   ¶57.  Moreover, the purported Wave/IBM deal was widely reported in the marketplace as a deal between Wave and IBM, where IBM would use the Company's software on certain IBM products.  ¶62.  As reported by *CBS MarketWatch* on August 4, 2003, "[s]hares of Wave Systems are trading among the leading NASDAQ percentage gainers, up a $1.03, or 28% at $4.68.  The security hardware and software firm announced a deal with IBM to use its software in certain IBM products." ¶62.   A Wave spokesperson confirmed and furthered the market's perception of the Company's materially misleading August 4th announcement:  that the IBM deal meant Wave's product would be bundled with IBM computers.   ¶64.  As reported in *The New York Times*, Wave represented the deal with IBM as follows:

> The Wave Systems Corporation said yesterday that it had agreed to a deal with IBM to imbed its security software inside selected IBM notebook and desktop computers, in the latest in a string of deals for Wave Systems. The Company, based in Lee, Mass., said its software would be available on selected ThinkPad notebooks and ThinkCenter desktops that include IBM's digital security subsystem.... Terms of the latest deal were not disclosed, but a Wave spokesman, John Callahan, said IBM computers with built-in Wave security would be available in the fourth quarter of this year.

*Id*.  On August 5, 2003, *Bloomberg* reported that ***according to defendant Sprague***, "INTEL will pay a license fee for bundling the software onto the computer circuit boards that INTEL sells[.]... Those fees typically range from $.50 to $1.50 per motherboard."  ¶66.

Indeed, against the backdrop of the Company's forecast for $5 million in gross margin contribution from revenue growth, the combined announcements caused Wave's stock to skyrocket.  ¶¶14, 56-58, 62-63, 66, 68.   On July 31, 2003, following the Company's Intel announcement, Wave's common stock closed at $2.25 per share, up from the prior day's close of

$0.84 per share, representing a 168% one day gain on extremely heavy volume. ¶¶14, 56.  On August 4, 2003, following the Company's IBM announcement, Wave's share price rose 21%, or $0.77 per share, to close at $4.42 per share, on very heavy volume. ¶¶14, 63.  The defendants' announcement caused Wave's stock price to soar 426% from its closing price of $.84 per share on July 30, 2003 to its closing price of $4.53 per share on August 5, 2003, after reaching a high of $5.24 per share earlier that day.  ¶68.

Acting on this "window of opportunity," as P. Sprague termed it, ¶94(g), P. Sprague and defendants Sprague, Feeney and Bushnell sold Wave shares from their personal holdings reaping millions of dollar in proceeds.  On August 5, 2003, defendant Feeney sold 100,000 Wave shares at $5.00 per share for $500,000, cutting his share ownership by 50%.  ¶69.  Feeney had not before, nor has he since, sold Wave shares.  *Id.*  On August 6, 2003, defendant Sprague sold 150,000 Wave shares at $3.17-$4.01 per share for $533,841, cutting his beneficial Class A share ownership by 36%.  ¶70.  On August 19, 2003, Bushnell sold 10,000 Wave shares for $35,742. ¶71.  The sale accounted for all of his Wave holdings.  *Id.*  Finally, as reported in the media based on comments made by P. Sprague, P. Sprague sold Wave shares in early August 2003, although any such sales have apparently not been reported to the SEC.[3]  ¶¶72, 94(g).

The statements made by defendants concerning the Intel deal were materially false and misleading, as the statements were incomplete.  ¶60.  The full terms and true nature of the purported Intel and IBM deals, which would have revealed to the market their unlikely prospects of generating anything close to the Company's forecasted revenue growth, were not disclosed. ¶14.  By the time the Intel announcement was made, the Individual Defendants and the Company

---

[3]  Although the Individual Defendants were able to profit by selling their personally held shares at artificially inflated prices, their plan to avoid the oppressive terms of the Series H Placement through the conversion of the preferred stock to Class A common stock was stalled by the SEC. ¶¶73-74.

