instance, in an August 9, 2004 article entitled "Tech Guru Reboots – Internet Evangelist's Stock Picks in Peril, Sparks Lawsuit," the *New York Post* wrote:

> With the Company's NASDAQ-traded stock selling for about $1.88 per share, ***he [Gilder] championed a man named Steven Sprague to become the Company's president and chief operating officer.***
>
> ***Saying of Sprague, "I have spent the last 20 years of my life interviewing and observing technology CEO's and I believe Sprague has the potential to be the best of the bunch."***
>
> ***In fact, Steven is the son of Wave Systems founder and Chairman of the Board, Peter Sprague. Other than that, Steven possessed no notable credentials for the job at all.***
>
> Nonetheless, roused by what came to be known as the "Gilder Effect," Wave System's stock began to climb, and by the time the tech bubble popped in the spring of 2000, it was selling for more than $50 per share.
>
> Thereafter the stock quickly plunged back to the $2 range and with the Gilder name no longer working its magic, the Company issued a series of stock-hyping press releases about deals with Intel and IBM that caused the Securities and Exchange Commission to open a formal securities fraud investigation in February of 2004 that is still underway.
>
> In addition, Defendants Gilder and Steven Sprague often participate together in technology conferences [specifically enumerated in the Complaint]... Wave Systems also is affiliated with Gilder's company, Gilder Technology Group, a publisher of monthly technology reports and of which Gilder is Chairman.

¶94(f)(ii).

Due to the extensive personal and professional relationships, and the entangling financial alliances, interests and dependencies among Bushnell, Gilder and the Spragues, it is unreasonable to assume that a majority of the Wave directors would or could objectively evaluate whether to sue themselves or their friends. ¶¶94(f)(i-ii); *see, e.g., Biondi v. Scrushy*, 820 A.2d 1148, 1157 (Del. Ch. 2003) ("Contributing to the [court's] disquiet is long-standing personal ties between Striplin and Scrushy, who are both large contributors to college sports programs in Alabama"). In cases such a this one where courts have found the majority of the

board to not be independent either through current or past business, personal or employment relationships with each other, demand is excused.[14] *See, e.g., New Valley*, 2001 WL 50212.

Moreover, Plaintiffs have alleged that a majority of Wave's Board is controlled and dominated by Sprague and P. Sprague, not only through extensive financial and personal relationships, ¶¶94(f)(i-ii), but also through voting control of the Company. ¶94(g). According to a Hoover's Company profile of Wave issued October 6, 2004, the "Sprague family own 65% of Wave Systems Class B common shares, giving them voting control over the Company." *Id.*

Finally, Plaintiffs have alleged past actions by the present Board members that raise a reasonable doubt that the Board is capable of acting independently of the interests of P. Sprague and defendant Sprague. Directors must not only be independent but also act independently. *Telxon Corp.*, 802 A.2d at 264. "'[I]t is the care, attention and sense of individual responsibility to the performance of one's duties ... that generally touches on independence.'" *Id.* (quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997)). Doubt concerning the independence of a director can be raised by alleging "'particularized facts manifesting a "direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling."'" *Orman*, 794 A.2d at 24 (quoting *Aronson*, 473 A.2d at 816). In the present case, Plaintiffs have alleged such facts.

In an August 26, 2003 article, "A Wave of Delusion" the *Free Republic*, reported:

---

[14] Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction. *See, e.g., In re Ply Gem Indus., Inc. S'holders Litig.*, No. 15779-NC, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001) (stating that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, ***may establish an obligation or debt (a sense of 'owingness')*** upon which a reasonable doubt as to a director's loyalty to a corporation may be premised"); *In re New Valley Corp. Derivative Litig.*, No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001).

Wave's liberal use of financial-engineering techniques to benefit its officers has long been a sticking point even among its most devout shareholders.

Board of Protectors. In 2001, certain executives took out big personal loans from the company to pay various outstanding debts. Wave's board later approved bonuses matching the amounts of some of the loans executives used to pay down their debts — a maneuver similar to the one at the heart of the Tyco International (TYC) accounting scandal, which has resulted in criminal indictments of three Tyco officers who, prosecutors allege, used the company as their "personal piggy bank."