had forecast Wave receiving a significant revenue stream in 2003 from "various deals that we are currently pursuing." ¶60. Having thus primed the market, the Individual Defendants knew, or recklessly disregarded, the fact that the investing public would be misled by the omission of the specific terms of the Intel agreement, which terms merely provided Intel with non-exclusive licensing rights to use Wave's products, without any minimum licensing requirement. *Id.* Intel could choose to use or not use this licensing right. *Id.* Thus, Intel was not obligated, and had not decided, to give Wave its business. *Id.* In fact, according to a former Wave employee who worked as an engineer in Wave's California office from 2000 through August 2003, performed work on the Intel deal for Wave, and had worked as an engineer at Intel before joining Wave, the Intel deal was considered by his contacts at Intel to be "a small deal." ¶59. The former Wave engineer's contacts at Intel viewed the deal with Wave as "kind of a joke," and were "very surprised" at the attention the announcement received. *Id.* Moreover, the former Wave engineer reported that Intel viewed the deal as not a lucrative one for Wave. *Id.*

The Individual Defendants and the Company's representations concerning the IBM deal were also materially false and misleading because, as defendants knew at the time the statements were made, Wave had merely established that its products were compatible, or would run on IBM's computers, not that IBM had partnered with Wave and would be bundling Wave's products with computers IBM shipped to its customers. *Id.*

The defendants continued to make false and misleading statements concerning the Intel and IBM deals and the business prospects of Wave into December 2003. ¶¶75-76 (Form S-3A Registration Statements signed by each of the Individual Defendants), ¶¶78-80[4] (Conference

---

[4] Although during Wave's August 14, 2003 earnings conference call with analysts and investors, Sprague, for the first time, described the Intel deal as a non-exclusive licensing agreement, with no minimum or maximum requirements - - "they can use it as broadly as they want or as little as they want;" and stated that while the Company's products were compatible with IBM, Wave did

calls with analysts and investors conducted by Sprague), ¶¶81-84 (Registration Statements and Prospectus signed by each of the Individual Defendants).

On December 18, 2003, the Company announced the commencement of a formal SEC investigation relating to certain public statements made by Wave during and around August 2003 as well as certain trading in Wave securities during such time. ¶87. On this news, Wave shares fell 17.13% on extremely heavy volume. ¶88. As a result of the Individual Defendants' wrongful conduct, P. Sprague, and defendants Sprague, Bushnell and Feeney received an improper benefit through the sale of their personally held Wave shares, the Company has been forced to incur legal costs and other expenses to defend itself in numerous securities class action lawsuits and an SEC investigation, and has lost market capitalization and goodwill - - for the foreseeable future, the Company's shares will be subject to a "liar's discount." ¶¶ 35-36, 69-72.

## II.    DEMAND IS EXCUSED

Demand is excused under Delaware law if the complaint alleges particularized facts supporting a ***reasonable doubt*** either: (a) that a majority of the directors on the date of the filing of the complaint were both disinterested and independent; ***or*** (b) that the challenged transactions were "the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 805 (Del. 2000). Pleading futility of demand is not nearly as difficult as defendants pretend.[5] Although a

---

not have a licensing arrangement with IBM, the impact of these partial disclosures was diluted if not totally eclipsed by Sprague's simultaneous statements reinforcing defendants' earlier stated expectations of imminent, significant revenue growth, including revenue growth from the "relationship that we've announced with Intel." ¶¶78-79.