\* \* \*

Wave also made loans in 2001 to then-Chairman and Chief Executive Peter Sprague totaling about $1.06 million — during a year in which the company lost $48.7 million and saw its stock price plunge 40% to $1.33. In 2002, Wave's compensation committee approved a payment of a bonus of $174,391 so that Sprague could repay part of the debt. This left Sprague owing $999,518. On March 31, 2003, Sprague resigned as chairman and chief executive and assumed the CEO post of Wave subsidiary Wavexpress. His son, Steven Sprague, was named CEO. The company put in place a loan-loss reserve against the elder Sprague's debt in a Nov. 15, 2002, 10(q) filing with the SEC, essentially forgiving the loan.

\* \* \*

*Steven Sprague, meanwhile, on Aug. 6, 2003, exercised options on 150,000 shares, most of which he sold for a total of more than a half a million dollars. And on Aug. 5, CFO Feeney sold 100,000 shares at $5 a piece — right near the stock's 52-week high.*

*Against the backdrop of Sarbanes-Oxley, it's difficult to avoid the conclusion that the loans were suspect moves for a company that was hemorrhaging cash. James Fisher, director of Emerson Center for Business Ethics at Saint Louis University, says that in such situations, the company's board of directors is often to blame for being too pliant. "If the board is under the thumb of management," says Fisher, "then there's some justification for concluding that these are ill-considered policies most likely designed to enrich the managers, who, from all appearances, haven't been able to guide the firm successfully."*

\* \* \*

*Steven Sprague isn't unaware of the power he and his father have wielded. "Put yourself in the shoes of any board of directors that has to make*

*that call against somebody who probably hired all the people that are on the board,"* he says. *"[Complying] was the right thing to do."*

Id.

Defendants dismiss these particularized allegations, including the public admission by Sprague that the Board is incapable of acting independently of Sprague and his father P. Sprague. First, defendants contend that it was the 2001 Wave Board - - as opposed to the 2004 Wave Board - - that approved the suspect loans. Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint ("Defs.' Mem.") at 18-19, n.15. However, each of the five present Wave Board members sat on and represented a majority of the seven member 2001 Board. ¶¶21-26. Next, defendants argue that because Plaintiffs' allegations concerning such loans and bonuses were based in part on a media report they are insufficient as well as somehow purportedly in violation of "Rule 11." Defs.' Mem. at 18-19, n.15. However, Plaintiffs alleged that the specifics surrounding these loans were also described in the Company's April 29, 2004 Proxy filed with the SEC.[15] *Id.*

Reasonable doubt as to a director's independence may arise either because of "financial ties, familial affinity, a particularly close or intimate personal or business affinity *or* because of evidence that in the past the relationship caused the director to act non-independently *vis a vis* an interested director." *Beam,* 745 A.2d 1052. Although "mere personal friendship," standing alone, or "mere outside business relationship," standing alone, are insufficient to raise reasonable doubt as to a director's independence, *Id.* at 1050-52, Plaintiffs have alleged more as to Gilder, Bushnell and the Spragues. Plaintiffs have alleged not only *both* long-time business and social relationships, ¶94(f)(i-ii), but also past actions by Gilder and Bushnell and the other so-called "independent" board members that appear to have been taken in the interests of the Sprague's and

---

[15] In any event, Plaintiffs are not required to plead evidence. *Levine,* 591 A.2d at 207.

17

to the detriment of Wave. ¶94(g). In determining whether there is **reasonable doubt** that Wave's Board members are independent, the Court must consider the totality of the allegations concerning a director's lack of independence - - not just each allegation in isolation. *Int'l Equity*, 1997 WL 208955 at *5 (Perhaps each allegation concerning each director's lack of independence "taken in isolation" would not be sufficient to cast reasonable doubt on director's independence, but "in combination" they do). In the present case, the totality of the allegations raise a reasonable doubt as to the independence of at least defendants Sprague, (a clearly interested director), Bushnell and Gilder - - a majority of Wave's Board of Directors.