[5] In fact, "recent Delaware decisions suggest a trend toward stricter judicial scrutiny of director decision-making." Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J. Corp. L. 625, 645 (Spring 2004). "Delaware's most recent corporate decisions depart dramatically from the tradition of management deference that preceded Enron." *Id.* at 654. "Since Enron, Delaware law has taken a decidedly tougher stance with respect to director protections." A. Gilchrest Sparks, III, et. al., *Trends in the Delaware Law: Director Liability*

plaintiff is held to a particularized standard of pleading, plaintiff need not plead evidence. *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991). Instead, the factual allegations of the complaint must be accepted as true and need only raise a "reasonable doubt" as to the directors' disinterestedness, independence or business judgment. *Aronson*, 473 A.2d at 814. Plaintiffs are not required to plead particularized facts sufficient to sustain a "judicial finding" that either of the tests excusing demand are satisfied. *Grobow v. Perot*, 539 A.2d 180, 195 (Del. 1988), *overruled on other grounds sub nom. Brehm*, 746 A.2d 805 "Reasonable doubt can be said to mean that there is a reason to doubt. This concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).[6] *See also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004). Contrary to the defendants' suggestion, the facts pled by Plaintiffs raise a reasonable doubt that a majority of Wave's Directors, at the time this lawsuit was filed, were both disinterested and independent.

## A.    Plaintiffs Have Alleged Facts Sufficient to Demonstrate Demand Futility

Under the *Rales* test:

[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

---

*and Indemnification*, 1405 PLI/Corp. 331, 333 (Jan. 14, 2004). "Recent case law has tightened the definition of 'independent' and expanded the concept of 'good faith.'" *Id.* "Recent judicial decisions ... indicate that the traditional safeguards of the business judgment rule, and charter provisions that eliminate personal liability for duty of care violations, will not protect directors that intentionally disregard their duties." Louis F. Herzeca & Ruke Ku, *Directors Take a Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight*, 230 NYLJ 9 (Sept. 29, 2003).

[6] Here, as throughout, all citations are deemed omitted and all emphasis is deemed added unless otherwise stated.

*Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

     **1.**      **Plaintiffs Have Alleged with Particularity that There Is Reason to Doubt a Majority of the Board Is Disinterested**

Directorial interest may be said to exist when a director receives a personal financial benefit from a transaction which is not actually shared by the stockholders or "'a corporate decision will have a materially detrimental impact on a director but not on the corporation and the stockholders.'" *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *Rales*, 634 A.2d at 936; *see also Beam*, 845 A.2d at 1049. A substantial likelihood of personal liability creates a disabling interest which prevents a director from impartially considering a demand. *Rattner v. Bidzos*, No. 19700, 2003 WL 22284323, at *9 (Del. Ch. Sept. 30, 2003); *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

Directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003). As alleged with particularity by Plaintiffs, each of the Individual Defendants face a substantial likelihood of liability for breaching one or more of these duties.[7] For instance, Plaintiffs alleged that Sprague and Bushnell breached their duties of loyalty and good faith to the Company through illegal insider trading and derived an improper personal benefit from same not shared by the Company and its other shareholders.[8] *Brophy v. Cities Servs. Co.*, 70 A.2d 5, 7 (Del. Ch. 1949). In fact, Sprague,

---

[7]  At a minimum, Plaintiffs have alleged with particularity a substantial likelihood of defendant Sprague being held liable. And as set forth below, a majority of Wave's Directors, and particularly defendants Bushnell and Gilder, are incapable of exercising independent judgment in responding to a demand to initiate legal action against Sprague.

[8]  Issues regarding the duty of loyalty arise in many contexts including insider trading. John L. Reid, Bruce N. Teles, Matthew M. Rosini, *Directors Liability for Y2K: A Corporate Governance Litigation Bear and A Securities Litigation Bull*, 24 Del. J. Corp. L. 835 (1999); *Oberly v. Kerby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to