Defendants rely heavily on *Beam*, a recent Delaware Supreme Court pronouncement, in pressing their argument that Plaintiffs have failed to allege a reasonable doubt that a majority of Wave's directors are independent. *Beam* is distinguishable on its facts. Moreover, the pronouncements in *Beam* are not as sweeping as Defendants would lead the Court to believe.[16]

---

[16] In *Beam*, a shareholder of Martha Stewart Living Omnimedia, Inc. ("MSO") sued Martha Stewart and the five other members of MSO's Board of Directors alleging that Stewart breached her fiduciary duties by illegally selling Imclone stock in December 2001 and by mishandling the media attention that followed thereby jeopardizing the financial future of MSO. 845 A.2d at 1044. Plaintiffs alleged, and the lower Court found, that Stewart was an interested director. Plaintiff further alleged that three of the other directors were not independent of Stewart. The Delaware Supreme Court upheld the lower court's holding that plaintiff failed to sufficiently allege that these three other directors lacked independence.

With respect to director Martinez, the plaintiff alleged that Martinez was the Chairman and CEO of Sears from August 1995 until October 2000; Martinez is a long-standing personal friend of defendant Stewart; while at Sears (his past employer), Martinez established a relationship with MSO which marketed a substantial volume of products through Sears; Martinez was recruited for the Board of Directors by Stewart's long-time personal friend, Charlotte Bears; and that another MSO director, Patrick, was quoted in a March 22, 2001 article as follows: "Arthur [Martinez] is an old friend to both me and Martha." *Id*. at 1045.

With respect to defendant Moore, plaintiffs alleged that Moore is a long-standing friend of defendant Stewart; in November 1995, Moore attended a wedding reception hosted by Stewart's personal lawyer and attended by Stewart; in August 1996, *Fortune* carried an article highlighting Moore's close relationship with Charlotte Bears and Defendant Stewart; and when Bears, a long-time friend and confident to Stewart resigned from the Company's Board in September 2001, Moore was nominated to replace her. *Id*.

In the present case, unlike the Plaintiffs in *Beam*, Plaintiffs have alleged more than mere friendships and business relationships between the Spragues, Bushnell and Gilder; or simple voting control of the Company by the Spragues. Additionally, Plaintiffs have alleged, for instance, that P. Sprague, Sprague's father, is a director and major shareholder of a company, uWink, for which Bushnell is the CEO (not just a director). Plaintiffs have also alleged that Gilder has publicly acknowledged that "I am deeply indebted to Peter Sprague" and that Gilder's publishing company has a business relationship with Wave. Plaintiffs have also alleged that Wave's present board members, including Bushnell and Gilder, have a long history of making corporate decisions that are in the best interests of the Sprague's rather than Wave. Finally, Plaintiffs allege a public admission by Sprague that Wave's present board members are not independent: "Put yourself in the shoes of any board of directors that has to make that call against somebody who probably hired all the people that are on the board ... [Complying] was the right thing to do." ¶94(g); *See, e.g., In re eBay, Inc. S'holders Litig.*, No. 19988-NC, 2004 WL 253521, at *3 (Del. Ch. Jan. 23, 2004) (Company's acknowledgement that interested directors controlled company was sufficient to demonstrate demand futility). Certainly Plaintiffs have alleged that defendant Sprague and his father P. Sprague are in the position "to exert considerable influence" over Bushnell and Gilder. This showing is sufficient to raise a reasonable doubt as to Bushnell's and Gilder's independence. *See Steiner v. Meyerson*, No.

---

With respect to defendant director Seligman, plaintiff alleged that according to a story appearing on July 2, 2002 in the *Wall Street Journal*, Seligman contacted the CEO of John Wylie & Sons, a publishing house of which he was a director, at Stewart's behest to express concern over its planned publication of a biography that was critical of Stewart. *Id.* at 1046.

The Delaware Supreme Court agreed with the lower court that these allegations were insufficient to allege demand futility based on the lack of independence of a majority of MSO's board. In doing so, however, the Court acknowledged that independence is a fact-specific determination made in the context of a particular case. *Id.* at 1049. The Court further acknowledged that "there are ways that the balance could be tipped so that mere allegations of social relationships would become allegations casting reasonable doubt on independence ...." *Id.* at 1054.