Bushnell and Feeney unloaded 36%, 50% and 100%, respectively, of their Wave shares immediately after purportedly positive news was announced by the Company. ¶¶69-71, 94(g). Feeney never before or after sold Wave shares. The timing of these sales and the percentage of Defendants' holdings that were sold were extremely suspicious giving rise to an inference of scienter. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 67 (2d Cir. 2001) (insiders selling large amounts of stock while disseminating positive information is "like a ship's captain exiting into the safety of a lifeboat while assuring the passengers that all is well"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98 (1st Cir. 1999). Plaintiffs have also pled with particularity that to facilitate this insider trading and to eliminate the onerous dividends payable to the Company's preferred shareholders, the Company and Sprague knowingly made misleading statements concerning the purported Intel and IBM deals.[9] ¶¶12, 13, 45, 54-55, 61. Plaintiffs have sufficiently alleged each of the director defendants breached his duty of good faith by permitting the Company and defendants Sprague and Bushnell, and Feeney to engage in the wrongful conduct alleged herein.[10] A director cannot act loyally towards the corporation unless he or she acts in good faith.[11] *Guttman,* 823 A.2d at 506 n.34.

---

profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary").

[9] Contrary to defendants' suggestion, defendants' statements in early August 2003, concerned present facts. In other words, they were not forward-looking statements.

[10] In *In re Caremark International, Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996), the court recognized that "a sustained or systematic failure of the board to exercise oversight ... will establish the lack of good faith that is a necessary condition to liability." *Canal Capital Corp. by Klein v. French*, No. 11,764, 1992 WL 159008, at *3 (Del. Ch. July, 2, 1992) ("a director breaches his fiduciary duty of due care if he abdicates his managerial duties"); *Mills Acquisition Co. v. MacMillan, Inc.* 559 A.2d 1261, 1282 n.32 (Del. 1989) (board's virtual abandonment of

## 2.    Plaintiffs Have Alleged with Particularity that There Is Reason to Doubt a Majority of Wave's Directors Are Independent

If a plaintiff pleads facts that create a reasonable doubt that a majority of the Board could have acted independently in responding to the demand the presumption of independence is rebutted for pleading purposes and demand will be excused as futile. *Beam*, 845 A.2d at 1049.[12] The Delaware test for directorial independence "focuses on whether the directors, for ***any substantial reason***, cannot act with only the best interests of the corporation in mind." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 937-38 (Del Ch. 2003) (finding reason to doubt independence of special litigation committee, tenured professors at Stanford University, to investigate conduct of directors with ties to the University).  The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board rather than on extraneous considerations or influences. *Beam*, 845 A.2d at 1049.  "That is, the Supreme Court cases ultimately focus on impartiality and objectivity." *Oracle*, 824 A.2d at 938; *Beam*, 845 A.2d at 1049.

A director may be compromised if he is beholden to or controlled by an interested person. *Oracle*, 824 A.2d at 938; *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).  Beholden in this sense does not mean just owing in the personal financial sense; it can also flow out of

---

oversight functions was breach of fundamental duties of loyalty and care); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists" will sustain liability for good faith claim).  Where a director consciously ignores his or her duties to the corporation thereby causing economic injury to its stockholders, the director's actions are either "not in good faith" or "involve intentional misconduct." *Disney*, 825 A.2d at 289.

[11]  As further set forth below, 8  Del. Corp. Code §102(B)(7) and the exculpatory provision in Wave's Corporate Charter do not protect the Individual Defendants from liability for breaches of their duties of good faith and loyalty. *Emerald Partners*, 787 A.2d at 90-92; *Disney*, 825 A.2d at 290; *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 133 (D.N.J. 1999).

[12]  A director is compromised if he is either not disinterested or not independent.

"personal or other relationships" to the interested party. *Oracle*, 824 A.2d at 938-39.   A controlled director is one who is dominated by another party through close personal or familial relationship or through force of will. *Telxon*, 802 A.2d at 264.   Independence of the board is a fact-specific determination made in the context of a particular case. *Beam*, 845 A.2d at 1049; *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. 14995, 1997 WL 208955, at *2 (Del. Ch. Apr. 22, 1997).  There are few bright lines. *Id.* In evaluating the impartiality and objectivity of the board, the court should employ a common sense application of those terms. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1231 (Del. Ch. 2001), *rev'd*, 817 A.2d 149 (Del. 2002).