19

13139, 1995 WL 441999, at *10-*11 (Del. Ch. July 19, 1995); *Grace Bros., Ltd. v. Uniholding Corp.*, No. 17612, 2000 WL 982401, at *10 and n.22 (Del. Ch. July 2, 2000).

In short, because Plaintiffs allege with particularity that a majority of the members of Wave's Board lack disinterestedness, independence or both, Plaintiffs have sufficiently alleged demand futility.

### III.   PLAINTIFFS SUFFICIENTLY PLEAD ALL CAUSES OF ACTION

#### A.   Applicable Legal Standards for a Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) will only be granted if, based solely on the pleadings, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); accord *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002). Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint is construed in a light most favorable to plaintiffs and their allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969) (factual allegations, once pled, must be accepted as true); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (a court must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff). In this case, the Complaint clearly satisfies these standards and sets forth many claims upon which relief can be granted.

Moreover, the liberal pleading requirements of Rule 8(a) demand only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Mitchell v. Newryder*, 245 F.Supp.2d 200 (D. Me. 2003). *See also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions"). Contrary to the defendants' broad-brush attacks, when all factual

allegations are taken as true, with all reasonable inferences drawn in Plaintiffs' favor, it is clear that the Complaint states legally sufficient claims against the defendants.

      **B.**    **Plaintiffs Have Adequately Pled Their Insider Selling Cause of Action**

Plaintiffs have adequately pled defendants Sprague, Feeney and Bushnell's violations of state common law breaches of fiduciary duty for insider selling and misappropriation of information. Defendants attempt to argue otherwise fails.

      **1.**    **Rule 9(b) Is Not Applicable to This Matter as Plaintiff Does Not Allege Fraud**

Defendants improperly assert that this Court must apply Federal Rule of Civil Procedure Rule 9(b) to Plaintiffs' insider selling claims. Defs.' Mem. at 28-29. Defendants contend that Plaintiffs' insider selling cause of action "'sound[s] in fraud'" and is thus covered by Rule 9(b). Defs.' Mem. at 29. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." This rule, however, does not apply to this action as Plaintiffs have only alleged violations of breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. ¶¶1, 97-123. *See Seidel v. Pub. Serv. Co.*, 616 F. Supp. 1342, 1357 (D. N.H. 1985) (Rule 9(b) "has no application to such 'allegations of breach of duty' grounded on 'conduct not amounting to fraud or mistake'"). *See also Roskos v. Shearson/Am. Exp., Inc.*, 589 F. Supp. 627, 631 (E.D. Wis. 1984) (this rule "does not extend to allegations of breach of duty"); *Shapiro v. Miami Oil Producers, Inc.*, 84 F.R.D. 234, 236 (D. Mass 1979) (9(b)"does not extend to allegations of breach of duty, whether or not characterized as fiduciary, by conduct not amounting to fraud or mistake"). Thus, Rule 9(b) is not applicable and Plaintiffs need only satisfy the notice pleading requirements of Rule 8(a).

      **2.**    **Plaintiffs Have Adequately Pled Insider Selling**

Plaintiffs have adequately pled insider selling and misappropriation of information by insider selling defendants Sprague, Feeney and Bushnell. Specifically, Plaintiffs allege that by

21

virtue of defendant Sprague's position as Wave's Chief Executive Officer since March 2000, a director since 1997 and Chief Operating Officer from May 1996 to March 2000, defendant Feeney's position as Wave's Senior Vice President and Chief Financial Officer since 1998 and Secretary of the Company since February 1999, and Bushnell's position as a director since 1999, defendants Sprague, Feeney and Bushnell had access to internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at Wave's Board and/or management meetings. ¶¶21-22, 24, 94(a). Plaintiffs further allege that these insider selling defendants knew of the material[17] adverse information concerning Wave's financials, business market and operations. ¶¶94(a), 98. Specifically, these defendants knew, but concealed from the investing public during the Relevant Period that: (a) the Company's Intel announcement dated July 31, 2003 was actually immaterial and would not generate any revenue from the Company because Intel was not obligated to give Wave any business as Wave did not impose a minimum licensing requirement on Intel; (b) the Company's representations in its IBM announcement on August 4, 2003 and spokesperson follow-up on August 5, 2003, were false and misleading because Wave had merely established compatible products with IBM, not partnered up with IBM; and (c) IBM's relationship with Wave was not fee producing. ¶¶60, 67, 76, 80, 84.