Defendants contend that "Plaintiffs attempt to rebut the presumption of independence, relying primarily on superficial allegations of relationships between those outside directors and non-party, Peter Sprague."  However, Plaintiffs' allegations are far from "superficial."  Plaintiffs have alleged a web of entanglements and longtime relationships between defendant directors Bushnell and Gilder and Sprague, an inside and clearly interested director, and his father, P. Sprague.[13]   These specific allegations of personal and financial entanglement between these individuals create a reasonable doubt as to the independence of a majority of the Wave directors.

Specifically, Plaintiffs alleged the following facts giving rise to a reasonable doubt that Bushnell is incapable of objectively and independently considering whether to sue Sprague:

> Defendant Steven Sprague is the son of Peter Sprague, the Company's founder and its former Chairman and CEO.  Peter Sprague has been a Director of uWink, Inc. ("uWink"), a publicly held company, since December 2003 and owns 8% of its common shares.  Director Bushnell, a director of the Company since 1999, is the Chairman and CEO of uWink.  According to an April 15, 2001 article

---

[13]  Defendants have not cited any authority that would preclude the Court's consideration of the defendant directors' relationship with P. Sprague, the founder and longtime CEO of the Company and father of Sprague, a clearly interested director, in determining whether there is reason to doubt a majority of the Board could impartially and objectively decide whether to sue Sprague. Indeed, independence must be determined on a case by case basis. *Beam*, 845 A.2d at 1049.

in Redhearing, Peter Sprague was then uWink's largest outside investor. In 2003 Bushnell was paid $159,773 for his services as CEO and President of uWink. uWink uses Wave Systems' wave chip in uWink's application set and on-line video games. Moreover, Peter and Steven Sprague are long-time friends of Bushnell. In 1999, Peter Sprague told the periodical the *American Banker* that "he met Mr. Bushnell more than 20 years ago on a television show where they 'were trying to predict the electronic future. We have since worked separately and together to try to make some aspects of that future occur.'" ("In Brief: Atari Pioneer Joins Security Firm's Board," *American Banker*, Vol. 164, No. 141, July 26, 1999). "I am a friend of Peter and Steven Sprague" Bushnell told David S. Isenberg. (Smart Letter #549, "Trip Notes from a Shrinking Planet," April 9, 2001 www.isen.com/archives/010409.hmtl.). Peter Sprague and Bushnell are also members of the Academy of Distinguished Entrepreneurs at Babson College and two of eight members of MetaMarket.com's Think Tank. Peter Sprague is Think Tank's Chairman.

¶94(f)(i).

Specifically, Plaintiffs alleged the following facts giving rise to a reasonable doubt that

Gilder is incapable of objectively and independently considering whether to sue Sprague:

Peter Sprague is also a long-time friend of Defendant/Director Gilder. Gilder, a director of the Company since 1993, is an author and publisher.... He was at one time perhaps Wall Street's most influential technology stock analyst and he wrote obsessively and enthusiastically about technology companies, especially those involved in telecom, including Wave Systems. He is also the author of the popular 2000 book "Telecosm." In a September 24, 1989 discussion with Brian Lamb published by the National Cable Satellite Corporation, in which the focus of the discussion was Gilder's then recent book "Microcosm: The Quantum Revolution in Economics and Technology," Gilder spoke of his longtime friendship with Peter Sprague and Peter Sprague's wife, as well as Peter Sprague's inspiration for his book:

*Lamb*: Other things out of the acknowledgement [of the book] I wanted to ask you about. "*I am deeply indebted to Peter Sprague and Nick Kelly for introducing me to this crucial subject.*" Who are these two men?

*Gilder*: *Well, Peter Sprague is Chairman of National Semiconductor Corporation. He lives down the road. His wife was an old friend of mine. He's an old friend of mine and my wife's and we've just have [sic] known each other for years.* And he is Chairman of National Semiconductor and has at first intrigued me with technology. I became conscious of semiconductors because of his role in industry.

Gilder has also been a promoter and enthusiastic supporter of the Spragues. For