    Defendants Sprague, Feeney and Bushnell used this knowledge to capitalize on sales of their stock. Waiting until Wave'stock was artificially inflated by defendants' dissemination of the false and misleading press releases on July 31, 2003 and August 4, 2003 which announced Wave's collaborations with Intel and IBM, respectively, ¶¶55, 61, defendants Feeney, Sprague and Bushnell rode the wave of the Company's stock inflation and cashed in on a large percentage of their Wave's stock. On August 5, 2003, defendant Feeney sold 100,000 shares of his Wave stock at $5.00 per share, a Relevant Period high, for proceeds of $500,000. ¶60. Those sales effectively reduced Feeney's stock ownership of Wave by 50%. *Id.* The very next day defendant

---

[17] This information was obviously material as evidenced by Wave Systems' $183 million market capitalization loss upon disclosure of the SEC's investigation into false and misleading statements and securities trading which occurred in and around August 2003. ¶90.

Sprague sold 150,000 shares of his Wave stock at $3.17-$4.01 per share for proceeds of $533,841. ¶70. Sprague's sales reduced his share ownership of Wave by 36%. *Id.* Shortly thereafter on August 19, 2003, defendant Bushnell sold 100,000 shares of his Wave stock for proceeds of $35,742. ¶71. Knowing that the truth of Wave's immaterial association with Intel and IBM would cause the stock to plummet, defendants Sprague, Feeney and Bushnell sold their stock prior to public disclosure. As expected, Wave's stock lost $183 million in market capitalization once the Company disclosed on December 18, 2003 that the SEC had commenced a formal investigation into defendants' false and misleading statements and sales of securities in and around August 2003.

Defendants contend that Plaintiffs have failed to show that each sale by each defendant was entered into on the basis of adverse material non-public information. Defs.' Mem. at 29. As shown above, defendants are incorrect. Clearly the proximity of the sales to positive press releases and knowledge of defendants Sprague, Feeney and Bushnell at that time support Plaintiffs' allegations that these defendants traded "on the basis of adverse material non-public information." As the Complaint easily meets applicable pleading standards and more than adequately pleads the elements of insider selling against the insider selling defendants, defendants' Motion as to this cause of action should be overruled.

### 3. Plaintiffs Adequately Allege a Claim for Breach of Fiduciary Duty

It is beyond dispute that under Delaware law the officers and directors of a corporation owe a fiduciary duty to the corporation and its shareholders. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 306 (1939). To fulfill their fiduciary duties of loyalty and good faith, directors must ensure that the corporation disseminates truthful and accurate information to shareholders. *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 389 (Del. Ch. 1999); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916-17 (Del. Ch. 1999); *Malone v. Brincat*, 722 A.2d 5, 10-11 (Del. 1998).

In the current matter, Plaintiffs have alleged sufficient facts whereby this Court could either find on the face of the Complaint, or by reasonable inference, that Plaintiffs have

23

sufficiently stated a claim against the defendants for breach of their fiduciary. Plaintiffs sufficiently allege that the defendants breached their duties of loyalty and good faith, ¶¶35, 99, 103, by failing to prevent the defendants from taking illegal actions, ¶¶35, 94(e); by concealing the fact the Company was improperly misrepresenting its financial prospects, ¶¶38-40, 94(h); by artificially inflating the Company's stock price through the dissemination of false and misleading statements pertaining to Wave's financials, ¶¶38, 40; by deceiving the investing public regarding management's operations, financial health and stability and future business prospects, ¶¶38-40; and by certain defendants' personally profiting from their misconduct and engaging in insider selling while in possession of non-public, adverse, material knowledge. ¶¶21-22, 24, 94(a).

Defendants have a duty to disseminate truthful information. Defendants' representations pertaining to IBM, Intel and Wave, however, were false and misleading because they portrayed IBM, Intel and Wave's business arrangements in a far more material and profitable light than in reality. In reality, IBM and Intel's affiliations with Wave were virtually immaterial and would not likely generate any revenue for Wave. The disclosure of the SEC's investigation into the truth caused Wave's stock to fall which led to a market capitalization loss of $183 million. ¶90. These allegations are more than sufficient to defeat defendants' motion. Accordingly, Plaintiffs have adequately pled that the defendants breached their fiduciary duties to Wave, the company they were entrusted to protect.

### 4. Plaintiffs Adequately Allege a Claim for Waste of Corporate Assets

"The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes.... It is common sense that a transfer for no consideration amounts to a gift or waste of corporate assets." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). "[W]aste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997). On this test, Plaintiffs' claim for waste of corporate assets is legally sufficient.

Plaintiffs allege that defendants committed waste of "valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions." ¶118. Defendants assert that Plaintiffs must plead that the Board "irrationally squander[ed] corporate assets." Defs.' Mem. at 28. Although the *Michelson* and *Lewis* tests described above are far more agreeable, compensation bonuses received by individuals who breach their fiduciary duties are "irrationally squander[ed] corporate assets" by their very nature as they are devoid of a legitimate corporate purpose, and are not in a company's best interests and are improper. Therefore, Plaintiffs have adequately pled their claim for corporate waste. Accordingly, the defendants' request to dismiss this cause of action should be denied.

### 5. Plaintiffs Adequately Allege a Claim for Unjust Enrichment

Under Delaware law, the elements of unjust enrichment are (1) an enrichment, (2) an impoverishment, (3) a relation between the impoverishment and the enrichment, (4) the absence of justification and (5) the absence of a remedy provided by law. *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998). Plaintiffs alleged that the defendants were unjustly enriched as they received some sort of compensation for their purported services to Wave "at the expense of and to the detriment of Wave Systems." ¶122. Plaintiffs thus "seeks restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches." ¶123. Any "profits, benefits and other compensation" removed from the corporate treasury and given to defendants impoverished Wave Systems. *Id.* Thus, despite defendants' contentions to the contrary, plaintiffs have adequately alleged unjust enrichment.

### 6. Wave's Certificate of Incorporation Does Not Immunize Defendants from Their Breach of the Duty of Loyalty and Good Faith

Defendants' argument that Wave's Certificate of Incorporation immunizes defendants from liability ignores both: (i) the Complaint's extensive and specific allegations describing how the directors breached their duty of loyalty to Wave and acted in bad faith; and (ii) the principle that the sufficiency of bad faith allegations cannot be determined on a motion to dismiss. The determination of whether defendants breached a duty of loyalty or acted in bad faith is inappropriate at this time as these questions raise a "question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993); *see also Sanders v. Wang*, No. 16640, 1999 WL 1044880, at *11 (Del. Ch. Nov. 10. 1999) (declining to dismiss Plaintiffs' complaint on an exculpatory provision at the summary judgment stage "[b]ecause the nature of the defendants' breach of fiduciary duty remains unclear at this time").

Section 102(b)(7) of the Delaware General Corporation Law allows a corporation to exempt its directors from liability for violations of the duty of due care, but not for violations of the duties of loyalty and good faith.[18] 8 Del. C. §102(b)(7). The Complaint contains numerous, particularized allegations which not only support Plaintiffs' claims that defendants engaged in bad faith acts, but that the defendants also breached their fiduciary duty of loyalty by obtaining personal benefits at the expense of Wave and its shareholders. ¶¶35, 40, 99. Also, defendants' dissemination of false and misleading information to the public implicates the duties of loyalty and good faith. *Jackson,* 741 A.2d at 389; *O'Reilly,* 745 A.2d at 916-17; *Malone,* 722 A.2d at

---

[18] This shield from liability in a certificate of incorporation is an affirmative defense and defendants seeking exculpation under it must bear the burden of establishing each element. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999). Section 102(b)(7) will support a motion to dismiss only where the sole conceivable basis of liability is a violation of the duty of care. *Id.* Where the nature of defendants' alleged breaches of duty are unclear, a complaint should not be dismissed. *Id. See also Sanders*, 1999 WL 1044880 at *11.

10-11. For these reasons, Wave's Certificate does not protect defendants from their violations of their breaches of fiduciary duties of loyalty and good faith.

### 7. Plaintiffs' Claim for Non-Speculative Damages Is Ripe

The defendants erroneously assert that "the Plaintiffs have failed to allege any legally cognizable theory of damages." Defs.' Mem. at 2. Defendants describe Plaintiffs' damages as "speculative, contingent ... and ... not legally cognizable." Defs.' Mem. at 25. Not surprisingly, defendants only refer to damages to Wave's reputation and goodwill and Wave's defense costs associated with the pending securities class action lawsuits.[19] Defs.' Mem. at 25-26. Defendants do not mention Plaintiffs' allegations of damages to Wave arising from more than $1 million in insider sales, ¶¶21-22, 24, 43, 100, and a $183 million loss in market capitalization as a result of defendants' wrongdoing. ¶90. Surely these latter allegations, as well as former allegations, result in "legally cognizable" damages. Moreover, Plaintiffs have more than adequately complied with Rule 8(a)(3) which requires only "a demand for judgment for the relief the pleader seeks."

Nevertheless, as defendants' own authority makes clear, under Delaware law a claim for damages based on breaches of fiduciary duty "is legally cognizable since Delaware law 'has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties.'" *Dollens v. Zionts*, No. 01 C02826, 2002 WL 1632261, at *9 n.8 (N.D. Ill. July 22, 2002) (quoting *Symbol Tech.*, 762 F. Supp. at 517); Defs.' Mem. at 25-26. Indeed, this is true even if no actual injury to the corporation is shown. *In re Symbol Techs. Sec. Litig.*, 762 F. Supp. 510 (E.D.N.Y. 1991). Thus, Plaintiffs have adequately pled damages for breach of fiduciary duty, especially as to defendants Sprague,

---

[19] Further, it is well settled that "[d]amage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved." *Cendant*, 189 F.R.D. at 135; *see also In re Symbol Tech. Sec. Litig.*, 762 F. Supp. 510, 517 (E.D.N.Y. 1991) ("[P]laintiff could show present injury to the Corporation by demonstrating a lessened ability to attract public capital investment, or to obtain institutional financing. Plaintiff could then specifically allege the damages attributable to such loss of credibility in the marketplace"). Accordingly, Plaintiffs' allegations that Wave Systems has suffered irreparable damage to its reputation is cognizable.

Feeney and Bushnell's insider selling and misappropriation of information, as well as to the receipt of profits and stock options by other defendants while they were in breach of their fiduciary duties.

Plaintiffs have also adequately pleaded a claim of damages for loss in the marketplace. Indeed, *Symbol Tech.*[20] and *Dollens*,[21] two cases which defendants rely upon, clearly demonstrate that Plaintiffs have adequately pled a damage claim for injury in the marketplace. In both of those cases, the claims for damages in the marketplace were held "conclusional and insufficient because plaintiffs [did] not apprise defendants of the basis and extent of the alleged damages." *Dollens*, 2002 WL 1632261 at *9. Here, unlike *Symbol Tech.* and *Dollens*, Plaintiffs have specifically alleged that the defendants' conduct caused Wave to lose over $183 million in market capitalization. ¶43. This is more than sufficient to give defendants notice of the basis and extent of these damages. Therefore, Plaintiffs have pled legally cognizable claims which are more than sufficient under Fed. R. Civ. P. 8(a)(3).[22]

---

[20] In *Symbol Tech*, the plaintiff brought a derivative action against the Symbol Technologies' officers and directors for a variety of claims, including securities laws violations. *Symbol Tech.*, 762 F. Supp. at 512, 516. There, plaintiff sought damages for legal fees and any payment Symbol Technologies might make to resolve claims asserted against it in a pending class action suit. *Id.* at 516. Thus, the court found that plaintiffs' damage claim "hinged entirely on the outcome of another pending action," and concluded that plaintiffs' cause of action was "more appropriately treated as an action for indemnification, which had not yet accrued." *Id.* at 516-17. Unlike *Symbol Tech.*, Plaintiffs' damages in this action based upon insider sales and drop in market capitalization do not hinge on anything, as they are present damages. *See Cendant*, 189 F.R.D. at 135.

[21] Indeed, the plaintiff in *Dollens* alleged damages based solely on the company's legal liability costs incurred and damage to reputation as a result of a pending securities class action. 2002 WL 1632261 at *9. Here, this action is neither predicated on the pending federal securities action, nor do Plaintiffs solely rely on costs incurred in defense of the securities class action. In this action, Plaintiffs allege harm to Wave Systems' market capitalization and damages arising from insider sales.

[22] Similarly, defendants' reliance on *In re United Telecomm., Inc. Sec. Litig.*, No. 90-2251-EEO, 1993 WL 100202 (D. Kan. Mar. 4, 1993), is misplaced. In *United Telecomm.* the plaintiff specifically alleged "potential damages" to the Company. *Id.* at *1. Plaintiffs here have alleged actual damages to the Company, such as the insider sales and loss of market capitalization. Plaintiffs' allegation of damages arising from the securities class litigation is merely one of many forms of damage the Company has and will incur.

### 8. Separate Participation

Defendants provide a cursory statement that Plaintiffs' Counts II-VI fail to state a claim pursuant to 12(b)(6) because Plaintiffs failed to separately identify each director's role in alleged conduct. Defs.' Mem. at 26-27. For support, defendants turn to a securities class action which incorporates a derivative claim, *In re Stratus Computer, Inc. Securities Litigation*, No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1992). *Stratus*, however, is inapplicable to this derivative action because the Stratus plaintiffs alleged fraud and violations of sections 10(b) and 20 of the Securities and Exchange Act, as well as violations of Rule 10b-5. *Id.* at *3-*4. This action is brought against defendants for violation of state, not federal securities laws. One of the *Stratus* plaintiffs, however, brought a derivative claim on behalf of *Stratus* which alleged breach of fiduciary duty. *Id.* at *7. As here, the defendants alleged that the plaintiff failed to plead his derivative cause of action with particularity pursuant to Rule 9(b). *Id.* In *Stratus*, however, the plaintiff virtually conceded to pleading fraud as he failed to respond to defendants' Rule 9(b) arguments and merely relied upon and incorporated the securities' plaintiffs' arguments regarding Rule 9(b). Because the *Stratus* court stated it saw "nothing to rebut the defendants' arguments," it dismissed the derivative breach of fiduciary duty claim. Unlike *Stratus*, Plaintiffs here have argued against the applicability of Rule 9(b) as they have not pled fraud.

If, however, this Court considers *Stratus*, Plaintiffs nevertheless allege that they have pled sufficient facts to put each defendant on notice of the allegations against him. First, Plaintiffs have clearly alleged that each Director Defendant improperly disseminated false and misleading information via press releases pertaining to Wave's business, specifically its associations with IBM and Intel, during the Relevant Period. Second, the Plaintiffs' assertion of a formal investigation by the SEC against Wave arising from these same false and misleading statements would have also put defendants on notice. Third, Plaintiffs' detailed allegations pertaining to defendants Sprague, Feeney and Bushnell's insider selling is also sufficient to put those two defendants on notice of the allegations against them. For all these reasons, defendants' argument fails.

## IV. CONCLUSION

Plaintiffs respectfully request that this Court deny defendants' Motion to Dismiss and sustain the Complaint in its entirety.

DATED: February 8, 2005

Respectfully submitted,

*/s/ Keith A. Minoff*
KEITH A. MINOFF

ROBINSON DONOVAN, P.C.
1500 Main St., Suite 1600
Springfield, MA 01115
Telephone: 413/732-2301
Facsimile: 413/785-4658

Liaison Counsel for Derivative Plaintiffs

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

FEDERMAN & SHERWOOD
WILLIAM B. FEDERMAN
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone: 405/235-1560
Facsimile: 405/239-2112

LAW OFFICES OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
Facsimile: 412/471-1033

Co-Lead Counsel for Derivative Plaintiffs

31

## CERTIFICATE OF SERVICE

This certifies that true and correct copies of the above and foregoing were delivered electronically and via facsimile on February 8, 2005 to the following.

Robert A. Buhlman
Eunice E. Lee
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Fax: 617-951-8736

**Attorneys for Defendants and Wave Systems, Corp.**

_____
Keith A. Minoff

G:\Wave Systems\Motions - Opps\MTD\ps response and obj to mtd th consol amd cpt.doc